**THE ESTATE OF LALIAH SWAYZER**;
**SHADÉ SWAYZER**; **DIANE RUFFIN** (a minor);
and, **CHARLENE RUFFIN** (a minor);

       Plaintiffs,

                                     **Case No: 16-CV-1703**

    v.

**DAVID J. CLARKE JR.**; **RICHARD E. SCHMIDT**;
**C.O. LOVE**; **C.O. BROOKS**; and, **JOHN DOES 1-10**,
821 W. State Street
Milwaukee, WI 53233

    And,

**MILWAUKEE COUNTY**, a municipal corporation,
901 N. 9th Street, Room 306
Milwaukee, WI 53223

    And,

**ARMOR CORRECTIONAL HEALTH SERVICES,
INC.**;
and, **JOHN DOES 11-20**,
c/o Registered Agent, C T Corporation System,
8020 Excelsior Drive, Ste. 200
Madison, WI 53717

    And,

**ABC INSURANCE COMPANY**;

    And,

**XYZ INSURANCE COMPANY**;

       Defendants.

---

### COMPLAINT AND JURY DEMAND

---

     NOW COMES the above named Plaintiffs, The Estate of Laliah Swayzer, Shadé Swayzer, Diane Ruffin, and Charlene Ruffin, by their attorneys, **JUDGE LANG & KATERS, LLC**, and as for their claims for relief against the above named Defendants, allege and shows the Court as follows:

1

# I. INTRODUCTION

1.    This case involves Milwaukee County, the Milwaukee County Sheriff's Office ("MCSO"), Armor Correctional Health Services, Inc. ("Armor Correctional"), and the individually named Defendants' methods of infringing on and violating the Constitutional, Civil, and Statutory Rights of Laliah Swayzer ("Laliah") and Shadé Swayzer ("Shadé"), causing Shadé and Laliah to suffer damages, injures and ultimately Laliah's death.  While under the Defendants care' and custody, Laliah and Shadé were subjected to inadequate and unconstitutional health care which involved the wanton and unnecessary infliction of pain.

2.    When Plaintiff Shadé was brought into the Milwaukee County Justice Facility ("Justice Facility") on July 6, 2016, she was eight months and one week (33 weeks) pregnant with Laliah and said pregnancy was healthy and progressing as normal.  A few days later, Shadé gave birth while in-custody to baby Laliah, by herself and without assistance, medical care, or any other help while locked in a disciplinary cell in the Justice Facility's Maximum Security Unit.  Tragically, Laliah died hours later in her mother's arms as a result of the Defendants' failure to provide any care or assistance.  As a result of the Defendants' reckless disregard and deliberate indifference, baby Laliah is not spending her first Christmas, or any other thereafter, with her mother or family, nor will she ever grow to have a family of her own.

3.    Plaintiffs bring this action under the United States Constitution, particularly under the provisions of the Fifth, Eighth, and Fourteenth Amendments; Title 42 of the United States Code Sections 1983 and 1985; Articles I, Sections One and Six of the Wisconsin Constitution; and, pursuant to Wis. Stat. §§ 895.03 and Chapter 655 of the Wisconsin Annotated Statutes.

## II.  JURISDICTION

4.     That this Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and Laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights.

5.     That this Court has supplemental jurisdiction over all state law claims which arise out of the same facts common to Plaintiffs' federal claims pursuant to 28 U.S.C. § 1367.

6.     That the amount in controversy exceeds Seventy-Five Thousand ($75,000) Dollars, exclusive of costs, interests, and attorneys' fees

## III.  VENUE

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because most Defendants reside in this district and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this district.

## IV.  THE PARTIES

8.     Plaintiff, the Estate of Laliah Swayzer ("the Estate"), represents the decedent, Laliah, whose serious-acute-obvious medical needs were deliberately ignored and neglected while she was in the custody and under the care/control of the MCSO, Milwaukee County, and Armor Correctional[1], all of which the Plaintiffs relied upon to provide adequate medical care. As a result, Laliah died in the very same place she was born, on the Maximum Security Unit of the Justice Facility.  At all times material hereto, Laliah was entitled to all rights, privileges, and immunities accorded by the Constitution of the United States.

9.     Plaintiff, Shadé Swayzer, is an adult citizen of the United States and a resident of the State of Wisconsin.   At all times material hereto, Shadé was an inmate residing at the

---

[1] The Estate of Laliah Swayzer is in the process of being opened in the Milwaukee County Courts.

3

Milwaukee County Justice Facility in Milwaukee County, City of Milwaukee, and entitled to all rights, privileges, and immunities accorded all residents of Milwaukee County and the State of Wisconsin, and as a citizen of the United States. At all material times hereto, Shadé was pregnant with a healthy baby while being involuntarily detained at the Justice Facility under the direct custody, control and supervision of the Defendants.

10. Plaintiff, Diane Ruffin, is a minor child and citizen of the United States and a resident of the State of Wisconsin. Plaintiff Diane Ruffin is a sibling of decedent Laliah Swayzer.

11. Plaintiff, Charlene Ruffin, is a minor child and citizen of the United States and a resident of the State of Wisconsin. Plaintiff Charlene Ruffin is a sibling of decedent Laliah Swayzer.

12. Defendant, Sheriff David J. Clarke Jr. ("Clarke"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Clarke was the Sheriff of the Milwaukee County Sheriff's Office ("MCSO") and was ultimately responsible for the health, safety, security, welfare and humane treatment of all inmates at the Milwaukee County Justice Facility, including Shadé and Laliah. At all times material hereto, Defendant Clarke oversaw, supervised and had direct control over the management and operations of the entire MCSO, including the Milwaukee County Justice Facility ("Justice Facility"), and was responsible for the MCSO's policies and procedures, as well as training. At all times material hereto, Defendant Clarke was aware of the MCSO's deficiencies and lack of compliance with the Consent Decree from Milwaukee County Circuit Court Case No. 1996-CV-1835 at the Justice Facility, as well as Medical Monitor Dr. Ronald Shansky's recommendations, but took little or no action to remedy the recorded deficiencies. At all times material hereto,

4

Defendant Clarke had control and authority over the MCSO/Milwaukee County's contract with Defendant Armor Correctional Health Services, Inc. At all times material hereto, Defendant Clarke was deliberately indifferent to the serious medical needs and Constitutional rights of Shadé and Laliah and ignored the Justice Facility's staff's lack of sufficient training in policies and procedures, both written and unwritten, to adequately address Shadé's, Laliah's, and other inmates in need of medical care.

13. Defendant, Richard E. Schmidt ("Schmidt"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Schmidt was employed by the MCSO as an Inspector and was ultimately responsible for the health, safety, security, welfare and humane treatment of all inmates at the Milwaukee County Justice Facility, including Plaintiffs Shadé and Laliah. At all times material hereto, Defendant Schmidt had oversight of the medical, clerical, correctional officers, and staff assigned to the Justice Facility. At all times material hereto, Defendant Schmidt also oversaw, supervised, and had control over the management and operation of the entire Sheriff's Department, and was responsible for the MSCO's policies, procedures, and training. At all times material hereto, Defendant Schmidt was aware of the MCSO's deficiencies and lack of compliance with the Consent Decree from Milwaukee County Circuit Court Case No. 1996-CV-1835 at the Justice Facility, as well as Medical Monitor Dr. Ronald Shansky's recommendations, but took no action to remedy the deficiencies. At all times material hereto, Defendant Schmidt was deliberately indifferent to the serious medical needs and Constitutional rights of Shadé and Laliah by ignoring the Justice Facility's staff's lack of sufficient training in policies and procedures, both written and unwritten, to adequately address Shadé's, Laliah's, and other inmates in need of medical care.

5

14.     Defendant Correctional Officer Love ("C.O. Love"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, C.O. Love was employed as a Correctional Officer at the Justice Facility by Milwaukee County and the Milwaukee County Sheriff's Office and was responsible for the health, safety, security, welfare and humane treatment of all inmates at the Justice Facility, including Shadé and Laliah, in July of 2016.  At all times material hereto, C.O. Love was assigned to the Maximum Security Unit and/or Special Needs Unit at the Justice Facility.  Upon information and belief, Defendant C.O. Love was a Correctional Officer who made the decision to transfer Shadé into to the Maximum Security Unit at the Justice Facility.  At all times material hereto, Defendant C.O. Love was acting under color of state law, within the scope of his/her employment and authority, and pursuant to Milwaukee County's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

15.     Defendant Correctional Officer Brooks ('C.O. Brooks"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, C.O. Brooks was employed as a Correctional Officer at the Justice Facility by Milwaukee County and the Milwaukee County Sheriff's Office and was responsible for the health, safety, security, welfare and humane treatment of all inmates at the Justice Facility, including Shadé and Laliah, in July of 2016.  At all times material hereto, C.O. Brooks was assigned to the Maximum Security Unit and/or Special Needs Unit at the Justice Facility.  Upon information and belief, Defendant C.O. Brooks a Correctional Officer who made the decision to transfer Shadé into to the Maximum Security Unit at the Justice Facility.  At all times material hereto, Defendant C.O. Brooks was acting under color of state law, within the scope of his/her employment and authority, and

6

pursuant to Milwaukee County's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

16.    Defendants John Does 1-10 are adult citizens of the United States and residents of the State of Wisconsin.[2]   At all times material hereto, John Does 1-10 were employed as Correctional Officers/Employees at the Justice Facility by Milwaukee County and the Milwaukee County Sheriff's Office and were responsible for the health, safety, security, welfare and humane treatment of all inmates at the Justice Facility, including Shadé and Laliah, in July of 2016.  At all times material hereto, John Does 1-10 were acting under color of state law, within the scope of their employment and authority, and pursuant to Milwaukee County's and the MCSO's policies, customs, and practices which were the moving force behind the constitutional violations asserted herein.

17.    John Does 11-20 are unnamed adult citizens of the United States and residents of the State of Wisconsin.  At all times material hereto, John Does 11-20 were employed at the Justice Facility by Defendant Armor Correctional Health Services Inc., Milwaukee County, and/or the Milwaukee County Sheriff's Office, and were responsible for the providing health care to all inmates at the Justice Facility, including Shadé and Laliah, in July of 2016.  At all times material hereto, John Does 11-20 were acting under color of state law, within the scope of their employment and authority, and pursuant to the policies, customs, and practices of Armor Correctional, Milwaukee County, and the MCSO, which were the moving force behind the constitutional violations asserted herein

18.    Defendant Milwaukee County, with offices of its executive at 901 N. 9th Street, Suite 306, Milwaukee, Wisconsin 53233, and offices of its Corporate Counsel, located at 901 N.

---

[2] The Plaintiffs have attempted to identify the John Doe Defendants, however, the Milwaukee County Sheriff's Office has refused to produce any records whatsoever despite Plaintiffs' repeated attempts to obtain said records through the Wisconsin Open Records Law and Freedom of Information Act.

9th Street, Suite 303, Milwaukee, Wisconsin 53233, at all times material hereto, was a Municipal Corporation organized under the laws of the State of Wisconsin. Defendant Milwaukee County established, operated and maintained the Justice Facility and at all times material hereto, Defendant Milwaukee County was responsible for training and supervising the employees of the MCSO, the creation and implementation of policies and procedures at the Justice Facility, ensuring the MCSO was in compliance with the Consent Decree from Milwaukee County Circuit Court Case No. 1996-CV-1835, and had control and authority over contracts with Armor Correctional Health Services, Inc.

19. Defendant Armor Correctional Health Services, Inc. ("Armor Correctional"), with its Principal Office located at 4960 S.W. 72nd Avenue, Suite #400, Miami, FL 33155, and Registered Agent being C T Corporation System whose address is 8020 Excelsior Dr., Ste. 200, Madison, WI 53717, is a Florida Profit Corporation, incorporated under the laws of the State of Florida, operating as a health care provider in the State of Wisconsin for purposes of providing medical care to patients, and is responsible for the acts of its employees and agents involved in health care services provided to patients therein. At all times material hereto, Defendant Armor Correctional provided health care services to inmates at the Justice Facility under color of law, including Shadé and Laliah.

20. Defendant ABC Insurance Company ("ABC") is a fictitiously named insurance corporation or corporations, authorized to conduct business in the State of Wisconsin and is engaged in the business of, among other things, issuing policies of insurance within the State of Wisconsin and said address is unknown at this time; upon information and belief, prior to and including all relevant times hereto, Defendant ABC issued a policy of liability insurance to Milwaukee County and all other Defendants. By the terms of said policy, ABC agreed to pay

any and all sums for which Defendant Milwaukee County and/or employees and agents thereof might be held legally liable for injuries or damages caused by Defendant Milwaukee County and/or employees and agents thereof. Upon information and belief, said policy was in full force and effect during the occurrences hereinafter stated. Pursuant to Wis. Stat. § 803.04, Defendant ABC is a proper party to this action.

21. Defendant XYZ Insurance Company ("XYZ") is a fictitiously named insurance corporation or corporations, authorized to conduct business in the State of Wisconsin and is engaged in the business of, among other things, issuing policies of insurance within the State of Wisconsin and said address is unknown at this time; upon information and belief, prior to and including all relevant times hereto, Defendant XYZ issued a policy of liability insurance to Defendant Armor Correctional and all other Armor Correctional Defendants. By the terms of said policy, XYZ agreed to pay any and all sums for which Defendant Armor Correctional and/or employees and agents thereof might be held legally liable for injuries or damages caused by Defendant Armor Correctional and/or employees and agents thereof. Upon information and belief, said policy was in full force and effect during the occurrences hereinafter stated. Pursuant to Wis. Stat. § 803.04, Defendant XYZ is a proper party to this action.

22. All of the Defendants are sued in their individual and official capacities. At all times material hereto, all Defendants were acting under the color of state law; pursuant to their authority as officials, agents, contractors or employees of Milwaukee County; within the scope of their employment as representatives of public entities and were deliberately indifferent to the Constitutional and Statutory rights of Shadé and Laliah Swayzer.

9

## V.  FACTS

23.     That at all material times hereto, Shadé was pregnant and being involuntarily detained at the Justice Facility under the direct custody, supervision, and care of the Defendants.

24.     That on July 6, 2016, Plaintiff Shadé was approximately eight months and one week (33 weeks) pregnant and in the third trimester.

25.     That on July 6, 2016, City of Glendale police officers were dispatched to the Motel 6 located at 5485 N. Port Washington Road, Glendale, Wisconsin 53217 because Plaintiff Shadé refused to leave the motel room.

26.     That upon making entry into the motel room where Shadé was staying, it was readily apparent and obvious to the police officers that Shadé was pregnant.

27.     That as a result of Shadé's refusal to exit the hotel room, she was arrested for resisting/obstructing and also on a parole violation warrant that the officers discovered when they arrived at the motel.

28.     That at the time of the arrest, Shadé had in her possession a bag of clothing, and a child car seat.

29.     That because of Shadé's readily apparent and obvious late stage pregnancy, combined with her behavior, the police officers requested an ambulance be dispatched to the Motel 6 to take Shadé to the hospital for medical clearance before being taken to the Justice Facility.

30.     That a North Shore Fire Department Ambulance was dispatched to the Motel 6 and subsequently transported Shadé to Columbia St. Mary's Hospital – Milwaukee Campus.

31.     At approximately 2:08 p.m. on July 6, 2016, Shadé was admitted to Columbia St. Mary's for medical clearance.

10

32. While at Columbia St. Mary's, Shadé was evaluated by several physicians, nurses, and other medical staff.

33. That in order to properly assess and evaluate Shadé, the doctors at Columbia St. Mary's ordered Shadé's medical records from Aurora Sinai Medical Center where she had previously received prenatal care.

34. As noted by the Columbia St. Mary's medical staff, Shadé's previous records from Aurora Sinai stated that Shadé's anticipated delivery date to be August, 3, 2016, and that Shadé had normal fetal heart monitoring on June 23, 2016, and June 30, 2016.

35. That while at Columbia St. Mary's, Shadé underwent an obstetrics assessment and was hooked up to a Fetal Heart Monitor to track the heart rate of baby Laliah.

36. That the obstetrics assessment revealed that Shadé was not experiencing cramping/contractions, was not leaking fluid, and was not experiencing any vaginal bleeding.

37. During the exam, Shadé reported positive fetal movement which was confirmed through palpations shown on the fetal heart monitor.

38. Specifically, the fetal heart tones documented by the fetal heart monitor showed, "moderate variability with a baseline of 135, 15x15 accelerations and no decelerations."

39. That the fetal heart rate monitor was documented by the Columbia St. Mary's doctors to be, "good and showed no abnormality."

40. That the Shadé's uterine activity was noted by Columbia St. Mary Staff to be normal.

41. That on July 6, 2016, because the fetal heart monitor was good with no abnormality and Shadé had normal uterine activity, Shadé's condition was determined to be

Case 2:16-cv-01703-BHL   Filed 12/23/16   Page 11 of 43   Document 1

stable and she was therefore medically cleared and discharged by Dr. Eric Savory to the Glendale police officers for transport to the Justice Facility at 4:01 p.m.

42.     That on July 6, 2016, Columbia St. Mary's doctors provided discharge paperwork to the Glendale police officers which detailed Shadé's pregnancy, the examination and assessment done at the hospital, along with necessary follow-up instructions.

43.     That on July 6, 2016, Shadé was transported from Columbia St. Mary's Hospital to the Justice Facility.

44.     That on July 6, 2016, Shadé was booked into the Justice Facility.

45.     That on July 6, 2016, the Milwaukee County correctional staff, medical staff, and mental health staff were fully aware that Shadé was eight and a half months pregnant.

46.     That on July 6, 2016, Justice Facility Registered Nurse Heather Berken noted in Shadé's Justice Facility Medical Chart that prior to her arrival at the Justice Facility, Shadé had been seen by the Obstetrics Staff at Columbia St. Mary's and that Laliah's, fetal heart tones were normal.

47.     That on July 6, 2016, Shadé was transferred to the Special Needs Unit at the Justice Facility for medical observation due to her late stage pregnancy.

48.     That on July 7, 2016, Registered Nurse Frederick Prolucas indicated that Shadé was 8 months pregnant on Shadé's Intake Health Screening Form.

49.     That on July 7, 2016, Defendant C.O. Love and/or Defendant C.O. Brooks transferred Shadé from the Special Needs Unit to the Maximum Security Unit without medical authority or approval.

50.     That between July 8, 2016, and July 14, 2016, Shadé was not seen by a licensed obstetrician, gynecologist, or any medical doctor.

12

51.     That on July 13, 2016, Shadé's had a scheduled appointment with John Doe 11.

52.     That despite Shadé being eight and a half months pregnant, Shadé's July 13, 2016, appointment with John Doe 11 was not a "priority" to any of the John Doe Defendants 11-13.

53.     That John Doe 11 cancelled the scheduled medical appointment with Shadé because Shadé was not a "priority" and John Doe 11 was unable to get to Shadé before his/her shift ended.

54.     That on July 14, 2016, at approximately 12:00 a.m., Shadé went into labor and began to experience intense contractions.

55.     That on July 14, 2016, at approximately 12:15 a.m., Shadé informed Defendant John Doe 1 that she was in labor, that her water had broken, that she was experiencing extreme contractions, and that she needed medical attention as soon as possible.

56.     That said Defendant John Doe 1 laughed at Shade's, ignored her request for medical help, and walked away.

57.     That Defendant John Doe 1 did nothing further in response.

58.     That Shadé was locked in her disciplinary cell and was not checked on, monitored, or observed by any of the Defendants John Does 2-5 or Defendants John Does 14-15, or anybody else for that matter, despite the obvious fact she was in labor and needed medical attention.

59.     While Shadé was confined to her cell between the time that Defendant John Doe 1 mocked her requests for help and the time in which she gave birth to Laliah, Shadé's labor pain intensified causing her to scream and plead for help so loud that other inmates in her unit could clearly hear her cries for help.

13

60.     Defendants John Does 2-6 heard or should have heard Shadé's cries for help and should have checked on and/or monitored Shadé.  However, no action whatsoever was taken.

61.     That Defendants John Does 6-8 were supervisors in charge of supervising the third shift Defendants John Does 1-5 on duty in maximum security unit while Shadé was in active labor and were duty bound to ensure that the proper care and treatment for a pregnant inmate such as Shadé was implemented pursuant to the MCSO policies and procedures.

62.     That on July 14, 2016, at approximately 4:00 a.m., Shadé gave birth to baby Laliah, both alone in the cell.

63.     That Laliah was born alive, cried profusely, and attempted to breast feed.

64.     That between 12:15 a.m. and 5:05 a.m., no Defendants or any other Justice Facility staff were anywhere near Shadé's cell, none made unit security rounds; and/or checked on, monitored or observed Laliah her.

65.     That at approximately 5:05 a.m., Defendant John Doe 9 walked by Shadé's cell during security rounds without even taking a glimpse inside.

66.     That at approximately 5:35 a.m., Defendant John Doe 9 made another security round, and again failed to take check Shadé's well-being.

67.     That had the 5:05 a.m. and/or 5:35 a.m. security rounds conducted by Defendant John Doe 9 been conducted in any meaningful manner, surely he would have discovered that Shadé had given birth.

68.     That had the by Defendant John Doe 9 announced or made his/her presence known while conducting  5:05 a.m. and/or 5:35 a.m., instead of proceeding in a fashion that would avoid inmate detection, Shadé and/or other inmates in the unit could have alerted them to the birth of Laliah.

14

69. At approximately 5:55 a.m., Defendant John Doe 10 finally discovered that Shadé had given birth.

70. That instead of immediately calling for a medical emergency, Defendant John Doe 10 inexplicably waited for approximately nine minutes before initiating a medical emergency response at 6:04 a.m.

71. That at 6:08 a.m., Defendants John Does 16-19 arrived at Shadé's cell.

72. Despite being fully aware that Shadé had given birth, Defendants waited another 5 minutes before calling the Milwaukee Fire Department ("MFD") at 6:13 a.m.

73. At 6:13 a.m. when Defendants called the MFD, nearly six hours had passed since Shadé had went into labor, informed Defendant John Doe 1 of the labor, and requested medical attention; and nearly two hours and thirteen minutes had passed since baby Laliah was born alive in the cold, dark and unsanitary maximum security cell.

74. That at the time the Defendants had called the MFD at 6:13 a.m., they had actual knowledge of Shadé's labor for over six hours, but failed to take any action or provide any assistance whatsoever.

75. That at 6:13 a.m. Defendants knew or should have known for approximately two hours and thirteen minutes that baby Laliah was born and fighting for her life in the deplorable conditions of the Justice Facility maximum security disciplinary cell.

76. That on July 14, 2016, at approximately 6:00 a.m., nearly six hours after Shadé went into labor and two hours after Laliah had been born, Defendant John Doe 10 discovered that the Shadé had given birth.

77. That at 6:20 a.m., the MFD responders on scene requested a portable medical unit designed to resuscitate a baby.

Case 2:16-cv-01703-BHL   Filed 12/23/16   Page 15 of 43   Document 1

78.    That at 6:21 a.m., a second set of the MFD Responders arrived on scene with the requested portable medical unit.

79.    That at 6:21 a.m. the MFD responders, took over for Defendants and began resuscitation attempts of Laliah which consisted of cardiopulmonary resuscitation ("CPR") and unsuccessful attempts to place an I.V.

80.    At 6:55 a.m., Defendants and the MFD ceased resuscitation attempts on Laliah and the baby was officially declared dead by Defendant John Doe 20 in the maximum security unit at the Justice Facility where she had been born hours earlier.

81.    That despite the Aurora Sinai Medical Center being just 0.3 miles away (and less than a 1 minute drive), where there are trained medical doctors with appropriate access to prenatal, pregnancy and birthing care, Defendants failed to transport Laliah to said hospital.

82.    Instead, Defendants opted to spend forty-seven minutes attempting to resuscitate baby Laliah on a metal table in the common area of a maximum security unit at the Justice Facility through CPR and the use of a portable medical device.

83.    That on July 14, 2016, the deceased baby Laliah was transferred to the Milwaukee County Morgue from the Justice Facility, after being robbed of her life or even a chance at life.

84.    That on the night of July 13, 2016, through morning hours of July 14, 2016, the Justice Facility was dangerously understaffed.

85.    Justice Facility staffing levels were so constitutionally inadequate, that the MFD was forced to wait to transport Shadé, a woman who had just given birth by herself in a cold, unsanitary, and unsterile jail cell, to the hospital for medical treatment for a very serious medical condition.

86. The inadequate staffing level at the Justice Facility is documented in the MFD call records, whereby Emergency Medical Technician David Bass notes that, "delays in patient movement and transport were required to ensure proper sheriff department staffing."

87. That despite having just given birth to a child and having that child tragically pass away in her arms, Shadé was forced to wait and endure additional pain and suffering until the MCSO had sufficient staffing to allow the MFD to transport Shadé to Aurora Sinai Grace via ambulance. Shadé was finally transported to the Aurora Sinai Medical Center at 7:05 a.m., after the Justice Facility was properly staffed.

88. As a result of the distress Laliah suffered during her birth, and as a direct result of not receiving medical care during the labor and delivery process, Laliah tragically suffered from a preventable death in the Maximum Security Unit at the Justice Facility.

89. That while conducting the autopsy, the Milwaukee County Medical Examiner noted that Laliah was a, "well-developed, well-nourished, female neonate of stated age 37 weeks gestation."

### Milwaukee County's Pattern Of Violating Constitutional Rights Of Inmates At The Justice Facility

#### *Recent Deaths At Justice Facility*

90. Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 89 as if fully set forth herein.

91. Since April of 2016, there have been 3 other tragic and wholly preventable deaths at the Justice Facility.

92. On April 24, 2016, Terrill Thomas died at the Justice Facility while in the custody of the MCSO. Thomas had been arrested and booked into the Justice Facility on April 14, 2016. Despite suffering from a severe mental illness and in the midst of a mental breakdown, Thomas

was placed in a Maximum Security Unit at the Justice Facility and never seen by any mental health professional. After displaying bizarre and erratic behavior, Justice Facility staff cut-off the water supply to Thomas' cell on April 18, 2016. Six days later, Thomas' was found dead in his cell.. Thomas' death was subsequently ruled a homicide by the Milwaukee County Medical Examiner with the cause of death being dehydration.

93. On August 28, 2016, Kristina Fiebrink died at the Justice Facility while in the custody of the MCSO. Fiebrink had been arrested and booked into the Justice Facility on August 24, 2016, while she displayed clear signs of being under the influence of heroine, alcohol, and cocaine, which were noted by staff.[3] Despite exhibiting signs and symptoms of acute heroin and alcohol intoxication, Fiebrink was never placed on preventative detoxification protocol, seen or assessed by a medical practitioner, provided withdrawal medication, or placed on a heightened observation level while at the Justice Facility. On the night August 27, 2016, and into the early morning hours of August 28, 2016, Fiebrink screamed, begged, and pleaded for help in her cell, but correctional staff ever even bothered to check on her. Fiebrink was subsequently found deceased on the morning of August 28, 2016, in her cell by correctional staff.

94. On October 28, 2016, Michael Madden died at the Justice Facility while in the custody of the MCSO. At the time of Madden's arrest, he was suffering from a heart condition which he had had been since birth, as well as a heroin addiction. Despite these serious and grave medical conditions, Madden received little to no health care while in the Justice Facility. On October 28, 2016, Madden suffered a seizure rendering unconscious. The responding officers believed Madden was faking and failed to call a medical emergency. The officers then attempted

---

[3] At the time of booking it was well known to Justice Facility staff that Fiebrink had an extensive history of drug and alcohol abuse.

to pick and hold Madden up, but dropped him on his head. Madden was subsequently pronounced dead the night of October 28, 2016, at the Justice Facility.

*Consent Decree*

95.     Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 94 as if fully set forth herein.

96.     The MCSO and Milwaukee County entered into a Consent Decree with a class of plaintiffs (current and future inmates at the Justice Facility) in Milwaukee County Circuit Court Case No. 1996-CV-1835, which was approved by Milwaukee County Circuit Court Judge Thomas Donegan on June 19, 2001.

97.     The Consent Decree had two components: (1) Population control; and, (2) Medical care.

98.     First, the Consent Decree required that Defendant Milwaukee County maintain a general population cap in the Justice Facility, as well as a maximum cap on inmates held in the booking room. It provided that no inmate would spend more than thirty hours in the booking room and required better staffing and training for staff in that area.

99.     In terms of medical care, the Consent Decree required that Defendant Milwaukee County provide adequate, well-trained staff to provide health care to inmates and that complete screening of inmates for physical and mental health conditions be conducted. It further set out requirements for physical examinations, dental care, women's health, sick call, mental health, chronic care, and emergencies.

100.     As part of the Consent Decree, the parties agreed that a medical monitor be appointed and approved by the Court to supervise Milwaukee County's compliance with the

19

Consent Decree's provisions while the court retained jurisdiction over the case until the County was in full compliance with the terms of the Consent Decree.

101.    At all times material hereto, Dr. Shansky was the Court approved medical monitor in charge of monitoring the County's compliance with the Consent Decree.

102.    During his tenure, Dr. Shansky documented a series of systematic problems in the Jail's healthcare system.

103.    Specifically, Dr. Shansky has found that, "health care staffing shortages contribute to delays in access to care and deterioration in quality of care for prisoners; reductions in the number of correctional officers contribute to dangerous lack of access to health care and inability to detect health crisis, and may have played a role in some of the recent deaths at the Jail; that continued turnover in health care leadership positions contribute to lack of oversite of quality of care; and that the electronic record has serious deficiencies and must be altered or replaced."

104.    That the County has exhibited a systematic deficiency in staffing for a period lasting over ten years.

105.    As a result of the lack of health care staff and deficient medical services at the Justice Facility, correctional officers often improperly attempt to substitute their untrained judgment for that of a medical professionals.

106.    The lack of staff at the Justice Facility creates severe problems for the County's ability to respond timely and appropriately to medical emergencies and needs, which is exactly what contributed to Laliah's untimely, horrific, and preventable death.

107.    Physical exams performed by Justice Facility staff are incomplete and inadequate, often lacking a referral to an appropriate medical professional.

20

108. That untrained correctional officers are forced to make medical decisions concerning the health and welfare of prisoners.

109. That inmates with acute medical conditions have suffered for days, failed to receive appropriate medical care or referrals and have then died in the Justice Facility.

110. On several occasions, Dr. Shansky has found that the County was not performing medical emergency drills as required by the Consent Decree.

111. The County has repeatedly failed to conduct investigations into deaths that occurred in there facility, thereby allowing staff to avoid being disciplined for their actions and creating an atmosphere of deliberate indifference to the health and welfare of inmates.[4]

112. The Consent Decree is still in force and the above listed failures have never been corrected although the County, Clarke, and/or Armor Correctional have been aware of the problems for over a decade.

113. Defendants Milwaukee County, Clarke, and/or Armor Correctional, each had a duty to ensure that reasonable measures were taken to provide for the safety of inmates at the Justice Facility.

114. All Defendants were on notice of the unconstitutional conditions in the Justice Facility, and the problems found by Dr. Shansky when he examined the Justice Facility as part of the Consent Decree and each failed to rectify these conditions.

115. The above acts and omissions of all Defendants, and each of them, constitute a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety, and welfare of Shadé and Laliah and those similarly situated, resulting in the deprivation of their constitutional rights.

---

[4] This allegation is made pursuant to Rule 11(b)(3).

116.     Federal and state law, as well as accepted corrections and medical practices at the time of the incident provided "fair warning" to Defendants that their conduct was improper, incompetent, illegal, and in violation of Shadé's and Laliah's constitutional rights.

117.     The acts and omissions of the Defendants, as set forth above, violated clearly established and well settled federal constitutional rights of the Plaintiffs, i.e., due process of law under the Fourteenth Amendment, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

118.     The acts and omissions of the Defendants, as set forth above, violated clearly established and well settled Rights of the Plaintiffs under Articles I, Sections One and Six of the Wisconsin Constitution

119.     As a direct and proximate result of the acts and omissions of the Defendants as set forth above, the Plaintiffs suffered the following injuries and damages:

  a.  Emotional distress, psychological distress, and mental anguish;
  b.  Physical pain and suffering;
  c.  Loss of companionship;
  d.  Loss of future enjoyment of life;
  e.  Fright and shock;
  f.  Denial of social pleasure and enjoyment;
  g.  Embarrassment, humiliation, and mortification;
  h.  Constitutional violations; and,
  i.  Death.

## VI.  VIOLATIONS OF LAW

### COUNT I
### Section 1983 Claims
### All Defendants

120.     Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 119 as if fully set forth herein.

121.    As a result of the Defendants' refusal to provide Shadé and Laliah medical attention and the denial of Shadé's requests for immediate medical attention when she went into labor, Laliah was born and tragically died in the Maximum Security Unit at the Justice Facility.

122.    At all relevant times, the late term and potential complications from Shadé's pregnancy and the delivery of Laliah was obvious and known, or should have been known to each of the above listed Defendants commencing on July 6, 2016, and continuing through July 14, 2016, which the Defendants deliberately chose to ignore.

123.    Defendants, and each of them, knew that Shadé and Laliah were suffering from serious medical conditions and needed immediate treatment to safely deliver Laliah, but deliberately ignored the same by failing to provide proper medical care while Shadé was in the Justice Facility and by denying Shadé's request for help when she went into labor.

124.    Defendants, and each of them, knew Shadé and Laliah needed medical care or would suffer complications during the delivery of Laliah.

125.    That the above named Defendants, and each of them, were deliberately indifferent to Shadé's and Laliah's serious medical needs and intentionally deprived Shadé and Laliah of the required medical care and treatment, and acted with reckless disregard of Shadé and Laliah's obvious serious medical conditions, in violation of Shadé and Laliah's rights, privileges, and immunities as guaranteed by the United States Constitution, the Eighth Amendment, and Federal Statutes, including 42 U.S.C. § 1983.

126.    That the conduct of the Defendants, and each of them, shocks the conscious, was reckless, and demonstrates a deliberate indifference to the consequences of their refusal to provide Shadé and Laliah medical care while in the Justice Facility, and refusal to transport Shadé to a hospital and obtain appropriate care and treatment in the delivery of Laliah.

127. That the conduct of each Defendant, individually and/or as employees and/or agents of Milwaukee County at the Justice Facility were committed while acting under color of state law, depriving Shadé and Laliah of their clearly established rights, privileges, and immunities, in violation of the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, and of 42 U.S.C. § 1983.

128. That Defendants, each of them, deprived Shadé and Laliah of those rights, privileges and immunities secured by the United States Constitution and federal laws, while acting under the color of the laws of the State of Wisconsin, and the rules, regulations, customs and usages of the State of Wisconsin in violation of 42 U.S.C. § 1983.

129. That the actions and omissions of all Defendants under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. § 1983, were all performed under the color of state law and were unreasonable and performed knowingly, intentionally, maliciously, and with deliberate indifference to Shadé's and Laliah's safety, well-being and serious medical needs; with wanton intent for Shadé and Laliah to suffer an unnecessary intentional infliction of pain and suffering by failing to obtain medical treatment, and failing to properly instruct, train, and supervise the staff of the Justice Facility, including the individual Defendants having responsibility over the care, supervision, and general welfare of Shadé and Laliah; and the failure to develop and implement appropriate policies and procedures and to ensure proper instruction, training, supervision, and medical care, as well as the implementation, adoption, and/or tolerance of policies and/or procedures which deprived Shadé and Laliah of medical attention for each of their serious medical needs as described above. Said policies and/or procedures comprise a deliberate indifference to those serious medical needs of

Shadé and Laliah, by reason of which Plaintiffs are entitled to compensatory and/or punitive damages.

130.     That the conduct of each Defendant, was committed pursuant to, and in execution and implementation of, the color of state law and officially sanctioned policies, practices, ordinances, regulations, and/or customs of the Justice Facility, and each of the named Defendants exhibited a deliberate indifference in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution to Shadé's and Laliah's serious medical needs, and in violation of 42 U.S.C. 1983, causing the constitutional deprivation of Shadé's and Laliah's individual rights to-wit:

> a. Deliberately failing to properly train the Justice Facility staff, including medical personnel providing medical care to residents therein, to properly assess and determine when a resident is facing a medical emergency;
> b. Deliberately ignoring Shadé's and Laliah's immediate needs for medical treatment;
> c. Deliberately failing to transport Shadé and Laliah to an appropriate hospital for immediate medical care and treatment;
> d. Deliberately failing to seek appropriate medical attention for a woman in active labor;
> e. Deliberately failing to seek appropriate medical attention for a newborn baby;
> f. Deliberately failing to render medical care to a woman in active labor;
> g. Deliberately failing to conduct timely security/rounds;
> h. Deliberately failing to conduct meaningful security checks/rounds;
> i. Deliberately and willfully failing to notify appropriate doctors, nurses, and medical staff of Shadé's pregnancy and labor;
> j. Deliberately failing to hire, train, maintain, and implement competent correctional staff at the Justice Facility;
> k. Deliberately failing to hire, train, maintain, and implement competent medical staff at the Justice Facility;
> l. Deliberately failing to discipline, instruct, supervise, and/or control the conduct of the correctional staff at the Justice Facility, thereby encouraging the wrongful acts and omissions complained of herein;
> m. Deliberately failing to discipline, instruct, supervise, and/or control the conduct of the medical staff at the Justice Facility, thereby encouraging the wrongful acts and omissions complained of herein;
> n. Deliberately allowing a custom and/or practice at the Justice Facility of deliberately ignoring complaints of inmates or their need for medical attention;

o. Deliberately, willfully, and wantonly withholding required medical care to Shadé and Laliah when they had actual knowledge of both Shadé's and Laliah's serious medical conditions requiring immediate attention;

p. Deliberately, willfully, and wantonly ensuring that the Justice Facility was properly staffed; and,

q. Deliberately, willfully, and wantonly failing to ensure the Consent Decree was complied with.

131.    That as a direct and proximate result of the deliberate, willful, wanton, and reckless violation of Shadé's and Laliah's Constitutional Rights, Plaintiffs suffered injuries and damages including, but not limited to the following:

a. Emotional distress, psychological distress, and mental anguish;
b. Physical pain and suffering;
c. Loss of companionship;
d. Loss of future enjoyment of life;
e. Fright and shock;
f. Denial of social pleasure and enjoyment;
g. Embarrassment, humiliation, and mortification,
h. Reasonable expenses of necessary medical care, treatment and services;
i. Constitutional violations;
j. Death;
k. Punitive damages for Defendants' willful conduct; and,
l. Any and all other damages, including, but not limited to attorney fees recoverable under 42 U.S.C. §§ 1983 and 1988.

## COUNT II
## Monell Liability
## Defendants Milwaukee County and Armor Correctional

A.    *Failure to Train and Adequately Supervise – Defendant Milwaukee County*

132.    Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 131 as if fully set forth herein.

133.    That the Defendants failed to adequately train officers, correctional employees, and Justice Facility Staff at all times material to this Complaint on how to care for pregnant inmates, persons in their custody suffering from serious-acute-obvious medical conditions, and individuals in their custody in need of immediate medical attention, how to perform life-saving

26

procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct security rounds on special needs inmates, and how to conduct intake screenings, amongst other failures.

134.    That the failure of the Defendants to adequately train and supervise its correctional staff concerning several key issues such as how to care for pregnant inmates, persons in their custody suffering from serious-acute-obvious medical conditions, and individuals in their custody in need of immediate medical attention, how to perform life-saving procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct security rounds on special needs inmates, and how to conduct intake screenings, demonstrated a deliberate indifference on the part of Defendant Milwaukee County as to whether the failure to adequately train and supervise their correctional employees would result in the violation of the Constitutional, Civil, and Statutory Rights of individuals in their custody, such as Shadé and Laliah.

135.    That the above mentioned failure to adequately train and supervise correctional staff was a direct and proximate cause of the violations of the Constitutional, Civil, and Statutory Rights of Shadé and Laliah.

136.    That the above mentioned failure to adequately train and supervise correctional staff, and the acts and omissions of these Defendants was a direct and proximate cause of Laliah's death, and the injuries, damages suffered by both Shadé and Laliah.

    B.    _Failure to Adequately Train and Supervise – Defendant Armor Correctional_

137.    Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 136 as if fully set forth herein.

138.    That the Defendants failed to adequately train doctors, nurses and other medical staff at all times material to this Complaint on how to care for pregnant inmates, persons in their custody suffering from serious-acute-obvious medical conditions, and individuals in their custody in need of immediate medical attention, how to perform life-saving procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct rounds on special needs inmates, and how to conduct intake screenings, amongst other failures.

139.    That the failure of the Defendants to adequately train and supervise its medical staff concerning several key issues such as how to care for pregnant inmates, persons in their custody suffering from serious-acute-obvious medical conditions, and individuals in their custody in need of immediate medical attention, how to perform life-saving procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct rounds on special needs inmates, and how to conduct intake screenings, demonstrated a deliberate indifference on the part of Defendant Armor Correctional as to whether the failure to adequately train and supervise their medical employees would result in the violation of the Constitutional, Civil, and Statutory Rights of individuals in their care, such as Shadé and Laliah.

140.    That the above mentioned failure to adequately train and supervise medical staff providing health care at the Justice Facility was a direct and proximate cause of the violations of the Constitutional, Civil, and Statutory Rights of Shadé and Laliah.

141.    That the above mentioned failure to adequately train and supervise medical staff, and the acts and omissions of these Defendants was a direct and proximate cause of Laliah's death, and the injuries, damages suffered by both Shadé and Laliah.

C.   *Policies, Practices, and/or Customs of Milwaukee County Failing to Formulate and Execute an Investigation Process and/or Internal Administrative Review for In-Custody Deaths and Discipline Those Who Have Been Found To Have Mistreated Individuals and Failed To Provide Appropriate Medical Care or Call For Attention – Defendant Milwaukee County*

142.   Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 141 as if fully set forth herein.

143.   That the MCSO failed to formulate and execute an investigation process and/or internal administrative review policy for in-custody deaths and discipline those who had been found to have mistreated individuals, failed to provide appropriate medical care, or call for medical attention.

144.   That the MCSO's policy, practice, and/or custom of failing to formulate and execute an investigation process and/or internal administrative review policy for in-custody deaths and discipline those who had been found to have mistreated individuals, failed to provide appropriate medical care, or call for medical attention authorized and created a culture of deliberate indifference to medical needs of persons in the custody of Milwaukee County at the Justice Facility, with or without life threatening situations, which became a de facto policy of the MCSO.

145.   That the MCSO's policy, practice, and/or custom of failing to formulate and execute an investigation process and/or internal administrative review policy for in-custody deaths and discipline those who had been found to have mistreated individuals, failed to provide appropriate medical care, or call for medical attention authorized and created a culture of deliberate indifference to medical needs of persons in the custody of Milwaukee County at the Justice Facility, with or without life threatening situations, which lead to a de facto policy of

29

officers not being held accountable for their failure to provide medical care and/or call for medical care.

146.    That these above mentioned de facto policies of the MCSO constitute deliberate indifference to the constitutional rights of those in the custody of Milwaukee County, and these de facto policies created an environment which would allow officers to ignore the medical needs of individuals in their custody and were factors that were a significant and causal of the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

147.    That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

148.    That each and every one of the above mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Shadé's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

149.    That the above mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

D.    *Policies, Practices, and/or Customs of Armor Correctional Failing to Formulate and Execute an Investigation Process and/or Internal Administrative Review for In-Custody Deaths and Discipline Those Who Have Been Found To Have Mistreated Individuals and Failed To Provide Appropriate Medical Care or Call For Attention – Defendant Armor Correctional*

150.    Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 149 as if fully set forth herein.

151.    That Armor Correctional failed to formulate and execute an investigation process and/or internal administrative review policy for in-custody deaths and discipline those who had been found to have mistreated individuals, failed to provide appropriate medical care, or call for medical attention.

152.    That Armor Correctional's policy, practice, and/or custom of failing to formulate and execute an investigation process and/or internal administrative review policy for in-custody deaths and discipline those who had been found to have mistreated individuals, failed to provide appropriate medical care, or call for medical attention authorized and created a culture of deliberate indifference to medical needs of persons in its care at the Justice Facility, with or without life threatening situations, which became a de facto policy of Armor Correctional.

153.    That Armor Correctional's policy, practice, and/or custom of failing to formulate and execute an investigation process and/or internal administrative review policy for in-custody deaths and discipline those who had been found to have mistreated individuals, failed to provide appropriate medical care, or call for medical attention authorized and created a culture of deliberate indifference to medical needs of persons in their care at the Justice Facility, with or without life threatening situations, which lead to a de facto policy of medical staff not being held accountable for their failure to provide medical care and/or call for medical care.

154.    That these above mentioned de facto policies of the Armor Correctional constitute deliberate indifference to the constitutional rights of individuals in its care at the Justice Facility, and these de facto policies created an environment which would allow medical staff and/or officers to ignore the medical needs of individuals in their custody and were factors that were a significant and causal of the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

31

155. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

156. That each and every one of the above mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Shadé's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

157. That the above mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

E. *Policies, Practices, and/or Customs of Allowing Untrained Correctional Staff to make Decisions Concerning the Need for Appropriate Medical Treatment – Defendant Milwaukee County*

158. Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 157 as if fully set forth herein.

159. That the actions of the Defendants of allowing untrained correctional officers to make decisions concerning the need for appropriate medical care were done in accordance with Defendants' policies, practices, and/or customs condoning the use of such procedures to deal with all inmates. That this policy, practice, and/or custom was officially adopted.

160. That this official policy, practice, and/or custom of allowing untrained correctional officers to make decisions concerning the need for appropriate medical care violated Shadé's and Laliah's Constitutional, Civil, and Statutory Rights and permitted, encouraged, tolerated, and/or ratified the actions of Defendant correctional staff, all in a malicious, reckless

disregard, and/or with deliberate indifference regarding the Constitutional, Civil, and Statutory Rights of Shadé and Laliah.

161. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

162. That each and every one of the above mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Shadé's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

163. That the above mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

F. *Policies, Practices, and/or Customs of Allowing Untrained Correctional Staff to make Decisions Concerning Housing Moves for Inmates At High Risk for a Medical Emergency – Defendant Milwaukee County*

164. Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 163 as if fully set forth herein.

165. That the actions of the Defendants of allowing medically untrained correctional officers to make decisions concerning housing moves for inmates at high risk for a medical emergency were done in accordance with Defendants' policies, practices, and/or customs condoning the use of such procedures to deal with all medically high risk inmates. That this policy, practice, and/or custom was officially adopted.

166. That this official policy, practice, and/or custom of allowing medically untrained correctional officers to make decisions concerning housing moves for inmates at high risk for a

33

medical emergency violated Shadé's and Laliah's Constitutional, Civil, and Statutory Rights and permitted, encouraged, tolerated, and/or ratified the actions of Defendant correctional staff, all in a malicious, reckless disregard, and/or with deliberate indifference regarding the Constitutional, Civil, and Statutory Rights of Shadé and Laliah.

167.    That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

168.    That each and every one of the above mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Shadé's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

169.    That the above mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

G.    _Policies, Practices, and/or Customs of Ignoring the Requirements of the Consent Decree and Failing to Follow Recommendations of A Court Approved Medical Monitor Created a Culture In Which Milwaukee County Employees were Deliberately Indifferent to the Constitutional Rights of Inmates and Disregarded Proper Policy and Procedure – Defendant Milwaukee County_

170.    Plaintiffs hereby reasserts and realleges each and every allegation contained in Paragraphs 1 through 169 as if fully set forth herein.

171.    Defendant Milwaukee County and the MCSO failed to comply with the terms and provisions of the Consent Decree concerning healthcare; failed to follow the recommendations of the Court approved Medical Monitor; failed to work towards compliance with the standards of the National Commission on Correction Healthcare; allowed officers to substitute their judgment

34

for that of health care staff; failed to conducts emergency drills; and have exhibited a systematic deficiency in staffing, amongst other failures, these actions have been ratified as official policy thereby creating a culture where healthcare staff and correctional staff are deliberately indifferent to the Constitutional Rights of persons in their custody, such as Shadé and Laliah.

172.     Milwaukee County's policy of allowing the failures identified in the previous paragraph have continued for years and are contrary to acceptable correctional practices.

173.     Milwaukee County's policy of allowing the failures identified in the previous paragraphs became a de facto policy of Milwaukee County and the MCSO, creating a culture of indifference, which lead to de facto policy of officers and health care staff not being held accountable for their failure to provide medical care and/or call for medical care, further creating a de facto policy of Milwaukee County and the MCSO that officers and health care staff were not required to provide a constitutional level of health care and/or follow policies and procedures in regards to medical care.

174.     That these above mentioned de facto policies of Milwaukee County and the MCSO constitute deliberate indifference against individuals in the custody of Milwaukee County at the Justice Facility, and the de facto policies created an environment which would allow officers and health care staff to ignore the medical needs of inmates and were factors that were significant and causal to the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

175.     That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

176. That each and every one of the above mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Shadé's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

177. That the above mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

H. *Polices, Practices, and/or Customs of Not Conducting Third Shift Security Rounds/Checks In A Timely and/or Meaningful Manner Which Created a Culture In Which Milwaukee County Employees were Deliberately Indifferent to the Constitutional Rights of Inmates and Disregarded Proper Policy and Procedure – Defendant Milwaukee County*

178. Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 177 as if fully set forth herein.

179. That the actions of the Defendants of allowing third shift correctional officers to skip security rounds/checks, not perform security rounds/checks, and or not perform meaningful security rounds/checks were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

180. That this official policy, practice, and/or custom of allowing correctional officers to skip security rounds/checks, not perform security rounds/checks, and or not perform meaningful security rounds/checks violated Shadé's and Laliah's Constitutional, Civil, and Statutory Rights and permitted, encouraged, tolerated, and/or ratified the actions of Defendant correctional staff, all in a malicious, reckless disregard, and/or with deliberate indifference regarding the Constitutional, Civil, and Statutory Rights of Shadé and Laliah.

36

181. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

182. That each and every one of the above mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Shadé's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

183. That the above mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Shadé and Laliah, as well as the eventual death of Laliah.

**COUNT III**
**Negligence**
**Defendants Clarke, Schmidt, C.O. Love, C.O. Brooks,**
**John Does 1-10, and Milwaukee County**

184. Plaintiffs hereby reasserts and realleges each and every allegation contained in Paragraphs 1 through 183 as if fully set forth herein.

185. That by accepting Shadé into custody, Defendants undertook and owed to Shadé and Laliah the duty to make reasonable efforts to care for each of them in a reasonably prudent manner, to exercise due care and caution and to follow the common law as it relates to persons in their custody who are unable to care for themselves or seek medical attention while in custody.

186. Notwithstanding the aforementioned duties, Defendants treated Shadé in a manner that was extremely negligent, careless, reckless, and without concern for her safety.

187. Notwithstanding the aforementioned duties, Defendants treated Laliah before she was born and after she was born, in a manner that was extremely negligent, careless, reckless, and without concern for her safety.

Case 2:16-cv-01703-BHL   Filed 12/23/16   Page 37 of 43   Document 1

188.  That Defendants, in the face of Shadé's and Laliah obvious need for medical attention and assistance, failed to obtain medical attention, failed to identify a medical emergency, and/or failed to act as required.

189.  Defendants failed to adequately train correctional staff and medical staff; failed to develop and implement proper policies and procedures for dealing with pregnant inmates and/or births in the Justice Facility; failed to have some method, policy, practice, and/or procedure in regards to identifying medical emergencies pertaining to pregnant inmates, and failed to have an intervention method, policy, practice, and/or procedure in regards to pregnant inmates and/or births at the Justice Facility so that treatment could be obtained on a timely basis.

190.  Defendants engaged in conduct that was so negligent, careless, and reckless that it demonstrated a substantial lack of concern by failing to appropriately implement policies and procedures concerning the training of correctional staff and/or medical staff regarding the processing and relaying of medical information and request for emergent medical treatment and by failing to act on requests for emergent medical treatment, including, but not limited to:

     a. Failing to properly train the Justice Facility staff, including medical personnel providing medical care to inmates and persons in custody therein, to properly assess and determine when an inmate/person in custody is facing a medical emergency;

     b. Negligently, carelessly, and recklessly ignoring Shadé's and Laliah's immediate needs for medical treatment;

     c. Negligently, carelessly, and recklessly failing to transport Shadé and Laliah to an appropriate hospital for immediate medical care and treatment;

     d. Negligently, carelessly, and recklessly failing to seek appropriate medical attention for a woman in active labor;

     e. Negligently, carelessly, and recklessly failing to seek appropriate medical attention for a newborn baby;

     f. Negligently, carelessly, and recklessly failing to render medical care to a woman in active labor;

     g. Negligently, carelessly, and recklessly failing to notify appropriate doctors, nurses, and medical staff of Shadé's pregnancy and labor;

     h. Negligently, carelessly, and recklessly hiring, training, maintaining, and implementing competent correctional staff at the Justice Facility;

38

i. Negligently, carelessly, and recklessly hiring, training, maintaining, and implementing competent medical staff at the Justice Facility;

j. Negligently, carelessly, and recklessly failing to discipline, instruct, supervise, and/or control the conduct of the correctional staff at the Justice Facility, thereby encouraging the wrongful acts and omissions complained of herein;

k. Negligently, carelessly, and recklessly failing to discipline, instruct, supervise, and/or control the conduct of the medical staff at the Justice Facility, thereby encouraging the wrongful acts and omissions complained of herein;

l. Negligently, carelessly, and recklessly allowing a custom and/or practice at the Justice Facility of deliberately ignoring complaints of inmates of their need for medical attention; and,

m. Negligently, carelessly, and recklessly withholding required medical care to Shadé and Laliah when they had actual knowledge both Shadé and Laliah had serious medical conditions requiring immediate attention

191.   That as a direct and proximate result of the negligent, careless, and reckless disregard for Shadé's and Laliah's safety and well-being, Plaintiffs suffered injuries and damages including, but not limited to the following:

a. Emotional distress, psychological distress, and mental anguish;
b. Physical pain and suffering;
c. Loss of companionship;
d. Loss of future enjoyment of life;
e. Fright and shock;
f. Denial of social pleasure and enjoyment;
g. Embarrassment, humiliation, and mortification,
h. Reasonable expenses of necessary medical care, treatment and services;
i. Constitutional violations;
j. Death;
k. Punitive damages for Defendants' willful conduct; and,
l. Any and all other damages, including, but not limited to attorney fees recoverable under 42 U.S.C. §§ 1983 and 1988.

## COUNT IV
### Negligence
### Defendants Armor Correctional and John Does 11-20

192.   Plaintiffs hereby reasserts and realleges each and every allegation contained in Paragraphs 1 through 191 as if fully set forth herein.

193.   At all times material hereto, Defendants Jane/John Doe Medical Staff were employees and/or agents of Defendant Armor Correctional and/or Defendant Milwaukee County

39

and were acting in the course and scope of their employment, and thus Defendant Armor Correctional is liable for the actions of these John/Jane Doe Medical Staff Defendants pursuant to the Doctrine of Respondeat Superior.

194.    That by entering into a contract with Defendant Milwaukee County for the purpose of providing healthcare to inmates at the justice facility, Defendants undertook and owed to Shadé and Laliah the duty to make reasonable efforts to care for each of them in a reasonably prudent manner, to exercise due care and caution and to follow the common law as it relates to persons in their custody who are unable to care for themselves or seek medical attention while in custody.

195.    Notwithstanding the aforementioned duties, Defendants treated Shadé in a manner that was extremely negligent, careless, reckless, and without concern for her safety.

196.    Notwithstanding the aforementioned duties, Defendants treated Laliah before she was born and after she was born, in a manner that was extremely negligent, careless, reckless, and without concern for her safety.

197.    That Defendants, in the face of Shadé's and Laliah's obvious need for medical attention and assistance, failed to obtain medical attention, failed to identify a medical emergency, and failed to act as required.

198.    Defendants failed to adequately train correctional staff and medical staff; failed to develop and implement proper policies and procedures for dealing with pregnant inmates and/or births in the Justice Facility; failed to have some method, policy, practice, and/or procedure in regards to identifying medical emergencies pertaining to pregnant inmates, and failed to have an intervention method, policy, practice, and/or procedure in regard to pregnant inmates and/or births at the Justice Facility so that treatment could be obtained on a timely basis.

199. Defendants engaged in conduct that was so negligent, careless, and reckless that it demonstrated a substantial lack of concern by failing to appropriately implement policies and procedures concerning the training of correctional staff and/or medical staff regarding the processing and relaying of medical information and request for emergent medical treatment and by failing to act on requests for emergent medical treatment, including, but not limited to:

   a. Failing to properly train the Justice Facility staff, including medical personnel providing medical care to inmate and people in custody therein, to properly assess and determine when an inmate/person in custody is facing a medical emergency;
   b. Negligently, carelessly, and recklessly ignoring Shadé's and Laliah's immediate needs for medical treatment;
   c. Negligently, carelessly, and recklessly failing to transport Shadé and Laliah to an appropriate hospital for immediate medical care and treatment;
   d. Negligently, carelessly, and recklessly failing to seek appropriate medical attention for a woman in active labor;
   e. Negligently, carelessly, and recklessly failing to seek appropriate medical attention for a newborn baby;
   f. Negligently, carelessly, and recklessly failing to render medical care to a woman in active labor;
   g. Negligently, carelessly, and recklessly failing to notify appropriate doctors, nurses, and medical staff of Shadé's pregnancy and labor;
   h. Negligently, carelessly, and recklessly hiring, training, maintaining, and implementing competent medical staff at the Justice Facility;
   i. Negligently, carelessly, and recklessly failing to discipline, instruct, supervise, and/or control the conduct of the medical staff at the Justice Facility, thereby encouraging the wrongful acts and omissions complained of herein;
   j. Negligently, carelessly, and recklessly allowing a custom and/or practice at the Justice Facility of deliberately ignoring complaints of inmates of their need for medical attention; and,
   k. Negligently, carelessly, and recklessly withholding required medical care to Shadé and Laliah when they had actual knowledge both Shadé and Laliah had serious medical conditions requiring immediate attention

200. That as a direct and proximate result of the negligent, careless, and reckless disregard for Shadé's and Laliah's safety and well-being, Plaintiffs suffered injuries and damages including, but not limited to the following:

   a. Emotional distress, psychological distress, and mental anguish;
   b. Physical pain and suffering;

41

    c.  Loss of companionship;
    d.  Loss of future enjoyment of life;
    e.  Fright and shock;
    f.  Denial of social pleasure and enjoyment;
    g.  Embarrassment, humiliation, and mortification,
    h.  Reasonable expenses of necessary medical care, treatment and services;
    i.  Constitutional violations;
    j.  Death;
    k.  Punitive damages for Defendants' willful conduct; and,
    l.  Any and all other damages, including, but not limited to attorney fees recoverable under 42 U.S.C. §§ 1983 and 1988.

### COUNT V
### Wrongful Death (Wis. Stat. § 895.03)
### All Defendants

201.    Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 200 as if fully set forth herein.

202.    That Laliah's death was caused by Defendants wrongful acts, negligence, and/or improper conduct

203.    That if Laliah's death had not ensued, Laliah would have been able to bring a claim against the above named Defendants for violations of Title 42 of the United States Code, Sections 1983 and 1985 for violations of her rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and her rights under the Wisconsin Constitution and Wisconsin Common law.

## VII.  CONDITIONS PRECEDENT

204.    Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 203 as if fully set forth herein.

205.    All conditions precedent to this lawsuit have been performed or otherwise occurred.

## VIII. PRAYER FOR RELIEF

206.     WHEREFORE, the Plaintiffs respectfully demands judgment in favor of Plaintiffs against each of the Defendants, jointly and severally, awarding Plaintiffs:

      a.  Compensatory damages in an amount to be determined by the Jury;

      b.  Punitive damages in an amount to be determined by the Jury;

      c.  Reasonable costs and expenses associated with this action including attorneys' fees pursuant to 42 U.S.C. 1988; and,

      d.  Any other further relief as this Honorable Court deems just and fair.

207.     Milwaukee County is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against the Defendants in this action because the Defendants were acting within the scope of their employment when they committed the above-mentioned unconstitutional and negligent actions.

208.     Plaintiffs hereby reserve their right to amend their Complaint as additional information becomes known through discovery.

## IX.   DEMAND FOR JURY TRIAL

209.     The Plaintiffs demand trial by jury.

Dated at this 23rd day of December, 2016.

Respectfully Submitted,
Judge, Lang & Katers, LLC

By:  s/ Christopher P. Katers
     Christopher P. Katers (SBN: 1067557)
     Jason S. Jankowski (SBN: 1096008)
     David J. Lang (SBN: 1001218)
     JUDGE LANG & KATERS, LLC.
     8112 W. Bluemound Road, Ste. 101
     Wauwatosa, WI 53213
     P: (414) 777-0778
     F: (414) 777-0776
     ckaters@jlk-law.com
     jjankowski@jlk-law.com
     dlang@jlk-law.com
     Attorneys for Plaintiffs