UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

THE ESTATE OF LALIAH SWAYZER, ) CASE NO: 2:16-CV-01703-PP-WED
ET AL.,                       )
                              )              CIVIL
            Plaintiffs,       )
                              )        Milwaukee, Wisconsin
      vs.                     )
                              ) Wednesday, November 29, 2017
DAVID A. CLARKE, JR., ET AL., )
                              )     (2:00 p.m. to 3:02 p.m.)
            Defendants.       )
_____   )

COUNTY DEFENDANTS' MOTION FOR SANCTIONS
AND TO TERMINATE DEPOSITION [DKT #69];

ARMOR CORRECTIONAL'S MOTION TO STAY DEPOSITIONS
AND PROTECT WITNESSES [DKT #72];

PLAINTIFFS' MOTION FOR LEAVE TO FILE DECLARATION [DKT #104]

BEFORE THE HONORABLE PAMELA PEPPER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:            SEE PAGE 2

Courtroom Deputy:       Joan Harms

Court Reporter:         Recorded; FTR

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>

For Plaintiffs:                JAMES J. GENDE, II, ESQ.
N28 W23000 Roundy Dr., Suite 200
Pewaukee, WI 53072

DAVID J. LANG, ESQ.
Judge Lang & Katers
8112 W. Bluemound Rd., Suite 101
Wauwatosa, WI 53213

James Gende:              TERRY E. JOHNSON, ESQ.
Peterson Johnson & Murray
788 N. Jefferson St., Suite 500
Milwaukee, WI 53202

For Defendants:           DOUGLAS S. KNOTT, ESQ.
SAMUEL J. LEIB, ESQ.
Leib Knott Gaynor
219 N. Milwaukee St., Suite 710
Milwaukee, WI 53202

MICHAEL P. RUSSART, ESQ.
JILL M. MUNSON, ESQ.
Hinshaw & Culbertson
100 E. Wisconsin Ave., Suite 2600
Milwaukee, WI 53202

1    **Milwaukee, Wisconsin; Wednesday, November 29, 2017; 2:00 p.m.**

2        **(Proceeding in progress)**

3            **MR. GENDE:**  Attorney James Gende.

4            **MR. JOHNSON:**  Terry Johnson appearing for Mr. Gende.

5            **MR. KNOTT:**  Good afternoon, Your Honor.  Doug Knott

6    and Samuel J. Leib appear for the Milwaukee County Defendants.

7            **MR. RUSSART:**  Good afternoon, Your Honor.  Michael

8    Russart and Jill Munson appear on behalf of Armor, its

9    employees, and Evanston Insurance Company.

10           **THE COURT:**  Good afternoon.  And good afternoon to

11   everyone.  As I believe you all are aware, we're here this

12   afternoon to resolve, I think we have three motions pending and

13   one of them I think will take about two seconds to resolve.  I

14   have Docket Number 69, which is the County Defendant's Motion

15   for Sanctions and To Terminate the Deposition of

16   Ms. Cunningham.  Docket Number 72, which is Armor's Motion to

17   Stay All Depositions and Protect Witnesses from Plaintiff's

18   Counsel.  And then I have Docket 104, which is the one I think

19   is fairly easily resolved, and that's the Plaintiff's Motion

20   Under 7(h) for Leave to File a Declaration Opposing Sanctions.

21   It is Mr. Cade's declaration.  I'll grant that motion.  The

22   declaration's been filed.  I've reviewed it.  So that motion I

23   think is easy enough to take care of and I'll take care of that

24   on the docket after we finish today's hearing.

25               As the parties requested when we had our phone

1    conversation on this issue, I gave everyone an opportunity to

2    fully brief the Motions for Sanctions, and I want to just

3    summarize.  I've read everything that's been filed, some of

4    which, quite frankly, I think was unnecessary, but I've read

5    it.  And so I want to start with the notion that everything

6    that you've provided me I have looked at.

7            The second thing I want to clarify is that I

8    understand that the County Defendants have requested three

9    forms of sanctions.  The first is that I terminate the

10   deposition of Ms. Cunningham under Federal Rule of Civil

11   Procedure 30(d)(3).  The second is that I preclude

12   Attorney Gende from participating in any other depositions that

13   may take place in the case.  And the third is that I impose

14   monetary sanctions on Attorney Gende and I'm quoting here from

15   the motion,

16           "Including Defense counsel's fees and expenses

17           related to the deposition of Trina (phonetic)

18           Cunningham."

19   As I understand Armor's motion, I think, and Mr. Russart or

20   Ms. Munson, you can correct me, I understand that Armor's

21   motion was, in essence, similar to the request that the County

22   Defendants had made, the second request, which was the

23   preclusion of Attorney Gende from participating in any further

24   proceedings.  The motion is phrased as an order to protect

25   witnesses, but as I understand it, really what it is, is a

1    request that Mr. Gende not participate in depositions.  Am I

2    understanding that correctly?

3              **MR. RUSSART:**  That would be correct, Your Honor.

4              **THE COURT:**  All right.  And am I correct that that's

5    the only relief that's being sought by Armor?

6              **MR. RUSSART:**  We would also be seeking the monetary

7    sanctions, Your Honor.

8              **THE COURT:**  All right.  Thank you for that

9    clarification.

10              All right.  So with that being said and that being

11    clarified, I am willing to give each party a brief opportunity

12    to address anything that you think you may not have covered in

13    your briefs.  But let me make a couple of comments in that

14    regard to perhaps confine your discussions.  The first comment

15    is that we're here today because I have been asked to impose

16    sanctions on Mr. Gende, because of what happened during the

17    deposition of Ms. Cunningham.  There's a lot of water under

18    this bridge and I'll comment on that a little bit later.  And

19    the fact that I got a three-inch thick binder here and many,

20    many trees have died in order for me to produce it, and I

21    didn't print out every single thing, indicates that there's a

22    lot of water under this bridge here.

23              I am not here today to decide whether people behaved

24    inappropriately at previous depositions.  I am not here to

25    decide today whether or not somebody said something somebody

1    else ought to have or ought not to have been upset at.  I am

2    here to decide whether or not Mr. Gende's behavior on the day

3    of Ms. Cunningham's deposition was sanctionable and, if so,

4    what the appropriate sanction is.  So in regard to making your

5    remarks, I would, first of all, encourage you to keep that in

6    mind.  Second of all, I would encourage you to keep in mind the

7    three sanctions that have been requested and confine your

8    remarks to discussing the appropriateness of those sanctions or

9    the inappropriateness of those sanctions.

10          Finally, I have been asked by motion to sanction

11   Mr. Gende, nobody else.  I am not considering sanctions against

12   anybody else today, because there is no motion in front of me

13   asking me to sanction anyone else today.  So I would ask that

14   you confine your remarks to the request that has been made,

15   which is the request to sanction Mr. Gende.

16          All right.  With those ground rules having been laid,

17   I'm going to start with the County Defendants, because it is

18   the County Defendants' motion.  I think that was the first one

19   that was filed.  If I'm wrong about that, forgive me.  But I'll

20   start with the County Defendants.  So, Mr. Knott or Mr. Leib,

21   whoever is going to make the argument.

22          **MR. KNOTT:**  Thank you, Your Honor.  While I

23   appreciate your comments and your requests that we confine our

24   argument today, I just want to say that this is quite

25   distasteful for what occurred in the deposition and it's

1  distasteful and, frankly, sickening in the manner in which the

2  briefing took.

3          But we are here today to talk about what happened to

4  my client, Lieutenant Trina Cunningham.  Regardless of what

5  happened in the deposition, she left that deposition

6  frightened, shaking uncontrollably, and crying, and requesting

7  an escort from the building, because of what an attorney did in

8  my conference room.  And I think it's quite clear that this is

9  not something that was orchestrated.  That this is something

10 that the Court would demand be brought to your attention.  We

11 have to -- I have declined to respond to the ugliness that was

12 raised and I just assure Your Honor that I'm willing to explain

13 myself and truly believe that there's a valid basis for

14 everything I've ever -- every objection I've ever asserted.

15 But really what we're doing is we have to reject the premise

16 that a certain number of objections asserted in a deposition

17 can be a provocation or justification for intimidation.

18          So the issues before you, Your Honor, are the

19 significance of what happened and what should be done about it.

20 In terms of what happened, I heard immediately contrition.  I

21 heard Mr. Gende concede that he'd lost his composure.  That has

22 morphed into that he was forcefully pointing at an exhibit and

23 I'd even heard that the cap came off.  It's all on film, Your

24 Honor.  I won't argue what happened.  But I will say it -- what

25 that film shows that has to be recognized, is that it was an

1  outburst of anger, uncontrolled anger, that it was an act of

2  intimidation to myself and to the witness, and that there was a

3  threat of physical injury. I don't think those things can be

4  disputed. And those things meet the definition of violence and

5  they meet the definition of assault.

6      And the question is, what should a Court, in

7  upholding the standards of the profession, do when there is

8  anger, a threat of violence, intimidation? I think it's

9  absolutely, unequivocally clear that Lieutenant Cunningham

10 should not have to face further questioning. She was -- I will

11 say she's a correctional officer. She's not thin-skinned. And

12 she was shaken and should not have to return to a civil

13 deposition, in which she faces a threat and lives with for

14 weeks knowing that she has to return to a conference room where

15 she felt physically threatened.

16     The question is, why would Mr. Gende be removed from

17 participation? I don't enjoy attacking, Your Honor. I don't

18 enjoy revisiting the OLR complaint that said he has no filter,

19 he can't control himself. I don't enjoy revisiting Judge

20 Randa's review of prior depositions. He found that the

21 questioning was abusive and intimidating. And, Your Honor,

22 that's -- it isn't just what happened in the Cunningham

23 deposition. This is a persistent act and Lieutenant Cunningham

24 is not isolated. We're probably looking at another 25 or 30

25 witnesses that are employees of the County that are going to be

1 deposed in this case. And they've been made aware of what

2 happened, and they can't understand it. And they need an

3 explanation and they need to know they're going to be protected

4 in their deposition. Mr. Gende has proven that even on video,

5 even when he knows it can be reviewed, he cannot control his

6 anger. Those witnesses should not have to be unprotected in

7 future depositions. I can't make a certain number of

8 objections, because Mr. Gende's going to come across the table

9 at me, because at that point he's provoked.

10 That just cannot be the standard, Your Honor. The

11 standard cannot be that if there was no physical injury, then

12 we all go home with a stern warning. I'm sorry, Your Honor,

13 that cannot be the standard for this Court. And a severe

14 sanction is necessary. And that sanction is to remove

15 Mr. Gende from this case, remove him from the depositions, so

16 that future witnesses are not threatened in this manner. Thank

17 you.

18 **THE COURT:** Thank you, Mr. Knott.

19 Mr. Russart and Ms. Munson, on behalf of Armor.

20 **MR. RUSSART:** Your Honor, thank you. I'm in

21 unfamiliar territory and that's probably why the motion that

22 was filed by Armor is awkwardly phrased.

23 **THE COURT:** I was not attempting to criticize

24 phrasing. I just wanted to make sure I understand the relief

25 that was being requested.

1       **MR. RUSSART:**  Right.  But the purpose of the motion

2  was to seek protection of my clients, the witnesses that my

3  client will produce in future depositions.  Mr. -- you know, I

4  know there's been a lot of water under the bridge.  But

5  Mr. Gende has been admonished by other judicial officers about

6  his conduct before.  And we would hope that an individual would

7  take those admonishments to heart and conduct himself in a

8  professional, courteous, and civil manner.  His behavior at the

9  Cunningham deposition was anything but.

10          The individuals who are being sued, the healthcare

11  providers, as well as the correctional officers, are

12  individuals, who have -- the plaintiff has alleged to have

13  caused either the fetal demise or death of an infant.  These

14  healthcare providers, I can speak for my clients, take that

15  matter very much to heart.  There's a segment in Fred

16  Porculas's deposition taken in this case, where he talked about

17  the emotional distress caused by the circumstances surrounding

18  the death of the infant or the fetal demise, whichever it ends

19  up being proven in this case, and how that tore at the hearts

20  of those individuals who were involved in trying to resuscitate

21  the baby and caring for the child.

22          These individuals have been sued -- I can only

23  imagine, I've never been in their shoes, but through the course

24  of my decades practicing law I've learned that they take

25  this -- some of them take it very much to heart.  It is very

1    stressful circumstances.  I've had healthcare providers who've

2    quit the profession after being exonerated at a trial, just

3    because of the whole circumstance of the allegations made

4    against them.  This is a very difficult thing for a person to

5    go through.  It's difficult then to sit for a deposition with

6    these allegations over their heads.  And even under the best

7    circumstances, it's very stressful, anxiety-causing.

8         But this -- you're not going to be under the best

9    circumstances any longer.  My clients are aware of what

10   Mr. Gende did.  I had an obligation to share with them what

11   happened at Ms. Cunningham's deposition.  And so now they are

12   going -- if Mr. Gende is continued to allow to participate in

13   depositions, even be there, they're going to have the

14   trepidation of an individual who can't control himself being

15   added to the stress and anxiety of already the circumstance of

16   being a defendant in an action where they're accused of causing

17   an injury or death.  That's -- that's -- it should not be

18   allowed.

19        We have rules of civil procedure.  We have rules of

20   conduct for professional attorneys.  What Mr. Gende did was

21   beyond the bounds of any of that.  And my clients should not be

22   subjected to the proposition that Mr. Gende can sit across the

23   table from them and cross examine them, because he has not

24   demonstrated that he can accept responsibility for what he did

25   or control his behavior.  And when I say he can't accept the

 1  responsibility for what he did, the excuse of Mr. Knott made me

 2  do it -- I was a police officer in the City of Milwaukee for 10

 3  years.  I've heard that excuse from many an individual --

 4  domestic abusers.  I had a man tell me that he murdered a man,

 5  because that man stole a potato chip from him.  Somebody else

 6  made him do it.  This is -- that excuse in itself tells me as a

 7  rational adult that Mr. Gende is in no way prepared to accept

 8  responsibility and able to conform his behavior.

 9          There's no going back.  There's no reset button.

10  There's no mulligan.  There's no do over.  What Mr. Gende has

11  done is done.  And the image of him doing that and the

12  understanding of the volatility of his behavior is there

13  forever as well in this case.  And so I ask that the Court

14  protect my clients and protect the witnesses they'll produce

15  from Mr. Gende and sanction him to preclude him from being at

16  any further depositions.

17          **THE COURT:**  Thank you, Mr. Russart.

18          Mr. Lang or --

19          **MR. JOHNSON:**  I believe I'm supposed to do it, your

20  Honor.

21          **THE COURT:**  Thank you.  And if you wouldn't mind

22  moving the mic a little bit closer to you, Mr. Johnson,

23  because --

24          **MR. JOHNSON:**  I was hoping to remember to do that.

25          **THE COURT:**  Yeah, well, it's the system in this room.

1    If you don't do that, we don't pick it up.

2           **MR. JOHNSON:**  I will try to confine my remarks to the

3    scope of what the Court asked us to address as closely as

4    Defense Counsel did.

5           **THE COURT:**  Try harder than that even.

6           **MR. JOHNSON:**  I think I should try a lot harder than

7    that.  But a brief comment about the context here.  What they

8    have said is that Mr. Gende is incapable of controlling

9    himself.  They ignore the fact that for three days tense,

10   stress-filled depositions went through and all they can point

11   to is a five-second lapse in judgment.  There is no question it

12   was a lapse in judgment, but it's five seconds in three days.

13   That is not the record of someone who has demonstrated he

14   cannot control himself.  That's the first point I'd like to

15   make.

16          The second point I'd like to make is this, I believe

17   the Court needs to separate out what is properly before the

18   Court as evidentiary submissions and what is either argument

19   unsubstantiated by any submissions or inadmissible evidence.

20   As an example, there is no record before the Court to support

21   Mr. Knott's assertion that he has 25 to 30 witnesses have been

22   made aware of this and are greatly concerned about showing up

23   at other depositions.  That is perhaps true, but in terms of

24   the record here, it is simply invented.  There is nothing in

25   this record to show that Mr. Russart's clients are genuinely

1  concerned about anything, because none of them have submitted a

2  single affidavit to support that.  That may be true.  It is not

3  supported by the record.  It is simply an argument without

4  support in the record.

5          And third, there is no support for many of the

6  assertions that have been made about what Ms. Cunningham

7  experienced and believes.  For example, this report to the

8  Sheriff's Department, which is attached as an exhibit, is

9  hearsay and not admissible.  There is no declaration from

10  Ms. Cunningham that says anything to support what they are

11  saying.  She has made a hearsay statement.  I, for one, would

12  be greatly interested in finding out how that statement was

13  drafted, particularly since it is at odds with the video in

14  many respects.  The video simply doesn't demonstrate those

15  things.

16          So what do we have before the Court in the narrow

17  focus that the Court has asked us to address?  We have a video

18  and a transcript.  And the transcript is largely unnecessary.

19  What does the video show?  Video shows that, whether provoked

20  or not, I've understood the Court on that subject, at some

21  point in time, Mr. Gende momentarily lost his temper.  He

22  forcefully, I think would be the right word, jabbed his pen

23  toward an exhibit in front of the witness, because he though

24  Mr. Knott was misdirecting the witness' attention to something

25  other than what he was directed -- wanted to be directed at.

1  And he did so while saying something in a louder voice than

2  we're used to hearing in a deposition.  And the pen broke.  Now

3  I've had pens break, sometimes under very unfortunate,

4  embarrassing circumstances many times.  I don't know why that

5  pen broke, but let's indulge in the assumption it was because

6  Mr. Gende hit that table forcefully or that had something to do

7  with it.

8          Balanced against that one moment, which was followed,

9  according to the undisputed evidence, by an immediate apology

10  from Mr. Gende, a request that he could apologize to the

11  witness, they seek to deprive these Plaintiffs of the ability

12  to have their chosen counsel question witnesses from this point

13  forward.  Deprive them of their choice of the attorney they

14  want, because of a -- it's not even momentary, it is a fleeting

15  instantaneous loss of judgment.  Now everyone makes losses of

16  judgment.  Everyone makes miscalculations.  And I'm not

17  excusing Mr. Gende's.  Mr. Gende doesn't excuse his.  All

18  Mr. Gende has sought to do is to place this in a context, so

19  that one would understand that it is not as if out of the blue

20  he chose one day to come in and do this.  That's not what

21  happened.  And that's the only purpose of the background that

22  we submitted.  The Court didn't find that helpful.  I apologize

23  for burdening you with it.  But the reason we submitted it is

24  because we don't think this act can be viewed out of context.

25          But the consequences they seek, to impose substantial

1  monetary costs, to deprive these Plaintiffs of their chosen

2  counsel forever, at least in depositions, because of one lapse

3  in judgment are completely disproportionate.  There is -- if

4  you look at that video, Your Honor, there is evidence that

5  Ms. Cunningham was surprised.  I suspect she was.  I believe

6  everyone in the room was surprised when the pen broke.  I'm

7  sure Mr. Gende was surprised when the pen broke.  There's no

8  evidence that she was frightened.  She didn't even get up to

9  leave, until after her lawyer said, we're going to take a

10 break.  And then she got up to leave.  There's no evidence on

11 that videotape that she was anything other than surprised.

12 There's no evidence on that videotape that any rational person

13 would've believed Mr. Gende was going to assault her.  There's

14 no evidence on the videotape that he was even angry with her,

15 other than being angry with Mr. Knott.  As a matter of fact,

16 moments before, in the very short portion of the videotape

17 that's before the Court, you can see the questioning is being

18 done in a very calm, very quiet, very professional way and the

19 witness is responding in a perfectly appropriate way.  As a

20 matter of fact, she's not even confused, despite what she says

21 in her inadmissible report to the Sheriff's Department.

22 There's no evidence on the videotape that she was confused.

23 Mr. Knott chose to direct her attention to a part of it and

24 raise an objection.   We can debate the validity of that

25 anytime we want, but there's no evidence of anything going

1 wrong, until Mr. Gende, for a brief moment, lost his temper,

2 and somewhat loudly pointed out what he thought was wrong and

3 hit the paper with his pen.

4          I would suggest this, let's suppose he had a more

5 high-quality pen, and he hit the paper and the pen didn't pop

6 off.  Would we be here?  Would anyone be suggesting that

7 because a lawyer for one second raised his voice and struck a

8 piece of paper, like I just did, forcefully, that that meant

9 that lawyer should not be allowed to participate in any further

10 depositions?  That the deposition of the witness should be

11 terminated?  And that even though there was no misconduct in

12 the deposition, until that second, and none is alleged, that

13 the Plaintiffs should have to reimburse the Defendants for

14 every expense they had in going through the deposition to that

15 point, when there's no criticism of his conduct?  I would

16 suggest not.  If I would've been there with Mr. Gende and he

17 had struck that forcefully and the pen had not popped off, I

18 would've said, hey, calm down.  Whether I was an opponent or

19 not, I would've done that.  But that's all there would've been

20 to it.  It doesn't mean what Mr. Gende did was the appropriate

21 thing to do.  We are not suggesting it was.  It does mean that

22 the sanctions that are sought are completely disproportionate.

23          You should tell Mr. Gende that he misbehaved.  He

24 doesn't need to be told that, but you certainly should tell him

25 that.  You should tell Mr. Gende that if anything like this

1   happens in this case again, the sanctions that have been asked

2   for will be reconsidered and may well be granted. But there is

3   no basis in the law, they have cited not a single case to

4   support the idea that what happened here warrants these kinds

5   of sanctions. There is no support in the law that they've ever

6   cited. There is no basis to impose these sanctions. Thank

7   you.

8           **THE COURT:** Thank you, Mr. Johnson. Any very brief

9   rebuttal, Mr. Knott?

10          **MR. KNOTT:** Thank you, Your Honor. I suspect that if

11  Mr. Johnson's client were shaking uncontrollably and crying and

12  unable to continue the deposition, that we would be here, Your

13  Honor. Whether it's the Plaintiffs' attorney or Defense

14  attorney, when a witness can't continue because of the conduct

15  of a witness -- of an attorney, then the Court needs to know

16  about it. I wish that the Plaintiffs had raised or Mr. Gende's

17  counsel had raised any concerns about admissibility of

18  Ms. Cunningham's statement. I'll just submit to you that, one,

19  if I had in any way orchestrated her statement, my name

20  would've been spelled correctly.

21          And, two, I think Mr. Johnson is making a legalistic

22  argument, breaking down the submissions and saying we haven't

23  cited a case. Your Honor, this is common sense, that when

24  there is an assault, an act of violence, an act of

25  intimidation, severe sanctions are necessary. And you don't

1  time it on a stopwatch.  You don't say, well, the threat only

2  lasted five seconds; therefore, what the attorney did was

3  acceptable.  It was momentary, and it was frightening, and it

4  was unprofessional.  And the Court needs to address it.  Thank

5  you.

6          **THE COURT:**  Any brief rebuttal, Mr. Russart?

7          **MR. RUSSART:**  Your Honor, if the Court needs any

8  assurances to the impact that this behavior had on

9  Ms. Cunningham, Ms. Munson was present at the deposition.  She

10  went into the room where Ms. Cunningham went after she left the

11  conference room and can testify as to what she saw the effect

12  was on Ms. Cunningham.  I don't think that should be in

13  dispute.  But if the Court needs some further assurances of the

14  impact of this behavior, Ms. Munson is here.  That's all.

15          **THE COURT:**  Thank you.  No, I don't need any

16  testimony.  Okay.  So speaking of the way that people sometimes

17  react under stress and in stressful situations, I will ask you

18  all's forgiveness for the fact that this hearing is taking

19  place at the end of what has been a long day of criminal

20  sentencings.  It's my sixth hearing of the day.  I know that's

21  not a lot for State Court.  This is shameful to me.  This is

22  shameful that we're sitting here having this conversation in

23  this room, in this courthouse.

24          So I was a theater major in undergrad.  My parents

25  were heartbroken, you might imagine, because they were pretty

1   sure I was not going to be able to feed myself for the rest of

2   my life.  And I went to law school and I managed to get through

3   it and actually earn a degree.  And my parents, as I'm sure

4   many of your parents were, were sort of awestruck that I had

5   managed to get myself into a career that they considered to be

6   sort of at the pinnacle of professional success.  My parents,

7   maybe some of your parents are too, are those people who think

8   that doctors and lawyers and university professors are --

9   that's just a world that's kind of a different planet from the

10  one that the rest of us inhabit at our different jobs.  And I

11  think part of the perception -- part of the reason that a lot

12  of people feel that way, maybe not just my folks do, but maybe

13  a lot of people do is because we're supposed to operate under

14  this self-imposed, self-enforced code of ethics and civility.

15  And they don't always have at John Deere a code of conduct that

16  says people shouldn't be getting into a fist fight in the

17  lunchroom.  We operate on a pretty high-level code, or we're

18  supposed to, of how we're supposed to treat each other, how

19  we're supposed to treat our clients, how we're supposed to

20  treat the litigants that we come across every day.

21          It's rare that I see a case, that I've ever seen a

22  case in my career, that didn't have some level of tension to it

23  and stress to it.  Maybe sometimes we hit things in Traffic

24  Court that everybody isn't quite worked up about.  But

25  certainly, when you get to Federal Court the stakes are high,

1  the tensions are high, emotions run high.  This kind of case is

2  an emotionally-laden one, as every single one of you knows and

3  all of you have dealt with before.  That is as it should be.

4  But that does not mean that attorneys, even in stressful

5  situations, get to check their tickets at the door and start

6  acting like fourth graders in a lunchroom.

7          The first thing that concerns me and the first reason

8  that I find this, I agree with Mr. Knott's word, distasteful,

9  that all of you grown-up, educated, smart, decent human beings

10 are sitting here in a hearing like this, is that the one thing

11 that was accomplished by the seven forests of paper that you

12 all provided was that it demonstrated to me at least that there

13 is an ongoing, and what I might describe as a little bit of a

14 toxic relationship between Mr. Gende and Mr. Knott.  Both of

15 you are very experienced in what you do.  Both of you very good

16 at what you do.  And the consequence of that is that you have

17 ended up in rooms across from each other or next to each other

18 an awful lot of times it appears.  I've got, again, half the

19 Amazon to prove it.  And each of you seems to have pointed to

20 or relied upon excerpts of what one transcript or another from

21 one deposition or another to say see, he doesn't behave

22 himself.  See.  See.

23         Now I will confess to you, I myself have never

24 conducted a deposition.  So this is a little bit like your

25 priest doing marriage counseling.  However, I've reviewed a ton

1 of depositions over my career and one of the things that I have

2 seen with some frequency is that there tends to be a particular

3 etiquette.  Everybody knows there's no judge in there.

4 Everybody knows there's nobody to bring a hammer down.

5 Everybody should know that there's no such thing as refusing to

6 answer a question.  Everybody should know that the point is to

7 make your objection and move on.  And I see many depositions

8 where opposing counsel says, objection, hearsay.  Objection,

9 irrelevant.  Objection, overly broad.  And counsel says noted

10 and then moves on and asks the next question or poses the

11 question again.

12          I have also had, as I am sure almost all of my

13 colleagues have had at one point or another, with perhaps one

14 exception, phone calls from attorneys saying we're sitting in

15 the middle of a deposition.  We've come across a problem that

16 we can't resolve ourselves.  Wondering if the judge has a

17 minute.  And if I'm there and I'm available, I'll take it.  And

18 if I'm not, the parties either decide to reconvene the

19 deposition at some other time or to wait and see if I'm

20 available or whatever they decide to do.  What I saw from the

21 transcripts that were provided in this case was a pattern of

22 behavior, quite frankly, on the part of both experienced

23 counsel of arguing with each other on the record, disagreeing

24 with each other on the record.  There are several passages that

25 I could pick out and read to you right here and now where the

1  witness must have been sitting there watching the ping-pong

2  game for a few minutes while there was a back and forth between

3  the two of you.  There were snide comments about questions that

4  each of you asked the other's witnesses.

5          Something has gone awry in this relationship and it's

6  not productive.  And it doesn't seem to reflect well or be

7  flattering on either of you, not in terms of your skill as

8  counsel, but in terms of the way that you have developed of

9  dealing with each other.  And that in my mind, I don't get to

10  tell you whether you ought to be embarrassed or not, but it is

11  embarrassing to read.  Counting the number of objections that

12  the counsel for the other side made, pointing back and forth at

13  each other.  This is something that I don't care how passionate

14  you are about your cause or your clients, and you should be,

15  this should not be what educated, respected professionals do.

16          You've got a problem, call the judge.  You got an

17  objection, state it and then move on.  You get 3,000

18  objections, you take a deep breath and sigh and say, I think

19  we're not getting anywhere.  Why don't we give the judge a

20  ring?  You get two objections that you think are so out of line

21  that they shouldn't have been made, let's take a break.  See if

22  the judge is available.  You don't do this.  You don't snipe at

23  each other.  You don't produce hundreds of hundreds of hundreds

24  of pages of see I told you so, he was not behaving himself.

25          I said earlier that we're not here to decide any of

1   that stuff, but I can't help but comment on it, because it

2   seems to have gotten us to the point that we are now.  Second

3   of all, Mr. Johnson noted that one can't view the moment on the

4   videotape, which by the way, I've watched more than once, in a

5   vacuum.  And that in the very shortest term, this incident took

6   place at the end of a series of several days of depositions,

7   which were stressful and tense.  And I don't have any doubt

8   that that's the case.  I am sure that that is true.  Given the

9   past history, I'm guessing that these depositions, when the two

10  of you are there, are often fraught and tense.

11          I also noted a couple of other things in the

12  depositions.  I know that many of us in a small town in

13  Milwaukee end up on cases with the same people over and over

14  and over again, especially if you have an expertise and a

15  specialty in a particular practice area.  Can't help but

16  happen.  I was a criminal lawyer for years.  I saw the same

17  people over and over and over again.  You get to know each

18  other and occasionally in court you -- you refer to Mike or Ted

19  or Jane, instead of Mr. Smith or Mr. Johnson or whoever.  It

20  happens to the best of us.  I'm embarrassed to say on one

21  occasion I have referred to an attorney, prosecutor or defense

22  attorney, who I know from my old days by their first name in

23  court and then had to correct myself.  But I noticed a trend in

24  these depositions as well of you all addressing each other by

25  first name, of telling each other to calm down, of commenting

1    on each other's behavior, again, in front of witnesses.

2              All of that is concerning to me in the context of

3    where this case is headed and in the context of my assumption

4    that there will be other cases that you will be on together.

5    As to this particular incident and this incident is the only

6    thing that I am here to consider sanctions on, as I indicated,

7    I watched the video a few times.  I think that some of the heat

8    in the rhetoric has blown over into heat of the arguments about

9    the incident.

10             What I saw in the video was a series of questions.

11   Ms. Cunningham answering the questions or attempting to answer

12   the questions, occasionally hesitating.  Either trying to

13   figure out what the question was or figure out what the answer

14   was.  And then Mr. Gende pose a question.  Tone of his voice

15   was a little frustrated.  Mr. Knott interpose what was going to

16   be either a question or a clarification.  I think it was a

17   question.  Where on the form are you talking about?  Where on

18   the flowchart are you talking about?  And then Mr. Gende comes

19   up out of his chair, leans over the table, takes the pen, slams

20   it rather forcefully down onto the pad, and some bits and

21   pieces fly in different directions.  Ms. Cunningham leans back

22   and her eyes get kind of big.  Mr. Knott leans back.  And then

23   there begins to be an exchange, not involving the witness, but

24   between Mr. Knott and Mr. Gende arguing over the behavior that

25   had just occurred.  Including, as Mr. Knott has indicated,

1   Mr. Gende saying after there was a break I think, I apologize

2   and if you bring the client back in here I'll apologize to her

3   as well.  But certainly a heated exchange before that.

4           We're talking semantics here, but I wouldn't

5   characterize what Mr. Gende did as a lunge across the table.  I

6   think he leaned across the table.  I perceived as I watched the

7   video that Mr. Gende's anger was directed, and I think it was

8   anger, it was directed at Mr. Knott and his frustration was

9   directed at Mr. Knott.  Because Ms. Cunningham hadn't done

10  anything.  I don't know that Ms. Cunningham necessarily knew

11  that.  I can't get in her head and I don't think that's the

12  point of my being here.  I can certainly imagine if I were

13  sitting in the chair and some guy I didn't know in a tie, who

14  was supposed to be asking me questions comes across the table

15  towards me and slams the pen down I'd have a reaction to it.

16  But I think some of the language that's been used to

17  characterize the incident is a bit incendiary.

18          I think there's been a lot of discussion about the

19  impact of what happened in that incident on other witnesses,

20  who stand in line yet to be deposed.  And Mr. Russart indicated

21  that he had an obligation to tell all of the other deponents

22  that this event had occurred.  I'm certainly not an ethics

23  guru.  There are other people who are far more schooled in

24  Supreme Court rules than I am.  I'm not familiar with the

25  source of that ethical obligation.  So if other witnesses are

 1  aware of what happened in that deposition it is because they've

 2  heard about it secondhand and not because they were present or

 3  they themselves were subject to any of this kind of behavior.

 4  And so I'm not sure that it's necessarily the case that every

 5  single other witness had to be informed of this incident and

 6  now those people are all reluctant to be deposed.  I think most

 7  people are reluctant to be deposed regardless of who's deposing

 8  them.  Nobody wants to go to a deposition or be deposed.

 9         So with regard to all of those things, I think where

10  that brings us is what to do about behavior that I certainly

11  agree, and I certainly hope Mr. Gende agrees is unacceptable

12  under any circumstances.  Every single one of you will be in a

13  deposition again in which you will become frustrated and

14  angered and irritated.  If you can't figure out how to manage

15  that without controlling your physical responses, then

16  that's -- this is not a job you should have.  Just like I

17  shouldn't have this job if I can't do my job without coming

18  over the bench at somebody, without throwing that gavel.

19         Mr. Johnson made reference to the fact that Mr. Gende

20  has been retained by his client.  They made a choice as to the

21  attorney that they wanted.  And while people don't have an

22  unfettered right to have any attorney no matter what, it is

23  important in our system that people be able to have counsel

24  that they can trust and who they feel is fighting for them and

25  will do a good job for them.  And I have no doubt that

1    Mr. Gende's clients retained him because they believe that he

2    is talented at what he does and experienced at what he does.

3    And that's why they made that choice.  Not to say that other

4    people in the firm are not also talented and experienced at

5    what they do, but I suspect that is the case with them.  And so

6    it is no small thing for someone to ask me to bar an attorney

7    from being able to participate in any further depositions in a

8    case in which that attorney has been retained by people who

9    have put their faith in that attorney.

10           At the same time, the Defendants are absolutely

11   correct that I cannot condone the behavior that took place on

12   that day.  It was a momentary lapse of judgment, I understand

13   that, but something needs to change in the tenor of these

14   interactions.

15           With regard to the motion -- motions plural, I have

16   to start with Rule 30(d)(3)(A) under the Federal Rules of Civil

17   Procedures, which indicates that,

18           "At any time during a deposition a deponent or a

19           party may move to terminate or eliminate the -- limit

20           the deposition, if it's being conducted in bad faith

21           or in a manner that unreasonably annoys, embarrasses,

22           or oppresses the deponent or party."

23   Under that standard, I think the behavior that was caught on

24   the video does unreasonably annoy, embarrass or oppress the

25   other party.  That rule provides that the Court may, and the

1  language you will note is discretionary, terminate the

2  deposition if the Court believes that it is appropriate.

3  Getting into a discussion of what Ms. Cunningham did or didn't

4  feel I don't think is any of our purview, but I do agree that

5  it is inappropriate to subject her to any further deposition,

6  given the circumstances.  And I will grant the motion to the

7  extent that one of the sanctions that is requested is to

8  terminate Ms. Cunningham's deposition.

9       Section B of that rule provides that not only do I

10 have the discretion to terminate the deposition, but that I

11 have the discretion to decide on an award of expenses.  And it

12 refers to Rule 37(a)(5).  37(a)(5) provides that if I grant a

13 motion to terminate a deposition or if there's some other sort

14 of disclosure that I require, the Court must,

15       "After giving an opportunity to be heard, require the

16       party or deponent whose conduct necessitated the

17       motion to pay the movant's reasonable expenses

18       incurred in making the motion, including attorney's

19       fees."

20 The request in the County Defendants' motion is a request that

21 I require as a sanction that Mr. Gende pay the fees and costs

22 associated with conducting the deposition.  The rule does not

23 provide for that as a sanction.  As I understand it, this was a

24 lawfully called deposition and appropriately noticed.  And

25 while the parties may disagree with each other about how well

1    it was going up until the moment of the pen incident, it was a

2    deposition that was appropriate for this case.  So I do not

3    think that it is appropriate to grant as a sanction fees and

4    costs for the deposition.  I do think that it is appropriate to

5    grant fees and costs for filing these motions and I will grant

6    that as a sanction and ask that the Defendants submit jointly

7    one bill of costs, please, rather than two.  I think that would

8    be more efficient for -- and then, of course, I'll give the

9    Plaintiff an opportunity to respond to the bill of costs.

10           Our local rules for this Court, General Local Rule

11   83, indicate that attorneys that practice here in the Eastern

12   District of Wisconsin are subject, of course, to the FCRs but

13   also, they state that,

14           "After notice and an opportunity to be heard, any

15           attorney who violates the standards for the Eastern

16           District may be barred from practice before the

17           Court, suspended from practice for a definite time,

18           reprimanded, or subjected to such other discipline as

19           the Court may deem proper."

20   I certainly think that a bar from practice would be

21   disproportionate as a sanction under these circumstances.  Not

22   trivializing in any way Ms. Cunningham's experience.  And in

23   this case, at this point, under these facts, I do believe that

24   it is a disproportionate response to bar Mr. Gende from

25   participating in any further depositions.  I'm going to comment

1   more on that in just a minute.  But I believe that is a

2   disproportionate response and a disproportionate sanction.

3   Because, as I indicated earlier, the Plaintiffs have chosen

4   Mr. Gende as their counsel.  Hopefully, not because they

5   anticipated that he would be overly aggressive, but because

6   they hoped that he would do a good job for them and also

7   because, as Mr. Johnson correctly notes, so far, while we can

8   debate the back and forth between counsel, this is the only

9   incident of this sort that took place.  So I am not going to

10  grant the motion jointly made by Armor and by the County

11  Defendants to bar Mr. Gende from participating in any further

12  depositions.

13          But on that point, I have a couple of other comments.

14  My first comment is that this is not the first issue of concern

15  that's come up in this case with regard to Mr. Gende.  I'm not

16  going to comment on what happened with Judge Randa or didn't

17  happen with Judge Randa.  I can read that stuff as well as you

18  all can.  I wasn't there.  I didn't see it.  I don't know.  I

19  will comment on two things here.  Back when we were getting

20  ready for the Rule 16 conference an issue arose in which there

21  was a dispute between the parties as to the location of

22  depositions, where those depositions would take place.

23  Mr. Gende argued, in fact in a written 26(f) statement to me,

24  that Federal practice was that the plaintiff got to decide

25  where the depositions would take place.  Said that that was

1  Federal practice and cited to a decision from Judge Randa.  The
2  decision that he cited from Judge Randa, which I think was the
3  *Perez* Decision, said exactly the opposite and that was a case
4  in which Mr. Gende was involved.  So Mr. Gende would have a
5  reason to know what that case said.  And in point of fact the
6  Federal practice is the opposite.  That concerned me and I
7  think I said something about it at the time.  And I, in fact,
8  ruled that no, we weren't going to have depositions in
9  Mr. Gende's location.  We were going to follow the Federal
10  practice.

11          In the e-mail exchanges that followed this incident
12  at Ms. Cunningham's deposition, which you all also provided me
13  and which, quite frankly, didn't improve matters any, at one
14  point Mr. Russart, I think, indicated that until all these
15  matters were resolved Armor did not want Mr. Gende coming to
16  them to conduct any depositions.  That exchange got pretty
17  heated, if e-mail can get heated and I reckon it can.  And at
18  one point, Mr. Gende said, well, if you'd rather, you can come
19  to my place and do the depositions if you'd feel more
20  comfortable.  That struck me as a little bit of a, for those of
21  you who know the Uncle Remus stories, tar baby in the briar
22  patch.  Mr. Gende originally wanted the depositions to be
23  conducted in his offices and I said no.  And then as a solution
24  for a problem created by Mr. Gende's behavior, Mr. Gende
25  suggested that people do the depositions at his offices.

1    Disingenuous I think.

2           The other incident that took place that concerned me

3    in this case was, as you all know, around this situation where

4    I think I noted at the Rule 16 conference, that I have noted to

5    everybody who comes in here and does a Rule 16 conference, that

6    if you run into any discovery troubles and you need help from

7    the Court, get on the phone with both parties on the line and

8    let us know that you need something and if I'm available, I'll

9    come take the call right then and there.  And as you all will

10   recall, we ended up in a hearing where it turns out that

11   Mr. Gende called and asked for a hearing on what had happened

12   or some sort of hearing, I don't know exactly what the request

13   was, but at least my staff who took the phone call got the

14   impression that everybody was in agreement about the need to

15   discuss a discovery matter by phone.  You all will recall that

16   when I got out here on the bench and you all were all on the

17   telephone, that's when I learned that, in fact, Defense counsel

18   were not in agreement on trying to resolve anything by phone.

19   Perhaps that was a misunderstanding and I'll certainly try to

20   give the benefit of the doubt.

21          But I'm going to tell you right now that in allowing

22   Mr. Gende to continue conducting depositions, this case is not

23   going to proceed the way it has.  There are not going to be

24   anymore arguments with each other on the record in deposition.

25   I assume that all of these are going to be videotaped.  They

1  certainly should be.  If there is any incident that comes up at

2  any deposition, the appropriate thing to do is to pick up the

3  phone and call my chambers.  If I am not available, I will

4  notify other people, perhaps one of the Magistrate Judges will

5  be available.  I will make sure that there is someone available

6  to take the phone call, if not that minute, within a few

7  minutes.

8       I expect that parties who have objections to

9  interpose during a deposition will do this:  Objection,

10  hearsay.  Objection, overly broad.  Objection, irrelevant.

11  Whatever your objection is and then move on.  No speaking

12  objections.  No arguments.  No characterizing the other side's

13  behavior as being this, that, or the other thing.  Forgive me

14  if you feel that constrains your creativity.  In this case I

15  think it is necessary.  And if there is a devolvement into

16  something like that, the next thing that will happen is a phone

17  call.  If I have to look at the videotape of every single

18  deposition in this case, which means I'll be up at 4:00 in the

19  morning, I guess that will assist me in my need to fight

20  insomnia.  I'll do it.

21       This case needs to proceed forward in an appropriate

22  and a professional manner.  Witnesses should expect that when

23  they show up they will be treated with respect.  Counsel should

24  expect that no matter what has happened before now each will be

25  treated with respect by the other.  If there is another loss of

1    control, then I will consider more extensive sanctions,

2    including preclusion or bar.

3            Mr. Knott anything further or any further questions

4    from the Defense?

5            **MR. KNOTT:**  No, Your Honor.

6            **THE COURT:**  Mr. Russart?

7            **MR. RUSSART:**  No, Your Honor.

8            **THE COURT:**  Mr. Johnson?

9            **MR. JOHNSON:**  No, Your Honor.  Thank you.

10           **THE COURT:**  Then just so I'm clear, I've granted

11   Docket Number 69 to the extent that I am imposing the sanction

12   of terminating Ms. Cunningham's deposition and imposing

13   attorneys' fees and costs for the filing of these motions.  I'm

14   lifting the stay for conducting depositions and will allow the

15   parties to resume scheduling those depositions under the

16   conditions that I just laid out.  And I am denying motion --

17   Docket Number 69 with regard to the request to bar Mr. Gende

18   from participating in further depositions.

19           The same is true with regard to Docket Number 72.

20   I'm granting the motion with regard to the request for fees and

21   costs and to the extent that, as Mr. Russart said, it's phrased

22   as a request that witnesses be protected, I think I've granted

23   that motion.  I haven't granted that motion by barring

24   Mr. Gende from conducting depositions, but I fully intend to

25   protect witnesses.  And I hope that this order will assist in

1    doing that.  Again, with regard to Docket Number 72, lifting

2    the stay and allowing the parties to proceed with scheduling

3    depositions.

4            And then finally, as I indicated at Docket Number

5    104, I will grant the motion for Mr. Cade's declaration to be

6    filed and it's already on the docket.  So I think that is a

7    done deal.

8            Finally, I know that there are two other motions, 100

9    and 101, pending in front of Judge Duffin and I assume that

10   those are proceeding apace in front of Judge Duffin.  Thank you

11   all for your time.  And you know my phone number.

12       **(Proceeding adjourned at 3:02 p.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
entitled matter.

_____          _January 3, 2018_

                    TONI HUDSON, TRANSCRIBER