**THE ESTATE OF LALIAH SWAYZER**;
**SHADÉ SWAYZER**; **DIANE RUFFIN** (a minor);
and, **CHARLENE RUFFIN** (a minor);
        Plaintiffs,

    v.                               **Case No: 16-CV-1703**

**DAVID J. CLARKE JR**. et al.,
        Defendants.

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT ARMOR'S MOTION FOR JUDGMENT ON THE PLEADINGS

---

NOW COMES, Plaintiffs, The Estate of Laliah Swayzer, Shadé Swayzer, Diane Ruffin, and Charlene Ruffin, by their attorneys, **JUDGE, LANG & KATERS, LLC** and **GENDE LAW OFFICE, S.C.**, and submit this Response in Opposition to Defendant, Armor Correctional Health Services, Inc.'s Motion for Judgment on the Pleadings.

### I.    INTRODUCTION

This case involves Milwaukee County ("MC"), the Milwaukee County Sheriff's Office ("MCSO"), Armor Correctional Health Services, Inc. ("Armor"), and the individually named Defendants' violation of the Plaintiffs' constitutional rights. Laliah Swayzer (a minor, "Laliah") and Shade Swayzer ("Swayzer"), a diagnosed bi-polar schizophrenic, suffered cruel and unusual punishment, and ultimately, Laliah's death in filthy conditions while under Armor's care.

Armor was responsible for the health, safety, welfare and humane treatment of all inmates at the Milwaukee County Criminal Justice Facility ("CJF"), including Swayzer and Laliah, in July of 2016. Armor asks this Court for judgment on the pleadings dismissing Plaintiffs' *Monell* Claims pursuant to Rule 12(c). Armor filed its motion a mere 72 hours after the depositions of Armor executives concluded and prior to the depositions of Armor's CJF

management and staff who were involved in the care of Swayzer and Laliah being conducted. Discovery, including *Monell* discovery, has been ongoing months and remains incomplete. Discovery remains open until November 30, 2018. Yet, Armor seeks clemency now, in the midst of ongoing, significant discovery. Despite the fact that depositions of Armor's management and employees continue regarding multiple issues including policies, procedures, customs and other *Monell* related information, Armor strategy is to substantially prejudice Plaintiffs' ability to elicit evidence of *Monell* violations or amend their Complaint to incorporate the newly discovered evidence and testimony. Armor again puts that cart before the horse and its procedural process is defective. Even worse, Armor misrepresents that *Monell* discovery has concluded. This is simply false.

Regardless of Armor's inexplicable grasp on discovery timelines, Plaintiffs have specifically identified widespread policies, procedures and practices that directly resulted in the violation of Swayzer and Laliah's Constitutional rights. Armor attempts to narrowly tailor the standard and ignores the specifically plead factual allegations in the operative Complaint. Plaintiffs intend to file a motion to amend the Complaint in near future incorporating newly discovered evidence gathered through discovery. Armor has known that Plaintiffs will seek to file an amended complaint since, at latest, February, but nevertheless filed its Motion in a transparent attempt to foreclose Plaintiffs from using materials and testimony obtained through the ongoing discovery process to establish *Monell* violations.

## II.    FACTS[1]

On July 6, 2016, Swayzer and Laliah arrived at CJF, Swayzer was almost nine months pregnant and said pregnancy was progressing normally. (D.146, ¶3) Eight days later Swayzer

---

[1] For the purposes of this Response the Plaintiffs rely on the Third Amended Complaint (D. 146) as is required here, but assert that additional documentation and depositions received and conducted post January 19, 2018 have revealed additional facts pertinent to Plaintiffs' *Monell* claims.

gave birth to Laliah, by herself and without assistance, locked in a Maximum Security cell filled with garbage and filth. *Id.*

On July 7, 2016, Swayzer and Laliah were placed in the Mental Health Unit/Special Needs Unit, the reason being, "Medical." *Id.* at 42. Defendant Porlucas, an Armor employee, conducted an Inmate Mental Health Screening and documented: (a) Swayzer had been diagnosed as a bipolar schizophrenic; (b) Swayzer showed signs of mental retardation or development disabilities; (c) Swayzer was on mental health medications; (d) Swayzer was pregnant; and (e) Housing Disposition: "Special Needs." "Per Dr. Horton [Swayzer] to be moved to special needs (nurse gray aware)." *Id.* at 43. On July 7, 2016, Defendant Armor employee and Medical Director Horton advised that Swayzer should be moved to the Special Needs Unit and that Swayzer could be monitored there daily by medical and mental health staff. *Id.* at 44. Horton advised that Swayzer was "so far along in pregnancy" that she would be housed in the Special Needs Unit until the delivery of Laliah and could not be moved. *Id.* at 45.

On July 8, Defendant Dr. Negrette, an Armor employee, met with Swayzer, but failed to provide Swayzer any mental health treatment. *Id.* at 48. On July 8, 2016, Swayzer was moved from the Special Needs Unit, the reason being "Maximum Custody," because Swayzer was on "Max" due to a prior incident at CJF, despite her late term pregnancy and medical directives to the contrary. *Id.* at 49. Defendant Porlucas, an Armor, employee, reported, "Swayzer should have been housed in MHU [Mental Health Unit] or [Special Needs Unit], and not general population …. Swayzer was moved to the [Special Needs Unit] due to her bizarre behavior and, 'In no way was she capable of going into general population in her condition." *Id.* at 51. Between July 8, 2016, and July 14, 2016, Swayzer was not seen by a licensed obstetrician, gynecologist, or any medical doctor. *Id.* at 52. On July 9th, 10th, and 11th Swayzer received no

3

medical or mental health care. *Id.* at 53. On July 13, 2016, Armor Employee and Defendant Medical Doctor Turay Gulsen was scheduled to see Swayzer but failed to do so. *Id.* at 54.

At 6:55 A.M. on July 14, 2016, Laliah was declared dead in the same Maximum-Security unit at CJF where she was born approximately an hour earlier. *Id.* at 79. On the night of July 13, 2016, through the morning hours of July 14, 2016, CJF was dangerously understaffed. *Id. at 80.*

Pursuant to a Consent Decree, Milwaukee County was subject to a Court appointed medical monitor who documented a series of systematic failures in regard to health care provided to inmates at CJF. *Id.* at 93-95. Specifically, medical monitor Shansky documented that, "health care staffing shortages contribute to delays in access to care and deterioration in quality of care for prisoners; reductions in the number of correctional officers contribute to a dangerous lack of access to health care and inability to detect health crisis, and may have played a role in some of the recent deaths at the Jail; that continued turnover in health care leadership positions contribute to lack of oversite of quality of care; and that the electronic record has serious deficiencies and must be altered or replaced." *Id.* at 96. The systematic deficiency in medical staffing had been in place for over ten years. *Id.* at 97. Inmates with acute medical needs have suffered for days, failed to receive appropriate medical care or referrals and have then died at CJF. *Id.* at 100. Armor has been aware of these above-cited problems for years. *Id.* at 102. Armor was on notice of the unconstitutional conditions at CJF and failed to rectify these conditions. *Id.* at 104. The acts and omissions of Armor identified in this paragraph, constitute a course of conduct and failure to act amounting to deliberate indifference to the constitutional rights, of Swayzer and Laliah and those similarly situated, resulting in the deprivation of their constitutional rights. *Id.* at 105.

4

Federal and state law, as well as accepted corrections and medical practices at the time of the incident provided "fair warning" to Armor that their conduct was improper, incompetent, illegal, and in violation of Swayzer and Laliah's constitutional rights. *Id.* at 106. Armor's deliberate indifference to health care needs of inmates and complete failure to correct deficient medical care documented by Shansky caused **a culture of indifference in those employed by Armor at CJF, who implicitly understood based on leadership's ignorance that health care was not a priority and those who failed in that regard suffered no repercussions.** *Id.* at 107. As a result of Armor's culture of indifference, Swayzer and Laliah suffered injuries and damages. *Id.* at 109.

Armor failed to adequately train medical staff at CJF at all times material to the Complaint **on how to care for pregnant inmates, persons in their custody suffering from serious-acute-obvious medical conditions, and individuals in their custody in need of immediate medical attention, how to perform life-saving procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies,** how to provide medical care and how to conduct intake screenings, amongst other failures, which demonstrated a deliberate indifference on the part of Armor as to whether the failure to adequately train and supervise those responsible for the care of those housed at CJF would result in the violation of the constitutional, civil, and statutory rights of individuals housed at CJF, such as Swayzer and Laliah. *Id.* at 123-24. The failure to adequately train and supervise staff was a direct and proximate cause of the constitutional violations suffered by Swayzer and Laliah as well as Laliah's death and the injuries and damages suffered by Laliah and Swayzer. *Id.* at 125-26.

5

The policy, practice and/or custom of Armor of allowing untrained correctional officers to make decisions concerning the need for appropriate medical care and decisions on where to house inmates with serious medical needs was done in accordance with Armor's policies, practices, and/or customs condoning the use of such procedures to deal with all inmates. *Id.* at 128. Armor's policy of allowing untrained correctional officers to make decisions concerning the need for appropriate medical care and decisions on where to house inmates with serious medical needs became a *de facto* policy of Armor creating a culture of indifference, **which lead to a *de facto* policy of health care staff not being held accountable for their failure to provide medical care and/or call for medical care, further creating a *de facto* policy of Armor that health care staff were not required to provide a constitutional level of health care and/or follow policies and procedures in regards to medical care.**[2] *Id.* at 130. Armor had knowledge of these *de facto* policies and customs and were deliberately indifferent as to whether said polices and customs would change. *Id.* at 131. These *de facto* policies and customs were a direct and proximate cause of the constitutional violations suffered by Swayzer and Laliah as well as Laliah's death and the injuries and damages suffered by Laliah and Swayzer. *Id.* at 132-33.

Armor placed inmates who had been previously disciplined at CJF into max-custody immediately upon their return to CJF with no due process, regardless of the medical needs of the inmate. Armor provided little or no medical care to inmates being held on probation holds. Armor placed inmates with mental health issues in Maximum-Custody as opposed to providing those inmates with mental health treatment. These practices were all done in accordance with

---

[2] This was confirmed by Dr. May, Armor Medical Director, who testified that Armor does not require its employees to follow policies and procedures, the same are simply "guidelines." ("I expect our staff to be aware of the polices and use them as a guide in their practice. I don't want to say that they must follow the policy. They are more guidelines than absolutes.") (Lang Decl. ¶6, Ex.B)

6

Armor's policies, practices, and/or customs condoning the use of said procedures, which created a culture of indifference. *Id*. at 107, 130, 152, 159, 166. This culture of indifference resulted in a *de facto* policy of health care staff not being held accountable for their failure to provide medical care. This *de facto* policy of lack of accountability resulted in a level of health care that was unconstitutional and evidences a deliberate indifference to provide care and/or follow policies and procedures in regard to medical care. *Id.* at 150-52. Armor had actual and/or constructive knowledge of the policies, procedures and customs outlined above and were deliberately indifferent as whether said polices would change. *Id.* at 153.

## III.    PROCEDURAL POSTURE

Plaintiffs filed their Complaint on December 23, 2016. (D.1) The discovery process has been a difficult endeavor at best fraught with Defendants' motions for stays, protective orders, and/or sanctions – as well as hundreds of speaking objections, and directing witnesses at deposition to exhibits/documents during counsel's cross-examination. This matter has been stayed three separate times, all at the Defendants' request. The second and third stays lead to a halt of discovery and continuance of depositions, including depositions of Armor employees/agents.

On February 23, 2018, Armor filed a motion for a protective order asking that all discovery and proceedings be stated as a result of Plaintiffs' counsel informing Armor's counsel that Plaintiff intended to **request leave to amend the Complaint**. (D. 167). Armor's motion notes that the depositions of Defendant Dr. Gulsen and Defendant Maureen White, noticed for February 26, 2018 and March 16, 2018, respectively, "will need to be rescheduled". *Id.* To date the depositions of White and Gulsen still have not occurred despite multiple scheduling attempts. On February 26, 2018, Armor followed with a Motion to Stay Proceedings based on a Fifth

7

Amendment Right it never possessed. (D.171). Armor argued that the individual defendants needed new counsel because a conflict of interest arose **when Plaintiffs informed Armor that it would be filing an amended Complaint**. The Honorable Magistrate Duffin granted a stay from February 28, 2018 until March 30, 2018. (D.176). On March 29, 2018, the Honorable William Duffin denied Armor's Motion to Stay Proceedings indefinitely. (D. 185). Unfortunately, a month was lost and scheduled depositions of Armor executives, employees and agents were again delayed. Beginning in early April, counsel for all parties attempted repeatedly to coordinate deposition dates and most have resumed, but pertinent depositions of Armor's employees remain. Armor has known that Plaintiffs intend to seek leave to file amend the Complaint since at the latest, February 22, 2018. (D. 167).

Armor's representation that Monell discovery has been completed is a blatant misrepresentation. Plaintiffs have been attempting to schedule depositions of Armor employees/agents since fall of 2017. The only deposition of an Armor employee that proceeded prior to the filing of the current operative complaint was Defendant Fredrick Porlucas on October 9, 2017. (Lang Decl. ¶4, Ex.A) Depositions of John May, Armor Medical Director, and Bruce Teal, Armor CEO, occurred on May 14 and 15, 2018, three business days prior to the filing of Armor's motion. (Lang Decl. ¶5, Exs. B,C) The deposition of Defendant Gina Negrette, the psychiatrist assigned to Swayzer, was conducted on May 18, 2018, the same day this motion was filed. (Lang Decl. ¶7, Ex.D) The Deposition of Karen Horton, Medical Director at CJF, was conducted May 30, 2018, twelve days after the filing of this motion – the parties have not received the transcript of Horton's deposition to date. The Deposition of Armor employee RN Mia Bruno occurred yesterday, June 14, 2018. The deposition of Nurse Practitioner and Defendant Karen Meine occurred today. The Deposition of Dr. Turay Gulsen, Armor employee

and Defendant was scheduled for June 18, 2018, but was again cancelled by the defendants. Additional depositions of Armor employees, such as Defendant Dr. White, the Mental Health Director at CJF, line nurses and social service workers with direct contact with Swayzer and Liliah have yet to be scheduled.

Further, on December 8, 2017 Armor moved for a protective order in regard to death investigations of those who died while in custody at CJF, "because there are no other deaths involving pregnancies at CJF since May 11, 2013." (D.112). On January 4, 2018, the Honorable William Duffin ordered Armor to turn over all death investigations at CJF within 30 days. (D.141). Armor produced the death investigations after Plaintiffs filed their current operative complaint. Plaintiffs informed defense counsel in February that an amendment of the Complaint was going to be necessary, but it is unwise to do so until the necessary discovery can be completed.

The bottom line is that the parties have completed a significant amount of discovery, including *Monell* issues since the filing of the operative Complaint, and there remains significant discovery to be completed.

## IV.     STANDARD

The Court reviews a Motion for Judgment on the Pleadings using the same standard as it would on a motion to dismiss under Rule 12(b)(6). *Hoskin v. City of Milwaukee*, 994 F. Supp. 2d 972, 976 (E.D. Wis. 2014). The Court must treat all of plaintiff's factual allegations as true and draw all reasonable inferences in favor of the Plaintiff. *Id*. Fed. R. Civ. P. 8(a)(2) simply requires a plaintiff must provide a "short and plaint statement of the claim showing that [he] is entitled to relief." As the Supreme Court further clarified in *Twombly* and *Iqbal*, a complaint must sufficiently state a claim to relief that is plausible on its face and provide adequate facts to give

defendants notice of what the claim is and the grounds on which it relies upon. *Ashcroft v. Iqbal*, 556 U.S. 622, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

Simply put, the pleading standard determined by the Supreme Court in *Twombly* and *Iqbal* should apply to Plaintiffs' *Monell* Claims. While boilerplate allegations are insufficient to survive a Rule 12(c) motion, the *Hoskins* Court clarified the standard applicable to *Monell* claims in the context of a civil rights action stating:

> The Court does not apply a heightened pleading standard to civil rights claims, including *Monell* claims. *See, e.g., Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) ("In a civil rights case alleging municipal liability, a federal court may not apply a heightened pleading standard more stringent than the usual Rule 8(a) pleading requirements.") (*citing Leatherman*, 507 U.S. at 165). *See also McCormick*, 230 F.3d at 323 (*also citing Leatherman*, 507 U.S. at 164); *Latuszkin*, 250 F.3d at 504.

994 F. Supp. 2d 972, 977 (E.D. Wis. 2014).

There is no heightened pleading requirement for *Monell* claims. *Id*.

## V.   ARGUMENT

The Plaintiffs' *Monell* claims address multiple widespread unconstitutional practices, policies and customs specifically addressing Armor's: (a) failure to train and supervise its staff, (b) failure to adequately staff CJF with medical personal; (c) failure to provide medical care to three specific classes of inmates; and (d) and failures to classify or properly house specific classes of inmates based on their medical and health needs.  Plaintiffs allege that these *de facto* polices lead to a *de facto* policy and culture of indifference, by which health care staff was not required to follow policy and procedure or provide constitutionally adequate care. These specific *de facto* policies are a direct and proximate cause of Swayzer and Laliah's constitutional

deprivations and damages. These specific and narrowly identified allegations surpass the pleading standard for *Monell* Claims.

Armor ignores specifically pled facts that it had notice of unconstitutional policies, practices and customs that were a direct cause of Plaintiffs' Constitutional injuries. Furthermore, discovery and depositions are underway and still ongoing and directly relate to Plaintiffs' *Monell* claims. Plaintiffs intend to amend their complaint to include evidence discovered in the past few weeks and months.

### A. ARMOR'S MOTION FOR JUDGMENT ON THE PLEADINGS IS UNTIMELY AS DISCOVERY REMAINS OPEN AND ONGOING RELATED TO PLAINTIFFS' MONELL CLAIMS.

The timing of Armor's 12(c) motion raises doubt as to whether it should even be considered by the Court. The purpose of a 12(c) Motion is to dismiss claims that have absolutely no chance of success prior to costly discovery taking place. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-558 (2007). As a result, courts have been reluctant to even consider motions to dismiss under 12(c) once significant discovery has taken place. *See Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40, 45-46 (1st Cir. 2012) (court of appeals reversed 12(c) dismissal stating that "while district courts enjoy broad discretion in managing their dockets, we think that, once the parties have invested substantial resources in discovery, a district court should hesitate to entertain a Rule 12(c) motion that asserts a complaint's failure to satisfy the plausibility requirement" in an appeal of dismissal that occurred after nine months of discovery); *AM Gen. LLC v. Demmer Corp.*, 2013 U.S. Dist. LEXIS 136360, at *3 (N.D. Ind. Sep. 23, 2013) (district court denied 12(c) motion to dismiss filed a year after the Complaint was filed and almost nine months after the scheduling order was entered stating, 'the parties have served scores of document requests, produced tens of thousands of documents, issued and answered written

discovery requests, and taken and defended depositions of AMG and Demmer witnesses); *Perez v. Oak Grove Cinemas, Inc.*, 2014 U.S. Dist. LEXIS 62254, at *10 (D. Or. May 5, 2014) (Defendant's 12(c) motion denied with court stating, "had Defendants brought this motion at an earlier stage in litigation, I may have granted the motion on the basis of the plausibility standard. However, because there has been substantial discovery, the underlying rationale, or "core purpose" of the plausibility standard has already been satisfied. In cases where an answer has been filed, there has been preliminary injunction motion practice, and discovery has progressed to include depositions, the application of the *Iqbal/ Twombly* plausibility standard is inappropriate on a Rule 12(c) motion."). That is exactly what has occurred here. Substantial discovery on *Monell* has already been completed and substantial discovery related thereto remains.

Armor's motion relies on cases where 12(c) motions were granted, but dismissals were without prejudice and leave to amend complaints were allowed. *See, for e.g., White v. Chicago*, 1991 U.S. Dist. LEXIS 13869 at 16 (N.D. Ill. Sep. 23, 1991) (court dismisses *Monell* claims without prejudice and allows leave to amend); *Mikolon v. City of Chicago*, 2014 U.S. Dist LEXIS 171318 at 13-14 (N.D. Ill. Dec. 11, 2014) (12(b)(6)) (court dismisses *Monell* claims without prejudice and allows leave to amend); *Peacock v. Rigsby*, U.S. Dist LEXIS 46994 (N.D. Ill. Apr. 7, 2016) (Plaintiff's *Monell* claims dismissed without prejudice). The procedural posture of Armor's cases, and its knowledge since February that Plaintiffs intended to amend as evidence continued to develop, is indicative of the frivolity of Armor's motion practice.

At this point in the pleading stage, the Plaintiffs intend to request leave to amend and add additional allegations base on newly obtained evidence to their *Monell* claims. All parties knew that the Plaintiffs intended to amend the Complaint after depositions of certain defendants. In

fact, Armor immediately sought a stay when Plaintiffs counsel informed it that Plaintiffs intended to amend the Complaint. However, it is unclear why the parties and the Court should spend the time arguing pleading standards when the case is in the middle of discovery and Armor will have the opportunity to move for dismissal of the *Monell* claims on summary judgment.

Armor asserts that Plaintiffs have completed discovery regarding their *Monell* claims; and therefore, Armor is entitled to judgment on the pleadings. Relying on *Foy v. City of Chi.*, Armor insinuates that no further discoverable information regarding Plaintiffs' *Monell* claims can or will be alleged as discovery on this matter has concluded. 2016 U.S. Dist. LEXIS 63346 * 33 (N.D. Ill. May 12, 2016). The *Foy* Court allowed plaintiff to amend six times, with the final amendment occurring after additional discovery was received. *Id.* at *3. At present, Plaintiffs have amended three times (only one amendment incorporated significant substantive changes) and have not amended since only one of Armor's employee's deposition was completed. The conclusion of discoverable information is a key principle in granting a judgment on the pleadings. *See Corley v. Detroit Bd. of Ed.*, 470 Mich. 274, 277, 681 N.W.2d 342, 345 (2004) (per curiam) (holding that a motion for judgment on the pleadings should be granted only 'if no factual development could possibly justify recovery"). Such is not the case here.

Armor's contention that discovery regarding Plaintiffs' *Monell* claims has been completed is false. On May 15, 2018, Plaintiffs deposed Armor Medical Director John May. Within 72 hours of the completion of that deposition, Armor filed this motion for judgement on the pleadings and argues *Monell* discovery was done. Plaintiffs did not receive Armor deposition transcripts until after this motion was filed and deposition of Armor's employees/agents continues. The testimony contained in depositions of key Armor employees provided and will provide Plaintiffs with specific information regarding their *Monell* claims. Plaintiffs most recent

Amended Complaint was filed on January 19, 2018. (D. 146, Third Amended Complaint). Post Janaury 19, 2018, months of discovery and depositions have occurred including the aforementioned depositions of Armor personnel. To state the obvious, Plaintiffs Third Amended Complaint could not possibly have been incorporated or be based on the new evidence and testimony relating to Plaintiffs *Monell* claims elicited over months of ongoing discovery.

As will be articulated more clearly in Plaintiffs' forthcoming Motion for Leave to Amend, the discovery obtained in Armor depositions is significant to Plaintiffs' *Monell* claims. Armor improvidently undertakes to bludgeon Plaintiffs' *Monell* claims with is most recent filing just three days after depositions of key management level personal were conducted and prior to the deposition of several other employees/agents including Horton, the Medical Director at CJF. Granting judgment at this stage, would be an affront to justice considering the timeline of discovery and the Armor's multitude of efforts to stop and/or limits discovery over the course of this litigation. Plaintiffs intend to dismiss defendants, add additional defendants, and add more specific factual allegations directly related to their *Monell* claims based on recent depositions and discovery. Fed. R. Civ. P. 15(a)(2) dictates that leave to amend should, "be freely given when justice so requires" and determining a Motion for Judgment on the Pleadings while discovery remains open until November, and is currently underway, is an illogical request. Despite all of the above, Armor insisted on filing the present motion for judgement on the pleadings.

### B. PLAINTIFFS HAVE PLED ADEQUATE FACTS THAT REASONABLY INFER SWAYZER AND LALIAH SUFFERED DEPRIVATIONS OF CONSTITUTIONAL RIGHTS.

To allege a *Monell* claim, "plaintiff must plead factual content that would allow the Court to draw a reasonable inference that: (1) he has suffered the deprivation of a constitutional right; and (2) that an official custom or policy of the City caused that deprivation." *McCauley v. City of*

*Chi.*, 671 F.3d 611, 616 (7th Cir. 2011); *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694-95 (1978); *See Bohannon v. City of Milwaukee*, 998 F. Supp. 2d 736, 743 (E.D. Wis. 2014). Plaintiffs have unequivocally alleged facts sufficient to raise the inference that they have suffered the deprivation of a constitutional right under the first element. Plaintiffs allege:

- That Defendants were aware that Swayzer was approximately nine months pregnant with Laliah when she entered MCJ on July 6, 2016. (D. 146 ¶ 41);

- That Swayzer was screened by Armor employee Porlucas classifying her housing disposition as "Special Needs" and Porlucas further noted Swayzer's bipolar and schizophrenia disorder, her mental or development disabilities, her current prescribed health medications, and her pregnancy status. *Id.* at ¶43;

- That Dr. Horton advised Swayzer would be house in the Special Medical Unit until delivery of Laliah. *Id.* at ¶ 45;

- That on July 8, 2016, Swayzer was moved to Maximum Security and out of the Special Medical Unit. *Id.* at ¶ 49;

- That between July 8, 2016 and July 14, 2016, Swayzer was not seen by a licensed obstetrician, gynecologist, or any medical doctor. *Id.* at ¶ 52;

- That on July 9th, 10th, 11th, and 13th, Swayzer received no medical or mental health care. *Id.* at ¶¶ 53, 54;

- That on the morning of July 14, 2016 Swayzer went into labor and began to experience intense contractions with no assistance in a Maximum-Security cell. *Id.* at ¶ 56;

- That at approximately 5:00 A.M. Swayzer delivered Laliah in extreme pain, covered in blood, after birth and her own feces, with no medical assistance of any sort. *Id.* at. ¶ 62;

- That Swayzer and Laliah received no medical care or assistance for nearly an hour after Laliah was born. *Id.* at ¶ 64; and

- That finally when Laliah was removed from the cell she did not appear to be breathing and was eventually declared deceased. *Id.* at ¶ 77-79.

The Plaintiffs allege sufficient facts evidencing violations of clearly established constitutional rights, specifically due process violations under the Fourth and Fourteenth Amendments, and cruel and unusual punishment under the Eight and Fourteenth Amendments to

15

the United States Constitution in regard to the Defendants failure to provide adequate medical care resulting in the death of a baby. *Id*. at ¶ 108. Plaintiffs alleged how these violations occurred, described the ways Swayzer and Laliah were subjected to cruel and unusual punishment and suffered unconstitutionally inadequate medical care, identified doctors, nurses, other medical professionals, correctional officers and other CJF and Armor employees present and responsible for these violations. Accepting the factual matters as true, the Plaintiffs clearly state a claim for relief that is plausible on its face and satisfying *Iqbal's* pleading requirements. 556 U.S. at 678. Armor does not assert otherwise.

### C. PLAINTIFFS HAVE PLED AND IDENTIFIED WIDESPREAD ARMOR POLICIES, PROCEDURES AND CUSTOMS THAT DIRECTLY LED TO THE VIOLATION OF SWAYZER AND LALIAH'S CONSTITUTIONAL RIGHTS.

The crux of Armor's argument focuses on the second element of a *Monell* claim requiring allegations that an official custom or policy caused the constitutional deprivation alleged. *Bohannon*, 998 F. Supp. 2d 736, 743. Armor's arguments boil down to: 1) Plaintiffs *Monell* claims are overbroad; and 2) Plaintiff failed to plead causation. *De facto* policies, procedures, and customs have been identified with sufficient specificity to meet the *Monell* pleading standard.

#### 1. Plaintiffs have identified and plead *de facto* Armor policies, procedures and customs with sufficient particularity to place Armor on notice of the alleged wrongful policies, practices and customs.

Courts in the 7th circuit have allowed *Monell* claims to proceed "even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing." *Doe v. Roe*, 2013 WL 2421771, at *6 (N.D. Ill. June 3, 2013) (*quoting Riley v. Cnty of Cook*, 682 F. Supp. 2d 856, 861 (N.D. Il. 2010)) (internal quotation marks omitted). Regardless, Plaintiffs' claims go far beyond broad conclusory policy

16

allegations. Plaintiffs distinctly identify five separate *de facto* Armor policies, customs, or procedures with specificity and supporting facts. These five practices of deficient medical care cultivated a culture of indifference for those employed by Armor. (D. 146 at ¶¶ 107, 130, 137, 145, 152, 159, 166). Each of the five individual policies or practices are evidence of a greater overall practice and culture of indifference to specific classes of inmates. At this stage in the proceedings, all Plaintiffs must do is raise a reasonable expectation that discovery will reveal evidence supporting their claims. *Rivera v. Sheriff of Cook Cty.*, No. 13 CV 4493, 2014 U.S. Dist. LEXIS 54871 *15 (N.D. Ill. Apr. 21, 2014). Plaintiffs have done so.

Plaintiffs plead that Armor failed to adequately train medical staff at CJF on how to care for pregnant inmates, care for persons suffering from serious-acute-obvious medical conditions, and how to conduct medical screenings among other failures. *Id*. at ¶¶ 123-124. Swayzer, a woman with a late-term pregnancy, who was diagnosed with mental health issues and a learning disability, was screened at intake by Armor employees. *Id*. at ¶ 43. Armor and named defendants determined Swayzer's housing disposition to be "Special Needs" but she was removed within one day. *Id*. at ¶ 49. Porlucas, an Armor employee, stated Swayzer should have been housed in the Mental Health Unit or Special Needs unit and not in general population and that she was **"in no way capable of going into general population in her condition."** *Id*. at ¶51. Despite this, Armor and other named defendants allowed a nearly nine month pregnant woman and diagnosed schizophrenic to be removed form a special medical unit and placed in Maximum custody. *Id*. at ¶ 49.

Swayzer's unique conditions exposed how woefully inadequate Armor staff was trained to deal with a pregnant, schizophrenic inmate. Due to, and consistent with, the custom of training inadequacies Armor was deliberately indifferent to Swayzer who received almost no medical

care and was housed in a unit completely unreasonable for an inmate in her condition. *Id.* at ¶¶ 53-54. Armor ignores these well-pled facts. Armor cites *Hardy v. Wexford Health Sources, Inc*, in which *Monell* claims were alleged, specifically failure to train on how to "process and treat inmates with serious medical conditions." No. 12 C 6554, 2015 U.S. Dist. LEXIS 43411 *45 (N.D. Ill. Apr. 2, 2015). The Court dismissed this claim because Hardy failed to state any supporting facts of the policy in question. *Id.* at *46. Swayzer's Complaint is easily distinguishable due to the supporting facts cited.

Plaintiffs clearly assert Armor's failure to provide Swayzer and Laliah with medical care was a result of Armor's ineffective training of staff to handle the medical and health issues presented by a late term pregnant woman or an inmate with mental health issues. (D. 146 at ¶¶ 107, 123-126). These allegations, not the unspecified policy assertions Armor asserts, are distinguishable from the overbroad policies identified in Armor's papers. The exact same arguments can be made for Plaintiffs' remaining identified *de facto* policies, practices and procedures.

Plaintiffs allege and describe with specificity, Armor policies, practices, and/or customs of allowing untrained correctional staff to make decisions concerning the need for appropriate medical treatment and the housing of inmates with medical needs. *Id.* at 128. More specifically, Plaintiff identifies that Armor allowed untrained correctional officers to make housing decisions concerning the placement of patients with serious medical concerns, specifically those that are pregnant. *Id.* at ¶130. Armor, despite Swayzer's mental health and medical conditions, allowed Swayzer to placed in Max-Custody where she received essentially no medical treatment due to Armor's policy and custom of allowing untrained correctional staff to determine the housing of inmates with acute medical needs. *Id.* at ¶¶ 43-45, 49, 51.

18

Plaintiffs allege and describe with specificity, Armor's policies, practices and customs of placing inmates who had been previously disciplined at CJF into Max-Custody immediately upon their return, with no due process, regardless of the medical needs of the inmate. *Id.* at ¶ 152. This is a specific policy, practice and custom that prioritizes an inmate's previous disciplinary status over their severe and acute medical needs. Plaintiffs' fourth *Monell* claim against Armor alleges *de facto* policies of providing little to no medical care to inmates being held on probation holds. *Id.* at ¶157. This is a policy or practice relating to inmates who are generally incarcerated for only a short period of time. Plaintiffs allege that this policy or custom provides little or no medical care to inmates held on probations hold resulting in deliberate indifference to the constitutional rights of such inmates. *Id.* at ¶ 158. Plaintiffs' fifth *Monell* allegation against Armor refers to policies of placing inmates with mental health issues in Maximum custody as opposed to providing those inmates with mental health treatment. *Id.* at ¶¶164-65. Armor ignores these allegations.

Armor cites a series of cases describing broad, conclusory allegations found to be inadequate by courts, but such cases are not analogous to the facts and allegations at hand. Armor identifies the court's decision in *Chaparro v. Powell* rejecting *Monell* Claims described as a "code of silence," or "city-wide acceptance of policed misconduct" as overly broad. Case No. 07 C 5277, 2008 U.S. Dist. LEXIS 834, at *5-6 (N.D. Ill. Jan. 2, 2008). The court found that such references to a "code of silence" encompass such a wide spectrum of alleged misconduct that Chaparro could not establish a discrete policy or custom. *Id.* at *7. Plaintiffs in this case do not merely allege blanket failures to train, house inmates, or provide medical care. Plaintiffs have narrowed alleged Armor's practices as they relate to pregnant inmates, inmates diagnosed mental health concerns, inmates with disciplinary histories, and inmates held on probation holds. All

19

these specific issues identified in Plaintiffs' complaint allege individual *de facto* policies that lead to and caused the deliberate indifference of Plaintiffs' constitutional rights. Combined, these individual practices represent evidence of an overall culture cultivated by Armor of indifference that lead to multiple failures and the constitutional violations suffered by Swayzer and Laliah.

Plaintiffs' *Monell* claims and supporting facts are tailored to the specific *de facto* policies that subjected a pregnant mother of nearly nine months, held on a probation hold, with mental health issues to inadequate-unconstitutional health care and violations of due process and cruel and unusual punishment. There can be no doubt that Plaintiffs have specifically identified *de facto* policies, practice, procedures, and customs that resulted in violations Plaintiffs' Constitutional rights.

> **2.     Plaintiffs alleged multiple instances of similar unconstitutional conduct to allow this Court to infer Armor deliberately adopted the unconstitutional and widespread practices pled.**

Plaintiffs Complaint alleges facts concerning a Consent Decree the MCSO and MC entered into with a class of plaintiffs (current and future inmates of CJF) in Milwaukee County Circuit Court Case No. 1996-CV-1835, which was approved by Milwaukee County Circuit Court Judge Thomas Donegan on June 19, 2001 and is still in effect. (D. 146 at ¶ 90). The Consent Decree had two components: (1) Population control; and, (2) Medical care. *Id*. at ¶ 91. The Consent Decree required that MC provide adequate, well-trained staff to provide health care to inmates and that thorough screening of inmates for physical and mental health conditions be conducted. It further set out requirements for physical examinations, dental care, women's health, sick call, mental health, chronic care, and emergencies. *Id*. at ¶92. A medical monitor, Shansky, was appointed by the court to supervise compliance. *Id*. at ¶94. During his tenure, Shansky documented a series of systematic problems in CJF's healthcare system. Staffing deficiency lead

Case 2:16-cv-01703-BHL     Filed 06/15/18     Page 20 of 27     Document 207

to deficient medical services and allowed untrained corrections officers to improperly substitute their judgment for that of medical professional. *Id*. at ¶ 98.

The Complaint identifies specific findings of deficient medical care that placed MC and Armor on notice of such deficiencies, specifically: inmates with acute medical conditions have suffered for days, failed to receive appropriate medical care or referrals and have then died at CJF. The Consent Decree is still in force and the above listed failures were never corrected although Armor have been aware of the problems for years. Armor had a duty to ensure that reasonable measures were taken to provide for the medical care of inmates at CJF. Armor was on notice of the unconstitutional conditions at CJF, and the problems identified by Dr. Shansky, yet failed to rectify these conditions. The above acts and omissions of Armor, constitute a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety, and welfare of Swayzer and Laliah and those similarly situated, resulting in the deprivation of their constitutional rights. *Id*. at ¶¶ 100-105.

Plaintiffs additionally cite three cases all occurring in 2016 wherein inmates failed to receive adequate medical care despite exhibiting obvious symptoms of either mental illness or health issues when they arrived at CJF under Armor's watch. *Id*. at ¶¶ 86 – 89. The first instance occurred on April 24, 2016, when Terrill Thomas, despite suffering from mental illness, was housed in a Maximum-Security Unit at CJF and received no medical treatment or assistance and eventually died in his cell. The next incident occurred on August 28, 2016, resulting in Kristina Fiebrink's death. *Id*. at ¶ 88. Fiebrink, despite Armor's awareness of her addiction, intoxication, and health issues, was never placed on preventative detoxification protocol, seen or assessed by a medical practitioner, provided withdrawal medication, or placed on a heightened observation level while at CJF. *Id*. Fiebrink died within four days of entering CJF. *Id*. Finally, Michael

Case 2:16-cv-01703-BHL    Filed 06/15/18    Page 21 of 27    Document 207

Madden suffered from grave medical conditions while he was arrested and taken to CJF. *Id.* at ¶ 89. Despite these serious medical conditions, Madden received little to no health care while at CJF, suffered a seizure and died on October 28, 2016. All three incidents involved inmates with serious and apparent medical issues which were ignored by Armor resulting in the loss of life.

Post-incident conduct is relevant to establish the existence of a policy or procedure that may have predated the specific incident in question. *Cox v. Glanz*, No. 11-CV-457-JED-FHM, 2014 U.S. Dist. LEXIS 29522 * 37 (N.D. Okla. Mar. 7, 2014) (rev'd on other grounds). The Ninth Circuit has found that post-incident conduct may be relevant to prove a policy or custom "[w]hen a county continues to turn a blind eye to severe violations of inmates' constitutional rights — despite having received notice of such violations — a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference." *Henry v. Cty. of Shasta*, 137 F.3d 1372 (9th Cir. 1997). Plaintiffs do not identify these incidents to show causation but to simply show Armor was aware widespread unconstitutional practices existed prior to and after Plaintiffs' Constitutional deprivations.

At this stage in the proceedings with discovery still open, "[r]equiring more than two instances of similar constitutional deprivations caused by Armor polices, practices and customs 'would make it nearly impossible for plaintiffs to plead *Monell* claims, because they would need to plead specifics about facts known only to the defendants (and perhaps other victims not known to the plaintiffs).'" *Nettles-Bey v. Cars Collision Ctr., LLC*, 2013 WL 317047, at *9 (N.D. Ill. Jan. 25, 2013) (*citing Warren v. Briggs*, 2009 WL 174996, at *5 (C.D. Ill. Jan. 21, 2009)). Plaintiffs have gone above and beyond the pleading requirement at this stage in the proceedings. By identifying known concerns in the Consent Decree and three similar incidents in

CJF, Plaintiffs have alleged sufficient instances of unconstitutional conduct to support their claims of unconstitutional widespread *de facto* policies against Armor.

## D. PLAINTIFFS ALLEGE A DIRECT CAUSAL LINK BETWEEN ARMOR'S WIDESPREAD PRACTICES AND CUSTOMS AND SWAYZER AND LALIAH'S CONSTITUTIONAL DEPRIVATIONS.

The Plaintiffs have plead numerous allegations throughout the Complaint that put Armor on notice that its *de facto* policies, procedures, customs and culture of indifference were a driving force behind the Plaintiffs' constitutional injuries. In arguing that the Plaintiff did not adequately plead causation, Armor simply nitpicks, misconstrues and ignores factual allegations in the Complaint and, in doing so, misses the point. The Complaint clearly alleges that Swayzer was placed in the Medical Health Unit/Special Needs Unit of CJF because she was in need of medical care for several reasons, including that she was nine months pregnant. (D. 146., ¶ 42-43.) Swayzer and Laliah were moved to a maximum-security cell shortly thereafter where they received virtually no medical care for six days. *Id.* at 52-54. On the sixth day, Swayzer gave birth to Laliah by herself in a maximum-security cell filled with garbage and filth. *Id.* at 3. Laliah died prior to Swayzer or Laliah receiving any medical assistance.

One of the driving forces behind Swayzer and Laliah being deprived of their constitutional rights is that Swayzer and Laliah were moved from the Special Needs Unit to Max-Custody. In spite of Swayzer and Laliah's obvious need for continuing medical attention, no one from Armor asked where they were or why they were moved, despite medical orders. No one from Armor provided her medical care when she was in maximum security. No one from Armor did anything to ensure that either Swayzer or Laliah was taken care of at all, even Armor's intake process and medical orders noted several medical reasons that Swayzer needed to be in the Special Needs Unit, including mental health needs and that she was nine months

pregnant. The complete lack of care provided to Swayzer and Laliah lasted for over a week consistent with Armor's custom of indifference. Armor does not acknowledge any of these factual allegations in their argument.

Plaintiffs also allege Armor failed to adequately train its employees, including on how to care for pregnant inmates, persons in their custody suffering from serious-acute-obvious mental conditions, and individuals in need of immediate medical attention. This failure to train resulted in a culture of deliberate indifference that resulted in Armor's failure to provide constitutional adequate medical care to Swayzer and Laliah. It also must be noted that the Plaintiff does not allege that only one act by one Defendant resulted in the constitutional harm to the Plaintiff. The failure to provide medical treatment was the result of a failure to act appropriately by several Defendants over the course of several days and within the larger context of other inmate deaths in which Armor employees provided little or no medical care over longer periods of time.

As Armor does not acknowledge any of this was plead, it is unsurprising that the caselaw Armor cites is inapplicable to the Plaintiffs' Complaint as pled. Armor cites to a number cases with inapplicable *Monell* standards, including: i) negligent hiring cases; ii) cases that stand for the proposition that *Monell* liability does not attach to an employer for acts of an employee under the theory of *respondent superior*; iii) 'code of silence' cases in which plaintiffs simply alleged that *Monell* liability applied because the code of silence surrounding a police department resulted in a general lawlessness among police officers and courts used proximate cause for the basis to dismiss claims; and iv) inadequate care cases based on cost-cutting policies. These cases are easily distinguishable. Plaintiffs are not arguing any of these legal theories apply, and the broad theories in the cases cited by Defendants that preclude findings of probable cause do not apply here.

24

Pleading causation under *Monell* is straightforward and the Plaintiffs have more than adequately pled facts to support a *Monell* claim. The basic question is "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Failure to train employees results in *Monell* liability when that failure to train amounts to deliberate indifference to the rights of persons with whom the employees come into contact. *Id.* at 388. This is consistent with the holding in *Monell* that § 1983 liability attaches to a municipality or corporation when its policies are the "moving force behind the constitutional violation." *Id.* at 389.

The Seventh Circuit's analysis of in *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004) is instructive of how *Monell* causality applies to health care providers in a correctional setting. The facts in *Woodward* are much more detailed than the present case because the Seventh Circuit was deciding a post-judgment motion. In that context, the Seventh Circuit affirmed the district court's upholding of a jury verdict finding *Monell* liability against a medical and mental health care provider at a correctional facility in a case in which a suicidal inmate hung himself in his cell.

The Plaintiff in *Woodward* committed suicide after he was identified as suicidal by the mental health care provider and no action was taken to ensure that suicide prevention measures steps were taken. *Id.* at 925. This failure to take suicide prevention measures was within the context of other issues with the mental health care provider's conduct in the correctional facility, including failure by staff to follow several identified policies and procedures. *Id.* at 922-24.

The court found a direct causal link between the established policy of the health care provider's and the Plaintiff's suicide because the entity's custom inflicted the injury on the Plaintiff. *Id.* at 928. The custom was essentially the indifference of the health care provider

25

toward inmate health as shown through various facts which played out in the Plaintiff's case. At intake the Plaintiff was identified as suicidal and the mental health care provider did not take any steps to prevent the suicide. Not just one employee, but multiple employees, were inadequately trained and deliberately indifferent toward the Plaintiff's constitutional right to adequate medical care. *Id.*

The same causation exists here. There is a series of similar bad acts here within the context of other inmate deaths. Then there is the specific context of the Plaintiffs' situation in which failure to provide even basic health services for several days caused the constitutional harm to the Plaintiffs. The failure to provide medical care does not fall upon one bad actor. It is the result of several people failing to act within a culture of deliberate indifference. All of this is pled within the four corners of the Complaint with adequate specificity. For these reasons, Armor's argument that the Plaintiff has not adequately pled causation must fail.

## VI.     CONCLUSION

For the reasons stated herein, the Plaintiffs respectfully request that Armor's Motion for Judgment on the Pleadings be denied. If the Court does grant this Motion, Plaintiffs respectfully request that dismissal be without prejudice.

Dated at Wauwatosa, Wisconsin this 15th day of June, 2018.

Respectfully Submitted,
Judge, Lang & Katers, LLC

By:  s/ Christopher P. Katers
      Christopher P. Katers (SBN: 1067557)
      David J. Lang (SBN: 1001218)
      Kevin Raasch (SBN: 1100196)
      JUDGE LANG & KATERS, LLC.
      8112 W. Bluemound Road, Ste. 101
      Wauwatosa, WI 53213
      P: (414) 777-0778
      F: (414) 777-0776

26

ckaters@jlk-law.com
kraasch@jlk-law.com
dlang@jlk-law.com
Attorneys for Plaintiffs
-and-

Gende Law Office, S.C.
By: s/ James J. Gende II
James J. Gende II (SBN: 1030921)
GENDE LAW OFFICE, S.C.
N28W2300 Roundy Dr., Ste. 200
Pewaukee, WI 53072
P: (262) 970-8500
F: (262) 970-7100
JGende@jamesgendelaw.com
Attorneys for Plaintiffs