United States District Court for the
Eastern District of Wisconsin
Milwaukee Division

---

The Estate of Laliah Swayzer;
Shade Swayzer; Diane Ruffin; and Charlene Ruffin,

     Plaintiffs;

  v.

David J. Clarke, Jr., Richard E. Schmitt;
C.O. Love; C.O. Brooks; John Does 1-10,
Milwaukee County, Armor Correctional
Health Services, Inc.; John Does 11-20,
ABC Insurance Company; and XYZ
Insurance Company,

     Defendants

Case No.: 16-cv-1703

---

# Expert Witness Report of Timothy P. Ryan

1

# Table of Contents

I.    Acknowledgement.................................................................................. 4

II.   Introduction...................................................................................... 5

III.  Summary of Opinions....................................................................... 6

IV.  Summary of Facts:

         General Overview..........................................................................10
         Case Overview (Reconstruction)………………………....…..........12

V.   Opinions:

    1.  Primary Opinions: ..........…………………………………………19

    2.  Secondary Opinion #1: MCSO/CJF/Armor's intentional, reckless,
       and deliberate acts regarding the care of Ms. Shade A. Swayzer,
       and subsequent death of her child, Liliah Swayzer over the period
       July 6, thru July 14, 2016 .................................................................24

    3.  Secondary Opinion #2: The MCSO and Armor, as the Health
       Care Contractor, have been out of compliance with
       "Best Practices" and correctional standards, as well as
       MCSO/DSB Policy and Procedure......................................................27

    4.  Secondary Opinion #3: The MCSO Corrections and Armor
       medical/mental health staff training is insufficient and not
       properly sustained...............................................................................32

    5.  Secondary Opinion #4: The MCSO and Armor do not follow
       their policies, procedures, and practices and, when updates are
       needed, they are not timely.................................................................35

    6.  Secondary Opinion #5: The MCSO and Armor failed to provide
       proper supervision of staff operations nor provide sufficient
       auditing of practices to insure adequate compliance with policy
       and procedure.....................................................................................36

    7.  Secondary Opinions #6: The MCSO only addressed some
       very limited mitigating actions, after the death of Liliah
       Swayzer and the violation of the civil rights of Ms. Swayzer,
       indicating that the intentional and deliberate dereliction of their

Case 2:16-cv-01703-PP-WED   Filed 08/14/18   Page 2 of 65   Document 218

professional, legal, and national expectations duties were
continuing.........................................................................................37

VI.    Conclusion...........................................................................................39

VII.   Appendix

Appendix A: Vitae..................................................................... 41
Appendix B: Resume...................................................................42
Appendix C: Methology...............................................................52
Appendix D: List of Acronyms Use.................................................53
Appendix E: Documents Received/Reviewed............................54
Appendix F: Performance-Based Standards for Adult Local
Detention Facilities.............................................57
Appendix G: Listing of Previous Cases (Expert Witness Past
Involvement) ...............................................................63
Appendix H: Fee Schedule for Expert Witness Services...................64

3

# I. Acknowledgement

Pursuant to Fed. R. Civ. P. 26(a) (2), I, Timothy P. Ryan, submit this report on the above referenced case. It contains a complete statement of expressed opinions and the basis and reasons therefore; the data and other information I considered in forming my opinions; my qualifications, including a list of publications authored within the preceding ten years; the compensation for the study and testimony; and a listing of other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

4

## II.    Introduction

***The Estate of Laliah Swayzer, et al, Plaintiffs, -against- David Clarke, Jr., et al,
Defendants (United States District Court, Eastern District of Wisconsin, Case No.:
16-cv-1703).***

I was retained on June 5, 2018 by Counsel to the plaintiffs, to serve as an expert
witness in the above entitled federal civil rights case brought against David Clarke,
Jr., et al.

Plaintiff alleges the Defendants' acts, inactions, and/or omissions resulted in the death of
Laliah Swayzer, whose Mother was confined at the Criminal Justice Facility for the
County of Milwaukee under the authority of Sheriff David Clarke, Jr., and the
consequent denial of her civil rights.

I was retained to assess this matter from the perspective of a long-time correctional
professional. I have endeavored to provide an accurate assessment of the materials
provided to me on which I relied (set out below) and observations I made while
conducting such an analysis.

I have based my assessment and opinions on the information provided to me to date. If
additional information becomes available, I reserve the right to amend or supplement
this report as necessary.

The following is that written Report.

5

## III.    Summary of Opinions

Given my education, training, and experiences over 44 years of public service in the criminal justice field, including as a line officer, supervisor, manager, and administrator for four of the twenty largest jails in the United States (two in California and two in Florida) and based on the materials that I have reviewed (set forth below in Appendix E), I have come to the following opinions and conclusions:

1.  It is my opinion that the Milwaukee County Sheriff's Office practices show a callous disregard for legal requirements and correctional professionalism and demonstrate deliberate indifference by the Milwaukee County Sheriff and his staff to the safety and well-being of inmates as exhibited by the lack of proper actions and failure to respond to obvious warning signs during the care and custody of Shade Swayzer and her unborn, and then, born child Laliah Swayzer.

2.  It is my opinion that the Milwaukee County Sheriff's Office and its staff failed to meet the expected national standards for the operation of a large jail as identified in the American Correctional Association's, *Performance-Based Standards for Adult Local Detention Facilities* (ALDF) and the National Commission on Correctional Health Care, *Standards for Health Services in Jails*. These "Best Practices" require professional responsibility in administering jail processes by the following of, not only, the Milwaukee County Sheriff's Office Policies and Procedures, but also national expectations for the safe, secure, and humane attention to those arrested and incarcerated.  These failures contributed to and resulted in the violation of the civil rights of Shade Swayzer and the death of Laliah Swayzer.

3.  It is my opinion that the Milwaukee County Sheriff's Office inadequately trains its correction officers, supervisors, and medical/mental health personnel to detect, address, and respond to the obvious needs of medically and mentally compromised arrestees and inmates. This fosters a custodial environment where correction officers, supervisors, and medical/mental health staff fail to comply with reasonable and appropriate policy and procedures which resulted in the death of Liliah Swayzer and violated the civil rights of Ms. Shade Swayzer.

4.  It is my opinion that because of these inadequate practices, the Milwaukee County Sheriff's Office and its jail operations (Criminal Justice Facility), medical/mental health contract services (Armor), and the respective leadership and staff have developed an in custody environment which has a lack of professional commitment, a lack of the understanding of legal mandates, and a failure of administrative, managerial, and supervisory oversight, to insure reasonable, required, and proper standards are met and maintained.  Such actions, inactions and omissions violated the civil rights of Shade Swayzer and her child, Laliah Swayzer.

5.  It is my opinion, that the Defendants knew, or should have known that Shade Swayzer was near the completion of her pregnancy (8 plus months) which identified her as a

6

Special Needs inmate requiring close supervision and immediate medical attention if any sign of birth surfaced (water broke). They knew, or should have known, given their determination in April (three months before) that she was pregnant at 145 pounds, given that she was 154 pounds on July 6, 2016 (unique weight gain in a short period), given that St. Mary's Hospital sent Armor records of a "fetal heart beat", given that Dr. Horton (another record indicates this may have been Dr. White, but both of Armor) did identify her pregnancy (but failed to pass the information along), provided that RN Porlucas did advise Lt. Cunningham of the pregnancy concerns (but Lt. Cunningham failed to document this until after the events), given that Lt. Andrykowski treated her uniquely due to her pregnancy on July 7 and 8, 2016 (but failed to document it on the Tier Movement Card so others would know), and given the verbal notice stated to CO Witkowaik of "water broke" by Ms. Swayzer, including a unique and "funky" smell, strange behaviors, and blood on the floor, that a special protocol was absolutely required. These failures, actions, inactions, and omissions violated both Shade and Laliah Swayzer's civil rights resulting in the death of Laliah Swayzer.

6. It is therefore, my opinion, that Defendants, Sheriff Clarke, the Milwaukee County Sheriff's Office, and its jail operations, et al., including its correctional staff, supervisors and management/administration, and its contracted medical provider (Armor Correctional Health Services, Inc.) exhibited a systemic failure to attain the appropriate level of correctional professionalism and failed to provide a legally adequate level of care for its arrestees and inmates, specifically Ms. Swayzer and her unborn, and then born child, Liliah Swayzer. On July 6 thru 14, 2016, Defendants repeatedly demonstrated deliberate indifference to the safety, security, and well-being of Ms. Swayzer, her unborn, and then born child, Liliah Swayzer by the intentional, reckless, and deliberate actions, inactions and omissions described in further detail below.

7. Further, it is my opinion, that Sheriff Clarke, the County of Milwaukee, Jail Staff, and the contracted Medical Provider, Armor, knew, or should have known, its legal, professional, and required mandates for the care and custody of inmates, like Ms. Swayzer and the birth of her child, due to its notice from the Christiansen Consent Decree of 2001 (specifically, Section II, Medical Services, Subsection J.1 Women's Health); the multiple follow up legal actions for failure to comply with the Decree (at least, 2006 and 2008); the many adverse Reports regarding the failure to maintain proper medical care of the inmates by the Court Monitor, Dr. Ronald Shansky; the multiple inmate deaths in 2016 and before, including the dehydration death of an inmate four (4) months before Ms. Swayzer's child death and the 2014 law suit over the birth of another child by an in custody inmate absent staff help; and finally, the new Sheriff, Richard Schmidt, stating that the jail operation would be in full compliance with the Christiansen Decree by April, 2018 (unknown if this expectation has actually been met). The Agency Administrator, Sheriff David Clarke, Jr. (Sheriff from 2002 until he resigned in 2017), who was responsible for all the operations of the agency (Milwaukee County Sheriff's Office and the Criminal Justice Facility/Jail under the Detention Services Bureau), and the Agency Governing Authority, the County of Milwaukee, had a direct responsibility for the operations of the correctional program, but absolutely failed to properly address known

problems, concerns, issues, and responsibilities for the care and custody of incarcerated individuals after multiple notices, over a decade plus period of reported deficiencies, in the jail. They are, in my opinion, then culpable for the death of Liliah Swayzer, and subject to the consequences of such malfeasance.

8. And finally, there were multiple individuals working on behalf of MCSO and Armor who independently, and/or in concert with others, intentionally and deliberately failed in their duties and responsibilities to address known needs of Ms. Swayzer, and subsequently her child Liliah Swayzer. These include, but may not be limited to:

    a. Lt. Cunningham who was provided with pregnancy information, but failed to document it on the classification forms leading to mis-housing of Ms. Swayzer;

    b. Lt. Andrykowski who, at least, twice knew that Ms. Swayzer was pregnant requiring him to communicate this on the Tier Card so others would have this knowledge, but did not;

    c. Physician Horton (and/or White) from Armor who had specific knowledge concern of Ms. Swayzer coming under the 32-week Pregnancy Protocol and failed to notify the Classification Unit as required;

    d. RN Porlucas who also had direct knowledge of Ms. Swayzer's pregnancy, who states he did notify Classification, but failed to follow up to insure his communication was followed;

    e. CO Love who knew, or should have known, of the doctor's directive that Ms. Swayzer was pregnant and in the Special Needs Unit due to this, but never communicated this as required on the Tier Card so others would be aware that Ms. Swayzer was not to be moved out of SNU;

    f. CO Adams, another CO overseeing SNU like CO Love, who knew or should have known, that Ms. Swayzer should not have been moved due to doctor's order failed to discus the move of Ms. Swayzer out of SNU on the evening of 7/8 with the medical staff and advised CO Avery that there were no restrictions relative to her move to 4A;

    g. CO Avery, the Classification Officer, who directed the moved of Ms. Swayzer on the late evening of 7/8 because there were no noted restrictions on the Classification Records or Tier Card but failed to seek further information as to why she was house in SNU and then as part of move team did not note her pregnancy even though she fully recognized it;

    h. CO Davis, CO Matthews, CO Giles, and, at least, one other officer, who failed to give a name, knew of Ms. Swayzer's pregnancy, but failed to communicate this on the Tier Card as directed by policy, procedure, and/or professional expectations;

    i. Numerous Armor Medical Staff who had access to the records and/or had personal contact with Ms. Swayzer who knew, or should have known, that she was not housed in SNU where directed by the Armor Physician, but failed to take any actions to move her to SNU;

    j. CO Ustby who when confronted with a concern by CO Witkowiak about a

8

problem with the inmate 4A #10, failed to make further inquiry as to the status which was clearly emergent;

k.  And CO Witkowiak who had numerous unusual contacts with Ms. Swayzer over the evening and morning of July 13-14, 2016 in which any of the first contacts should have initiated a medical contact at the very least and which, later, were clearly of an emergency nature.  However, she did not even act responsibly until over an hour after the birth of Liliah Swayzer, and then, only at the direction of the medical staff.

Each and all these persons had specific opportunity to take actions that could have changed the eventual outcome of these events, the death of Liliah Swayzer.  However, none did and therefore must bare culpability for the consequences.

9

## IV. Summary of Facts

### A. General Overview

9. Laliah Juaniah Swayzer (African American baby) was born during the early morning of July 14, 2016 to Ms. Shade Alline Swayzer while Ms. Swayzer was incarcerated in the Criminal Justice Facility (Jail) in Milwaukee County, Wisconsin. She was eighteen inches (18") long and weighed 5 pounds, 12.5 ounces. She was born in a cell defined as #10 in housing unit 4A without any assistance from jail staff or acknowledgement at that time. The time of birth was estimated at 4 am, but this is unconfirmed as the clock available for inmate observation was set one hour behind actual time. Her Mother, Ms. Swayzer, states that she was born alive and that she attempted nursing; however, the jail staff did not find the baby until 6:13 am at which time the child was non-responsive. An outside Emergency Response Team arrived soon after and declared the baby dead. An autopsy was performed the next day and the Medical Examiner's Office has classified the birth as "Undetermined" meaning they cannot determine whether the baby was born alive or still-born leaving the Mother's statements as the only direct information.

10. Ms. Shade Alline Swayzer was a 30-year-old, African American female, at the time of the incident on point, who was born on March 1, 1986. She is 5'2" tall and weighed 154 pounds at booking up from 145 pounds at her previous booking in April 2016. She was arrested by the Glendale Police Department on July 6, 2016 for a violation of parole and resisting arrest. Over the period on point, she was housed in the jail from July 6-26, 2016 when she was released. While in custody she gave birth to Laliah Swayzer on the morning of July 14, 2016 in unit 4A, Cell 10, without staff assistance. (Notes: She was unmarried, with two (2) live children, and without employment information. There is information that she had mental health issues prior to the events described below including being bi-polar and schizophrenic. This information was both self-reported and found in multiple medical/mental health records. She had a criminal history and was on parole. She had a previous history of incarceration at the Milwaukee Criminal Justice Facility dating back to 2008 and the staff was familiar with her. Her behaviors during this incarceration history is described in multiple manners as both recalcitrant, as well as cooperative.)

11. The Milwaukee Criminal Justice Facility (CJF), and/or described as the Milwaukee County Jail, is within the Detention Services Bureau, under the authority of the Sheriff of Milwaukee County and the Milwaukee County Sheriff's Office (MCSO), which is responsible for the incarceration, custody, and care of all adults arrested in Milwaukee County. The CJF holds adult males and females who are being detained awaiting trial, inmates convicted of misdemeanors, and convicted felons awaiting transfer to the State Prisons. The MCSO was established in 1835 and is responsible for the operation of the CJF.

12. The CJF was completed in 1992 and is a multi-floor facility described as a podular indirect jail operation in Housing Unit 4A where the events on point occurred. The jail capacity is rated at 960 inmates and processes about 34,000 arrestees each year. This

10

averages to 94 arrestees per day or 4 per hour. This jail is where Ms. Swayzer was incarcerated (housed) from Wednesday, July 6, 2016, thru Thursday, July 14, 2016 when her baby was born (8th day of incarceration), until she was released on Tuesday, July 26, 2016. On the date of Laliah Swayzer's death (7/14/2016), the jail population was not determined.

13. In 1999 the County of Milwaukee, Milwaukee County Sheriff's Office, and CJF (Milwaukee County Jail) was sued for unconstitutional conditions existing at the jail resulting in the Christiansen Consent Decree in 2001. This 48-page document is inclusive of mandated and acknowledged requirements for the operation of the jail, specifically including medical and mental health care requirements and pregnant inmate mandates (which has been in effect since June 2001 or for over 17 years to date). There is a court appointed monitor, Dr. Ronald Shansky, who has over seen the Consent Decree since the beginning which requires multiple reports on the operations of the jail regarding the requirements of the Decree (see #14).

14. On July 6, 2016, and through the below described events, the CJF was administratively lead by Sheriff David Clarke, Jr., including medical and mental health services under contract with Armor Correctional Health Services, Inc., which began its services April 1, 2013. The Milwaukee County Sheriff has a Mission Statement stating, "We are law enforcement professionals, representing a variety of criminal justice disciplines, and we exist to serve the public. We are committed to creating a culture of service that views our citizens as customers whose satisfaction is absolutely essential to our success." The Motto is "Performance Matters Here; Expect the Best." (Note: Given the events of Liliah and Shade Swayzer the integrity of these statements has certainly not been a pat of the MCSO performance.)

15. Pursuant to the Christiansen Decree, there exists a monitor who has been overseeing the jail's operation from the beginning (June 2001) thru the events surrounding the incarceration of Shade Swayzer, the death of Laliah Swayzer, and beyond. Dr. Ronald Shansky, the Monitor, has submitted Formal Reports twice a year identifying issues and concerns and making recommendations for corrective actions. In 2012 his Report noticed the Sheriff and Jail that the medical operation was in "sustained crisis" due to staff shortages and during his deposition RN Porlucas, an employee of Armor, confirmed this problem in 2016 with him working many hours of overtime covering vacancies. In 2016, Dr. Shansky reported that the policies were outdated and had not been updated every two years as required. Further, he reported that the medical program did not meet National Commission on Correctional Health Care standards as accreditation requires and as mandated by the terms of the contract Milwaukee County had with Armor Correctional Health Care. To place these concerns in better perspective, the present Acting Sheriff Richard Schmidt stated in early 2018 that the Milwaukee County Sheriff's Office and the CJF would be in "Full Compliance by April 2018" which would be 17 years after the County accepted the terms. It is not known at the writing of this Report whether full compliance has been attained. However, no matter the status today during the incarceration of Shade Swayzer and the death of her baby, the CJF, MCSO, and County of Milwaukee were not in compliance.

11

**B. Case Overview (Arrest, Intake, Medical Assessment, Jail Housing, Baby Birth/Death, Release)**

16. On or about 1:13 pm in the early afternoon of Wednesday, July 6, 2016, members of the Glendale Police Department were called to a Days Inn Hotel in their city. They were advised that a resident had refused to vacate. They determined that the resident was Shade Swayzer and that she had an outstanding warrant for her arrest on a violation of parole in the bail amount of $500. Upon the officers attempting to facilitate her leaving the room voluntarily, she became recalcitrant and barred the door. With the help of a hotel maintenance worker, the door was opened, and an effort was made to arrest Ms. Swayzer. It was said that they were able to handcuff her, but she would not walk to the door and had to be carried.

17. At this point in the arrest the contact with Ms. Swayzer is not clear. It was reported that she attempted to bite one of the officers, but concurrently, she was apparently placed in the back of the patrol car. During this period, she took the seat belt and put it around her neck which tends to indicate a suicidal ideation. At some point then (about 1:40 pm) an ambulance was called, she was apparently picked up, and transported via ambulance to St. Mary's Hospital. The details of the reason for this type of transport are not explained.

18. At the emergency area of the hospital, Ms. Swayzer was examined with a notation that she was "uncooperative". It seems that although "uncooperative", she did recognize the importance of having the hospital staff check on the condition of her baby. There is a notation that a "fetal heartbeat" was identified. She was eventually given a medical clearance on or about 4:00 pm making her eligible for incarceration at the jail. There is not a reference to an ambulance transport, and given the medical clearance, it seems she was transported, via a vehicle under the control of a parole officer, to the Milwaukee County Jail (CJF).

19. Upon arrival at CJF Intake/Booking, she was logged in at 4:32 pm. There was a reference that she was moved via a wheel chair into the CIU (Central Intake Unit) which visually noted to staff's attention concerns regarding medical conditions. During Detective Desotell's investigation, he confirmed that the Intake Staff were, in fact, aware of her pregnancy; however, there is no documentation of this in the booking records.

20. Sometime between intake and 8:59 PM, an Intake Medical Screening was conducted which identified her as pregnant, in the last trimester, and needing to be housed on a lower bunk, given milk at every meal, and requiring assignment to the "Special Needs Unit" (SNU) or "Infirmary". This is where she was housed on the first night in custody (over 7/6-7/2016). There were no issues noted during this housing. (Note: At this time though, she was given a "blue inmate jump suit" to wear which is an indication of a minimum-security inmate.)

21. On 7/7/2016 there were four significant events including her Custody Classification for her formal housing assignment, her medical examination follow-up, her psychological

12

examination, and her on-site observation by Lt. Andrykowski. Specifically:

**A.** First, although standard practice for classification involves a "face to face" conversation between the inmate and the Classification Officer, this did not occur for Ms. Swayzer. She was classified, in absentia, via a records search by the Classification Officer, Lt. Cunningham, who determined that she was a "Max Custody" inmate due to adverse allegations, which were dismissed in her previous incarcerations. Additionally, although medical and mental health conditions are part of the classification process, there is no mention of her pregnancy and/or mental health concerns. **Note:** It was stated by RN Porlucas that he advised her of Ms. Swayzer's pregnancy, but if true, she never noted it in the classification records. **(Special Note:** During the investigation by Detective Desotell, he determined that CO Cunningham did know of Ms. Swayzer's pregnancy, but she failed to log it on the forms. He then directed that she writes this information on the Tier Care as a "LE", late entry.)

**B.** Second, Dr. Horton, a Physician working for Armor, reviewed the medical intake screening records and reaffirmed the proposed actions surrounding her pregnancy. Of significance, he directed that she be placed in the "Special Needs Unit" relative to her pregnancy. He also noted that she was in the "Third Trimester" and in the last weeks of pregnancy so that she fell under the Armor 32+ weeks medical pregnancy actions protocol for special services. **However,** he did not convey this information to the Classification Staff and/or the General Custody Personnel. As such, this information was never logged in the Classification Records and/or Custody Card (Tier Card which moves everywhere the inmate moves), so the custody staff were never formally advised per policy and/or procedure of Ms. Swayzer pregnancy and its late term status.

**C.** Third, RN Porlucas, who was apparently working as a PSW (Psych Social Worker) that day for Armor, conducted the mental health review of Ms. Swayzer. During this interview he determined that she was pregnant and indicated that he passed this information along to Lt. Cunningham (see 21. A above). **However,** Ms. Swayzer was so grateful for the attention he had given her, that she hugged Mr. Porlucas. He apparently took great offense at this and this became the focus of his interview instead of the pregnancy and mental health concerns as he mentions it numerous times leaving out the very important pregnancy information.

**D.** Fourth, on the evening of 7/7/2016, Lt. Andrykowski enters the SNU and observes Ms. Swayzer in a wheel chair. He sees that she is wearing the "blue jump suit" of a minimum-security inmate and immediately directs that she be redressed in the "orange jump suit" of a "Max Security" inmate. During this process he becomes aware that she is pregnant, but that factor does not take any precedence over the change of uniforms and he makes no notation of her condition on the Tier Card which is required to be used to document and communicate information of such importance.

13

Basically, by the end of 7/7/2016, while discounting what was already known by the Intake Staff, four (4) personnel, 2 from MCSO and 2 from Armor, knew or should have known, some very critical information regarding the status of her pregnancy and were required to properly communicate this necessary information, but did not.

22. The next day, 7/8/2016, Ms. Swayzer remained in SNU until the evening when it was determined by the Classification Unit that she be moved to make room for another inmate in need of her cell. CO Avery, the Classification Officer making this decision on the midnight shift, stated that there was no information on the Classification Record and/or Tier Card indicating any medical or mental health issues that would have prevented the move (also see information regarding Lt. Cunningham's inactions in #20. A above). She also stated that she contacted CO Adams (while at the site helping with the move), the Housing Control Officer in SNU, to confirm that there were no restrictions on the move of Ms. Swayzer and CO Adams indicated no restrictions even though she was being housed in SNU.

23. Lt. Andrykowski was then contacted to initiate and complete the move of Ms. Swayzer by CO Avery from the Classification Unit. Lt. Andrykowski, CO Avery, and two other COs made the move, but not before placing her in a wheel chair and restraining her giving due regard to her pregnancy which each recognized. (Note: Wisconsin is not one of the 25 states that has a law preventing such restraint actions for pregnant inmates.) Again, although clearly and fully aware that she is pregnant, he, Co Avery, nor CO Adams make no written notation of this on the Tier Card as required for information to be communicated to any other custody staff on 4A or elsewhere.

24. Relative to the next four (4) days, 7/9-12/2016, the following is referenced including that on 7/9 Armor requests and receives information about Ms. Swayzer's pregnancy status from Aurora Sinai Medical Center which indicates that the pregnancy is normal and that she is due August 3, 2016 (last appointment 6/30/2016); on 7/11/2016 she had an appointment with the Women's Health Professional from Armor where she advises the Armor Medical Provider that the "baby is fine", but does not have a fetal heart test (and the Armor person takes no further actions seemingly accepting this information as valid and appropriate); and on 7/9-12/13 she was offered pregnancy related medication but refused (indicating that she believes she is being released and does not need it), but she apparently does receive and eat her provided meals (including milk) as there is no reference to a refusal.

Of importance in the "Nurses Notes" during their contacts with her during this period are charting document statements including:

   a. She is "Currently Pregnant";
   b. Her recent memory is "Intact";
   c. Her thought process is "Logical";
   d. Her mood is "Fine";
   e. Her speech is "Goal Directed";

14

f. She has "No Distortions";

g. She has a "Good Appetite".

Over this same period, the following Correctional Officers knew that Ms. Swayzer was pregnant in Housing Unit 4A but did not document it on the Tier Card or apparently advise anyone of her condition including CO T. Davis, CO K. Love, CO T. Giles, and one CO who said "she knew" but did not identify herself.

25. The last Armor medical contact with Ms. Swayzer, before the major issues at point, are at 8:44 PM on the evening of 7/13/2016 by an Armor nurse making her rounds (about 8 hours before the birth and death of Laliah Swayzer during the early morning of 7/14/2016). The nurse's contact notes document the following:

a. Ms. Swayzer is "alert";

b. She is "able to communicate";

c. She has "no distortions" in her perceptions;

d. And she has a "good appetite".

Also, on this day, 7/13/2016, CO J. Matthews was working Housing Unit 4A and said she knew that Ms. Swayzer was pregnant. However, she made no notation on the Tier Card and did not notify anyone.

26. The next actions, inactions, and omissions that cover the next shift are extremely relevant and will be detailed below:

a. The midnight shift begins at 10:30 PM (7/13/2016), is eight (8) hours, and goes to 6:30 AM (7/14/2016). There are two Corrections Officers, Kimberly Witkowiak and Kevin Ustby, assigned to provide care, custody, and control for the Housing Units described as 4A, 4B, and 4C. As part of these responsibilities is a requirement to report any unusual and/or emergency events, immediately. Ms. Swayzer was in Cell #10 of 4A and CO Witkowiak has been given primary responsibility of 4A, and therefore, Ms. Swayzer in Cell #10;

b. The COs are required to make rounds every 30 minutes. They are responsible to visually examine each cell and ensure that each inmate so housed is safe and is breathing. This requires the CO to look through the cell window long enough to be assured that these responsibilities are met. Since there is limited lighting, each officer has a flashlight so that adequate light may be available to properly view the inside, if necessary. (Note: On a normal shift this means a minimum of 16 rounds should occur, but more may occur. On this evening there is testimony that over 25 rounds are documented; however, there is also testimony that the computer system is not trusted so staff members double enter the rounds records to ensure that the rounds are properly recorded. Therefore, the accuracy of the number of rounds testimony is questionable.);

15

c. Housing Unit 4A is constantly monitored by a video camera so that all activities, outside of the cells, can be viewed and recorded. This includes observing the activities of the COs during their rounds. (Note: Due to the placement of the video camera, the activities in front of Cell #10 are obscured by a construction pole.) By observing the videos for the evening and morning of 7/13-14/2016, it shows CO Witkowiak making her rounds, but her individual cell observations are extremely quick (1-2 seconds); however, it does appear that she stops a Cell #10 several times during the shift. (**Special Note**: The video monitoring timing is one hour ahead of real time, so it does not match the incident reporting timeline.);

d. CO Witkowiak testified that Ms. Swayzer did not sleep over this shift, but rather was up throughout her round's observations. Although inmates tend to sleep during the day periods and stay awake for extended periods at night, Special Needs inmates, like Ms. Swayzer's behavior, should have been consider unusual under the "Suicide Inmate" Procedure and reported. Her behavior was even more unusual when she was observed to have rolled up her mattress and was sitting on it. These should have, at the very least, triggered a call to the HSU for reporting. CO Witkowiak did not;

e. At some time prior to 5:00 am on 7/14/2016, and during a stop in front of Cell #10 by CO Witkowiak, Ms. Swayzer states that she told CO Witkowiak that she was "hemorrhaging". Such a statement, or anything similar, at any time while someone is in custody, should have immediately triggered an emergency call out of medical for help. Again, CO Witkowiak took no action;

f. On or about 5:00 am, Ms. Swayzer gave birth to Laliah Swayzer, without any assistance from CJF staff, specifically CO Witkowiak (Note: Ms. Swayzer said that this occurred about 4:00 am, but, once again, the clocks in the Housing Unit 4A are incorrect as they are apparently kept one (1) hour behind time (and all the inmates reported this.) As such, Ms. Swayzer statement of 4:00 am would have been accurate pursuant to the clocks she might have been able to see;

g. Ms. Swayzer reported that her baby was born alive and she attempted to nurse the child. This was not successful, so she wrapped the baby in a blanket and cradled her. At about this time, CO Witkowiak conducted her rounds and observed Ms. Swayzer sleeping in an unusual pattern. CO Witkowiak asked Ms. Swayzer if she was ok and Ms. Swayzer said, "I'm fine". Not exploring these observations any further, CO Witkowiak left taking no action;

h. On or about 5:35 AM CO Witkowiak was conducting her rounds when she indicated that she smelled something "funky" outside of Ms. Swayzer's cell.

16

CO Witkowiak peers inside the cell of Ms. Swayzer via the window and observes something "shiny" on the mattress. She asks Ms. Swayzer if everything is okay and Ms. Swayzer indicates that her "water broke", but she is "fine". CO Witkowiak apparently "mentally notes this", but once again, takes no immediate action;

i. About 5:55 am CO Witkowiak conducts the final rounds of Unit 4A for her shift. She encounters an even stronger "funky smell" outside Cell #10 but takes no immediate action. She completes her review of 4A but returns to Cell #10 about 5:57 AM and has a longer review with Ms. Swayzer (possibly 45-55 seconds). However, for the sixth time, CO Witkowiak takes no immediate action and proceeds to complete her rounds in 4B. She then returns to the Control Booth and relieves CO Ustby to proceed to conduct his rounds of 4C. However, before he leaves she mentions that she thinks that there is something unusual occurring in Cell #10 and would like to discuss it with him upon his return. Again, taking no immediate action;

j. During the absence of CO Ustby, CO Witkowiak calls HSU (Medical) and asks for information regarding Ms. Swayzer. She is quickly advised that Ms. Swayzer "is pregnant" and that an "immediate medical emergency" should be directed. At this point CO Witkowiak, finally, calls for an emergency through Central Control and a response is initiated. The response includes a lieutenant and two Armor nurses;

k. Per the video the response personnel arrive in front of Cell #10 at 6:13 am (Special Note: The video shows the times as 6:58 – 7:13 am or 15 minutes after CO Witkowiak's last visit). However, rather than immediately entering the cell, the lieutenant prevents entry until additional COs arrive (possibly an additional 2 minutes pass). Finally, a nurse demands that the lieutenant open the cell door, so they might examine Ms. Swayzer and he complied;

l. Upon entry, blood is observed on the floor, on the mattress, and a substantial amount of Ms. Swayzer's legs. Ms. Swayzer is apparently cradling the baby and refusing to release it. Eventually, the COs hold Ms. Swayzer and the nurse removed the baby from her arms. The baby is brought out of the cell at 6:23 am (10 minutes after the emergency staff arrived). Resuscitation techniques were initiated but were unsuccessful. Upon arrival of EMTs resuscitation was continued, but to no avail. Laliah Swayzer was declared dead at 6:55 am;

m. At 7:12 am Lt. Gregory Baracky of the MCSO/CJF contacted the Medical Examiner's Office Investigator and advised that, "That the decedent was a newborn black female, 36 weeks gestation, and was born delivered by the Mother who was an inmate." The investigator arrived soon after and removed the baby, Laliah Swayzer, from the jail. In the meantime, Ms. Shade Swayzer

17

was emergency transported to the hospital for her care where she remained until 7/16/2016;

n. An autopsy was performed on Laliah Swayzer on 7/15/2016 at 8:30 AM at the Medical Examiner's Office. The focus of this examination was an effort to determine whether the baby was stillborn or born alive. The results were inconclusive, and the official conclusion was identified as "Undetermined";

o. On 7/16/2016 Ms. Swayzer was returned to the jail and placed under "suicide watch". Ms. Swayzer was released from the jail on 7/26/2016.

**This concludes the Reconstruction of the events surrounding the care and custody of Ms. Shade Swayzer and the death of her baby, Laliah Swayzer, while in the custody of the Milwaukee County Sheriff's Office over the period July 6, 2016 thru July 26, 2016.**

18

## V. Opinions

### A. Primary Opinions

27. As stated above in Paragraphs 1-8, given my 44 years of service in the correctional field including my education, training and experience and position from line staff thru administration, it is my opinion that the Milwaukee County Sheriff's Office in its responsibility for and of the Criminal Justice Facility (Milwaukee County Jail), has shown a callous disregard for legal requirements and correctional professionalism. By such, the MCSO has demonstrated "deliberate indifference" to its responsibility to ensure the safety, security, and well-being of incarcerated persons, and their unborn, and born children, it detains, like Ms. Shade A. Swayzer and her child Laliah Swayzer.

28. The MCSO failed to properly identify the pregnancy of Ms. Swayzer, its late term concerns, the commensurate custody requirements, and the birth necessities for such an inmate, over an eight (8) day period, even though there had been multiple separate and distinct information gathering and communicating points. This information was readily available and should have been logged according to applicable policy and procedures for both the custody staff and medical vendor (Armor). These failures indicate a significant dereliction of duties and general professional recklessness which resulted in the failure to properly attend to the birth of Laliah Swayzer resulting in her death.

29. These "failures" exhibit what may best described as an unsafe, unsecure, and uncaring custody environment which permeates the MCSO/CJF jail operation. The death of Laliah Swayzer is the result of multiple opportunities to take proper, effective, and necessary actions, any of which could have prevented this adverse situation. From the moment Ms. Swayzer arrived at the jail, July 6, 2016, at 4:32 pm, the MCSO/CJF intake personnel knew, or should have known, of the nature of Ms. Swayzer's pregnancy and medical conditions. In fact, Detective Desotell's report documents that they did. However, no special attention was granted and there was no reference made on the Tier Card which followed Ms. Swayzer wherever she moved within the facility. **Special Note:** Lt Cunningham did make a notation on the Tier Card, but this was after the events were over and at the direction of the detective.

30. The Armor Intake Medical Screening staff, also, documented her pregnancy but determined to simply pass this detailed information along to the attending physician the next day (7/7/2016). There was reference that the nurse did indicate that she should receive a pregnancy meal which includes milk and be assigned a lower bunk which would indicate "a pregnancy" but did not use the descriptive and/or communicative words that Ms. Swayzer was, in fact, pregnant, in her last trimester, and beyond 32 weeks which would have triggered the necessary protocol from the beginning. This seems to indicate that the only "formal" acknowledgement of her pregnancy is in Armor Medical Records at that time and the custody staff remained formally unaware. This continuing "failure to communicate important information" set the stage for the adverse situation that would follow.

19

31. The next day (7/7/2016) there were four (4) opportunities to take actions that could have properly identified the pregnancy needs of Ms. Swayzer, but each failed. Armor failed twice to convey the need for Ms. Swayzer to be placed under their 32+ week pregnancy protocol and remain in the Special Needs Unit so that they might pay close attention to her birth of Laliah Swayzer and its special needs. The MCSO Classification staff was not given this information by Armor Physician (but most likely given it by RN Porlucas; however not properly documented by Lt. Cunningham), but they also failed to seek any additional information either (even though their form calls for attention to medical and mental health needs for classification purposes and safe incarceration housing). And lastly, that day, the MCSO custody shift lieutenant personally contacted Ms. Swayzer, identified her as pregnant, but did not seek further information about her condition, did not document the condition, and only directed that her clothing be changed from minimum security to maximum. These actions, inactions, and omissions compounded the adverse events and support an ongoing environment of intentional and deliberate misconduct regarding serious duties and responsibilities, and which, resulted in the death of Laliah Swayzer.

32. The next day (7/8/2016) the same custody lieutenant, Lt. Andrykowski, that saw Ms. Swayzer on 7/7/2016 was directed to move her to Housing Unit 4A. He clearly knew that she was pregnant as he moved her in a wheel chair and restrained her uniquely giving due recognition to her pregnancy. However, once again, even though he had this knowledge, he did not properly log it on the Tier Card and omitted to notify the housing personnel in any manner. As a supervisor, he failed to ask necessary movement questions when he arrived in SNU prior to initiating the actual move. Had he done so by questioning the medical staff, he would have discovered that Armor staff had directed that she remain in SNU until her baby was born. This dereliction of supervisory oversight, again, compounds this on-going adverse situation and resulted in the death of Laliah Swayzer.

33. On or about 7/9/2016, Armor staff determined that the Aurora Sinai Medical Center had medical records concerning the pregnancy of Ms. Swayzer. They requested these records and they were received and reviewed by Armor Staff on both 7/11/2016 and 7/12/2016. The records indicate a healthy baby and a due date of August 3, 2016. Given this information, it was clear that Ms. Swayzer was in her last month of pregnancy. Per Armor Policy she was required to come under the 32+ week protocol which required special attention in the Special Needs Unit. However, twice again, even though they knew, or should have known, that Ms. Swayzer was housed in 4A not SNU, they took no action to redirect her mandated housing back to SNU. Further, they did not pass any of this necessary housing information onto the custody personnel. Whether from an environment of intentional and deliberate indifference, the information was not communicated and further compounded the adverse consequences that were about to occur.

34. On the last day, before the birth of Laliah Swayzer, the day shift custody staff acknowledged that they were aware that Ms. Swayzer was pregnant but did not pass this information along. Further, the Armor staff saw Ms. Swayzer twice and determined that there were not any adverse medical conditions. In fact, they document that she is "logical",

20

with "no distortions" and cognizant of "time, place, etc." This occurred as late as 8:44 pm on the evening of 7/13/2018 (8 hours before the birth of Laliah Swayzer). Once again, they did not pass along any information regarding her pregnancy nor question her being housed in 4A instead of SNU. These continuing failures show dereliction of duty, misfeasance, and professional indifference given the death of Laliah Swayzer which is only hours away. These were the last Armor medical staff that could have corrected the situation, but failed to act responsibly, professionally, and according to policy. This leads to a conclusion of "deliberate indifference" to the needs of Laliah Swayzer and her mother, Shade Swayzer.

35. The next ten (10) hours, from the late evening of 7/13/2016 to the morning of 7/14/2016, involve numerous elements of actions, inaction, and omissions which can best be described as intentional and deliberate indifference. These include, but are not limited to:

    a. From the beginning of the next shift at 10:30 pm Ms. Swayzer's cell was identified as unkempt with food cartons, etc. in disarray around the cell. However, the cell was identified as sanitary and properly clean on 7/8/2016 when she entered it. Any CO seeing this should have taken immediate steps to correct the situation, as simply, a recognized duty. But, intentionally and deliberately, CO Witkowiak took no action. She indicated that she had come to expect such disarray and found no reason to act. Had she made a direction to "clean up", whether it would have made a difference in the birth and death of Laliah Swayzer, it is unknown; however, it does indicate a continuing behavior of dereliction of duty which permeates her performance;

    b. CO Witkowiak stated that Ms. Swayzer was "up all night" and that she talked to her several times. Such behavior by an inmate who has had numerous incarceration events where she had been on a "suicide watch", as well as a policy (Inmate Suicides) which indicates that staff are required to report any unusual behaviors to medical should have triggered an immediate call on this point alone. CO Witkowiak did not call or report this to anyone. Had she done so she might have been advised of the imminent birth possibilities which might have initiated an emergency medical call out;

    c. CO Witkowiak was required to conduct her rounds every 30 minutes. These rounds are to closely examin each cell and the inmates so housed to ensure that they are safe and secure. The videos of her making these rounds on the morning of 7/14/2016 show an extremely "cursory look see" in the cells. There is no ability to insure the health of the inmates so housed in this manner. Much of her rounds can be seen to be a glance in the window as she quickly passes. This is a clear dereliction of duty and supports the intentional and deliberate indifference to her normal, routine, and required duties.

Of on-going note and concern is the following:

Special Note #1: Given that the video timer is one (1) hour ahead of real

time, supervisors are not monitoring the behavior of custody staff doing their rounds, via these videos, or this time problem would have been corrected. Such a lack of over sight and appropriate supervision on the part of supervisors and managers perpetuates the concept of intentional and deliberate indifference;

Special Note #2: Since the actions of CO Witkowiak while conducting her rounds does not meet the expected observation requirements of policy and procedure, it is evident that supervisors are not monitoring the videos. Therefore, I must consider that the MCSO staff have developed what has been described as a lack of accountability for proper conduct where their behaviors are not monitored, and poor performance not corrected via any sort of discipline. (Note: This jail operational concern is further supported by no information developed that there was any personnel action taken in the cell birth event that occurred in 2014 or the dehydration death of an inmate in 2016.);

Special Note#3: As an aside and with consideration under the concept of dereliction of duty, the inmate observable clock in housing unit 4A is one (1) hour behind real time. The inmates are apparently aware of this and the staff have not corrected the situation. This shows a distinct lack of staff professional attention to the simple duties of custody, so it is extremely difficult to believe that the important events will ever be properly addressed.

d. During this shift and before the birth of Laliah Swayzer, Ms. Swayzer stated that she advised CO Witkowiak that she was "hemorrhaging", and later, Ms. Swayzer stated that she told CO Witkowiak that her "water broke". CO Witkowiak stated that this did not happen. However, given the Armor nursing staff's mental assessment of Ms. Swayzer at 8:44 pm the evening before, which indicated that she was logical, etc., it is my opinion that Ms. Swayzer must have said something that should have triggered an immediate medical call out. But given CO Witkowiak's intentional and deliberate indifference to her professional duties, she took no action. Even soon after the birth of Laliah Swayzer, about 5:00 am, when CO Witkowiak apparently observed something amiss in the cell, she only asked Ms. Swayzer how she was. When Ms. Swayzer responded that she was "fine, just tired", she left taking no action. At this point in the chronology, CO Witkowiak had exhibited dereliction of duty, careless non-attention to an inmate's emergent needs, and misfeasance, at best. It called all her training, supervision, and experience into question. However, it did not end here;

e. On or about 5:35 am, CO Witkowiak smelled something "funky" near Cell #10, Ms. Swayzer's cell. But as in actions, inactions, and omissions identified above in #33, she did nothing;

22

f. About 5:55 am she noticed that the smell was even stronger, and at 5:57 am, she stood in front of the cell and talked to Ms. Swayzer for 45-55 seconds. But again, she took no immediate action like calling for a "medical emergency". Further, rather than immediately addressing the medical emergent events, she continued with her rounds of 4B. At this point her inactions are clearly intentional and deliberately indifferent to the emergency needs of Ms. Swayzer and her child;

g. Upon returning to the control booth, she did say something to her CO partner, Ustby, but let him leave to conduct his rounds in unit 4C instead of immediately acting on her concerns. On or about 6:04 am, Armor staff indicated that they were called by CO Witkowiak seeking only information about Ms. Swayzer (8 minutes after her last contact with Ms. Swayzer). Armor told her that Ms. Swayzer was pregnant, and she was then directed by the Armor Medical Staff to call for a "medical emergency". According to the video, the emergency response team arrived about 6:13 am (7:13 am according to the improperly timed video monitor) which was 15 minutes after CO Witkowiak's last discussion with Ms. Swayzer at 5:58 am. (Note: Accreditation Standards direct that emergency responses in the jail shall be within 4 minutes and this one was, at least, 9 minutes.);

h. However, the improper response actions did not stop at this point, as the responding lieutenant refused to allow the medical staff to enter the cell for possibly 2 more minutes awaiting further CO assistance. During this wait, the Armor nurse demanded to be allowed entry, given his observation of blood and other sights visible in the cell, and the lieutenant finally consented. The medical staff was delayed in finding and examining the baby, but about 6:23 am (10 minutes after arrival at the scene) exited the cell with the child. They then began resuscitation actions which were unsuccessful and Laliah Swayzer was declared dead at 6:55 am.

36. During this entire event, from July 6, 2016 thru July 14, 2016 (8 days), the MCSO/CJF and Armor had information that should, and could have, lead the CJF to house Ms. Swayzer properly, under a close supervision watch in the Special Needs Unit, while closely monitoring the final month of her pregnancy. Such an action would have provided the necessary due, reasonable, and appropriate attention to the birth needs of Laliah Swayzer while doing all that may be necessary to prevent her death. However, due to multiple failures to communicate, pass relevant information along, follow necessary procedures and policies, actually practice required procedures, and/or pay attention to the actions of Ms. Swayzer, it is my opinion that the CJF (Milwaukee County Jail) has an operational environment which support intentional and deliberate indifference which adversely compounds one action/inaction after another, while creating multiple omissions, at every point, thereby exhibiting dereliction of duty and deliberate indifference to birth, and death,

23

of Laliah Swayzer and the care and custody requirements needed by Ms. Swayzer.

**B. Secondary Opinion #1: The MCSO/CJF's intentional, reckless, and deliberate acts regarding the incarceration of Shade Swayzer and subsequent birth and death of Laliah Swayzer over the period of Wednesday, July 6 thru Thursday, July 14, 2016:**

37. On Wednesday, July 6, 2016, Ms. Swayzer was arrested in the City of Glendale, taken by ambulance to and assessed in the Emergency Room at St. Mary's Hospital, and transported (upon clearance) to the MCSO Criminal Justice Facility (Jail) in Milwaukee by a State of Wisconsin Parole Officer. She was logged in at 4:32 pm at the Central Intake Unit. At this point, there was, and should have been, a significant amount of arrest, emergency room, classification, past incarceration, as well as medical and mental health information available to the CJF staff since she entered the jail in a wheel chair. This would also have included the jail staff's past personal experience with her. They should have been told of the encounter details at the point of arrest including the suicidal ideation of the seat belt around her neck, the ambulance trip to St. Mary's Hospital, the events at the ER plus her identified pregnancy and fetal heart-beat, and reason for the arrest itself, including the "resisting arrest components" for medical clearance purposes. However, even though the Armor Screening Nurse identifies her as pregnant and directs certain preliminary housing and eating expectations, the reason for the same are not communicated to the staff nor entered on the Tier movement card. Whether this was from a lack of training, supervisory oversight, or other misnomer, it shows improper intent and intentional dereliction of duties to protect.

38. On Thursday, July 7, 2016, Armor, the contracted medical and mental health provider for the jail, conducted assessments. One was medical (a doctor reviewed the screening nurse's file) and the other a face to face mental health exam. In each of these her pregnancy was clearly identified. The doctor (either Dr. Horton or Dr. White), upon identifying her to be in the last trimester of the birth period, directed that she be placed in the Special Needs Unit (where she is housed on 7/7-8/2016) until the birth of her child, but never advises the classification and/or custody staff of this directive. The Armor PSW (Psychological Social Worker), RN Porlucas, also identified her as pregnant, and states that he advised classification, Lt. Cunningham, but rather than giving this discovery due attention, he focuses his attention on the fact that she was so grateful for his attention to her concerns that she hugged him in apparent violation of rules. Further, he pays no attention to the information that developed during the arrest that she attempted suicide by placing the seatbelt around her neck, which if addressed, might have led to close supervision under a "suicide watch". These two failures by Armor staff to properly communicate this critical information to custody staff lead to her movement the next day to Housing Unit 4A and out of the Special Needs Unit. These serious intentional and deliberate acts and inactions lead to the mishandling of Ms. Swayzer and the death of her baby.

39. That same day, 7/7/2016, during the day, custody staff (CO Love) identified Ms.

24

Swayzer as pregnant and that evening, a custody lieutenant also saw her in a wheel chair and recognized her as pregnant. However, CO Love does not add this information to the Tier Card nor does she examine the medical information available to determine why she was in SNU or assess the doctor's directive to have her remain there until the birth of Laliah Swayzer. Also, the lieutenant does not add this information to the Tier Card and only focuses on his concern that she is wearing the wrong colored inmate attire. These two failures compound the failures of communication by the Armor staff (noted above) and whether via intentional and deliberate dereliction of duty continue the negative path resulting in the death of Laliah Swayzer.

40. On the following day, Friday, July 8, 2016, since the Classification/Custody staff, CO Avery, had received no information regarding the directive to keep Ms. Swayzer in SNU until her baby is born, classification directs that she be moved to Housing Unit 4A. The same Lieutenant who had seen her the evening before is identified to conduct this movement. Recognizing her pregnancy, he had her placed in a wheel chair and restrained carefully for this change of housing location. However, this recognition should have triggered a supervisor, like a lieutenant, to question the necessity of the move given her obvious condition. Had he done so, he would have discovered the Armor doctor's directive and reassessed his actions. However, he did not, nor did he note anything on the Tier Card about the need for the move, nor her pregnancy or care requirement. This left the custody staff in Housing Unit 4A in the dark about her condition as she was then being placed in a unit where the necessary attention to her pregnancy was limited, and even then, only if known by the custody staff. This negligence by a MCSO supervisor continues the compounding of the failures of communications and process which lead to the death of Laliah Swayzer. (Note: Mandatory Professional Standard 4-ALDF-4C-13, "Pregnancy Management" requires that female inmates have "...access to pregnancy management services..."; further, both the Christiansen Decree and the Armor/Milwaukee County contract direct that special attention be given to pregnant women.)

41. On Saturday, July 9, 2016, Armor identified that there was additional information available on Ms. Swayzer's pregnancy in the medical records of Aurora Sinai Medical Center and requested them. These records are received by Armor medical staff and reviewed, at least, two times on Monday, July 11, and Tuesday, July 12, 2016. These records indicate a "due date" of August 3, 2016, and that Ms. Swayzer's baby is healthy. However, even though Armor medical staff now have documented information that Ms. Swayzer is in the final month of her pregnancy, coming under 32+ week protocol, requiring that she be housed in SNU for special attention, this information is still not passed along. One of these record's reviews was completed by the Armor person in charge of pregnancy management, who absolutely knew, or should have known, of these housing and attention requirements. But, in neither case was this critical information passed to custody staff nor was she moved back to SNU at the direction of Armor or as required under policy and procedure. It is my opinion that these failures were irresponsible, derelict in duty, and disastrous to the life-safety of the about to be born, Laliah Swayzer.

42. On the last day before the birth of Laliah Swayzer, Wednesday, July 13, 2016, three more

events occurred that could have possibly changed the outcome and subsequent death of Ms. Swayzer's child, but again they were mishandled. First, the CO in charge of Housing Unit 4A, became aware of Ms. Swayzer's pregnancy; however, she did not explore these conditions any further nor make any notice of the concern on the Tier Card. Additionally, there were two encounters with Ms. Swayzer by Armor nurses, both, who knew, or should have known, of the directive by the Armor doctor that she was required to be housed in the SNU under the 32+ week protocol and acted to correct the situation. However, instead, simply did what appears to be a cell window review acknowledging that Ms. Swayzer was "logical', with "no distortions", etc. These failures to act, with less than 8 hours remaining before the birth of Laliah Swayzer, were the last opportunity to correct a situation that could have been properly addressed 7 days previously were it not for the multiple intentional and deliberate actions, inactions, and omissions by both MCSO and Armor personnel day after day. It is my opinion that these officers, as well as Armor staff were complicit in a correctional environment which does not make the health and safety of inmates a priority and that this permeates the MCSO/CJF operations. As such, through unprofessional attention to duty and a lack of operational integrity, the life safety of Laliah Swayzer was seriously jeopardized over the last opportunity for correction, on that evening.

43. Over the next eight and one-half hours from the late evening of Wednesday, July 13 (10:30 pm) thru the morning of Thursday, July 14, 2016 (6:55 am), the several actions, inactions, and omissions by the custody staff, specifically CO Witkowiak, bring into question the entire operation of the CJF, its supervision and management, its administration, and its training, as well as professional expectations. Over this period, simple and correctible equipment errors, like video timing one hour advanced while inmate clocks are one hour behind, as well as computer logging that is not trusted requiring duplicative records creating further confusion. Such identified items support a lack of professional commitment to national standards and especially the needs of inmates like Ms. Swayzer.

However, these are small indeed when examining the failures of those seen in the performance and behaviors of CO Witkowiak. These include, but are not limited to:

a. Her lack of attention to sanitation under the concept of "care", custody and control of a jail;

b. Her failure to act under the "Suicidal Inmate" policy when she observes the strange behaviors of Ms. Swayzer pacing and staying up all night;

c. He failure to conduct her rounds in a professional and committed manner as require by policy and procedure;

d. Her failure to act, in an emergency manner, when she was verbally advised by Ms. Swayzer that she was "hemorrhaging" or her "water broke";

e. Her failure to investigate further at 5:00 am when she saw something unusual in Cell #10, Ms. Swayzer's (which was immediately after the birth of Laliah Swayzer);

f. Her failure to investigate further, and act in an emergency manner, when she

26

smelled something "funky" near Cell #10 during her rounds at 5:35 am:

g. Her failure to act immediately, in an emergency manner, at 5:55 am when the "funky smell" was even stronger in Ms. Swayzer's cell;

h. Her failure to stop and truly assess the situation in front of Ms. Swayzer's cell at 5:57 am when she had an extended conversation with Ms. Swayzer, but rather, continued her rounds by assessing Housing Unit 4B;

i. Her failure to take immediate emergent actions when she returned to the Control Booth, after her rounds, and decided to talk to her partner after he finished his rounds;

j. Her failure to act independently by directing an emergency response, given her unusual and distressing observations, until she discusses these with the medical staff (6:04 am, then 6 minutes after her final talk with Ms. Swayzer and 1 hour and 4 minutes after she clearly has knowledge of unusual events by Ms. Swayzer);

k. Her failure, even at this point, to call for an emergency response until directed

l. to do so by the medical staff;

m. And finally, her failure to immediately arrange to meet the responding emergency staff at Ms. Swayzer's cell to provide a critical explanation for her call for an emergency response.

Above is identified, at least 12 points, during the shift of CO Witkowiak, where she could and should have acted responsibly relative the standard, as well as unusual observations she made. Such an extensive list of failures indicates a failure to train, to supervise, and to correct poor behaviors. The number and magnitude of these failures compound each other and indicate intentional and deliberate dereliction of duties and deliberate indifference due to her comment that she has become used to such observations and does not address them anymore. Her actions, inactions, and omissions lead to Ms. Swayzer giving birth to her child absent any help from custody and/or medical staff. Such failures, in conjunction with all the other failures, makes her specifically complicit in the death of Laliah Swayzer.

44. In characterizing all that is identified in this opinion area, the failure to act according to policy and procedure, as well as professional practices seems to permeate the operation of the MCSO/CJF. So many failures cannot simply be described as "inconsequential errors or mistakes" because the life of Laliah Swayzer was taken as a result. Time and again corrective measures could have been exercised but were not. This leads to conclusions that the action, inactions, and omissions were irrational, irresponsible, unprofessional, and indifferent to the needs of Ms. Swayzer and her child. It is therefore, my opinion that MCSO and Armor were intentional and deliberate in their inactions, actions, omissions, and therefore, culpable for the death of Laliah Swayzer.

C. **Secondary Opinion #2:** **The MCSO and Armor, as the Health Care Contractor, have been out of compliance with "Best Practices" and correctional standards, as well as MCSO/DSB Policy and Procedure:**

27

45. The "Best Practices (for a jail's overall custodial functions)" can be found in the American Correctional Association (ACA), Performance-Based Standard for Adult Local Detention Facilities (ADLF). The "Best Practices (for a jail inmates overall medical and mental health care)" is in the Accreditation Standards of the National Commission on Correctional Health Association (NCCHC). Both standards have been in place since before 1980 and updated ever since. The ADLF was last fully edited, in 2004 with slight modifications, as the years have passed.

46. To place these standards in perspective some definitions are important as follow:

   A. "Health Care" is the sum of all actions taken, preventive and therapeutic, to provide for the physical and mental well being of the inmate population. It includes medical..., mental health services, nursing, personal hygiene, dietary services, and environmental conditions;

   B. "Health Care Personnel" are individuals whose primary duty is to provide health services to inmates in keeping with their respective levels of health care training or experience;

   C. "Health Authority" is the health administrator, or agency responsible for the provision of health care services at an institution...;

   D. "Facility Administrator" is any official, regardless of title (for example Sheriff, ...) who has the ultimate responsibility for managing and operating the facility.

47. Of significance, relative to medical and mental health care (NCCHC Standards) is that the Armor Correctional Health Services contract required that Armor comply with these standards within one year after signing the contract with Milwaukee County and the MCSO. However, according to the Reports submitted by Dr. Ronald Shansky, the Christiansen Decree Monitor, these contractual obligations have yet to be achieved (Now 2018, some 5 years after the initial contract's signing). Specifically, under Section II, Subsection J, Women's Health, it states, "County defendants will develop a program for women's health including urine screening for pregnancy ... An obstetrician or family practice physician using standard prenatal protocols will follow pregnant women." Obviously, if properly developed, this would and should have been a positive for the care of Ms. Swayzer during her incarceration and pregnancy while in custody over the period 7/6-14/2016.

However, even though sometime before 2016, Dr. Shansky had identified the Armor pregnancy management effort in "Substantial Compliance", the actual operations and Shansky's Reports tell a different story. For example, in September of 2016, Dr. Shansky reported that he had a glowing conversation with the Armor person in charge of pregnancy management; however, in the same report, at the end, he reported on the death of Laliah Swayzer, after her birth in the cell of Ms. Swayzer unassisted by staff. Given that this same person saw and evaluated Ms. Swayzer on 7/11 taking no action

28

to move her to the SNU for the safety of the birth of Laliah Swayzer, the "glowing" statement characterized in Dr. Shansky's Report is in direct conflict with actual actions and inactions. Further, the "Substantial Compliance" report was also during a time when another inmate gave unassisted birth to her child in 2014. These consideration, along with the failure of Armor to become accredited after 5 contract years of service, calls all into question.

Also noted in the Dr. Shansky Reports is discussion of the requirement to have a properly functioning "Quality Improvement Council" (QIC). Per the Agreement, the QIC is to be chaired by the Medical Director, meet monthly, and "...evaluate in custody deaths, significant or unusual occurrences, etc." His Reports identify failures of the QIC to meet and, more significantly, discuss the significant areas of possible improvement (like pregnancy management). Given the inmate unassisted by staff baby birth in 2014, this Council should have certainly assessed this event and improvement standards put into place to ensure that Ms. Swayzer would not face a similar issue in 2016. Clearly, that must not have occurred as required. Also, of note:

    a. Dr. Shansky wrote in his April 2014 Report that "...in reviewing the minutes (of the QIC), we found that they consist of a series of announcements as opposed to data from studies on how to improve either processes or professional performance."

    b. Dr. Shansky also wrote as a Recommendation: "The QI program should monitor the clinical performance of the women's health nurse practitioner on a regular basis." One must wonder as to why he wrote such a recommendation when he has also written that this are of the Consent Decree is in Substantial Compliance."

Given this information, it is clear and convincing that Armor has been out of compliance with "Best Practices", as well as Accreditation Standards as are required pursuant to the contractual obligations of 2013. If they had been complying would the life of Laliah Swayzer been saved is unknown. However, being out of compliance certainly calls into question the entire program.

48. Armor Correctional Health Services also has an identified policy and procedures relative to pregnant inmates entitled "Counselling and Care of the Pregnant Inmate", #J-G-09, dated 10/2014. There are several significant points listed which directly did or should have affected Ms. Swayzer and her child, as follows:

    A. Procedure #2: "...Patients (over) 32 weeks gestation shall be admitted to the infirmary on observation status, or medical housing unit, until evaluated by the Health Care Provider (HCP)... The HCP will then provide further direction/orders re management and housing of the patient." This procedure seems extremely clear and with it, the Armor HCP had directed on 7/7/2016 that Ms. Swayzer be housed in SNU until her baby was born. However, this was not communicated to

custody staff by the Armor Physician, and Armor staff who had access to the files did not ensure this directive was followed.

**B.** Procedure #12: "Restraints during other pre-and postpartum periods should be avoided as much as possible and used only with consultation from medical staff. Abdominal restraints, ..., should not be used..." On Friday 7/8 Ms. Swayzer was moved from SNU to Housing Unit 4A by custodial staff including a supervising lieutenant. There was no contact with medical staff or they would have discovered that she should not be moved from SNU and a restraint was used to restrain her above her waist in the wheel chair. Again, had this procedure been followed, more pregnancy related information would certainly have been made available and the move as directed quashed.

**C.** Procedure #16: "Pregnancy care will be tracked using a Pregnancy Log Form (#MG-026)." No such form has been provided by Armor for Ms. Swayzer. Was this an oversight or another piece of the intentional and deliberate failure to follow policy and procedure required to ensure the safe care of pregnant inmates?

**D.** Under the Subsection entitled "Pregnancy Observation", it calls for pregnant inmates to be placed on the "OB/Housing/Infirmary Nursing Flow Chart", #IN-008. There are four (4) sub procedures which identify the duties of Armor staff relative to pregnant inmates including observation Levels one, two and OB. It goes on to say that "...the patient's care will be managed per routine clinical guidelines for obstetrical patients (Manual of Obstetrics, Seventh Edition, Lippincott, Williams, and Wilkins) and/or referred to contracted obstetrician." No such form has been provided by Armor for Ms. Swayzer. Was this an oversight or another example of a failure to follow policy?

This procedure seems very clear, understandable, and applicable to the needs of Ms. Swayzer and all relative to her while in the last month of her pregnancy while incarcerated in July 2016. However, it is also apparent that they were not followed as required. If they had been followed could Liliah Swayzer been born safely is unknown. However, the failure to follow them again brings the entire operation into question.

49. Relative to the MCSO Detention Services Bureau Procedure entitled "Treatment of Medical Conditions (MMHS 3.0), under Subsection 3.3. Pregnancy, it states, "Pregnant inmates receive timely and appropriate prenatal care, specialized Obstetrical services when indicated..." Under Pregnancy management it includes "...routine and high-risk prenatal care..." Further, it concludes with a statement commensurate with Armor's saying, "Inmates over 32 weeks gestation shall be evaluated by the Health Care provider (HCP) – usually within 24-48 hours. The HCP will then provide further direction/orders re Management and housing of the inmate." There are multiple pieces of available information that Ms. Swayzer is over 32 weeks pregnant and the Armor physician has directed that she be house in SNU until her baby is born. And yet, custody staff, like

30

Armor staff, took no steps to place Ms. Swayzer in SNU in compliance with the doctor's orders, the Armor policy or the MCSO directive.

50. In addition to policies and procedures related to health care, there are a couple of other best practices/national standards worthy of attention, including:

A. 4-ALDF-2A-30, Classification and Separation, states that, "There is a formal classification process that starts at admission, for managing and separating inmates, and administering the facility based upon the agency mission (see Opinion Summary), classification goals, and inmate custody and program needs. The process uses verifiable and documented data about inmates... At a minimum, the classification system evaluates the following: mental and emotional stability, ..., **medical status**, ... (and) need to keep separate." Although this is a national standard and the MCSO Classification Form itself has a specific area for including medical status, the MCSO Classification do not utilize this information and leave it fully up to Armor. As in Ms. Swayzer's case, the Classification Unit was not aware of pregnancy status as Armor did not tell them, classification did not ask, and classification did not have the standard face to face classification review so that a personal assessment could have been made. The MCSO process is not an accepted practice.

B. 4-ALDF-42-27, Mental Health Program, a Mandatory Standard, states that, "Mental health services include at a minimum: ..., crisis intervention ..., stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting, ..., (and) obtaining and documenting informed consent." Given Ms. Swayzer's mental health history while incarcerated, this standard has unique applicability to her being in custody while in her last weeks of pregnancy. The medical records reflect that several times she refused fetal examinations. Recognizing the sensitivity of the in-custody birth possibilities, the mental health staff should have initiated a competency review with the court for the safety of her unborn child relative to her ability to make an "informed refusal." This should, at the very least been assessed, but it was not.

C. 4-ALDF-4C-40, Special Needs Inmates, states that, "The facility and program administrator, or a designee, and the responsible clinician, or designee, consult prior to taking action regarding ..., physically disabled (pregnant, ..., developmentally disabled (special education person), inmates in the following areas: housing assignments ..." Ms. Swayzer had been assigned to the SNU by the physician; however, she was being moved to 4A. This national standard directs that any SN inmate that is being requires a consult with the medical staff. This did not occur in Ms. Swayzer's case.

D. 4-ALDF-4D-08, Emergency Response, a Mandatory Standard, states that, "Correctional and health care personnel are trained to responds health-related situations within a four-minute response time. The training program is conducted on an annual basis and is established by the responsible health authority in cooperation

31

with the facility or program administrator and includes instruction on the following: recognition of signs and symptoms, and knowledge of action that is required in potential emergency situations, ..., methods of obtaining assistance, ..., signs and symptoms of mental illness ..., suicide intervention." There were up to 12 events that over CO Witkowiak shift on 7/13/-14/2016 that could, or should have triggered an emergency response; however, it appears that she did not recognize any of them. Even after she was told to call for an "emergency response", the response took 9 minutes which was 15 minutes after her last contact with Ms. Swayzer, and over one (1) hour after she first had a clear suspicion that something was amiss. This Emergency Response standard was certainly not achieved in Ms. Swayzer's case.

These identified national standards, in my opinion, have applicability to what happened to Ms. Swayzer and her child during her incarceration in July of 2016. When combined with the other issues on point, these support the conclusions that the MCSO/CJF operation fails to meet national standards for a large jail in urban environment.

51. At this point it is beyond reasonable comprehension that these failures are mere oversights or mistakes. These policies and procedures support "best practices" in the corrections field, but they are not followed at the MCSO. This indicates an intentional and deliberate operational environment where no one is monitoring the operations so there is no accountability for following policy/procedures. Since there is no consequence for the failure to follow policy/procedure, there is no professional incentive to achieve best practices. As a result, pregnant inmates and their unborn, and then born, children will suffer.

52. As a final point in this area of opinion, the Christiansen Decree provided a detailed roadmap for proper, reasonable, and appropriate jail medical and mental health care starting in 2001. Over the years there have been multiple legal actions advising the Sheriff and MCSO of its failures to meet these requirements. These have included lawsuits on specific points in the Decree, including specific legal action relative to inmate complaints, like the female inmate who had an unassisted birth in 2014 by herself in her cell. There have been numerous reports by Dr. Shansky of the issues, with these coming twice a year, with specific recommendations for corrective measures. And yet, the Sheriff, David L. Clarke, Jr. and the Jail Inspector/Armor Contract Monitor, now Sheriff, Richard Schmidt, have continued to fail, for over 17 years, to achieve proper compliance. Such a failure can only be described as intentional and deliberate over such an extended period making these leaders culpable for the mishandling in all areas of Ms. Swayzer and her child Laliah Swayzer's incarceration in July 2016 (15 years after the Christiansen Consent Decree was signed).

## D. Secondary Opinion #3: The MCSO corrections and Armor medical/mental health staff training is insufficient and not properly sustained.

53. The MCSO Correctional Officer must be certified by the State of Wisconsin pursuant to the having successfully completed a 160-hour Basic Training Course. This program

32

must meet the training requirements as directed by Wisconsin Law Enforcement Standards Board. In Milwaukee, information was developed that this program is provided by the Milwaukee Area Technical College in conjunction with the Milwaukee County House of Correction. However, the detailed curriculum was not available at this writing nor was information developed as to the certification requirements for Correctional Officers working in 2016 (provided it might have been different).

Of note is that the "National Standard" is 160 hours as well, but the specifics of the curriculum are extremely important (4-ALDF-7B-10). The national standards call for specific training in "all emergency plans and procedures", "sign of suicide risk", "suicide precautions", "safety procedures", "communication skills", as well as other important operational skills needed to become a successful Correctional Officer. For Ms. Swayzer, and her child, Laliah, the specific training in these areas would be of significance. Did the "all emergency plans and procedures training" actually occur in the jail or was it only a "classroom exercise"?

The detailed training history of the involved COs has not been provided so the information is not available as to the involved MCSO staffs level of training, when certified, etc. Should this become available a further assessment may be made as to its sufficiency for a beginning Correctional Officer.

54. In addition to Basic Training, the "National Standard" calls for "Correctional Officers (to) receive at least 40 hours of training each subsequent year of employment" (4-ALDF-7B-10). No information has been provided that this standard is being met at the MCSO.

55. Further, the "National Standard" calls for "Facility management and supervisors to receive at least 40 hours of management and supervisor during their first year and at least 24 hours of management training each year thereafter" (4-ALDF-7B-11). No information has been provided that this standard is being met at MCSO.

56. Lastly in this area of note, the "National Standards" calls for "Correctional Officers assigned to a specialized emergency unit have at least one year of experience as a correctional officer and 40 hours of specialized training before undertaking their assignments. Officers on emergency units receive 40 hours of training annually, at least 16 of which are specifically related to emergency unit assignment" (4-ALDF-7B-12). Given the emergency response to the scene of Ms. Swayzer, and her child, it does not appear that MCSO/CJF has such a unit and only calls for "any supervisor" to respond. (Special Note: The Milwaukee County Jail (CJF) is considered a large metropolitan jail and is certainly subject to an emergency at any time. It would, therefore, be my opinion that the failure of the MCSO/CJF to have a "specialized emergency unit" or, at the very least, "specialized emergency response training" for supervisors has been intentionally and deliberately indifferent in its training responsibility.)

57. The "Inmate Classification Process" is an extremely important element of a successful

33

jail operation. The formal definition is "A process for determining the needs and requirements of those for whom confinement has been ordered and for assigning them to housing units and programs according to their needs and existing resources." It is, therefore, critical that those so assigned to conduct this process be properly trained in its mission and goals, as well as inmate custody and program needs. For Ms. Swayzer, Classification Officer Lt. Cunningham conducted the initial process. Pursuant to Lt. Cunningham's response during "Interrogatories", relative to her her training for this responsibility, she said she had "one week of on-the-job training" by another classification officer and has never read the MCSO/CJF Classification Policy and Procedure. She further said that, relative to the form used for classification purposes, she was trained to not use the information gathering box in the lower left "at all"; however, this is the location of the form designed to gather medical, mental health, etc. information that might be critical to insuring that inmates are properly housed according to their needs. CO Avery, the Classification Officer, who initiated the move of Ms. Swayzer to Housing Unit 4A also said she had no formal training other one week of "on-the-job". To say that the MCSO has been remiss in its training of Lt. Cunningham, CO Avery, and probably other Classification Officers would be a certain understatement. The mere fact that Lt. Cunningham has never even read the Classification Policy/Procedure is incredible. Relative to this lack of reasonable, appropriate, and absolutely, necessary in-depth training need, it is my opinion that the MCSO has not only provided insufficient training, it has provided no reasonable training at all.

58. I have monitored private jail health providers since 1986 in California, as well as Public Health Care Jail Programs in California and Florida from 1998 thru 2013. Part of this monitoring is to ensure that the medical provider conducts a proper level of training for its staff. Since 2014 the Armor contract has required that the Health Services Program was to have been NCCHC Accredited, upon which, then the expected training standards, under this accreditation process, were expected to have been met. Per Dr. Shansky's Reports, Armor had not achieved accreditation by the time of Ms. Swayzer's incarceration in July 2016, and as such, although presumptive, the training requirements must not have been met either. This is supported by Dr. Shansky's reports that there has been significant turnover of staff, the use of overtime to fill vacant positions, and temporary staff to fill vacancies which indicates that Armor had staff assume positions without truly understanding their expected responsibility. This is also supported by RN Porlucas' deposition indicating he had been working many excess hours in 2016 filling vacancies, as well as assuming duties, like PSW, when PSW staff were unavailable.

For example, RN Porlucas assumed PSW duties relative to Ms. Swayzer on Thursday, July 7, 2016. In completing the form required under this function, he noted that she had mental health issues and was "pregnant". However, rather than giving these seemingly very important concerns necessary attention, he focused on the hug he received from Ms. Swayzer in gratitude for his attention. Rather than giving due attention to mental illness and pregnancy, which he seemingly had an affirmative duty

34

to address, he simply filled out the form and never connected her 32+ weeks gestation and mental health for Special Needs housing and attention. As such, his training certainly comes into question.

59. On September 8, 2003 a Milwaukee County Internal Audit of the jail's operations, surrounding the Christiansen Decree, was conducted by Mr. J. Herr. In this eleven (11) page report, a special staff training requirement of 44 hours was identified for all MCSO/CJF staff. The curriculum of this training was not identified, but it obviously surrounded the issues and concerns of the Christiansen Decree. Since the Christiansen Decree was still in place in 2016, and still not satisfied, this training requirement must also have been in place; however, no information has been provided that this training occurred for any of the staff involved with Ms. Swayzer and her child. Although presumptive, the failure to have this training for 2016 staff means that MCSO was in violation of the Decree requirements, that the training was clearly insufficient, and staff were not trained to deal with the issues surrounding the birth of Laliah Swayzer.

60. Training for correctional staff as well as medical is critical in a jail environment. Although the Florida Certification Process is different than Wisconsin, the differences are dramatic. To be a certified corrections officer in Florida, the initial training is a minimum of 720 hours (or 18 weeks) followed by the successful passage of a 300-question certification exam, a minimum 3-week Field Training Officer Oversight Program and a minimum of one-year probation. Even non-certified staff have a 12-week training program. It might seem to some that to make such a comparison is unfair, but given the death of Laliah Swayzer, with a similar adverse birth in a cell situation in 2014 at the Milwaukee County Jail, the topic of proper training for all staff is a reasonable and appropriate inquiry to make. It is therefore my opinion that the training at the MCSO/CJF has been insufficient, not sustained, and, basically, not updated, despite the unassisted birth event of 2014, to the detriment of Liliah Swayzer and her mother.

**E. Secondary Opinion #4: The MCSO and Armor do not follow their policies, procedures, and practices and, when updates are needed, they are not timely.**

61. In Dr. Shansky's Report of 2016, he refers to Armor policies and procedures being inadequate, as they had not been properly updated since 2014. This is a NCCHC standard, of which, Armor was suppose-to-have achieved by 2014 but had not.

62. Armor, via policy, procedure, and practice, is suppose-to-provide the Classification Unit with all appropriate information regarding an inmates' "Special Needs". However, the Armor Physician, on 7/7/2016 and thereafter, admitted failing to advise the Classification Unit that Ms. Swayzer was in her last trimester of pregnancy and was required to remain in SNU until the birth of her child.

63. Although the Inmate Classification Form, itself, calls for Classification Officers to

35

examine "Special Needs" like medical issues (located on the left side of the form), Classification Officers are trained to not investigate this issue and told that they are not to use this area of the form. Since the creator of the form must have recognized the importance of this information, to have the users of the form told to not use the area is incomprehensible. Such a failure in classification process and procedure lead to Ms. Swayzer being incorrectly housed in a unit where she could not be properly monitored during her late term pregnancy and in violation of a directive given by the Armor Physician. (Special Note: Sometime in 2017 or beyond (date uncertain), Classification Staff was directed "verbally" to identify pregnant inmates and place a "P" on their classification documents. This also, apparently, included a directive to house all pregnant inmates in the same location. Although too late for Laliah Swayzer, for the future, maybe such an adverse event might be mitigated.)

64. The "Tier Card" is a document, per procedure and practice, that moves with the inmates wherever they are moved within the jail. On the front is some initial identifying information, but on the back is located space to include routine information as well as special needs information. Ms. Swayzer's card had no information on her, even given, her identified special needs and many clinical contacts and visits. Even something simple like "late term pregnancy, monitor closely" seemingly would have allowed custody staff to be aware of the concerns surrounding Ms. Swayzer but there was nothing. Even though some custody staff, like CO Love, knew this information as early as 7/7/2016, no documentation per policy was made on the card. Even though Lt. Andrykowsky had two opportunities to provide such information, he did not. Other custody staff knew and they, also, did not write the information on the card. Such inactions support the concept of intentional and deliberate indifference to their required duties at the jail and all to the detriment of Ms. Swayzer and her child, Laliah.

**F.** **Secondary Opinion #5:** **The MCSO and Armor failed to provide proper supervision of staff operations nor provide sufficient auditing of practices to insure adequate compliance with policy and procedure.**

65. One of the most critical topics identified in Dr. Shansky's Reports is the failure to have a properly functioning auditing process in place via its "Quality Improvement Council" (QIC). He found that the QIC only functions as a "... series of announcements as opposed to data from studies on how to improve either processes or professional performance." His discussions, after these findings, included, that the QIC should improve its focus, on intake processing, sick call, ..., specialist referrals, unscheduled care, infirmary services, ..." and others. Further of special note, in his April 2014 Report, he recommended that the QIC "... should monitor the clinical performance of the women's health nurse practitioner on a regular basis." These indicate a responsibility for Armor to meet contract obligations but is also indicative of MCSO not properly overseeing that Armor does, in fact, meet its obligations.

66. In Dr. Shansky's Report of May 16-20, 2016 (just two months before the event surrounding Laliah and Shade Swayzer) he reported that there had been "instability in

the (Armor) administrative leadership, as well as nursing leadership." In the Report he noted that there were 17 of 31 RN position vacant, 9 of 26 LPN vacancies, and 7 of 14 Nurse Practitioner vacancies. He indicates an overall vacancy rate of 30% and clearly many of these are in supervisory positions. Regarding this he states, "...a high vacancy rate is not consistent with adequate quality of service but also does not portend well to achieving substantial compliance (with Christiansen Decree even after 15 years". This 15-page report goes on to identify several other deficiencies including that the Records System does not meet the needs of the staff in monitoring cases. This Report indicates numerous issues with the Armor operation and this is just before the birth and death of Laliah Swayzer.

67. Additionally, in his May 2016 Report, Dr. Shansky writes, "I am concerned about the support being provided to the downtown jail health program by the custody leadership." This points directly at Sheriff Clarke and the MCSO jail administration and leadership as failing to monitor the inmate health program insuring its integrity. At the writing of this Report, Armor Correctional Health Care has been in place for over five years, but still has failed to meet NCCHC Accreditation Standards as directed contractually. It is obvious that MCSO is not paying adequate attention to the Inmate Health Care. The failure of the Sheriff and MCSO to address these concerns immediately and directly is indicative of deliberate indifference to the needs of all inmates especially, Ms. Swayzer.

68. Although possibly tangential to the events of Ms. Swayzer but with certain relevance to the overall operation of the CJF, Dr. Shansky's Report of August 7, 2012 stated the following:

> During his review, several issues came up in which officers attempted to substitute their judgement for the judgement of health care staff... In one instance, an officer wanted to place a disturbed pregnant woman who was near term on a restraint bed. Instead the Monitor and women's health nurse practitioner... had her sent to the hospital, where a day later she... (gave birth).

Given the number of opportunities that CO Witkowiak had to contact inmate health care over the evening/morning of July 13-14, 2016, relative to her contacts with Ms. Swayzer, was she substituting "her judgement" over that of the health staff? Given the event noted above, the unassisted birth of another baby in a cell in 2014, and Ms. Swayzer's events, it is only reasonable to opine that custody staff were still using their judgement over that of medical staff. Further, it seems clear and convincing that supervisory and management staff failed in their oversight of such concerns.

G. **Secondary Opinions #6:** The MCSO only addressed some very limited mitigating actions, after the death of Liliah Swayzer and the violation of the civil rights of Ms. Swayzer, indicating that the intentional and deliberate dereliction of professional, responsible, and national expectation of duties were continuing.

37

69. In late 2016 or in 2017 (date uncertain), the Classification Unit was advised "verbally" that all pregnant inmates were to have a "P" placed on their classification and Tier Card paperwork. The inmates were then to be housed in the same area of the jail. Although it would be my opinion that an entirely new and comprehensive policy and procedure should have been created, at least, something was done. Too late for Laliah, but possibly better for other pregnant inmates and their children.

70. In early January 2018, the new Sheriff, Richard Schmidt, announced that he was appointing an Inmate Wellness Monitor, creating a Jail Transition Program (relative to medical care), and assuring the Milwaukee community that the MCSO would come into compliance with the 17-year old Christiansen Decree by April of 2018. Each of these actions points to a final recognition of the problems that have previously occurred, but too late for Laliah and Ms. Swayzer.

71. In December 2017 there was another jail death. However, rather than directing his own MCSO Detectives to conduct the investigation, Sheriff Schmidt chose an outside agency. This supports a belief that he could not trust his staff to conduct a fair and impartial inquiry. Given that six (6) custody and medical staff were indicted out of separate investigation in the dehydration death of Mr. Thomas in April of 2016, just before the events with Ms. Swayzer, such an action seems most appropriate. As such, though, the integrity of MCSO Detective Desotell investigation of the death of Laliah Swayzer requires sincere scrutiny as well.

72. Throughout the 17 years of the Christiansen Decree there could and should have been many, many collaborative meetings between the Sheriff, MCSO leadership, the County Hospital, and then Armor. Since at every step of Ms. Swayzer's incarceration between 7/6-14/2016 there was either no communication or miscommunication, such problems should have been resolved at monthly, quarterly, bi-annual, etc. meetings with an Action Plan to follow. However, there is no evidence of this which means that each adverse inmate medical issue compounded the next which has resulted in this lawsuit and others. Unfortunately, it seems that this lack of communications is continuing to the detriment of inmates now beyond Ms. Swayzer and Laliah.

**The above identifies my opinions regarding this matter as I have concluded from the materials I have been provided and assessed, along with some materials I have reviewed to augment my own knowledge. Should new information be developed I reserve the right to re-assess my opinions pursuant to this new information.**

## VI.    Conclusion

73. Given my 44 years of public service in the corrections profession and jail management, I have had the opportunity to lead the operations of four of the largest jails in the United States, the last being the Miami-Dade Corrections and Rehabilitation Department in Florida (the eighth largest system in the United States). Additionally, I participated in the American Jail Association for over 20 years which addresses the needs of all jails in America, big and small (President in 2002-2003). With this experience in mind and much more in training and education, I am truly aware of the challenges facing America's jails.

74. However, in full recognition of this (#73 above), no jail can divorce itself from its professional and legal responsibility for the proper care of any individual incarcerated, even though they might be pregnant, mentally ill and/or medically compromised through their own actions. It remains a requirement of the jail to ensure the proper care, custody, control, safety, security, and well-being of such persons no matter their reason for being brought to the jail. Each jail is required to live up to its "Community Standard of Care". As such, I cannot believe that anywhere in Milwaukee a pregnant woman must give birth unassisted when medical assistance is immediately available.

75. Relative to Ms. Swayzer, the MCSO/CJF and Armor, together and separately, had numerous opportunities to correct this situation over the 8 days she was in custody prior to the birth of Laliah. In the words of RN Porlucas while discussing her need to have remained in SNU, he said, "She should not have been housed in GP. (She was) in no way capable of GP in her condition." She was not actually in GP, but the most important element was that she was not in SNU either which was where the Physician had directed she be housed. This is only one of the numerous trigger points where Ms. Swayzer's situation could have changed. However, repeatedly, these triggers for action were either missed, dismissed, or improperly addressed. The result was the unfortunate unassisted birth of Liliah Swayzer and her death.

76. Overall, the actions, inactions, and omissions that surround the death of Liliah Swayzer and the civil rights of her mother, Shade, including, but not limited to, a failure to follow policy and procedure, a failure to provide adequate training, a failure to supervise and properly manage the operation whether custody or medical, and a failure to provide leadership and commitment to insure that the jail meets professional and correctional standards, rests solely under the responsibility of the Sheriff of Milwaukee County, Milwaukee County, its staff, and its inmate medical contractor, Armor Correctional Health Care, Inc. and for which they are fully accountable.

**My comments, findings, opinions, and conclusions are presented with a reasonable degree of certainty based upon the documents cited and the professional standards reviewed, along with my education, training, and experience of 44 years of public service**

in the operation and administration of four (4) of the largest jails in America. However, I must reserve the right to revise this Report if it becomes necessary to review additional materials

_____
Timothy P. Ryan

Date: 8/13/2018

CINDY SORTO
Commission # FF 908257
Expires August 10, 2019
Bonded Thru Troy Fain Insurance 800-385-7019

08/13/2018

# **APPENDICES**

41

**Timothy P. Ryan, MPA, CJM**
**Retired Director of the Miami Dade Corrections and Rehabilitation Department**
**(Presently working as Ryan Correctional Consulting Services, PLLC)**

Timothy P. Ryan is the Retired Director of the Miami Dade Corrections and Rehabilitation Department, January 2014; previous Chief of the Orange County, Florida, Corrections Department; Chief of Santa Clara County, California, Department of Corrections; and Commander of the Corrections Division of the Alameda County Sheriff's Office, Oakland, California. He has a total of 44 years of public service in the jails of America serving through the ranks of Deputy Sheriff, Sergeant, and up thru Commander in the Sheriff's Office, and then, assuming the administrative leadership of three other agencies. Tim's educational background includes a BS in Business from the University of California, Berkeley, 1970; a Master of Public Administration from the California State University, Hayward, California, 1976; Graduation from the 175th FBI National Academy, 1993; and completion of the 2001 Senior Executives in Local Government, Harvard University, JFK School of Government, Cambridge, Massachusetts. Tim is a past "Dual Certified" Corrections and Law Enforcement Officer in Florida, as well as previously completing all the necessary training under California's STC requirements.

Tim is a Life-Time Member of the American Jail Association (AJA) having served as its national President 2002-2003. He was one of the first AJA Certified Jail Managers (CJMs) remaining certified since 1997. He has been a member of the American Correctional Association (ACA) for over 20 years having served on the Delegate Assembly, Commission on Accreditation for Corrections, the Standards Committee, and the Adult Local Detention Committee. He was a member of the NIC Large Jail Network for over 20 years conducting training for NIC, as well as most recently serving as a jail assessor for Technical Assistance Projects. While in Florida he was a Commissioner on the Florida Commission on Accreditation for Corrections (FCAC), appointed by the Governor to serve on the Executive Board for the Criminal Justice Institute, and trainer for the Florida Sheriff's Association on jails and general correctional issues. Over his career he has served numerous national, state, local, non-profit, and private groups while speaking before many civic and government entities. (Also: For 17 years (1983-2000) in California he served as an elected School Board Member serving 14,000 students, 1500 employees, and 70,000 constituents.)

Tim lives in Miami with his wife Sue. He has two sons living with their families in California, along with, three grandchildren. He is the Past-President of the Rotary Club of Miami, is a Board Member for the local Mothers Against Drunk Driving, is involved in his family genealogical research, has started collecting coins to keep out of his wife's hair, and has become a "cruiser" whenever he can with trips including crossing the Atlantic to Italy, then a separate one to the Grecian Isles (catamaran around the islands), Croatia (river cruise), etc., and just completing a trip to Istanbul, Turkey followed by a cruise from Venice to Athens where he visits police agencies and jails, if possible.

# Appendix B: RESUME
### (3/2018)

## Timothy P. Ryan, CJM, MPA, BS
### 3333 Rice Street #203
### Miami, FL 33133-5299
### TimSueRYAN@aol.com
### (786-999-5096; 305-442-2127)

## Ryan Correctional Consulting Services, P.L.L.C.
### Same
### EIN: 46-5233249; SAM: 7AV81; DUN: 048-512-493
### Florida Certification: L1-4000041707
### Created: March 12, 2014

**PRESENT POSITION:**

> **Consultant,** serving as correctional assessor/auditor, trainer, and expert witness since 3/12/2014;

**SUMMARY:**

> Over forty-four years in correctional and law enforcement services with experience covering administration, command, supervision, coordination, and duty in county jail and community corrections (probation) activities, including personnel and budget, internal affairs, patrol, criminal investigation, court security, recruit academy training, planning and research, records control and automated systems operations; and additional experience in legislative analysis, program development, technology application, criminal justice research, professional training, and local and national jail operational audits and assessments.

> Serving over the last four plus years as a jails operational consultant for NIC regarding 15 jails in America, a Trainer for NIC, AJA, and SHSU, as well as an expert witness in 3 defense and 4 plaintiff related cases.

**PHILOSOPHY:**

> With a corporate motto of _**"Organized to advance the field of corrections"**_ and a personal approach of _**"Have Problem, Will Solve"**_, I would offer that I have an open and honest style which, when coupled with my professional experience and educational background, exhibits the necessary credibility to gain the confidence of those with whom I work. I would characterize my approach as one that insures a critical, but proactive legal assessment, which will accurately determine the points at issue, leading to appropriate and meaningful resolutions.

**ETHNICITY:**

Native American, Cherokee #C0053286

**PREVIOUS POSITION:**

**Retired - Director (1/17/2014), Miami-Dade Corrections and Rehabilitation Department (MDCR).** Appointed to the position of Director of MDCR on December 4, 2006. With nearly 5,000 inmates in custody and 3,000 in community-based programs, the Miami-Dade C&R Department is the largest jail system in Florida and the 8th largest in the nation. The department employs over 2,200 sworn and 600 civilian staff, with a budget of $300 million, while serving 37 law enforcement agencies. It processed nearly 90,000 arrestees in 2013, all within 5 jails, including a Boot Camp. It includes court services and inmate transportation, as well as pre-trial services and juveniles, who are processed as adults. The Department developed a Master Plan in 2008 and is pursuing a Mental Health Diversion Facility and a new 2,000-4,000 jail facility, plus infra-structure.

**EDUCATION:**

**California State University** – East Bay, Hayward, CA, **Masters**, 1976: **Public Administration.**

**University of California**, Berkeley, CA, **BS**, 1970: **Business Administration.**

**Harvard University**, John F. Kennedy School of Government, Boston, MA, **Graduate**, 2001: Senior Executives in State and Local Government Program.

**FBI National Academy (175th Session)**, Quantico, VA, **Graduate**, 1993: Executive Leadership, Legal Issues, Media Relations, Terrorism Assessment, Forensics, Major Case Management, and Fitness;

**Florida State Sheriff's Association – Jail Managers Workshops, Trainer/Speaker/Moderator/Sponsor/Attendee** (2002 – 2013);

**Valencia College**, Orlando, FL, **Graduate**, 2003: Corrections Officer Recruit Academy - Modified Program.

**California Standards and Training for Corrections (STC) Programs, Graduate/Attendee Certificates** (1987 – 1998): Jail/Correctional Management, Medical Issues in Jails, Inmate Management, and Others;

**California Peace Officer Standards and Training (POST) Programs, Graduate/Attendee Certificates** (1971-1998): Executive Development, Long Range/Strategic Planning, Advance Management, Leadership, Jail/Police/Administrative Services/Personnel/Records/Civil/ Emergency Management, and Supervisory/Intermediate/Basic Training.

**Alameda County Sheriff's Academy** (Recruit Training), Pleasanton, CA, **Graduate**, 1971: Valedictorian.

**Chabot College**, Hayward, CA, Law Enforcement Program and Teacher Education Certification, **Supplemental Course Graduate**, 1976-1984.

**ELECTED OFFICIAL:**

**Retired – Trustee, Livermore Valley Joint Unified School District, Board of Education**, Elected 12/1983 – 11/2001, Livermore, CA, overseeing 14,000 students, 1,500 employees, 5 unions, and 70,000 constituents. **Board President:** 1985/86, 1989/90, 1994/95, and 1999/00.

**PAST EXPERIENCE:**

**Chief of Corrections**, Resigned to accept MDCR Director Position, March, 2002 – December, 2006, Orange County Corrections Department, 3723 Vision Blvd., PO Box 4970, Orlando, FL 32802-4970.

**Chief of Correction**, Retired (3/20/2002), February, 1998 – March, 2002, Santa Clara County Department of Correction, 180 West Hedding Street, San Jose, CA 95110-1772.

**Commander, Detention and Corrections Division**, Retired (2/28/1998): September, 1989 – January, 1998, Alameda County Sheriff's Office, 1401 Lakeside Drive, 12th Floor, Oakland, CA, 94612. Previous ranks:

| | |
|---|---|
| **Captain:** | 1986 - 1989; |
| **Lieutenant:** | 1979 - 1986; |
| **Sergeant:** | 1974 - 1979; |
| **Deputy:** | 1970 - 1974. |

**CREDENTIALS:**

**American Jail Association (AJA)**, **Past President** (2002 – 2003), **Member** (AJA Board of Directors 1996 – 2004), and **Certified Jail Manager** (1997 – Present);

**American Correctional Association (ACA)**, **Commissioner** (Commission on Accreditation for Corrections (2005 – 2008)), **Delegate** (ACA Delegate Assembly (1998 – 2004)), **Member** (Adult Local Detention Committee (2000 – Present)), **Member** (Task Force on Correctional Affiliations (2002 – 2003)), and **Member** (ACA Standards Committee (2004 – 2008));

**National Institute of Corrections Programs (NIC)**, **Graduate/Attendee** (1987 – 2013): Large Jail Network (1993-2013), Correctional Leadership, Public and Media Relations, HONI/PONI Schools, and Direct Supervision.

**Federal Emergency Management Agency (FEMA)**, **Certified Emergency Manager** (2006);

**Florida Corrections Accreditation Commission (FCAC)**, **Commissioner** (2010 – 2013);

**Florida Department of Law Enforcement (FDLE), Certified Correctional and Law Enforcement Officer** (Dual Certification Standards 2003/05 – Present);

**Florida Criminal Justice Executive Institute (FCJEI), Board of Directors, Gubernatorial Appointee** (2004 – 2013);

**State of California, Community College Life-Time Teaching Credential** (1980): Police Science

**UNIQUE CORRECTIONAL EXPERIENCE:**

**AJA Representative/Member, Integrated Justice Information Systems Institute (IJIS),** Grantee from DOJ, Washington, D.C. (2014): Selected as one of the jail professionals to be involved in the PREA Work Group;

**Director, Miami-Dade County Corrections and Rehabilitation Department,** Miami, FL (2007 -2008): Administrator overseeing the research, preparation, review, and presentation of the County's Correction's Master Plan;

**Juror, American Institute of Architects, Annual Justice Review Committee** (2012): One of Seven Nationally Recognized Criminal justice Expert Selectees;

**Selected Advisor, Federal Bureau of Justice Assistance (BJA)** (2007 -2008), Orlando, FL and Las Vegas, NV: Jail Leaders "Speak on Current and Future Challenges in Jail Administration and Operations";

**AJA Selected Representative, Federal Commission on the Prison Rape Elimination Act of 2003,** Miami, FL (2006): Presentation of the "National Position" of American Jails Association regarding the act's implementation;

**Selectee/Member, National Prisoner Re-Entry Roundtable Task Force,** Council of State Governments, Washington, D.C. (2006);

**Commissioner, Commission on Safety and Abuse in America's Prison (and Jails),** Vera Institute, Washington, D.C. (2005): Selected as national jail representative;

**Selectee/Member, Prisoner Re-Entry Institute Advisory Committee,** John Jay College, New York City, NY (2005 -2008);

**AJA Selected Representative, Federal Bureau of Justice Statistics (BJS),** Washington, D.C. (2003) and New Orleans, LA (2004): Prison Rape Elimination Act of 2003 Implementation Workshop;

**Selectee/Member, American Probation and Parole Association,** Dallas, TX and Washington, D.C. (2003): Council on Re-Entry Policy;

**Selectee, National Center for Disease Control (CDC),** San Antonio, TX (2003): Participant in the Workshop on the "Management of Hepatitis C in Prisons (and Jails)";

**Selectee/Member**, **National Institute of Corrections (NIC)**, Washington, D.C. (2002): Participant on the Assessment Committee for "Staff Sexual Misconduct with Inmates";

**Attendee as President of AJA**, **National Highway Traffic Safety Administration**, Washington, D.C. (2002): DUI Processing Review;

**Selectee/Member**, **California State Board of Corrections**, Sacramento, CA (1999): Executive Steering Committee to conduct the 2000 Biennial Review of the Minimum Jail Standards for Local Detention Facilities;

**Selectee/Participant**, **California State Board of Corrections**, Sacramento, CA (1997): Executive Committee to assess the "Impact of the Three Strikes on Local Jails";

**Gubernatorial Appointee**, **Representative for the California State Sheriff's Association**, Sacramento, CA (1987 – 1988): Senate Bill 550 – Advisory Committee on Pharmacy Standards in Corrections;

**Transition Leader**, **Captain/Alameda County Sheriff's Office**, Dublin, CA (1986 – 1989): Coordinated the construction, personnel plan, and policy/procedural development for the $172 million, 3600 bed Santa Rita Rehabilitation Center which opened September 1, 1989;

**Transition Team Manager**, **Lieutenant/Alameda County Sheriff's Office**, Oakland, CA (1983 – 1984): Developed operational plan components for the opening of the new North County Pre-Detention Facility (Jail);

**Sheriff's Training Officer**, **Alameda County Sheriff's Office, Training Academy**, Dublin, CA (1974 – 1991): Recruit Training Officer, and Intermittent Supervisors and Management Presenter and Trainer;

**Law Enforcement Liaison Officer**, **Sergeant/Alameda County Sheriff's Office**, Oakland, CA (1974 -1977): Served as the Sheriff's Representative to the CORPUS Integrated Criminal Justice Information System coordinating the 17 Alameda County Law Enforcement Agencies in the development of the Consolidated Arrest Report and overall technology program implementation;

**Research Sergeant**, **Alameda County Sheriff's Office**, Oakland, CA (1974 -1976): Grantsmanship (Helicopter, Navigable Waters, and Inmate Education Programs); Analyst (Legislative Issues: Privacy/Security, Criminal Records Release, and Misdemeanor Release Policy); and Federal Jail Planning and Research Assessments.

**OTHER UNIQUE RECOGNITION/ EXPERIENCE:**

**Manager of the Year**, Alameda County, CA, (1994): Selected among 2,000 Alameda County managers for the first annual presentation;

**Coordinator**, **Commander/Alameda County Sheriff's Office**, Hayward, CA (1997): Bay Area Mutual Aid Response to the "Rodney King Verdict";

**Coordinator, Commander/Alameda County Sheriff's Office**, Hayward, CA (1991): Bay Area Mutual Aid Response to the "Oakland Fire Storm";

**President, Alameda County Management Employees Association (ACMEA)**, Oakland, CA (1991 – 1992): First President of the Association leading it in its inaugural year as the representation organization for managers in the county.

**Recognized, Alameda County Board of Supervisors**, Oakland, CA (1989): Relative to actions after the "Loma Prieta Earthquake";
**Reserve Police Officer and Deputy Sheriff, Miami-Dade Police Department**, Miami, FL (2007 – 2014) and **Orange County Sheriff's Office**, Orlando, FL (2002 -2006);

**Graduate, Orlando Florida Chamber of Commerce**, Orlando, FL (2004): Leadership Orlando Class #62;

**Regional Director, California School Boards Association (CSBA)**, Sacramento, CA (1997 – 2001): Representing the Board Members of the School Districts of Alameda County, CA;

**Elected Member, California School Boards Association (CSBA)**, Sacramento, CA (1989 – 2001): State Delegate Assembly;

**Graduate, California School Boards Association (CSBA), Boardsmanship Academy** (1991 - 1992): Leadership, Forecasting, Spokesperson, and Other Training;

**Attendee, American Telephone and Telegraph (AT&T), Corporate Education and Training** (1992): Communication about Performance and Development;

**Member, Joint Powers Board of Directors, Special Education Local Plan Agency**, Alameda County, CA (1984 – 1999): President (1991);

**Member, Joint Powers Board of Directors, Amador Valley Regional Occupational Programs**, Alameda County, CA (1986 -1990): President 1986/87 and 1989/90);

**Field Platoon Leader, Lieutenant/Alameda County Sheriff's Office**, Livermore, CA (1982): Response Team Supervisor to the civil demonstrations during the "Livermore National Laboratory Blockade";

**President, Country Children Count Association (CCC)**, Livermore, CA (1979 -1983): 300 Community-based Educational Watch Dog Organization;

**Personal General Contractor, Construction of Home**, Livermore, CA (1979 -1980): Twenty-five acre ranch north of city;

**Negotiations Chairman, Alameda County Deputy Sheriff's Association (DSA)**, Oakland, CA (1974 -1976): Lead the Association in its first response to employee representation discussions with the county under the newly approved California State Law "Meyers/Millias/Brown Act".

**SPECIAL AUDITS/**
**INVESTIGATIONS/**
**ACTIONS:**

**Expert Witness Case Review, Consultation, and Testimony (2014-2018),** involving:

1. Inmate homicide (Consulting only);
2. Four separate cases of inmate suicide (1 settled);
3. Staff/Inmate Use of Excessive Force Allegation;
4. Staff sexual misconduct allegations/civil rights violations.

**Volusia County, FL, Vulnerability Assessor (Jail Expert)**, selected October, 2014:
Relative to breach of security concerning the exposure of the Branch Jail Renovation
Project's architectural and masonry plans on the Internet and *risk* to present and future
jail operations;

**Miami-Dade County Jail, Miami, FL, Director of the County Response Team,**
Selected by Office of the Mayor, (2008-2014): Addressing the County Responses to the
Department of Justice (DOJ) Investigation under the Civil Rights for Institutionalized
Persons Act (CRIPA);

**Fulton County Jail, Atlanta, GA, Investigative Team Member (Jail Expert)**, Selected
by NIC, June 2010: One of three nationally identified jail professionals to audit/assess
physical plant, jail operations, and adequacy of policies/procedures after a jail/court
escape event;

**Prince George County, MD, Investigative Team Member (Jail Expert),** Selected by
ACA, July, 2008: One of four nationally identified jail professionals selected to conduct
an administrative inquiry into the internal operations of the jail necessitated by the
mysterious death of an inmate.

**Technical Resource Provider (TRP), Auditor/Assessor for NIC,** relative to the
following fifteen (15) County Jails:

- Multnomah County (UOF), Portland, OR (12/10/2016)
- Osceola County (Facility), Kissimmee, FL (7/27/2016);
- Lawrence County, Deadwood, SD (5/2016);
- Baltimore City Jail (Staffing), MD (3/31/2016);
- Bernalillo County (UOF), Albuquerque, NM (11/2015);
- Franklin County Jail, Pasco, WA (9/2015);
- Philadelphia Prison System (UOF), MD (9/2015);
- Pueblo County, CO (2014);
- Jasper County, IO (2014);
- Baltimore County, MD (2014);
- Snohomish County, WA (2013);
- Baltimore City Jail, MD (2013);
- Westmoreland County, PA (2012);
- Siskiyou County, CA (2012);
- Shelby County, GA (2012).

**Judicial Order Administrator, Captain/Alameda County Sheriff's Office,** Santa Rita Rehabilitation Center, Dublin, CA (1986): Assessment and implementation of the Judicial Jail Capacity Release Order to reduce jail over-crowding.

**Master's Thesis, California State University,** Hayward, CA (1976): The applicability and results of the State Probation Subsidy Act on Alameda County probationers and county costs;

## SPECIAL PRESENTATIONS:

**Speaker/Presenter, American Jail Association (AJA), Jail Expo and Training Conferences,** Numerous National Locations (1995 -2014): Presentations/Workshops including, but not limited to, PREA, Direct Supervision, Budget Management, RFP Development, Vendor Understanding, Personnel Scheduling, and Others;

**Speaker/Presenter, American Correctional Association (ACA), Annual Conferences,** Numerous National Locations (2002 – 2014): Presentations/Workshops including, but not limited to, PREA, Vendor Understanding, RFP Development, Direct Supervision, and Others;

**Speaker/Presenter, Florida Sheriff's Association (FSA), Annual Jail Administrators Conferences,** Several Florida Locations (2003 -2013): Speaker on "Jail Deaths and Investigations", plus presentations on "Hot Topics in Jail Operations" and "Legal Issues";

**Speaker/Presenter, Numerous Civic Groups including Rotary, Lions, Kiwanis, Chambers of Commerce, and Others,** California and Florida (1983 -2014);

**Plenary Speaker, American Association for Treatment of Opioid Dependency (AATOD),** Atlanta, GA (2006);

**Special Speaker, American Correctional Association (ACA),** Dallas, TX (1995): A response to "Overcrowding and Innovative Alternatives to Incarceration";

**Presenter, Livermore Chamber of Commerce,** Livermore, CA (1991 – 1992): "Leadership in Education";
**Commencement Speaker, Livermore Valley Joint Unified School District,** Livermore, CA (1984 – 1999): High Schools (1984, 85, 86, 91, 92, 93, 95, 98 and 99) and Middle Schools (1985, 87, 88, 89, 90, 96, 97);

**Speaker/Presenter, California Work Furlough Conference,** Concord, CA (1988): The "Role of Work Furlough in the Reduction of Jail Over-Crowding".

## PUBLICATIONS:

**"The Sensitive John Wayne" (Section: Your Haas Network),** Berkeley Haas Magazine, Page 17, Fall, (2014);

**"My Excellent Opportunity: A Personal Reflection" (Retirement Speech),** American Jails Magazine, Page 39, July/August (2014);

"Incarceration Therapy: Local Approaches", <u>Corrections Today Magazine,</u> February (2006);

"Confronting Confinement", <u>Report of the Commission on the Safety and Abuse in America's Prisons (and Jails)</u>, Vera Institute, Washington, D.C. (2006): Contributing Commissioner;

"President's Commentary", <u>American Jails Magazine,</u> (May/2002 – April/2003);

"Changes in Sentencing Patterns: Impact to Jails, Prisons, and Boards", <u>Proceedings from the 1995 ACA Annual Conference</u>, Washington, D.C. (1996);

"Alameda County moves Inmates to New Jail", <u>California State Sheriff's Association Official Publication,</u> Volume 5, Number 3, Fall (1989);

"Working with Illegal Aliens", <u>American Jail Association Bulletin</u>, Volume VI, #12 (1995).

**PRESENT PROFESSIONAL ASSOCIATIONS:**

American Jail Association (1991 – Present);

American Correctional Associations (1998 – Present);

Florida State Sheriff's Association (2003 – Present);

FBI National Academy Associates (Florida (2002 – Present) and California (1994 – 2002);

**PRESENT COMMUNITY ORGANIZATIONS:**

Rotary Club of Miami (2007 – Present): President 2015-16; Board of Directors;

Mothers Against Drunk Driving (2007 – Present): Board of Directors;

Plymouth Congregational Church, Coconut Grove, FL (2006 – Present).

**PAST PROFESSIONAL/ COMMUNITY ASSOCIATIONS:**

NIC Large Jail Network (1991 – 2014);

Rotary Clubs of Orlando, FL and San Jose and Livermore, CA;

United Way of Miami-Dade and Orange Counties, FL; Board of Directors;

Boy Scouts of Central Florida;

California State Sheriff's Association;

California Peace Officers Association (Life member);

Police Management Association;

Alameda County 4-H Association;

University of California Alumni Association (Life Member);

American Cancer Society, Tri-Valley Unit, CA;

Pleasanton-Blairgowrie Sister City Association (Scottish Games);

Date:  March 12, 2018

Prepared by:  Timothy P. Ryan

**Appendix C: Methodology**

The methodology used in this Report is best described as a Qualitative Analysis in which subjective judgement is used to assess unquantifiable facts. These facts are organized and assessed through professional expertise, garnered from education, training, and experience during 44 years of public service in the correctional field.

The process deals with intangible and in-exact information that is best assessed from experience in the field of jail operations through a career of professional involvement. It requires a rigorous approach which consumes time, energy, and effort and depends on assessments that require serious consideration via intelligence, education, training, and experience that a machine lacks.

The purpose of this Qualitative Analysis Methodology is to explain, as well as gain insight and understanding of actual events in this matter, through an intensive collection of narrative data, like depositions. It is subjective, but also holistic and process oriented. It is intended to examine individual cases, like this matter, and not global cases. It uses free-form, non-numbered information inclusive of procedures, interviews, and observations to reach reasonable, supportive, and justifiable conclusions. It collects important, matter-related facts, in a meaningful way, which helps the reader understand the totality of the events and facilitates proper determinations in finding the truth.

Therefore, to prepare this Report, I reviewed and assessed an extensive archive of records and materials provided by the firm of Judge Lang & Katers, LLC, Attorneys at Law (A complete listing is included in the Appendices). Further, I framed my opinions, in reference to the ACA "Performance Based Standards for Adult Local Detention Facilities". I, then, based my final findings, opinions, and conclusions on a qualitative analysis of the information, provided and developed, based on my education, training, professional involvement, and 44 years of experience in jails from a line officer to a leader of four of the largest jail operations in the nation.

All of which has led to findings, opinions, and conclusions that can be assured to a reasonable degree of certainty.

## Appendix D: List of Abbreviations

| | |
|---|---|
| ACA: | American Correctional Association |
| ALDF: | Adult Local Detention Facility |
| MCSO: | Milwaukee County Sheriff's Office |
| CJF: | Criminal Justice Facility (same as MCJ = Milwaukee County Jail) |
| NCCHA: | National Commission on Correctional Health Association |
| SMU: | Special Management Unit |
| SMT: | Special Management Team |
| MHU: | Mental Health Unit |
| CIU: | Central Intake Unit |
| INF: | Infirmary |
| GPR: | General Population (w/restrictions) |
| Tier Card: | Document that accompanies the inmate wherever assigned and/or moved in the facility |
| 4A: | A Podular In-Direct Female Housing Unit on the 4th floor of CJF |
| CO: | Correctional Officer |
| Lt: | First Line Supervisor (such as a sergeant in other agencies) |
| Captain: | Shift and Team Leader |
| HSU: | Health Services Unit |
| Jail Commander: | Ranking Person serving as the Jail Administrator |
| Armor: | Armor Correctional Health Services, Inc. |
| PSW: | Psych Social Worker |
| PCS: | Psych Crisis Services |

## Appendix E: Documents Received/Reviewed

Since being retained in this matter, I have been provided with and/or reviewed the following:

**Case Filings and Discovery Responses (The Estate of Laliah Swayzer, et al., v. David J. Clarke, Jr, et al.):**

> Armor Correctional Health Services Privilege Log;
> Defendant's Answers to Plaintiff's First Request for Production of Documents;
> Defendant Terina Cunningham's Responses to Plaintiff's First Set of Interrogatories and Request for Production;

**Exhibits:**

> Video recording of Housing Unit 4A from the morning of 7/13/2016 thru 0930 on 7/14/2016, noting that the timing is out of proper sequence and is one hour ahead of actual time. Identified as Video #DVR-J-07132016060014-071-42016083014;
> MCSO/CJF Booking Photo, S. Swayzer, #656275206, 7/6/2016;
> Arrest/Booking Cards/Booking Photos for S. Swayzer including 7/6/2016 plus 9 other dates;
> Exhibits 94-96, including Notice of Video Deposition for Amika Avery, memo from Amika Avery to Detective Desotell, Memo to Amika Avery from Detective Desotell, Handwritten log of activities for Ms. Swayzer 7/7-20/2016, and Supplemental Report #16-098271 from Detective Desotell.

**Depositions Provided for Review:**

> Frederick Porlucas, RN, 157 pages;
> Joseph Mazurczak, Detective, 86 pages;
> Brian Morgan, Detective, 182 pages;
> Keven Ustly, CO, 48 pages;
> Kimberly Witkowiak, CO, 118 pages;
> Terina Cunningham, Lt, 118 pages;
> Paul Hein, Lt, 110 pages;
> David Clarke, Jr., Sheriff, 92 pages;
> Jeffrey Andrykowski, Lt, 187 pages;
> Amika Avery, CO, 128 pages.

**Directives and Internal Documents of the MCSO/CJF:**

> MCSO/Detention Services Bureau, Policy & Procedure, "Treatment of Medical Conditions" (MMHS 3.0), 10/2014, 4 pages;
> MCSO/Detention Services Bureau, Policy & Procedure, "Inmate Medical Services Documentation" (MMHS 6.0), 10/2014;
> MCSO/Detention Services Bureau, Policy & Procedure, "Hospital Intensive Security Directed Mission/Hospital Security Transport" (MMHS 13.0), 10/2014;
> MCSO/Detention Services Bureau, Policy & Procedure, "Security Inspections" (SC 7.0), date not clear;
> MCSO/Detention Services Bureau, Policy & Procedure, "Inmate Health Screening (1 - 8)", 10/2014;
> MCSO/CJF, ADR Tracking Form, Booking Operations, Re: S. Swayzer, 7/6-7/7/2016, 1 page;
> Possible Movement Card, S. Swayzer, #656275206, Dark Photo;
> MCSO/CJF Inmate Activity Card w/photo, Booking, 7/6/2016, 16:54:51 hours, "SNA, Cell #2", 2 pages;
> MC - C/CJIS, List Custody Summary, multiple events, 2008-2016;
> Classification Form, Maximum/Protective Custody Report, Lt. Cunningham, #656275206, 7/7/2016 and 7/16/2016;

Custody Summary, Handwritten notes from different MCSO/CJF Staff (varying handwriting), covering multiple dates from 2/17/2016 -7/20/16, no sequential order, various informational entries;

Class Moves, Handwritten notes re: S. Swayzer, from 2/17/12 – 6/16/16;

MC – C/CJIS, View Housing Assignment History, Multiple dates of custody events from 2010 – 2016, (Special notes 7/6 – 7/26/2016), 17 pages;

MCSO Live Activity System Chronology, re: Multiple Inmates and S. Swayzer, 7/7 – 7/14/2016, Important dates identified, but reading is difficult, Notes: SMU = Special Medical Unit (and) AKA: Infirmary;

Transaction Doors Report, re: 4A – Cell 10 for 7/14/2016, Several notations, but difficult to read, 9 pages;

Lists, re: Custody summary, Charges Forms, and Alias's, seemingly about date 4/14/16;

Classification, Disciplinary Reports, and Housing Records for multiple dates;

## Internal Documents of the Milwaukee County Sheriff's Office (MCSO):

Records including booking/intake, housing, and classification documents for S. Swayzer, multiple dates from 2011-2016, 76 pages;

Records including arrest report for S. Swayzer, 7/6/2016, 9 pages;

Verbal Command, documented by Lt. Cunningham, late 2016/2017, "All pregnant inmates are to be house together";

Death Investigation of Laliah Swayzer, RMS #16-098271, including "Time Line of Incident and Case Summary", Detectives Desotell/Morgan, 4 pages;

Incident Report #16-0982871, Lt. Paul Hein, 3 pages, plus 15 Supplemental Reports, 65 pages;

Memos to Captain Ducket, 13 staff members, 13 pages;

Memos to Detective Desotell, CO Love and Captain Scott Sobek, 2 pages;

Call Detail Report for Swayzer Incident, #16-098271, 1 page;

MCSO Arrest-Detention Report, re: Swayzer, 7/6/2016, 2 pages.

## Internal Documents of the Armor Correctional Health Services, Inc.:

County of Milwaukee and Armor Medical Services Agreement, 2013;

County of Milwaukee and Armor Medical Services Agreement, 1/1/2016;

Procedure J-G-09, "Counselling and Care of Pregnant Inmates", 4 pages, 10/30/2014;

Medications Report and special notes (multiple dates);

Full Patient History, 9/12/2014 – 7/7/2016, 263 pages;

Multiple Chart Notes, Special 7/6/2016 including "currently pregnant" and "fetal heart tones were done and normal (with normal limits) per Judy "B";

"Privilege Log", re: Armor Services for Shade Swayzer, covering multiple dates including period 7/6-7/26/2016, 386 pages;

## Internal Documents from other Milwaukee County Agencies:

County Statements Document, Medical Examiners Report entitled "Demographic Report" #16-03596, date of document uncertain as includes information from 7/14/2016 thru November 11, 2016, 5 pages;

Milwaukee County Medical Examiners, Autopsy Report for Laliah Swayzer, 7/15/2016, 0830 hours, plus toxicology report, Result "Undetermined", 37 Weeks Gestation, 11 pages;

Internal Status (Audit) Memo regarding the compliance with Christiansen Decree, J. Herr, 9/8/2003, 11 pages;

Christiansen Decree, Dr. Ronald Shansky Medical Monitor's Reports covering multiple dates from 7/2012 thru 5/2017 including some separate memos

## State of Wisconsin Information:

Probable Cause Statement and Judicial Determination, Circuit Court, Milwaukee County,

7/6/2016, 2 pages;

Civil/Criminal Justice Information System, Milwaukee County, Date Entry Worksheet, 1 page;
Order to Detain, CCC -- C/CCF -- S/MSDF Booking # 656275206, Shade Swayzer, Probation Hold for Resisting, by Josh Rozier, Milwaukee County Jail Liaison Agent for Parole/Probation;
Time Report, Wisconsin Department of Justice, Crime Information Bureau, Information Sheet for Shade Alline Swayzer, Parole Conditions, 2 pages;
Time Report, Wisconsin Criminal History, 16 pages;
Court Records, Milwaukee County Case Summaries, re: S. Swayzer and Case Dispositions for 2011, 2012, and 2014.

## Other Records:

Glendale Police Department, Incident Report #16-007610 plus supplementals, 7/6/2016, 5+ pages;
City of Milwaukee Fire Department, Administrative Division, Medical Reports of Services, 34 pages;
Columbia St. Mary's Hospital, 7/6/2016, "Normal fetal heart monitoring" and "8 months pregnant";
Aurora Sinai Medical Center Records, 6/23 -- 6/26/2016, 71 pages.

## Legal Actions of Note:

Christiansen decree, signed 6/19/2001, certain sections including Section II, Subsection J.1, Women's Health;
Christiansen Decree follow up actions in 2006 for a failure to follow decree expectations and 2008 for a failure to comply with decree entitling inmates to monetary compensation;
*Terry v. County of Milwaukee,* Failure of jail staff to assist in jail birth of baby, 2014;
*Estate of Thomas v. Milwaukee County,* Inmate death by dehydration, 2016;
*Doe v. County of Milwaukee,* Sexual abuse and rape of female inmate, settled $6.7 million.

## News Articles related to MCSO, CJF, and Death of Baby in Jail:

*Fox6 News,* 12/27/2016, "Federal Lawsuit Filed after Newborn Baby Died at Milwaukee County Jail; 1 of 4 deaths";
*Time,* 11/17/2016, "Newborn Baby Died in Milwaukee Jail after Staff ignored Birth, Inmate Says";
*Prison Education Guide,* 8/30/2017, Milwaukee County Sheriff David Clarke's Jail under Fire for Deaths, Civil Rights Abuses;
*Journal Sentinel,* 10/3/2012, (Jail's) Medical Operation in a Sustained Crisis;
*Press Releases by Acting Sheriff Richard Schmidt:*
12/20/2017, Announces that the latest inmate death will be investigated by an outside agency (Waukisha County Sheriff's Office);
1/3/2018, Jail Transition Program announced;
1/4/2018, Announces the creation of an "Inmate Wellness Monitor" at the Command Level.

## Other Materials Reviewed and Considered:

American Correctional Association *Performance-Based Standards for Adult Local Detention Facilities, Certain Sections, June, 2004;*
Office of Legislative Research, Objective Research for Connecticut Legislature, Research Report, "Restraining Pregnant Inmates", 3/8/2018, 14 pages.

## Appendix F: Performance-Based Standards for Adult Local Detention Facilities - June 2004

These standards were created by the American Correctional Association for the purpose of jails becoming nationally accredited. They include "mandatory and non-mandatory standards" which are designed to identify the "Expected Practices" of a professional correctional facility. They are conditions to be achieved, and then, maintained.

As an Expert Witness, I believe in these "Expected Practices" and support their achievement and maintenance. The MCSO/CJF knew of these expectations, and as a professional organization in the business, should have been constantly striving to develop, achieve, train, and maintain the same.

Mission of the Standards
The American Correctional Association provides a professional organization for all individuals and groups, both public and private, which share a common goal of improving the justice system.

Standards
There are over 440 standards that are applicable to the Milwaukee County Sheriff's Office Criminal Justice Facility. Relative to these standards, I have identified the enclosed as those with the most applicability to the case at point.

Specifically, relevant portions of the following are excerpted below:

Glossary: Safety, Security, Order, Care, and Justice

The identified standards are listed in the body of the Report as may be appropriate to my opinions, as well as defined in detail below:

Glossary:

**Adult detention facility or Jail** - A local confinement facility with temporary custodial authority. Adults can be confined pending adjudication for forty-eight hours or more and usually for sentence of up to two years.

**Correctional facility** - A facility used for the incarceration of individuals accused of or convicted of criminal activity. A correctional facility is managed by a single chief executive officer with broad authority for the operation of the facility. This authorization typically includes the final authority for decisions concerning (1) the employment or termination of staff members, and (2) the facility operation and programming within guidelines established by the parent agency or governing body.

**Classification** – **A process for determining the needs and requirements of those for whom confinement has been ordered and for assigning them to housing units and programs according to their needs and existing resources.**

**Code of ethics** - A set of rules describing acceptable standards of conduct for all employees.

**Detainee** - Any person confined in a local detention facility not serving a sentence for a criminal offense.

*Emergency care* - **Care of an acute illness or unexpected health care need that cannot be deferred until the next scheduled sick call. Emergency care shall be provided to the resident population by the medical director, physician, or other staff, local ambulance service, and/or outside hospital emergency rooms. This care shall be expedited by following specific written procedures for medical emergencies described in the standards.**

*Facility Administrator* – **Any official, regardless of local title (for example sheriff, chief of police, etc.,) who has ultimate responsibility for managing and operating the facility.**

*Health Authority* – **The health administrator, or agency responsible for the provision of health care services at an institution or system of institutions; the responsible physician may be the health authority.**

*Personnel policies manual* - A manual that is available to each employee and contains the following: an affirmative action program; an equal employment opportunity program; a policy for selection, retention, and promotion of all personnel on the basis of merit, and specified qualifications; a code of ethics; rules for probationary employment; a compensation and benefit plan; provisions of the Americans with Disabilities Act (ADA); sexual harassment/sexual misconduct policy; grievance and appeal procedures; infection control plan; and employee disciplinary procedures.

*Pregnancy management* – **Provisions that include pregnancy testing, routine and high-risk prenatal care, management of chemically addicted pregnant inmates, comprehensive counselling and assistance, appropriate nutrition, and postpartum follow up.**

*Special Needs* – **A mental and /or physical condition that requires different accommodations or arrangements than a general population offender ...would receive. Offenders ... with special may include, but are not limited to, the emotionally disturbed, ... mentally ill, ... disabled or infirm...**

*Training* - An organized, planned, and evaluated activity designed to achieve specific learning objectives and enhance the job performance of personnel. Training may occur on site, at an academy or training center, an institution of higher learning, during professional meetings, or through contract service or closely supervised on-the-job training. It includes a formal agenda and instruction by a teacher, manager, or official; physical training; or other instruction programs that include a trainer/trainee relationship. Training programs usually has requirements for completion, attendance recording, and a system for recognition of completion. Meetings of professional associations are considered training where there is clear evidence of this.

## SAFETY

*Goal: Provide a safe work environment for industries staff, volunteers, contractors, and inmates.*

## SECURITY

*Goal: Protect the community, staff, contractors, volunteers, and inmates from harm.*

*Performance Standard: Protection from Harm*

2A. The community, staff, contractors, volunteers, and **inmates are protected from harm. Events that pose risk of harm are prevented. The number and severity of events are prevented.** The number and severity of the events are minimized.

*Standards:*

**4-ALDF-2A-04 (Ref. 3-ALDF-3A-05).** There are current written orders for every correctional officer post. Officers assigned to those posts acknowledge in writing that they have read and understand the orders and record the date. The facility administrator or designee reviews post orders annually and updates them as needed.

**4-ALDF-2A-11 (Ref. 3-ALDF-3A-10).** Correctional staff maintain a permanent log and prepare shift reports that record routine information, emergency situations, and unusual incidents.

**4-ALDF-2A-12 (Ref. 3-ALDF-3A-11).** Supervisory staff conducts a daily patrol, including holidays and weekends, of all areas occupied by inmates. Unoccupied areas are to be inspected at least weekly. Patrols and inspections are documented.

*Classification and Separation:*

**4-ALDF-2A-30 (Ref. 3-ALDF-4B-01 and 2C-03). There is a formal process that starts at admission, for managing and separating inmates, and administering the facility based upon the agency mission, classification goals, and inmate custody and program needs... At a minimum, the classification system evaluates the following:**

> **mental and emotional stability...**

> **medical status...**

> **need to keep separate**

**4-ALDF-2A-32 (Ref. 3-ALDF-4B-03 and 3E-06). Inmate management and housing assignments are based on ... gender, ... special problems and needs ...**

*Special Management Inmates:*

**4-ALDF-2A-44 (Ref. 3-ALDF-3D-02): The facility administrator or designee can order immediate segregation when it is necessary to protect the inmate or others. The action is reviewed within 72 hours by the appropriate authority.**

**4-ALDF-2A-45: (Mandatory) When an inmate is transferred to segregation, health care personnel are informed immediately and provide assessment and review as indicated by the protocols established by the authority. Unless medical attention is needed more frequently, each inmate in segregation receives a daily visit from a health care provider...**

**4-ALDF-2A-52 (Ref. 3-ALDF-3D-08).** All special management inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule. **Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation ...**

**4-ALDF-2A-55 (Ref. 3-ALDF-3D-11): Staff operating special management units maintains a permanent log that contains at a minimum the following information for each inmate admitted to segregation: name, number, housing unit, date admitted, ... reason for admission, Special Medical or Psychiatric Problems or Needs (emphasis added). Officials who inspect the units ... use the log to record all visits.**

# CARE

*Personal Hygiene:*

**4-ALDF-4B-06 (Ref. 3-ALDF-4D-13):  Articles necessary for maintaining proper personal hygiene are available to all inmates.**

*Continuity of Care:*

**4-ALDF-4C-04 (Ref. 3-ALDF-4E-30):  Continuity of care is required from admission to ... discharge from the facility...**

**4-ALDF-4C-08 (Ref. 3-ALDF-4E-08): (Mandatory) There are 24-hour emergency medical, ..., and mental health services.  Services include the following:**

> **on-site emergency first aid and crisis intervention ...**

> **emergency evacuation of the inmate from the facility ...**

> **security procedures ensure the immediate transfer of inmates, when appropriate**

## *PREGNANCY MANAGEMENT* (emphasis added):

**4-ALDF-4C-13 (Ref. ALDF-4E-19-1): (MANDATORY (emphasis added) If female inmates are housed, access to pregnancy management services is available. Provision of pregnancy management include the following:**

> **Pregnancy testing**

> **Routine and high-risk prenatal care ...**

> **Comprehensive counselling and assistance**

> **Appropriate nutrition**

> **Postpartum follow up**

*Health Screens:*

**4-ALDF-4C-22 (Ref. 3-ALDF-4E-19) (Mandatory)** Intake medical screening for inmates commences upon the inmate's arrival at the facility and is preformed by health-trained or qualified health care personnel.  All findings are recorded ...The screening includes at least the following:

> **Inquiry into:**

> > **... current illness and health problems ...**

> > **the possibility of pregnancy**

> > **history of problem ...**

> **Observation of the following:**

> > **behavior, including state of consciousness, mental status, appearance, conduct,**
> > **...**

> body deformities ...

> ease of movement

> condition of skin, including trauma markings, bruises, ...

*Mental Health Program:*

**4-ALDF-4C-27 (Ref. 3-ALDF-4e-11). (Mandatory) Mental health Services include at a minimum**:

> > screening for mental health problems at intake ...

> > crisis intervention and the management of acute psychiatric episodes

> > Stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting ...

*Mental Illness and Developmental Disability:*

**4-ALDF-4C-34 (Ref. New).** Inmates with severe mental illness or who are severely developmentally disabled receive a mental health evaluation. Where appropriate, these inmates are referred for placement in non-correctional facilities or in units specifically designated for handling this type of individual. **These individuals may be a danger to themselves or others or be incapable of attending to their basic physiological needs.**

*Special Needs Inmates:*

**4-ALDF-4C-40 (Ref. 3-ALDF-4E-38).** The facility administrator, or a designee, and the responsible clinician, or designee, consult prior to taking action regarding chronically ill, physically disabled, ..., seriously mentally ill, ... inmates in the following areas:

> > Housing assignments ...

*EMERGENCY RESPONSE (emphasis added):*

**4-ALDF-4D-08 (Ref. 3-ALDF-4E-24). (Mandatory) Correctional and health care personnel are trained to respond to health-related situations within a four-minute response time. The training program is conducted on an annual basis and is established by the responsible health authority in cooperation with the facility or program administrator and includes instruction on the following:**

> > **Recognition of signs and symptoms, and knowledge of action that is required in potential emergency situations ...**

> > **Method of obtaining assistance...**

*Peer Review:*

**4-ALDF-4D-25 (Ref. New). (Mandatory)** An external peer review program for physicians, mental health professionals, and dentists is implemented. The review is conducted no less than every two years.

## Administration and Management

***Training and Staff Development:***

**4-ALDF-7B-05 (Ref. New).** Each new employee is provided with an orientation prior to assuming duties. At a minimum, the orientation includes:

Working conditions

Code of ethics

Personnel policy

**Employees' rights and**

**responsibilities**

Overview of the criminal justice system

Tour of the facility

Facility organization

Staff rules

Personnel policies

Program overview

**4-ALDF-7B-10 (Ref. 3-ALDF-1D-10). All new correctional officers receive 160 hours of training during their first year of employment. At least 40 of these hours are completed prior to being independently assigned to any post. Correctional officers receive at least 40 hours of training each subsequent year of employment. At a minimum, <u>this training covers the following areas</u>:**

**... <u>all emergency plans and procedures</u> ...**

**4-ALDF-7B-08 (Ref. 3-ALDF-1D-12, 1D-14).** All new professional and support employees, including contractors, who have regular or daily inmate contact receive training their first year of employment. **<u>Forty hours are completed prior to being independently assigned to a particular job. An additional 40 hours of training is provided each subsequent year of employment.</u>**

There are other applicable standards in the over 400 Standards in the Manual. The above are only a few of the ones that are noted.

## Appendix G: Listing of Previous Cases (Expert Witness Past Involvement)

Although I have given testimony during my previous employments, I have only been involved as an Expert Witness since March 12, 2014. Pursuant to that, I have participated as follows:

1. Confidential Consultant in two (2) cases (Non-Disclosure Agreements).

2. Expert Witness in seven (7) cases:

   a. *Crisante v. Israel,* Case No. 12-018433 (Fla. 17th Cir. Ct. 2012)- Settled;

   b. *Williams v. Israel,* Case No. 14-023944 (Fla. 17th Cir. Ct. filed 2014)- continuing;

   c. *Militello v. Israel,* Case No. 14- 60173 (S.D. Fla. filed Jan. 24, 2014)-Settled;

   d. *Jane Doe 1 and Jane 2, et. al. v. The City of New York, et. al.,* Case No. 15 Civ. 3849 (AKH), (S.D. New York filed May 19, 2015)- Settled;

   e. *Jane Doe v. The City of New York, et al.,* Case No. 1:15-cv117 (AJN) (KNF), continuing;

   f. *Dane Shikman v. County of Lake, et al.*, United States District Court of Northern California, Case No. 1:16-cv05121-NJV- Settled;

   g. *Victoria Mannina v. District of Columbia, et al, Case No. 1:15-cv-0931.*

3. I have not been required to provide testimony in court.

## <u>Appendix H: Fee Schedule for Expert Witness Services</u>

Pursuant to the Retention Agreement, the following is applied:

Expert Witness Service Fees
*(1/1/2017)*

The following are the routine, normal, and expected fees for Expert Witness Services:

1. All documents review, any reports written, and any necessary site examination and/or other assessments will be charged at a rate of two-hundred dollars {$200) per hour;

2. Any necessary attorney and/or other meetings, phone contacts of an extended nature, and/or written communications required which are of an in-depth response (i.e., emails) will be charged at the same rate;

3. Any court or deposition testimony will be charged at the rate of two-hundred and fifty dollars ($250) per hour with a minimum of $500;

4. All actual travel time will be charged at a rate of one-hundred and twenty-five dollars ($125) per hour to a maximum of 8 hours per day. Flights will be arranged and expensed at the business rate, if available; otherwise arranged and expensed at the economy rate. Pre-check periods, up to two hours, will be expensed at seventy-five dollars ($75) per hour, unless work related actions are required during the period which will be charged at the documents review rate;

5. All travel expenses shall be expensed at the actual documented costs (i.e., flights, rental cars, taxis, etc.). (Note: The consultant will first attempt to use the Federal GSA Per Diem Rates for the City/County/State of lodging, unless this is not available (i.e., government lodging rates, plus taxes; three quarter meal rates on travel days; etc.).

6. Any unusual expenses shall be discussed before occurrence, absent exigent circumstances, and are subject to approval;

7. All expenses are subject to appropriate supporting documentation and necessary approvals;

8. Upon retaining, a Retention Fee of $1,000 will be requested.

All expenses will be invoiced, monthly, unless agreed otherwise.