IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

ESTATE OF LALIAH SWAYZER, *et al.*,

        Plaintiffs,

                            Case No. 16-CV-1703

v.

DAVID A. CLARK, JR., *et al.*,

        Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO CAUSATION REGARDING THE DEATH OF LALIAH SWAYZER**

In July 2016, Plaintiff Shade Swayzer was a pregnant inmate at the Milwaukee County Jail. While housed in the jail, she unfortunately lost her unborn baby. While the loss of a child is a tragedy, Plaintiffs have failed to unearth any evidence which supports the allegation that Defendants caused the death of Laliah Swayzer. Causation is a necessary element of each of Plaintiffs' claims, and Defendants are entitled to summary judgment on each of Plaintiffs' claims as they relate to Laliah's death.

**Factual Background**

On July 6, 2016, City of Glendale police officers were dispatched to the Motel 6 located at 5485 N. Port Washington Road, in Glendale, Wisconsin. (PFOF 4). Shade was arrested at the Motel 6 and Glendale Police Officers requested an ambulance be dispatched to transport Shade to the hospital for medical clearance before transfer to the Milwaukee County Jail. (PFOF 5). On July 6, 2016, at 2:08 pm, Shade was admitted to Columbia St. Mary's for medical clearance. (PFOF 6). While at Columbia St. Mary's,

Shade underwent an obstetrics assessment and a fetal heart monitor, which documented that Shade was not experiencing cramping/contractions, was not leaking fluid, and was not experiencing any vaginal bleeding. (PFOF 7). Shade reported to the labor and delivery nurse at Columbia St. Mary's that her baby was possibly due August 15th, and that she "still had a couple months to go." (PFOF 8).

After being medically cleared, Shade was booked at the Milwaukee County Jail on July 6, 2016. (PFOF 9). Upon arrival, staff confirmed that Shade had been evaluated and medically cleared at Columbia St. Mary's, where her fetal heart tones were normal. (PFOF 10). During the pre-booking process at the jail, Shade refused to answer a nurse's safety-related questions, and Psychiatric Social Worker Damon Camarata was asked to perform an assessment of Shade. (PFOF 11).

Shade informed Camarata that she was fine and not suicidal. (PFOF 12). Camarata encouraged Shade to complete the medical evaluations since she was pregnant. (Id.). At this time Shade was alert and oriented, agreeable, cooperative, coherent with logical through process, stable for general population, and did not meet the criteria for special needs housing based on her history of schizophrenia. (Id.). On July 7, 2016, Shade was evaluated by Nurse Fred Porlucas for an intake screening, where Shade was cooperative, responsive, and coherent. (PFOF 13).

Later on July 7, 2016, Shade met with Certified Nurse Midwife Katherine Meine. (PFOF 14). Shade informed Meine that she was 8-months pregnant and due in the middle of August, which meant Shade was either 35 or 36 weeks pregnant. (Id.). The standard for prenatal care for a patient who is 36 weeks or more pregnant is to be seen on a weekly

basis.  (PFOF 15).  It does not require daily vital signs or observation of fetal heart tones.
(Id.).

Shade provided a history to Meine, informed Meine that the baby was fine and
moving, that she was receiving prenatal care, and denied any contractions, leaking, or
bleeding.  (PFOF 16).  Shade refused to allow Meine to perform a physical prenatal
assessment, including taking vital signs or observing the baby's fetal heart tones, and
refused to sign a form documenting her refusal.  (PFOF 17).  Meine informed Shade of
preterm labor precautions and the risks of refusing the physical evaluation including
stillbirth, death, long-term disability, preterm birth, or other complications causing
damage or death to Shade or the baby.  (PFOF 18).  Meine informed Shade to report
contractions occurring every ten minutes for more than an hour, any leaking, fluids,
bleeding that she could not explain, or if Shade did not feel the baby move for more than
a couple of hours.  (Id.).  Shade responded that she still refused the physical examination.
(PFOF 19).  Meine informed Shade that if she had complications such as contractions,
bleeding, leaking fluids, the baby not moving, and reported them to the healthcare staff,
she would be sent out of the jail for an appointment with an outside provider.  (PFOF 20).

Meine was not concerned that Shade had refused the physical exam because
Swayzer had been assessed the day before at Columbia St. Mary's and Shade told Meine
the baby was moving.  (PFOF 21).  Meine's treatment plan for Shade was for her to be seen
once a week given the gestational age of Shade's baby, and for an evaluation by Mental
Health, which was based on Shade's history of mental health illness.  (PFOF 22).
Following her visit with Shade, Meine had a nurse expedite getting Swayzer's medical

records. (PFOF 23). Upon receipt, Meine reviewed Shade's medical records from a June 23rd prenatal visit to Aurora Sinai, which did not result in any changes to her treatment plan. (Id.). Shade was not experiencing any acute obstetric issues that required immediate or emergent care on July 7, 2016. (PFOF 24).

On July 8, 2016, psychiatrist Dr. Gina Negrette met with Shade. (PFOF 25). Shade was pleasant and calm, and there was no overt evidence of psychosis, mania or manic behaviors. (Id.). Swayzer was linear and goal directed, and denied psychotic symptoms, denied hearing things, and denied thought disorder symptoms. (Id.). Shade had no acute mental health needs at the time she met with Dr. Negrette and the purpose of the meeting was to obtain consent for medications. (PFOF 26). Shade was stable at the time of the meeting. (Id.).

Shade informed Dr. Negrette that she had previously been on Risperdal but was not currently taking it, that Shade did not feel like she needed her medications, and she did not want the Risperdal medication from the jail. (PFOF 27). Shade was able to state why she needed the medication, what her symptoms were, and if she did not take the medications what those symptoms would be, and still declined the offer of medication from Dr. Negrette. (Id.). Shade confirmed to Dr. Negrette that she knew how to get a hold of Dr. Negrette through a pink-slip system at the jail and that she did not have any other concerns. (PFOF 28). Dr. Negrette discussed with Shade that she should continue with her Risperdal medication and to ask for follow up if Shade needed it. (Id.).

Shade had to consent to take medications and had the right to refuse to take medications. (PFOF 29). Shade testified that she refused to take medications while

pregnant, and that it was her choice not to take medications. (PFOF 30). Shade had no acute mental health symptoms on July 8, 2016 and Dr. Negrette's plan was to follow up as needed with Shade if she remained in custody. (PFOF 31).

On July 8, 2016, Shade refused a physical assessment and fetal heart tone check by Nurse Karen Gray. (PFOF 32). On July 8, 2016, Shade also refused to be seen by Dr. Tulay Gulsen, a primary care physician. (PFOF 33). This did not raise any concerns with Dr. Gulsen because Shade's hospital records, Meine's records, and the notes from mental health all indicated that Shade was stable. (Id.). Dr. Gulsen testified that pregnant inmates thirty-two weeks pregnant or more are seen on a weekly basis, and this care plan for Shade was appropriate because she was not reporting any complications such as bleeding, or not feeling the baby move. (PFOF 34).

On July 11, 2016, Shade met again with Meine and informed her that the baby was fine and moving, and denied she was having contractions, leaking or bleeding. (PFOF 35). Shade again refused to allow Meine to perform a physical exam or listen to the baby's fetal heart tones. (Id.). Meine repeated the labor precautions and instructions she had previously provided Shade, including the need to report contractions, leaking, bleeding, or the baby not moving, and that by not getting a physical examination it could mean they missed something regarding the baby. (PFOF 36). Shade was not experiencing any acute obstetric issues that required emergent or immediate care on July 11, 2016. (PFOF 37).

Meine informed Dr. Horton that Shade had refused a physical assessment. (PFOF 38). In response, Meine and Dr. Horton arranged for an outside appointment at Aurora

Sinai for Shade to occur within seven days. (Id.). Meine and Dr. Horton also agreed to have another provider attempt to see Shade in the jail in case Shade would be receptive to someone else. (Id.). Pregnant inmates are sent to the hospital when they report complications such as contractions, leaking fluids, bleeding, or not feeling the baby move. (PFOF 39). Refusing to be seen by a healthcare worker is not a reason to send an inmate to the hospital. (Id.).

Dr. Tulay Gulsen attempted to physically assess Shade on July 12, 2016. (PFOF 40). Dr. Gulsen informed Shade of the potential adverse consequences of refusing care, and Shade responded "I know, I know. I don't need to see you. I am okay. I know myself and my baby." (Id.). Shade told Dr. Gulsen that the baby was moving. (Id.). Shade did not allow Dr. Gulsen to take vital signs or listen to the baby's fetal heart tones, and refused to sign the form indicating she was refusing treatment. (Id.).

Based on Shade's verbal responses Dr. Gulsen believed Shade was stable, but because Shade would not allow her to physically assess vital signs and the baby's fetal heart tones, Dr. Gulsen could not confirm whether Shade's baby was alive on July 12, 2016. (PFOF 41). When Dr. Gulsen attempted to assess Shade on July 12, 2016 the process of scheduling an outside appointment for Shade at Aurora Sinai had already begun. (PFOF 42). She believed the outside appointment was necessary because Shade was refusing vitals and observation of fetal heart tones. (Id.). The appointment would have been one week from July 7th or July 8th. (Id.).

On July 13, 2016, Case Manager Rebecca Goss saw Shade in her cell for case management rounds. (PFOF 43). Shade was alert and able to communicate and stated

she had no case management needs at the time.  (Id.).  Shade was educated on mental health services and how to access mental health services.  (Id.).

On July 13, 2016, at 8:44 pm, Mental Health Clinician Steven Schmid evaluated Shade on his rounds.  (PFOF 44).  Shade was alert and oriented and laying on her bunk while reading a book.  (Id.).  Shade denied any mental health concerns or questions.  (Id.).  Shade did not require any mental health counseling or crisis intervention at that time.  (Id.).

During the night of July 13, 2016 into the morning of July 14, 2016, Correctional Officer Witkowiak was assigned to tour Shade's housing unit.  (PFOF 45).  Witkowiak toured Shade's housing unit multiple times throughout the night.  (PFOF 46).  Witkowiak testified that during her 5:35 am rounds she might have smelled a possible odor, but had no idea where it was coming from and it would not have alerted her to some issue in Shade's cell.  (PFOF 47).  During Witkowiak's 5:55 am rounds she noticed a smell in the air and observed bizarre behavior from Shade.  (PFOF 48-49).  Witkowiak spoke with Shade and observed her cell.  (PFOF 50-51).  Shade could not recall if she used the intercom/medical emergency button to call for help before giving birth or during labor.  (PFOF 57).  Shade denied having any problems with the baby before going into labor.  (PFOF 58).

At 6:05 am a medical emergency was called for Shade's cell.  (PFOF 52).  When security and medical personnel entered the cell they found Shade holding Laliah, and Laliah had no signs of life.  (PFOF 53-54).  Despite providing CPR and other measures to

attempt to revive the baby, the security and medical personnel were not able to do so and never observed any signs of life for Laliah. (PFOF 55-56).

The Milwaukee County Medical Examiner's Office conducted an autopsy and was not able to determine the cause or manner of death for Laliah. (PFOF 59, 61). Upon conclusion of the autopsy, the medical examiner concluded the infant was likely stillborn. (PFOF 60). The hydrostatic float test conducted during the autopsy indicated that Laliah never breathed air into her lungs. (PFOF 63-64). Her stomach was found to be empty, indicating no successful nursing had occurred. (PFOF 68). In addition, Laliah had multiple bacterial infections and pneumonia in both lungs. (PFOF 62, 65-67). Microscopic examination of the placenta revealed acute chorioamnionitis—an infectious inflammation of the tissues of the placenta. (PFOF 62). Neither of Plaintiffs' expert witnesses offer any opinion or testimony regarding the cause of Laliah's death. (PFOF 69-73). Defense experts offered opinions that Laliah died at least 24-36 hours before delivery due to widespread infection and pneumonia. (PFOF 74-82). The deadline for Plaintiffs to name rebuttal expert witnesses expired on May 15, 2019, without Plaintiffs naming any rebuttal witnesses. (PFOF 84).

## Summary Judgment Standard

Summary judgment is not a disfavored means of resolving cases. *See Celotex Corp v. Catrett*, 477 U.S. 317, 327 (1986). If anything, summary judgment is an "integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* Summary judgment on "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing

courts' trial time for those that really do raise genuine issues of material fact." *See Pecor v. Northwestern Nat'l Ins. Co.*, 869 F. Supp. 651, 654 (E.D. Wis. 1994) (quoting *United Food & Commercial Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F. Supp. 328, 330 (E.D. Mo. 1992)). Summary judgment is a vital way of separating the wheat from the chaff.

Summary judgment is proper on "part of each claim or defense" when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Best Wood Judge Firewood and Tree Service v. U.S. Dept. of Transportation*, 784 F. Supp. 2d 1059, 1062 (E.D. Wis. 2011) (citing *Anderson*, 477 U.S. at 247-48). "Material" means that the factual dispute must be outcome-determinative under governing law. *See id.* (citing *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997)). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Celotex*, 477 U.S. at 322-23.

Once the movant establishes that there is no genuine issue of material fact, the opposing party must come forward with "specific facts" showing that there is a need for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986). The non-moving party cannot satisfy that burden by "some metaphysical doubt as to material facts," by conclusory allegations, unsubstantiated assertions, or a mere "scintilla" of evidence. *Id.*; *Anderson*, 477 U.S. at 249-52. "Summary judgment is the 'put up or shut

up' moment in a lawsuit. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).

## Argument

**I.     As to Laliah Swayzer's Death, Each Count of Plaintiffs' Complaint Requires Them to Prove Causation.**

Plaintiffs are required to prove Defendants caused Laliah's death in order to recover on each count of their Third-Amended Complaint with respect to her death. Causation is an essential element to each count and Plaintiffs have failed to offer any evidence to support their claims.

Plaintiffs' first count, a Section 1983 claim for deliberate indifference to serious medical needs, requires that the Plaintiffs prove the Defendants' actions caused the alleged injury:

> No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition **without providing evidence that the failure caused injury or a serious risk of injury**. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic.

*Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (emphasis added). "[A] plaintiff alleging inadequate medical care must demonstrate more than a serious medical need and the defendant's deliberate indifference to it. He also must show a causal link between his injury and the defendant's conduct." *Kyles v. Williams*, 2015 WL 5461566, *4 (N.D. Ill. Sept. 17, 2015) (then citing and quoting *Jackson*). "Causation of harm is an essential element of a deliberate indifference to medical needs claim, and if an official was deliberately indifferent to a medical need but caused no harm, there can be no liability."

*Roberts v. Neal*, 2016 WL 4267988, *3 (S.D. Ill. Aug. 15, 2016) (citing *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999)).

A plaintiff claiming a delay in medical treatment violated the Eighth Amendment must offer verifying medical evidence that the delay caused harm:

> In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer "verifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental.

*Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007) (citations omitted). *See also Jackson*, 733 F.3d at 790. Evidence of a plaintiff's diagnosis and treatment is insufficient if it "does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed" the plaintiff. *Williams*, 491 F.3d at 715.

Plaintiffs' second count, for *Monell* liability, also requires that the Plaintiffs prove causation. As the Supreme Court discussed in *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, stringent causation requirements apply to claims for *Monell* liability:

> Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality **directly caused a deprivation of federal rights**. A failure to apply **stringent culpability and causation requirements** raises serious federalism concerns, in that it risks constitutionalizing particular hiring requirements that States have themselves elected not to impose.

520 U.S. 397, 415 (1997) (emphasis added). *See also Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000) (plaintiff must show "that the injury was caused by the policy."); *Terry v. County of Milwaukee*, 357 F. Supp. 3d 732, 752 (E.D. Wis. 2019) (plaintiff must "provide evidence that the custom at issue directly caused her injury").

Plaintiffs' third count alleges that certain defendants were negligent. It is hornbook law that a claim for negligence requires Plaintiffs to prove that a defendant's breach of the duty of care caused the plaintiff's injury. *See Melchert v. Pro Electric Contractors*, 2017 WI 30, ¶ 37, 374 Wis. 2d 439, 892 N.W.2d 710. "There can be no liability predicated upon a breach of duty unless it is determined that such breach was a legal cause of the plaintiff's injuries." *Johnson v. Misericordia Comm. Hosp.*, 97 Wis. 2d 521, 294 N.W.2d 521 (Ct. App. 1980).

Finally, Plaintiffs' fourth count states a wrongful death claim under Wis. Stat. § 895.03 against certain defendants. (Dkt. No. 146 at ¶¶ 178-180). "Wrongful death actions are derivative tort actions." *Christ v. Exxon Mobil Corp.*, 2015 WI 58, ¶ 22, 362 Wis. 2d 668, 866 N.W.2d 602. Although the "statute creates a 'new action' . . . the person's right of action depends not only upon the death of another person but also upon that other person's entitlement to maintain an action and recover if [her] death had not occurred." *Id.* The decedent must have had a valid claim for damages against the defendant at the time of death for a wrongful death claim to exist. *Id.* at ¶ 23. The statute merely "permits the representative of a deceased to maintain an action the deceased could have maintained had he or she lived." *Tesar v. Anderson*, 2010 WI App 116, ¶ 34, 329 Wis. 2d 240, 789 N.W.2d 351.

As Plaintiffs' Third-Amended Complaint makes clear, the wrongful death claim alleges that Laliah would have been able to bring the Section 1983, *Monell*, and negligence Counts I-III. (Dkt. No. 146 at ¶¶ 178-180). As such, it is subject to the same causation elements and arguments discussed above.

## II. Plaintiffs Have Failed to Provide Any Evidence Defendants Caused Laliah Swayzer's Death.

Despite causation being an element of each of Plaintiffs' claims, they have failed to provide evidence that anything Defendants did, or failed to do, caused Laliah's death. In fact, Plaintiffs have offered no theory of the case that suggests Laliah's death—whether *in utero* or after birth—could have been prevented. They offer no medical theory at all. The jury should not be permitted to speculate on a question of complex medical causation. *See Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000) (granting summary judgment for defendants where inmate could only speculate that refusals to provide treatment caused injury); *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 821 (N.D. Ill. 2010) (excluding lay witnesses from testifying regarding medical opinions requiring specialized knowledge). Having failed to adduce appropriate expert testimony explaining the nature of Laliah's medical crisis and how it could have been averted, Plaintiffs' claims must fail. Defendants are entitled to summary judgment on each of Plaintiffs' claims to the extent they relate to Laliah's death.

### A. Courts Routinely Grant Summary Judgment Where Inmates Fail to Present Evidence on Causation.

Prisoners do not have a constitutional right to the treatment of their choice, and must provide medical evidence showing that the course of treatment they received

deviated from an accepted standard of care and caused the injury complained of. *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 857-58 (N.D. Ill. 2013). A plaintiff claiming deliberate indifference to the serious medical needs of prisoners "must demonstrate both that he has suffered an actual present injury and that there is a causal connection between that injury and the deprivation of a constitutionally protected right caused by a defendant." *Henderson*, 196 F.3d at 848. As a result, courts routinely dismiss claims against prison officials and medical providers where the plaintiffs fail to present evidence showing their claimed actions/inaction caused the complained of injury.

In *Benson v. Bowens*, an inmate failed to present medical evidence that a long delay between complaining of pain and receiving prescribed alternative footwear "detrimentally affected, unnecessarily prolonged, or exacerbated his pain." 2018 WL 566846, *4 (E.D. Wis. Jan. 25, 2018). The inmate complained of pain while he was waiting for the new shoes, but offered no evidence that the shoes would have made a difference. *Id.* Absent such evidence, "there is no basis upon which a jury could find that the delay in providing the new footwear caused any injury." *Id. See also McDonald v. Lovell*, 2014 WL 520901 (S.D. Ill. Feb. 7, 2014) (granting summary judgment where there was no evidence to suggest seeing nurse sooner would have made situation better, or waiting made condition worse or caused additional pain).

Similarly, in *Cooper v. Mahone*, an inmate injured his knee and was given a knee brace by an outside provider, but the knee brace was removed when he returned to the prison because it contained metal. 2014 WL 4813740, *1-2 (N.D. Ill. Sept. 29, 2014). It took approximately seven months for the inmate to receive a replacement brace, during which

time he complained of pain and received other treatment for his knee injuries.  *Id.*  The

inmate filed a deliberate indifference claim stating that the condition of his knee

worsened because of the failure to provide him with a knee brace.  *Id.* at *2.  The court

granted summary judgment because the inmate "failed to provide evidence that would

permit a jury to find that any harm he suffered was the result of Defendants' delayed

provision of his knee brace rather than his original injury."  *Id.* at *4.  The testimony that

the condition of the plaintiff's knee worsened without the brace was not sufficient to

support the causation element:

> Cooper offers testimony that the condition of his knee
> worsened after his brace was removed, **but in the absence of
> any medical evidence demonstrating the causal
> relationship** between the removal of the brace and his injury,
> **such testimony must be categorized as the sort of *post hoc
> ergo propter hoc* evidence that is routinely rejected as
> proof of causation**.  Without medical evidence that the delay
> in providing a knee brace caused him harm, Cooper would lack
> proof of a necessary element of his claim even if he could
> support a finding that the delay was produced by deliberate
> indifference.

*Id.* (internal citations omitted, emphasis added).  In *Jackson v. Pollion*, the Seventh Circuit

upheld summary judgment against an inmate who claimed a three-week break in

receiving hypertension medications caused bloody noses, headaches, loss of vision, and

could have resulted in strokes or death.  733 F.3d at 788-89.  The inmate failed to present

evidence that the alleged failure to treat his condition caused injury or a serious risk of

injury, requiring the court to dismiss his claims.  *Id.* at 790.  *See also Johnson v. Obiora*,

2018 WL 4496313, *3-4 (E.D. Wis. Sept. 19, 2018) (granting summary judgment where

inmate failed to present evidence that delay in ordering restrictions caused any injury);

*Foote v. Lewis*, 2014 WL 202706, \*2-3 (N.D. Ill. Jan. 17, 2014) (granting summary judgment because inmate failed to present medical evidence that delay in receiving medications caused complained of injuries).

In *Kyles v. Williams*, the inmate alleged prison officials terminated his physical therapy early and failed to treat his knee injuries. 2015 WL 5461566 at \*4. But he could not show on summary judgment that these actions caused the knee pain or "knee-locking" for which he sought relief, and there was no "medical evidence that would support an inference that his injury was caused by the cessation of his therapy or his subsequent lack of treatment, as opposed to this original injury or the ineffectiveness of his surgery." *Id.* at \*5. Without this "required link," summary judgment for defendants was appropriate. *Id.*

Although causation does not always necessarily require expert testimony in the context of a deliberate indifference claim, it can be required where causation is not within the knowledge of lay persons. In *Lacy v. Berge*, the inmate's medical records showed that he was treated for injuries immediately after a fight, and continued to receive treatment and monitoring while recovering. 921 F. Supp. 600, 610 (E.D. Wis. 1996). Despite receiving treatment, he complained that he developed a crook in his neck, headaches, and rectal bleeding, and attributed these conditions to the fight. *Id.* The court granted summary judgment, "[b]ecause causation under these circumstances is not within the common knowledge of a lay person, the court cannot draw the inference that [plaintiff]'s health problems were caused by lack of care from [defendant]." *Id.* Without expert

testimony or verifying medical records to support causation, defendants were entitled to summary judgment.

Testimony about what "could have" occurred because of delays in medical treatment are not sufficient. In *Norwood v. Ghosh,* an inmate argued that failure to provide more effective treatment for knee pain resulting from a fall for over three years caused his knee to deteriorate. 723 Fed. Appx. 357, 361-63 (7th Cir. 2018). His surgeon testified that failure to treat the initial injuries "more promptly *could have* resulted in the osteoarthritis that later forced [plaintiff] to undergo a full knee replacement." *Id.* at 366. But "'could have' is not enough. The mere possibility that delays in treating [plaintiff]'s knee contributed to permanent damage falls short of verifying medical evidence that would allow a reasonable jury to find by a preponderance of the evidence that such causation actually occurred." *Id.*

### B. Plaintiffs Offer No Evidence on Causation.

Plaintiffs offer nothing to show that anything Defendants did, or failed to do, caused Laliah's death. It is undisputed that Shade received a physical assessment and observation of fetal heart tones at Columbia St. Mary's before she was incarcerated. Shade then received medical treatment while at the jail from July 6, 2016 throughout her incarceration. But she repeatedly informed prison staff that Laliah was fine and moving, and she was not experiencing any complications such as bleeding or contractions. When medical providers attempted to physically assess Shade, and listen to Laliah's fetal heart tones, Shade refused to let them do so. As a result, the medical records from the time of Shade's incarceration, and the testimony of her treating providers, demonstrate that

Shade was not experiencing any acute obstetric issues that required immediate hospitalization. The medical records do not support any argument that a delay in physically assessing Shade, listening to fetal heart tones, or hospitalizing Shade, between her clearance at Columbia St. Mary's and the morning of July 13th caused Laliah's death.

Similarly, neither of Plaintiffs' two expert witnesses—Timothy P. Ryan and Dr. Susi Vassallo—have offered an opinion on what caused Laliah's death. Mr. Ryan is a retired correctional administrator. He has no medical training and offered no opinions relevant to medical causation:

> Q.· And you read the autopsy materials that indicate that it's undetermined whether the child was stillborn?
> A. Yes, I did.
> Q. And I assume you're not qualified to give an opinion as to whether the child was stillborn or not?
> A. No, I'm not.
> Q. And you would not have an opinion as to the cause of the baby's death?
> A. No, I would not.

(PFOF 70).

> Q. And would you agree since you're not a medical doctor, you're not in a position to say whether Shade Swayzer's baby would have died even if Shade Swayzer would have been in a hospital when she delivered?
> A. That's correct. I would not.
> Q. And since you're not a medical doctor, you're not in a position to say when the baby died?
> A. That's correct.
> Q. And finally, since you're not a medical doctor, you're not in a position to say what caused the baby's death?
> A. No, I'm not.

(Id.).

Plaintiffs' second expert, Dr. Susi Vassallo, is an Emergency Medicine physician and toxicologist. She lacks qualifications necessary to address the cause or time of Laliah's death and appropriately declined to do so:

> Q I do not read your report as having an opinion as to the cause of death of the neonate. Is that a correct reading of your report?
> A That is correct.
> Q So you would defer to the medical examiner or forensic pathologist with respect to the cause of death?
> A I defer to this autopsy, yes.
> Q And what is your understanding based on the autopsy as to the cause of death?
> A The cause of death and the manner of death were unspecified. That's what was written.
> Q Do you have any understanding based upon that autopsy report as to whether this was a stillbirth?
> A I have no understanding of that.
> Q So you have no opinion one way or the other whether it was a stillbirth; is that correct?
> A That's correct.

(PFOF 72).

> Q And you won't be providing any opinions regarding what possibly would cause a fetus to be delivered stillborn?
> A None of that is within my report and, no, I will not.
> Q And I think you might have already testified to this, but I want to make sure I'm clear on it. You are not going to give any opinions about whether the baby was deceased upon delivery or not?
> A Correct.

(Id.).

Although the defense does not have the burden of proof on causation, the only credible evidence in the record as to the cause and timing of Laliah's death will come from defense experts, who have offered opinions that Laliah died at least 24-36 hours before delivery due to widespread infection and pneumonia. (PFOF 74-82). There is no

19

credible evidence from a qualified expert (or any other witness) that the unborn child's infection could have been detected or that it could have been treated *in utero* before her premature delivery. Nor is there credible evidence that she was not deceased upon delivery. As a consequence, any claim asserted <u>by or on behalf of the Estate of Laliah</u> must be dismissed. *See Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993); *Coe v. Cook County*, 162 F.3d 491 (7th Cir. 1998)("This circuit has already concluded that fetuses are not persons within the scope of the fourteenth amendment"), *citing Keith v. Daley,* 764 F.2d 1265, 1271 (7th Cir. 1985); *see also La Placa v. Johnson,* 1990 WL 304323, \*9 (N.D. Ill. 1990); *Planned Parenthood of Ind. & Ky. v. Comm'r*, 194 F. Supp. 3d 818 (S.D. Ind. 2016).

In addition, any claim made by the other plaintiffs that assumes Laliah's death could have been prevented by an unspecified medical intervention is unsupported and must also be dismissed. Plaintiffs have failed to meet their burden to prove a delay in treatment rather than her underlying medical condition—a profound and systemic infection—caused Laliah death. *Williams*, 491 F.3d at 714-15 (holding "plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental"); *Jackson*, 733 F.3d at 790. The jury cannot be left to speculate in the complicated fields of obstetrics, infectious disease, and pathology. Plaintiffs' claims related to the death of Laliah must be dismissed.

### C. Swayzer's Medical Records Do Not Satisfy Plaintiffs' Burden.

Without expert testimony in support of causation, recitation of diagnosis and treatment is insufficient to establish causation. *Williams,* 491 F.3d at 714–16. Rather, in the absence of expert testimony on causation, medical records must assist the jury in

determining whether defendant's alleged inadequate medical treatment actually caused harm. *Id.*; *see also Kendrick v. Frank*, 2008 WL 11452081, at *4 (E.D. Wis. Mar. 21, 2008), aff'd, 310 F. App'x 34 (7th Cir. 2009) (affirming grant of summary judgment where there was no expert testimony on causation and medical records were not sufficient to establish that plaintiff suffered harm from the delayed medical care). Here, Plaintiffs must demonstrate that inadequate medical care caused Laliah's death. Plaintiffs do not have expert testimony establishing causation and can only rely on medical records. But the medical records cannot provide the required "verifying medical evidence" because Shade repeatedly refused physical assessments and requests to monitor fetal heart tones. There is nothing in the medical records that would allow a jury to infer when the baby was alive in utero and when exactly it passed away, or the reason for its death. In fact, the medical examiner determined that the baby died in utero, and there is nothing in the medical records that supports even an inference that any medical treatment would have saved the baby's life, whether in utero or upon being born.

This case is clearly distinguishable from the cases where medical records were sufficient to establish the required "verifying medical evidence" on causation without expert testimony. In such cases, the records clearly demonstrate the patient's prognosis prior to receiving adequate or delayed medical care and how the prognosis was affected as a result of defendant's conduct. E.g., *Williams*, 491 F.3d at 714–16; *Gayton v. McCoy*, 593 F.3d 610, 625 (7th Cir. 2010). For example, in *Williams*, medical records were sufficient to show causation in a Section 1983 claim where the plaintiff's records showed he had elevated blood pressure and an abnormal EKG prior to treatment and that those

symptoms were immediately relieved when plaintiff received the medication he alleged defendants delayed in providing. *Id.* The records showed that plaintiff suffered harm as a result of defendant's conduct because once he was treated, his condition improved. *Id.*

In *Gayton*, the medical records showed that plaintiff had a serious heart condition and elevated blood pressure. 593 F.3d at 625. The records also showed that the prison health care providers were aware of these conditions and knew plaintiff needed medical treatment. A prison nurse refused to provide treatment when the plaintiff repeatedly requested it, causing a delay in plaintiff's treatment. *Id.* The plaintiff later died. *Id.* The records in *Gayton* showed that plaintiff was alive, in need of medical treatment and that defendant's conduct delayed receipt of treatment.

Plaintiffs have no evidence through expert testimony or in the medical records, that Laliah was alive in utero immediately prior to being delivered. or upon delivery. Nor is there any testimony or evidence that transporting Shade to the hospital after she refused physical assessments and fetal heart monitoring would have resulted in any different outcome, or that if Shade had gone into labor at a hospital that Laliah would have survived. Plaintiffs' theory of the case is to essentially argue that circumstances could have been different if Shade had been physically assessed sooner, seen more frequently, or transported to a hospital. But these mere possibilities, without supporting expert testimony describing what would have occurred (not merely what "could have" occurred) or verifying medical evidence in the records, are not sufficient as a matter of law to survive summary judgment. *See Norwood*, 723 Fed. Appx. at 366; *Lacy*, 921 F. Supp. at 610. There is no testimony or medical evidence that any treatment would have been

provided, or was even possible, that would have saved Laliah's life.  All that we are left with is the absence of any medical evidence demonstrating a causal relationship between alleged delays in taking action and the death of Laliah.  This amounts to nothing more than "the sort of *post hoc ergo propter hoc* evidence that is routinely rejected as proof of causation."  *Cooper*, 2014 WL 4813740 at *4.  The "required link" between the actions of the Defendants and the death of Laliah is missing, and no reasonable jury could infer from the record before this Court that inadequate or delayed medical treatment caused Laliah's death.

Without being able to prove that anything Defendants did, or did not do, caused Laliah's death, Plaintiffs cannot move forward on any of their claims to the extent they relate to Laliah's death.  As discussed above, causation is an essential element of each claim, and Plaintiffs have failed to carry their burden on this issue with any genuine issue of material fact.

## Conclusion

For the reasons discussed above, Defendants are entitled to summary judgment on each of Plaintiffs' counts related to the death of Laliah Swayzer.

Dated this 29th day of May, 2019.

GASS WEBER MULLINS LLC
Attorneys for Defendant Dr. Gina Negrette

*s/Stephen T. Trigg*
Linda V. Meagher, WI SBN 1000558
meagher@gwmlaw.com
Stephen T. Trigg, WI SBN 1075718
trigg@gwmlaw.com

OTJEN LAW FIRM, S.C.,
Attorneys for Defendant Karen Ronquillo-Horton

*s/Lori Gendelman*
Lori Gendelman
Randall R. Guse
20935 Swenson Drive, Suite 310

241 North Broadway
Suite 300
Milwaukee, WI 53202
414-223-3300 T
414-224-6116 F

CUNNINGHAM, MEYER & VEDRINE, P.C.
Attorneys for Defendants Dr. Maureen White, Dr. Tulay Gulsen, N.P. Katherine Meine, and R.N. Frederick Porlucas

*s/ Chad M. Skarpiak*
Chad M. Skarpiak (IL Bar #6304021)
One East Wacker Drive, Suite 2200
Chicago, Illinois 60601
(312) 578-0049
cskarpiak@cmvlaw.com

LEIB KNOTT GAYNOR LLC
Attorneys for Defendants David J. Clarke, Jr., Kimberly Witkowiak, Kevin Ustby, Keziah Love, Terina Cunningham, Jeffrey Andrykowski, Paul Hein, Milwaukee County and Wisconsin County Mutual Insurance Company

*s/ Douglas S. Knott*
Charles R. Starnes, SBN 1113293
Douglas S. Knott, SBN 1001600
219 N. Milwaukee Street, Suite 710
Milwaukee, WI 53202
Telephone: (414) 276-2102
Fax (414) 276-2140
dknott@lkglaw.net
cstarnes@lkglaw.net

Waukesha, WI 53186
262-777-2215/262-777-2221
rguse@otjen.com
lgendelman@otjen.com

GODFREY & KAHN, S.C.,
Attorneys for Defendant Wisconsin Health Care Liability Insurance Plan

*s/ Nina G. Beck*
James A. Friedman
Nina G. Beck
833 E. Michigan St., Ste. 1800
Milwaukee, WI 53202
Phone: 414-273-3500
Fax: 414-273-5198
jfriedma@gklaw.com
nbeck@gklaw.com

MWH LAW GROUP LLP
Attorneys for Defendants Armor Correctional Health Services, Inc.

*s/Eric Andrews*
Emery K. Harlan, Esq.
State Bar No. 1000240
Eric Andrews, Esq.
State Bar No. 1068550
735 N. Water St., Suite 610
Milwaukee, WI 53202
Phone: (414) 436-0353
Fax: (414) 436-0354
emery.harlan@mwhlawgroup.com
eric.andrews@mwhlawgroup.com