**THE ESTATE OF LALIAH SWAYZER**;
**SHADÉ SWAYZER**; **DIANE RUFFIN** (a minor);
and, **CHARLENE RUFFIN** (a minor);

    Plaintiffs,

  v.

**KIMBERLY WITKOWIAK; KEZIAH LOVE; TERINA**  **Case No: 16-CV-1703**
**CUNNINGHAM; JEFF ANDRYKOWSKI; AMIKA**
**AVERY; DIEDRE ADAMS;**
821 W. State Street
Milwaukee, WI 53233
   And,

**MILWAUKEE COUNTY**, a municipal corporation;
901 N. 9th Street, Room 306
Milwaukee, WI 53223
   and,

**WISCONSIN COUNTY MUTUAL INSURANCE**
**CORPORATION;**
c/o Registered Agent, David Bisek
Aegis Corporation
18850 W. Capitol Drive
Brookfield, WI 53045
   and

**ARMOR CORRECTIONAL HEALTH SERVICES, INC.**;
and **DR. MAUREEN WHITE; DR. RONQUILLO-**
**HORTON; N.P. KATHERINE MEINE; DR. GINA**
**NEGRETTE; R.N. FREDERICK PORCULAS; DR.**
**TURAY GULSEN; N.P. KAREN GRAY; STEVEN**
**SCHMID;**
c/o Registered Agent, C T Corporation System,
8020 Excelsior Drive, Ste. 200
Madison, WI 53717
   and,

**EVANSTON INSURANCE COMPANY**;
Ten Parkway North
Deerfield, IL 60015.
   and

**WISCONSIN HEALTH CARE LIABIITY INSURANCE**
**PLAN;**
125 S Webster St.
Madison, WI 53703-3474.
   and

**INJURED PATIENTS AND FAMILIES**
**COMPENSATION FUND**;
125 Webster St.
Madison, WI 53703.

Defendants.

## FOURTH AMENDED COMPLAINT[1]

NOW COMES the above-named Plaintiffs, The Estate of Laliah Swayzer, Shadé Swayzer, Diane Ruffin, and Charlene Ruffin, by their attorneys, **JUDGE LANG & KATERS, LLC** and **GENDE LAW OFFICE, S.C.**, and as for their claims for relief against the above-named Defendants, allege and shows the Court as follows:

## I.   INTRODUCTION

1.     This case involves Milwaukee County ("MC"), the Milwaukee County Sheriff's Office ("MCSO"), Armor Correctional Health Services, Inc. ("Armor"), and the individually named Defendants' methods of infringing on and violating the Constitutional, Civil, and/or Statutory Rights of Laliah Swayzer ("Laliah") and Shadé Swayzer ("Swayzer"), causing Swayzer and Laliah to suffer damages, injures and ultimately, Laliah's death.  While under the Defendants' care, control and custody, Laliah and Swayzer were subjected to deliberate indifference and reckless disregard which amounted to inadequate and unconstitutional health care which involved the wanton and unnecessary infliction of pain and ultimately death.

2.     Laliah was brought into the Milwaukee County Criminal Justice Facility ("CJF") in her mother's womb at almost nine months of development, was provided absolutely no medical care by the Defendants named herein and left CJF eight days later a deceased new born.

[1] Plaintiffs file this Fourth Amended Complaint in accord with the Court's June 18, 2019 order. (D. 312). Per that Order, Plaintiffs removed previously dismissed defendants Kevin Ustby, Paul Hein, and David Clarke. Plaintiffs also removed defendant Nancy Evans, who was never served with a summons here nor been a defendant or party in this case.

2

3.　　Swayzer arrived at CJF on July 6, 2016; she was almost nine months pregnant, and said pregnancy was progressing normally.  Eight days later and while in custody, Swayzer gave birth to baby Laliah, by herself and without assistance, medical or otherwise, while locked in a maximum-security cell filled with garbage and filth.  Swayzer's cries for help along with visible blood and water from her birth were ignored.  In the days prior to the birth of Laliah, neither Laliah or Swayzer received any medical attention in the maximum-security solitary cell.  Both had been assigned to the Special Needs Unit to assure Laliah and Swayzer received the necessary medical and prenatal care, but those medical orders were violated and Laliah and Swayzer, pursuant to de facto policy and procedure were placed in a maximum-security cell with no access to medical care.  Tragically, Laliah died in her mother's arms as a result of the Defendants' failure to provide any care or assistance.  As a result of the Defendants' reckless disregard and deliberate indifference, baby Laliah passed away and will never be able to pursue health and happiness.

4.　　Plaintiffs bring this action under the United States Constitution, particularly under the provisions of the, *inter alia,* Fourth, Eighth, and Fourteenth Amendments; Title 42 of the United States Code Sections 1983 and 1985; and, pursuant to Wis. Stat. §§ 895.03.

## II.  JURISDICTION

5.　　That this Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and Laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights.

6.　　That this Court has supplemental jurisdiction over all state law claims which arise out of the same facts common to Plaintiffs' federal claims pursuant to 28 U.S.C. § 1367.

7.　　That the amount in controversy exceeds Seventy-Five Thousand ($75,000) Dollars, exclusive of costs, interests, and attorneys' fees.

3

## III. VENUE

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because most Defendants reside in this district and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this district.

## IV.  THE PARTIES

9.      Plaintiff, the Estate of Laliah Swayzer ("the Estate"), represents the decedent, Laliah Swayzer, ("Laliah") whose serious-acute-obvious medical needs were deliberately ignored and neglected while she was in the custody and under the care/control of the Defendants, all of whom she relied upon to provide adequate medical care.  As a result, Laliah died in the very same place she was born, on the Maximum-Security Unit of the CJF.  At all times material hereto, Laliah was entitled to all rights, privileges, and immunities accorded by the Constitution of the United States.

10.      Plaintiff, Shadé Swayzer, ("Swayzer") is an adult citizen of the United States and a resident of the State of Wisconsin.  At all times material hereto, Swayzer was an inmate residing at CJF, and entitled to all rights, privileges, and immunities accorded residents of MC, the State of Wisconsin, and citizens of the United States.  At all times material hereto, Swayzer was pregnant with a healthy baby while being involuntarily detained at CJF under the direct custody, control and supervision of the Defendants.

11.      Plaintiff, Diane Ruffin, is a minor child and citizen of the United States and a resident of the State of Wisconsin.  Plaintiff Diane Ruffin is a sibling of decedent Laliah Swayzer.

12.      Plaintiff, Charlene Ruffin, is a minor child and citizen of the United States and a resident of the State of Wisconsin.  Plaintiff Charlene Ruffin is a sibling of decedent Laliah Swayzer.

13.      Defendant Correctional Officer Kimberly Witkowiak ("Witkowiak"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Witkowiak was employed as a Correctional Officer at CJF by MC and the MCSO and was

4

responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. Witkowiak was assigned to the Maximum-Security Unit where Swayzer was housed on July 14, 2016 and was directly responsible for monitoring Swayzer and Laliah. Witkowiak ignored Swayzer's cries for help, blood in Swayzer's cell and the fact that Swayzer had reported that her water had broken; and thereby forced Swayzer to give birth to Laliah in a filthy maximum-security cell with no assistance, medical or otherwise. At all times material hereto, Witkowiak was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

14.     Defendant Correctional Officer Keziah Love ("Love"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Love was employed as a Correctional Officer at CJF by MC and the MCSO and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. Love was present in the medical unit of July 7, 2016, when medical staff made it abundantly clear that Swayzer was to be housed in the Special Needs/Medical Unit to assure she received the appropriate prenatal care. Love failed to take any action to assure Swayzer was housed consistent with medical directives. At all times material hereto, Love was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

15.     Defendant Correctional Officer Terina Cunningham ("Cunningham"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Cunningham was employed as a Correctional Officer at CJF by MC and the MCSO and was

5

responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. Cunningham was responsible on July 7, 2016, for recording medical staff's directives that Swayzer be housed in the Special Needs/Medical Unit on Swayzer's custody badge. Despite Cunningham's knowledge that medical staff had ordered that Swayzer be housed in the Special Needs/Medical Unit, Cunningham took no action to assure the same occurred, including recording the proper documentation to assure Swayzer was appropriately housed consistent with medical directives. At all times material hereto, Cunningham was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

16. Defendant Correctional Officer Amika Avery ("Avery"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Avery was employed as a Correctional Officer at CJF by MC and the MCSO and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July 2016. Avery was responsible on July 8, 2016, for the approval and re-classification of Swayzer out of the Special Needs Unit to Unit 4A, the cell where she gave birth to Laliah without any supervision or medical care. At all times material hereto, Avery was acting under color of state law, within the scope of his employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

17. Defendant Lieutenant Jeff Andrykowski ("Andrykowski"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Andrykowski was employed as a Lieutenant at CJF by MC and the MCSO and was responsible for the health,

6

safety, security, welfare and humane treatment of all inmates at CJF, including Swazyer and Laliah, in July of 2016. Andrykowski observed Swazyer in the Medical Unit on July 7, 2016, and understood she was pregnant; in direct disregard of Swazyer's pregnancy, medical directives and policy and procedure, Andrykowski transferred Swazyer to a Maximum-Security with no medical monitoring on July 8, 2016. At all times material hereto, Andrykowski was acting under color of state law, within the scope of his employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

18. Defendant Correctional Officer Diedre Adams ("Adams"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Adams was employed as a Correctional Officer at CJF by MC and the MCSO and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swazyer and Laliah, in July 2016. Adams was the correctional officer assigned to the Special Needs Unit on July 8, 2016, and ignored medical directives and/or failed to seek permission of medical providers, in violation of policy and procedure, before allowing the transfer of Swazyer and Laliah from the Special Needs Unit to Cell 4A, the cell where Swazyer gave birth to Laliah without any supervision or medical care. At all times material hereto, Adams was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

19. Defendant Milwaukee County, ("MC") with offices of its executive at 901 N. 9th Street, Suite 306, Milwaukee, Wisconsin 53233, and offices of its Corporate Counsel, located at 901 N. 9th Street, Suite 303, Milwaukee, Wisconsin 53233, at all times material hereto, was a Municipal Corporation organized under the laws of the State of Wisconsin. MC established, operated and

maintained CJF and at all times material hereto, MC was responsible for training and supervising the employees of the MCSO, the creation and implementation of policies and procedures at the CJF, ensuring the MCSO was in compliance with the Consent Decree, and had control and authority over contracts with Armor.

20.     Defendant, Wisconsin County Mutual Insurance Corporation is a domestic insurance company whose registered agent for service of process is David Bisek, Aegis Corporation, 18550 W. Capitol Drive, Brookfield, WI 53045, and is primarily engaged in the business of insurance. At all times relevant hereto, Wisconsin County Mutual Insurance Corporation provided insurance to MC and MC employees, agents, public officials, officers and representatives, insuring against liability imposed by law rising out of negligent conduct and/or constitutional violations and further insuring the defendants against any damages they might be liable to others by virtue of the negligent conduct and/or constitutional violations; that said policy or policies of insurance were in full force and effect at the time of the events that are subject of this lawsuit; that in said contract(s) of insurance Wisconsin County Mutual Insurance Corporation reserved the right settle or adjust any claims arising thereunder and to defend any lawsuits instituted by virtue of any such claims and has a direct interest in this litigation; that by virtue of the laws of the State of Wisconsin, Wis. Stat. § 803.04(2)(a), Wisconsin County Mutual Insurance Corporation is a property defendant herein.

21.     Defendant Armor Correctional Health Services, Inc. ("Armor"), with its Principal Office located at 4960 S.W. 72nd Avenue, Suite #400, Miami, FL 33155, and Registered Agent being C T Corporation System whose address is 8020 Excelsior Dr., Ste. 200, Madison, WI 53717, is a Florida Corporation, incorporated under the laws of the State of Florida, operating in the State of Wisconsin for purposes of providing medical care at correctional facilities, and is responsible, along with MC, for the acts of its employees and agents involved in health care services provided to

8

patients therein. At all times material hereto, Armor Correctional provided health care services to inmates at CJF under color of state law, including Swayzer and Laliah.

22.     Defendant Dr. Maureen White ("White"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, White was employed as the Mental Health Director at CJF by MC and Armor and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. At all times material hereto, White had oversight of the mental health staff assigned to CJF. At all times material hereto, White was responsible for the MSCO's and Armor's policies, procedures, and training in regard to mental health treatment and medical care. At all times material hereto, White was deliberately indifferent to, exhibited reckless disregard of and turned a blind eye to the serious medical needs and Constitutional rights of Swayzer and Laliah and others held at the CJF, and ignored CJF's lack of sufficient training, policies, procedures, both written and unwritten, as well as staffing, to adequately supervise and provide medical care to Swayzer, Laliah and other inmates in need of medical care. Further, White made the decision that Swayzer and Laliah should be housed in the Special Needs Unit, but took no action to assure that occurred. At all times material hereto, White was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

23.     Defendant Dr. Karen Ronquillo-Horton ("Horton"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Horton was employed as the Medical Director at CJF by MC and Armor and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. At all times material hereto, Horton had oversight of the medical health staff assigned

9

to CJF. At all times material hereto, Horton was responsible for the MSCO's and Armor's policies, procedures, and training in regard to medical treatment and medical care. At all times material hereto, Horton was deliberately indifferent to, exhibited reckless disregard of and turned a blind eye to the serious medical needs and Constitutional rights of Swayzer and Laliah and others held at the CJF, and ignored CJF's lack of sufficient training, policies, procedures, both written and unwritten, as well as staffing, to adequately supervise and provide medical care to Swayzer, Laliah and other inmates in need of medical care. Further, Horton made the decision that Swayzer should be housed in the Special Needs Unit, but took no action to assure that occurred or to assure Swayzer and Laliah received medical care. At all times material hereto, Horton was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

24.     Defendant N.P. Katherine Meine ("Meine"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Meine was employed as a Nurse Practitioner at CJF by MC and Armor and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. Meine made the decision that Swayzer should be housed in the Special Needs Unit, but took no action to assure that occurred. At all times material hereto, Meine was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

25.     Defendant Dr. Gina Negrette ("Negrette"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Negrette was employed as a psychiatrist at CJF by MC and Armor and was responsible for the health, safety, security, welfare

10

and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. Negrette was assigned to Swayzer to address her mental health issues, but failed to provide Swayzer treatment at any time. At all times material hereto, Negrette was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

26. Defendant R.N. Frederick Porlucas ("Porculas") is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Porculas was employed as a registered nurse at CJF by MC and Armor and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. Porculas conducted an initially screening of Swayzer and recognized her acute need for medical care and monitoring, but took no action to assure Swazyer was appropriately housed or received appropriate medical care. At all times material hereto, Porlucas was acting under color of state law, within the scope of his employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

27. Defendant Dr. Tulay Gulsen ("Gulsen"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Gulsen was employed as a doctor at CJF by MC and Armor and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. Gulsen was assigned to Swayzer and Laliah to address their medical needs, but failed to provide Swayzer or Laliah treatment at any time. At all times material hereto, Gulsen was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and

11

acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

28.     Defendant Karen Gray ("Gray"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Gray was employed as a Nurse Practitioner at CJF by MC and Armor and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016. Gray was aware of the decision that Swayzer should be housed in the Special Needs Unit, but took no action to assure that occurred. At all times material hereto, Gray was acting under color of state law, within the scope of her employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

29.     Defendant Steven Schmid ("Schmid"), is an adult citizen of the United States and a resident of the State of Wisconsin.  At all times material hereto, Schmid was employed as a psych-social worker at CJF by MC and Armor and was responsible for the health, safety, security, welfare and humane treatment of all inmates at CJF, including Swayzer and Laliah, in July of 2016.  Schmid was assigned to monitor Swayzer's mental health status, but failed to do so.  Schmid encountered Swayzer the evening before the birth of Laliah and despite his knowledge that Swayzer and Laliah were to be housed in the Special Needs Unit took no action assure Swayzer and Laliah were appropriately housed and receiving appropriate care.  At all times material hereto, Schmid was acting under color of state law, within the scope of his employment and authority as an employee or public official of MC, and acting, at times, pursuant to MC's and the MCSO's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

12

30. Defendant, Evanston Insurance Company is a foreign insurance company whose address is Ten Parkway North, Deerfield, IL 60015, who is primarily engaged in the business of insurance. At all times relevant hereto, Evanston Insurance Company provided insurance to Armor and Armor's employees, agents, officers and representatives, insuring against liability imposed by law rising out of negligent conduct and/or constitutional violations and further insuring the defendants against any damages they might be liable to others by virtue of the negligent conduct and/or unconstitutional violations; that said policy or policies of insurance were in full force and effect at the time of the events that are subject of this lawsuit; that in said contract(s) of insurance Evanston Insurance Company reserved the right settle or adjust any claims arising thereunder and to defend any lawsuits instituted by virtue of any such claims and has a direct interest in this litigation; that by virtue of the laws of the State of Wisconsin, Wis. Stat. § 803.04(2)(a), Evanston Insurance Company is a proper defendant herein.

31. Defendant, Wisconsin Health Care Liability Insurance Plan is a Wisconsin insurance company whose address is 125 S. Webster St., Madison, WI 53703-3474, who is primarily engaged in the business of insurance. At all times relevant hereto, Wisconsin Health Care Liability Insurance Plan provided insurance to Karen B. Ronquillo-Horton, M.D. and Gina Negrette, M.D, amongst others, insuring against liability imposed by law rising out of negligent conduct and/or constitutional violations and further insuring the defendants against any damages they might be liable to others by virtue of the negligent conduct and/or unconstitutional violations; that said policy or policies of insurance were in full force and effect at the time of the events that are subject of this lawsuit; that in said contract(s) of insurance Wisconsin Health Care Liability Insurance Plan reserved the right settle or adjust any claims arising thereunder and to defend any lawsuits instituted by virtue of any such claims and has a direct interest in this litigation; that by virtue of the laws of the State of

13

Wisconsin, Wis. Stat. § 803.04(2)(a), Wisconsin Health Care Insurance Plan is a proper defendant herein.

32.     Defendant, Injured Patients and Families Compensation Fund ("the Fund") is a legal liability fund created by Wisconsin Statues for the purpose of paying the portion of claims in excess of limits expressed under statute or the maximum liability for which the insureds are insured, whichever limit is greater.

33.     All of the Defendants are sued in their individual and official capacities.  At all times material hereto, all Defendants were acting under the color of state law; pursuant to their authority as officials, agents, contractors, employees or public officials of MC; within the scope of their employment as representatives of public entities and were deliberately indifferent to the Constitutional and Statutory rights of Swayzer and Laliah.

## V.  FACTS

34.     That at all material times hereto, Swayzer was pregnant, with Laliah, and being involuntarily detained at CJF under the direct custody, supervision, and care of the Defendants.

35.     That at all material times hereto, Swayzer was being detained on an alleged violation of probation.

36.     That on July 6, 2016, Swayzer was approximately nine months pregnant and in her third trimester.

37.     That on July 6, 2016, City of Glendale police officers were dispatched to the Motel 6 located at 5485 N. Port Washington Road, Glendale, Wisconsin 53217.

38.     That because of Swayzer's readily apparent and obvious late stage pregnancy, Glendale Police Officers requested an ambulance be dispatched to the Motel 6 to transport Swayzer and Laliah to the hospital for medical clearance before transport to CJF.

14

39.     At approximately 2:08 p.m. on July 6, 2016, Swayzer was admitted to Columbia St. Mary's for medical clearance.

40.     That in order to properly assess and evaluate Swayzer and Laliah, Columbia St. Mary's staff ordered Swayzer's and Laliah's medical records from Aurora Sinai Medical Center where they had previously received prenatal care. As noted by the Columbia St. Mary's medical staff, Swayzer's and Laliah's previous records indicated that Laliah had normal fetal heart monitoring on June 23, 2016, and June 30, 2016.

41.     That while at Columbia St. Mary's, Swayzer and Laliah underwent an obstetrics assessment and a Fetal Heart Monitor was utilized to track the heart rate of Laliah. The obstetrics assessment revealed that Swayzer was not experiencing cramping/contractions, was not leaking fluid, and was not experiencing any vaginal bleeding. During the exam, Swayzer reported positive fetal movement which was confirmed through palpations shown on the fetal heart monitor. That the fetal heart rate monitor exhibited, "good and showed no abnormality." Swayzer's uterine activity was noted to be normal.

42.     That on July 6, 2016, Swayzer and Laliah were booked into CJF.

43.     That on July 6, 2016, the Defendants were aware that Swayzer was approximately nine months pregnant, with Laliah.

44.     That on July 7, 2017, Swayzer and Laliah was placed in the Mental Health Unit/Special Needs Unit, the reason being, "Medical."

45.     On July 7, 2017, Porculas conducted an Inmate Mental Health Screening and recorded:

- Swayzer reported that she was diagnosed as bipolar and schizophrenia;

- Swayzer reported that had spent a month at a mental health hospital for her paranoid schizophrenia;

- Swayzer showed signs of mental retardation or development disabilities;

- Swayzer reported that she was currently on mental health medications;

- Swayzer reported that she was pregnant;

- Housing Disposition: "Special Needs." "Per Dr. Horton [Swayzer] to be moved to special needs (nurse gray aware)."

46.     That at about 11:40 A.M. on July 7, 2017, Horton advised that Swayzer would be moved to the Special Needs Unit after conferring with White.  Horton further advised that Swayzer could be seen there by mental health workers and medical staff could monitor her daily.

47.     That on July 7, 2016, Love heard Horton advise Swayzer that due to Swayzer being "so far along in pregnancy" she would be housed in the Special Needs Unit until delivery of Laliah and that she could not be moved until delivery of her child.

48.     On July, 7, 2016, Cunningham allegedly noted on Swayzer's CJF identification badge Swayzer is required to have at all times, "House in MHU per Dr. White, Per NP K. Meine", however upon information and belief Cunningham failed to provide those special instructions on Swayzer's classification card and the notation was a late entry documented during the internal investigation of the death of Swayzer's baby.

49.     On July 7, 2016, Andrykowski observed Swayzer and Laliah in the Special Medical Unit and alleges he was unaware Swayzer was pregnant.

50.      On July 8, 2016, Swayzer was seen by Dr. Gina Negrette, a psychiatrist, who failed provide Swayzer with any mental health treatment.

51.     On July 8, 2016, Swayzer was moved to Maximum Security, cell 4A, the reason being "Maximum Custody," by Andrykowski because Swayzer was on "Max" status due to incidents occurring during prior incarcerations at CJF, despite her late term pregnancy, medical instructions to

the contrary and the medical instructions that were supposed to be written on her classification card.

52.     Andrykowski and/or Adams allegedly contacted Avery, who was assigned to classification, who allegedly informed Andrykowski and/or Adams that it was permissible to move Swayzer and Laliah to a Maximum-Security cell despite medical orders to the contrary likely because Cunningham failed to properly document said orders on Swayzer's classification card.

53.     Correctional staff, Avery, Andrykowski, nor Adams informed medical personal or sought medical personal's permission to move Swayzer and Laliah out of the Special Needs Unit.

54.     That the Maximum-Security cell in which Swayzer was placed was, "blocked by a pillar, and you cannot see it on the camera system on the floor control."

55.     Porlucas reported that, '. . . . Swayzer should have been housed in MHU [Mental Health Unit] or [Special Needs Unit], and not general population . . . Swayzer was moved to [the Special Needs Unit] due to her bizarre behavior and, 'In no way was she capable of going into general population in her condition.'"

56.     That between July 8, 2016, and July 14, 2016, that despite doctor's orders that Swayzer was to be seen daily in the Special Needs Unit, she was not seen by a licensed obstetrician, gynecologist, or any medical doctor.

57.     On July 9,10, and 11th Swayzer and her baby received no medical or mental health care.

58.     That on July 13, 2016, Gulsen was scheduled to see Swayzer, but failed to do so despite Swayzer's comorbid conditions and orders to be seen daily.  Despite being nine months pregnant, medical indication and directive Swayzer and Laliah were not treated as "special needs patients" and received no medical care on July 13, 2016.

59.     That no medical staff notified correctional staff about the "necessity" to move Swayzer and Laliah from 4A back to either Special Needs or the Infirmary, in violation or medical orders.

60.     That on her first round of the evening of July 13, 2016, Witkowiak observed Swayzer perched up against the wall on a folded mattress, "which [Witkowiak] thought was weird." Despite Witkowiak's observation of Swayzer's "weird" behavior, she took no further action to investigate Swazyer's "weird" behavior.

61.     That on the morning of July 14, 2016, Swayzer went into labor and began to experience intense contractions, alone, with no assistance in a Maximum-Security cell.

62.     That on July 14, 2016, Swayzer informed Witkowiak that she was in labor, that her water had broken, that she was experiencing extreme contractions, and that she needed medical attention as soon as possible. Witkowiak did nothing in response.

63.     Witkowiak was tasked with conducting "rounds" in the late evening hours of July 13, 2016 and the early morning hours of July 14, 2016, but Witkowiak briskly walk past all of the cells, including Swazyer's and Laliah's cell with not even the slightest glance into the cells.

64.     That during her rounds Witkowiak sensed "something odd with Swayzer," but, "didn't think anything of it because Swayzer has a history of odd behavior."

65.     Witkowiak observed a "funk" in the area of Swayzer's cell, but took no action to investigate further.

66.     At approximately 5:00 A.M. Swayzer delivered Laliah, in extreme pain, covered in blood and her own feces, with no medical assistance of any sort.

67.     Swayzer's placenta had also exited her body. Swayzer wrapped Laliah in a blanket with her faced exposed and wrapped her placenta in a different sheet. Swayzer and Laliah remained in the cell alone without medical assistance for over an hour.

18

68. That almost an hour after Laliah was born, Witkowiak observed Swayzer laying on the bed in such a manner that she had never seen an inmate lay. Witkowiak also noticed, what she believed to be blood in the cell on Swayzer's mattress. At the time Swayzer informed Witkowiak that her water had broken – Witkowiak believed it do blood. Witkowiak also observed that Swayzer's cell was "filthy with several food trays throughout the cell and all of the blankets bunched up by Swayzer." Despite her observations and despite the fact that Swayzer was pregnant Witkowiak did not immediately call a medical emergency.

69. That Witkowiak told Correctional Officer Utsby "I've got to talk to you about something" and explained that was something out of the ordinary and would talk to Utsby about it when she had completed her rounds of 4B.

70. That Witkowiak completed her rounds of 4A and then conducted rounds of 4B. Next, Witkowiak informed Utsby "[A] lady in 4A looked as if she had blood on her mattress [Swayzer] told her that her water bag broke."

71. Despite this information, Witkowiak did not call a medical emergency.

72. That Witkowiak did not call a medical emergency, but after completing her rounds returned to control and eventually called medical who instructed her to call a medical emergency.

73. Deppitch responded to the medical emergency and looked into Swayzer's cell and observed a substantial amount of dried blood and he requested to enter the cell immediately and not continue to wait.

74. R.N. Deppitch observed Swayzer to be confused and disoriented.

75. When Deppitch entered the cell, he observed Swayzer holding Laliah in a blanket with Laliah's head exposed.

76. When Lt. Hein allowed medical staff access to Swayzer's cell he observed: food trays; blood on the floor; blood on the mattress; blood on Swayzer's legs; and blood on Swayzer's t-shirt.

19

77.     Detective Donald Desotell examined the scene and reported, "I noted 6 empty/old Styrofoam food trays on the floor and another jammed inside the toilet roll/holder dispenser. I observed numerous red like substance droplets on the bare mattress inside cell #10. I observed blue MCJ female inmate pants that appeared to soaked with a red like substance. I also observed a light blue blanket and white sheet with large amounts of a red like substance. I further observed a red like substance on the painted white cinder blocks of the cell next to the bed of the cell. I also observed a red like substance that had ran down the side of the bed and appeared to have originated under the above mattress. Upon lifting the above mattress, I observed another white sheet with a large amount of a red like substance . . . I also observed a large amount of smeared red like substance directly beneath the mattress and next to the aforementioned white sheet. I also observed what appeared to be feces under the mattress and next to wall of the bed area. Witkowiak failed take notice of any of the above during her rounds."

78.     Detective Donald Desotell also noted Laliah, "had the appearance of a full-term baby."

79.     That after Laliah was removed from the cell, Swayzer was placed in a "rip belt" and continued to ask, "how is my baby, how is my baby."

80.     That upon Laliah's removal from the cell it did not appear that she was breathing.

81.     That at 6:21 a.m. the MFD responders, took over for medical staff and began resuscitation attempts of Laliah which consisted of cardiopulmonary resuscitation ("CPR") and unsuccessful attempts to place an I.V.

82.     At 6:55 a.m., MFD ceased resuscitation attempts on Laliah was officially declared deceased at the Maximum-Security unit at CJF where she had been born hours earlier.

83.     That on the night of July 13, 2016, through morning hours of July 14, 2016, CJF was dangerously understaffed.

20

84.     CJF's staffing levels were so constitutionally inadequate, that the MFD was forced to wait to transport Swayzer, a woman who had just given birth by herself in a cold, unsanitary, and unsterile jail cell, to the hospital for medical treatment for a very serious medical condition.

85.     That despite having just given birth to a child and having that child tragically pass away in her arms, Swayzer was forced to wait and endure additional pain and suffering until the MCSO had sufficient staffing to allow the MFD to transport Swayzer to Aurora Sinai via ambulance.

86.     As a result of the Defendants' action Laliah suffered during her birth, and as a direct result of not receiving medical care during the labor and delivery process, Laliah tragically suffered a preventable death in the Maximum-Security Unit at CJF.

87.     That while conducting the autopsy, the Milwaukee County Medical Examiner noted that Laliah was a, "well-developed, well-nourished, female neonate of stated age 37 weeks gestation."

88.     That during the investigation by the MCSD, several defendants, including but not limited to, Cunningham, Avery and Andrykowski intentionally provided inaccurate information to investigators regarding Swazyer and Laliah's reclassification from the Special Needs Unit to Maximum-Security, Unit 4A.

89.     Cunningham, who conceded she placed late entries into Swayzer's classification records told investigators she recalled writing the medical note from Dr. White and doing so on 7/7/16, "House in MHU Dr. White Per NP K. Meine."

90.     That Avery, despite the alleged Note made by Cunningham on 7/7/16, "House in MHU Dr. White Per NP Karen Meine," told investigators, "[Swayzer] did not have medical restrictions."

91.     That investigators, particularly Det. Desotell have recognized that either Cunningham, Avery or Andrykowski was providing him inaccurate and misleading information concerning the events surrounding Laliah Swayzer's death.

21

92.     That Horton authored a post-death report that indicated that Swayzer was provided pre-natal medications at 4:00 A.M. on July 14, 2016. Surveillance video reveals the same did not occur and Horton's post death investigation appears to be fabricated record.

### Milwaukee County and Armor's Pattern of Violating Constitutional Rights Of Inmates at the County Justice Facility

*Recent Deaths at Justice Facility*

93.     Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 96 as if fully set forth herein.

94.     Since April of 2016, there have been 6 other tragic and wholly preventable deaths at CJF.

95.     On April 24, 2016, Terrill Thomas died at CJF while in the custody of the MCSO. Thomas had been arrested and booked into CJF on April 14, 2016. Despite suffering from a severe mental illness and in the midst of a mental breakdown, Thomas was placed in a Maximum-Security Unit at CJF and never seen by any mental health professional. After displaying bizarre and erratic behavior, CJF staff cut-off the water supply to Thomas' cell on April 18, 2016. Six days later, Thomas' was found dead in his cell. Thomas' death was subsequently ruled a homicide by the Milwaukee County Medical Examiner with the cause of death being dehydration.

96.     On August 28, 2016, Kristina Fiebrink died at CJF while in the custody of the MCSO. Fiebrink had been arrested and booked into CJF on August 24, 2016, while she displayed clear signs of being under the influence of heroine, alcohol, and cocaine, which were noted by staff. Despite exhibiting signs and symptoms of acute heroin and alcohol intoxication, Fiebrink was never placed on preventative detoxification protocol, seen or assessed by a medical practitioner, provided withdrawal medication, or placed on a heightened observation level while at CJF. On the night of August 27, 2016, and into the early morning hours of August 28, 2016, Fiebrink screamed, begged, and pleaded for help in her cell, but correctional staff ever even bothered to check on her. Fiebrink

22

was subsequently found deceased on the morning of August 28, 2016, in her cell by correctional staff.

97.     On October 28, 2016, Michael Madden died at the Justice Facility while in the custody of the MCSO.  At the time of Madden's arrest, he was suffering from a heart condition which he had had been since birth, as well as a heroin addiction.  Despite these serious and grave medical conditions, Madden received little to no health care while at CJF.  On October 28, 2016, Madden suffered a seizure rendering him unconscious.  The responding officers believed Madden was faking and failed to call a medical emergency.  The officers then attempted to pick and hold Madden up, but dropped him on his head.  Madden was subsequently pronounced dead the night of October 28, 2016, at CJF.

98.     Several other deaths have occurred at CJF since 2016.

*Consent Decree*

99.     The MCSO and MC entered into the Consent Decree with a class of plaintiffs (current and future inmates of CJF) in Milwaukee County Circuit Court Case No. 1996-CV-1835, which was approved by Milwaukee County Circuit Court Judge Thomas Donegan on June 19, 2001.

100.    The Consent Decree had two components: (1) Population control; and, (2) Medical care.

101.    In terms of medical care, the Consent Decree required that MC provide adequate, well-trained staff to provide health care to inmates and that thorough screening of inmates for physical and mental health conditions be conducted. It further set out requirements for physical examinations, dental care, women's health, sick call, mental health, chronic care, and emergencies.

102.    As part of the Consent Decree, the parties agreed that a medical monitor be appointed and approved by the Court to supervise MC's compliance with the Consent Decree's

provisions while the court retained jurisdiction over the case until the MC was in full compliance with the terms of the Consent Decree.

103.    At all times material hereto, Shansky was the Court approved medical monitor tasked with monitoring MC's compliance with the Consent Decree.

104.    During his tenure, Shansky documented a series of systematic problems in CJF's healthcare system.

105.    Specifically, Shansky has found that, "health care staffing shortages contribute to delays in access to care and deterioration in quality of care for prisoners; reductions in the number of correctional officers contribute to dangerous lack of access to health care and inability to detect health crisis, and may have played a role in some of the recent deaths at the Jail; that continued turnover in health care leadership positions contribute to lack of oversite of quality of care; and that the electronic record has serious deficiencies and must be altered or replaced."

106.    That MC has exhibited a systematic deficiency in staffing for a period lasting over ten years.

107.    As a result of the lack of health care staff and deficient medical services at CJF, correctional officers often improperly attempt to substitute their untrained judgment for that of a medical professional.

108.    The lack of staff at CJF creates severe problems for MC's and Armor's ability to respond timely and appropriately to medical emergencies and needs, which is precisely what contributed to Laliah's untimely, horrific, and preventable death.

109.    That inmates with acute medical conditions have suffered for days, failed to receive appropriate medical care or referrals and have then died at CJF.

110.    On several occasions, Shansky has found that the County nor Armor was not performing medical emergency drills as required by the Consent Decree.

24

111.    The Consent Decree is still in force and the above listed failures have never been corrected although the MC and/or Armor have been aware of the problems for over a decade.

112.    MC, Armor, Horton and White each had a duty to ensure that reasonable measures were taken to provide for the safety of inmates at CJF.

113.    All Defendants were on notice of the unconstitutional conditions at CJF, and the problems identified by Dr. Shansky and each has failed to rectify these conditions.

114.    The above acts and omissions of all Defendants, and each of them, constitute a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety, and welfare of Swayzer and Laliah and those similarly situated, resulting in the deprivation of their constitutional rights.

115.    Federal and state law, as well as accepted corrections and medical practices at the time of the incident provided "fair warning" to Defendants that their conduct was improper, incompetent, illegal, and in violation of Swayzer and Laliah's constitutional rights.

116.    That MC and Armor's deliberate indifference to health care needs of inmates and complete failure to correct medical conditions reflected in the reports of Shansky caused a culture of indifference by which those employed by MC at CJF understood that health care was not a priority and failures in regard thereto would not have any repercussions.

117.    The acts and omissions of the Defendants, as set forth above, violated clearly established and well settled federal constitutional rights of the Plaintiffs, i.e., due process of law under the Fourth and Fourteenth Amendments, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

118.    As a direct and proximate result of the acts and omissions of the Defendants as set forth above, the Plaintiffs suffered the following injuries and damages:

      a.    Emotional distress, psychological distress, and mental anguish;
      b.    Physical pain and suffering;

25

c.   Loss of companionship;
d.   Loss of future enjoyment of life;
e.   Fright and shock;
f.   Denial of social pleasure and enjoyment;
g.   Embarrassment, humiliation, and mortification,
h.   Constitutional violations; and,
i.   Death.

## VI.  VIOLATIONS OF LAW

### COUNT I
### Section 1983 Claims
### All Defendants

119.   Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 122 as if fully set forth herein.

120.   As a result of the Defendants' refusal to provide Swayzer or Laliah medical attention Laliah was born and tragically died in Max-Custody at CJF.

121.   At all relevant times, the late term and potential complications from Swayzer's pregnancy and the impending delivery of Laliah was obvious and known, or should have been known to each of the above listed Defendants commencing on July 6, 2016, and continuing through July 14, 2016, which the Defendants deliberately chose to ignore.

122.   Defendants, and each of them, knew that Swayzer and Laliah were suffering from serious medical conditions and needed immediate constitutionally adequate medical treatment, but deliberately ignored the same by failing to provide any medical care while Swayzer and Laliah were housed at CJF.

123.   Defendants, and each of them, knew Swayzer and Laliah were in need of medical care and would suffer substantially if that medical care was not provided.

124.   That the above-named Defendants, were deliberately indifferent to Swayzer's and Laliah's serious medical needs and intentionally deprived Swayzer and Laliah of the necessary medical care and treatment, and acted with reckless disregard of Swayzer's and Laliah's obvious

26

serious medical conditions and needs, in violation of Swayzer and Laliah's rights, privileges, and immunities as guaranteed by the United States Constitution, the Fourth, Eighth, and Fourteenth Amendments, and Federal Statutes, including 42 U.S.C. § 1983.

125.    That the conduct of the Defendants, shocks the conscious, was reckless, and demonstrates a deliberate indifference to the consequences of Defendants' refusal to provide Swayzer and Laliah medical care while at CJF.

126.    That the conduct of each Defendant, individually and/or as employees and/or agents of MC and Armor was committed while acting under color of state law, depriving Swayzer and Laliah of their clearly established rights, privileges, and immunities, in violation of, *inter alia,* the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, and of 42 U.S.C. § 1983.

127.    That Defendants deprived Swayzer and Laliah of those rights, privileges and immunities secured by the United States Constitution and federal laws, while acting under the color of the laws of the State of Wisconsin, and the rules, regulations, customs and usages of the State of Wisconsin in violation of 42 U.S.C. § 1983.

128.    That the actions and omissions of all Defendants under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. § 1983, were all performed under the color of state law and were unreasonable and performed knowingly, intentionally, maliciously, and with deliberate indifference to Swayzer and Laliah's safety, well-being, serious medical needs and lives; with wanton intent for Swayzer and Laliah to suffer an unnecessary intentional infliction of pain and suffering by failing to properly provide any medical treatment, and failing to properly instruct, train, and supervise staff at CJF, including the individual Defendants having responsibility over the care, supervision, and general welfare of Swayzer and Laliah; and the failure to develop and implement appropriate policies and procedures and to ensure proper

27

instruction, training, supervision, and medical care, as well as the implementation, adoption, and/or tolerance of policies and/or procedures which deprived Swayzer and Laliah of medical attention for each of their serious medical needs as described above. Said policies and/or procedures comprise a deliberate indifference to those serious medical needs of Swayzer and Laliah, by reason of which Plaintiffs are entitled to compensatory and/or punitive damages.

129. That the conduct of each Defendant, was committed pursuant to, and in execution and implementation of, the color of state law and officially sanctioned policies, practices, ordinances, regulations, and/or customs of MC and Armor; and each of the named Defendants exhibited a deliberate indifference in violation of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution to Swayzer's and Laliah's serious medical needs, and in violation of 42 U.S.C. 1983, causing the constitutional deprivation of Swayzer's and Laliah's individual rights to-wit:

    a. Deliberately failing to properly train CJF staff, including medical personnel providing medical care to inmates thereof, to properly assess and determine when a inmate is facing a medical emergency;
    b. Deliberately ignoring Swayzer's and Laliah's immediate needs for medical treatment;
    c. Deliberately failing to seek appropriate medical attention for a woman in active labor;
    d. Deliberately placing Swayzer and Laliah in Max-Custody as a result of the Swayzer's mental illnesses and actions consistent therewith;
    e. Deliberately failing to seek appropriate medical attention for Laliah;
    f. Deliberately failing to conduct timely and meaningful security/rounds;
    g. Deliberately and willfully failing to notify appropriate doctors, nurses, and medical staff of Swayzer's pregnancy and labor;
    h. Deliberately failing to hire, train, maintain, and implement competent staff at the CJF;
    i. Deliberately failing to discipline, instruct, supervise, and/or control the conduct of staff at CJF, thereby encouraging the wrongful acts and omissions complained of herein;
    j. Deliberately allowing a custom and/or practice at CJF of deliberately ignoring complaints of inmates or their need for medical attention;
    k. Deliberately, willfully, and wantonly withholding required medical care to Swayzer and Laliah when they had actual knowledge of both Swayzer and Laliah's serious medical conditions requiring immediate attention;
    l. Deliberately, willfully, and wantonly failing to ensure that CJF was properly staffed; and,

Case 2:16-cv-01703-BHL   Filed 06/26/19   Page 28 of 37   Document 313

m. Deliberately, willfully, and wantonly failing to ensure the Consent Decree was complied with.

130.    That as a direct and proximate result of the deliberate, willful, wanton, and reckless violation of Swayzer's and Laliah's Constitutional Rights, Plaintiffs suffered injuries and damages including, but not limited to the following:

   a. Emotional distress, psychological distress, and mental anguish;
   b. Physical pain and suffering;
   c. Loss of companionship;
   d. Loss of future enjoyment of life;
   e. Fright and shock;
   f. Denial of social pleasure and enjoyment;
   g. Embarrassment, humiliation, and mortification,
   h. Reasonable expenses of necessary medical care, treatment and services;
   i. Constitutional violations;
   j. Death;
   k. Punitive damages for Defendants' willful conduct; and,
   l. Any and all other damages, including, but not limited to attorney fees recoverable under 42 U.S.C. §§ 1983 and 1988.

## COUNT II
### Monell Liability
### Defendants Milwaukee County and Armor

*A. Defacto Policies, Practices, and/or Customs of Allowing Untrained Correctional Staff to make Decisions Concerning the Need for Appropriate Medical Treatment and the Housing of Inmates with Medical Needs.*

131.    Plaintiffs hereby reassert and realloge each and every allegation contained in Paragraphs 1 through 134 as if fully set forth herein.

132.    That the actions of MC, MCSO, and Armor of allowing untrained correctional officers to make decisions concerning the need for appropriate medical care and decisions on where to house inmates with serious medical needs were done in accordance with MC, MCSO, and Armor's policies, practices, and/or customs condoning the use of such procedures to deal with all inmates. That this policy, practice, and/or custom was officially adopted.

133.    On June 22, 2016 Dr. White identified the widespread defacto practice regarding corrections staff moving patients from their assigned housing area without consulting mental health.

29

134.    That this official policy, practice, and/or custom of allowing untrained correctional officers to make decisions concerning the need for appropriate medical care and decisions on where to house inmates with serious medical needs despite medical orders violated Swayzer and Laliah's Constitutional, Civil, and Statutory Rights and permitted, encouraged, tolerated, and/or ratified the actions of Defendants, all in a malicious, reckless disregard, and/or with deliberate indifference regarding the Constitutional, Civil, and Statutory Rights of Swayzer and Laliah.

135.    That MC, MCSO, Armor, Horton and White had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

136.    That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Swayzer's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

137.    That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

B.    *Policies, Practices, and/or Customs of Ignoring the Requirements of the Consent Decree and Failing to Follow Recommendations of a Court Approved Medical Monitor Created a Culture in Which Milwaukee County Employees were Deliberately Indifferent to the Constitutional Rights of Inmates and Disregarded Proper Policy and Procedure.*

138.    Plaintiffs hereby reasserts and realleges each and every allegation contained in Paragraphs 1 through 141 as if fully set forth herein.

139.    MC and MCSO and Armor failed to comply with the terms and provisions of the Consent Decree concerning healthcare; failed to follow the recommendations of Shansky; failed to work towards compliance with the standards of the National Commission on Correction Healthcare; allowed officers to substitute their judgment for that of health care staff; failed to conduct

30

emergency drills; and have exhibited a systematic deficiency in staffing, amongst other failures, these actions have been ratified as official policy thereby creating a culture where healthcare staff and correctional staff are deliberately indifferent to the Constitutional Rights of persons in their custody, including Swayzer and Laliah.

140.    MC's, MCSO's and Armor's policy of allowing the failures identified in the previous paragraphs have continued for years and are contrary to acceptable correctional practices.

141.    MC's MCSO and Armor's policy of allowing the failures identified in the previous paragraphs became a de facto policy of MC, MCSO and Armor, creating a culture of indifference, which lead to de facto policy of officers and health care staff not being held accountable for their failure to provide medical care and/or call for medical care, further creating a de facto policy of MC, MCSO and Armor that officers and health care staff were not required to provide a constitutional level of health care and/or follow policies and procedures in regards to medical care.

142.    That these above-mentioned de facto policies of MC, MCSO and Armor constitute deliberate indifference against individuals in the custody of MC at CJF, and the de facto policies created an environment which would allow officers and health care staff to ignore the medical needs of inmates and were factors that were significant and causal to the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

143.    That MC, MCSO, Armor, Horton and White had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

144.    That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Swayzer's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

31

145. That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

C. *Polices, Practices, and/or Customs of Having No Policies and Procedures in Place to Dictate the Quality of Care Provided to Detainees.*

146. Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 149 as if fully set forth herein.

147. That the actions of MCSO, MC, and Armor of failing to have any policies and procedures in place to dictate the quality of care provided to detainees were done in accordance with MC's, MCSO's and Armor's policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

148. That this official policy, practice, and/or custom of failing to have any policies and procedures in place to dictate the quality of care provided to detainees violated Swayzer's and Laliah's Constitutional, Civil, and Statutory Rights and permitted, encouraged, tolerated, and/or ratified the actions of correctional and medical staff, all in a malicious, reckless disregard, and/or with deliberate indifference to the Constitutional, Civil, and Statutory Rights of Swayzer and Laliah.

149. That MC, MCSO, Armor, Horton and White had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

150. That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Swayzer's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

151.    That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

> D. *Polices, Practices, and/or Customs of Fabricating Medical Records to Make it Appear as if Medical Care was Provided were Deliberately Indifferent to the Constitutional Rights of Inmates and Disregarded Proper Policy and Procedure*

152.    Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 155 as if fully set forth herein.

153.    That the actions of MCSO, MC, and Armor of fabricating medical records to make it appear as if medical care was provided were done in accordance with MC's, MCSO's, and Armor's policies, practices, and/or customs condoning the use of said procedures.  That this policy, practice, and/or custom was officially adopted.

154.    That this official policy, practice, and/or custom of fabricating medical records to make it appear as if medical care was provided violated Swayzer's and Laliah's Constitutional, Civil, and Statutory Rights and permitted, encouraged, tolerated, and/or ratified the actions of correctional and medical staff, all in a malicious, reckless disregard, and/or with deliberate indifference to the Constitutional, Civil, and Statutory Rights of Swayzer and Laliah.

155.    That MC, MCSO, Armor, Horton and White had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

156.    That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Swazyer's and Laliah's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

33

157.     That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Swayzer and Laliah, as well as the eventual death of Laliah.

## COUNT III

### Negligence
### Defendants Witkowiak, Love, Cunningham, Andrykowski, Adams, and Avery.

158.     Plaintiffs hereby reasserts and realleges each and every allegation contained in Paragraphs 1 through 161 as if fully set forth herein.

159.     That Defendants undertook and owed Swayzer and Laliah a duty to make reasonable efforts to care for each of them in a reasonably prudent manner, to exercise due care and caution and to follow the common law as it relates to persons in their custody who are unable to care for themselves or seek medical attention while in custody.

160.     Notwithstanding the aforementioned duties, Defendants treated Swayzer in a manner that was negligent, careless, reckless, and without concern for her safety.

161.     Notwithstanding the aforementioned duties, Defendants treated Laliah, in a manner that was negligent, careless, reckless, and without concern for her safety.

162.     That Defendants, in the face of Swazyer's and Laliah obvious need for medical attention and assistance, failed to obtain medical attention, failed to identify a medical emergency, and/or failed to act as required.

163.     Defendants failed to adequately train correctional staff and medical staff; failed to develop and implement proper policies and procedures for dealing with pregnant inmates and/or births at CJF; failed to have some method, policy, practice, and/or procedure in regard to identifying medical emergencies pertaining to pregnant inmates, and failed to have an intervention method, policy, practice, and/or procedure in regards to pregnant inmates and/or births at CJF so that treatment could be obtained on a timely basis.

34

164.     Defendants engaged in conduct that was so negligent, careless, and reckless that it demonstrated a substantial lack of concern by failing to appropriately implement policies and procedures concerning the training of correctional staff and/or medical staff regarding the processing and relaying of medical information and request for emergent medical treatment and by failing to act on requests for emergent medical treatment, including, but not limited to:

   a. Failing to properly train CJF staff to properly assess and determine when an inmate/person in custody is facing a medical emergency;
   b. Negligently, carelessly, and recklessly ignoring Swayzer's and Laliah's immediate needs for medical treatment;
   c. Negligently, carelessly, and recklessly failing to seek appropriate medical attention for Swayzer;
   d. Negligently, carelessly, and recklessly failing to seek appropriate medical attention for a Laliah;
   e. Negligently, carelessly, and recklessly failing to notify appropriate doctors, nurses, and medical staff of Swayzer and Laliah's medical condition;
   f. Negligently, carelessly, and recklessly hiring, training, maintaining, and implementing competent staff at CJF;
   g. Negligently, carelessly, and recklessly failing to discipline, instruct, supervise, and/or control the conduct of staff at CJF, thereby encouraging the wrongful acts and omissions complained of herein;
   h. Negligently, carelessly, and recklessly allowing a custom and/or practice at CJF of deliberate indifference to medical needs; and,
   i. Negligently, carelessly, and recklessly withholding required medical care to Swayzer and Laliah when they had actual knowledge both Swayzer and Laliah had serious medical conditions requiring immediate attention;

165.     That as a direct and proximate result of the negligent, careless, and reckless disregard for Swayzer's and Laliah's safety and well-being, Plaintiffs suffered injuries and damages including, but not limited to the following:

   a. Emotional distress, psychological distress, and mental anguish;
   b. Physical pain and suffering;
   c. Loss of companionship;
   d. Loss of future enjoyment of life;
   e. Fright and shock;
   f. Denial of social pleasure and enjoyment;
   g. Embarrassment, humiliation, and mortification,
   h. Reasonable expenses of necessary medical care, treatment and services;
   i. Constitutional violations;
   j. Death;
   k. Punitive damages for Defendants' willful conduct; and,

35

l.   Any and all other damages.

## COUNT IV

### Wrongful Death (Wis. Stat. § 895.03)
### Defendants Witkowiak, Love, Cunningham, Andrykowski, Adams, Avery.

166.    Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 169 as if fully set forth herein.

167.    That Laliah's death was caused by Defendants' wrongful acts, negligence, and/or improper conduct

168.    That if Laliah's death had not ensued, Laliah would have been able to bring a claim against the above-named Defendants for violations of Title 42 of the United States Code, Sections 1983 and 1985 for violations of her rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and her rights under the Wisconsin Constitution and Wisconsin Common law.

## VII.  CONDITIONS PRECEDENT

169.    All conditions precedent to this lawsuit have been performed or otherwise occurred.

## VIII. PRAYER FOR RELIEF

170.    WHEREFORE, the Plaintiffs respectfully demands judgment in favor of Plaintiffs against each of the Defendants, jointly and severally, awarding Plaintiffs:

      a.   Compensatory damages in an amount to be determined by the Jury;
      b.   Punitive damages in an amount to be determined by the Jury;
      c.   Reasonable costs and expenses associated with this action including attorneys' fees pursuant to 42 U.S.C. 1988; and,
      d.   Any other further relief as this Honorable Court deems just and fair.

171.    Milwaukee County is liable pursuant to Wis. Stat. § 895.46 for payment of any judgment entered against the Defendants in this action because the Defendants were acting within the scope of their employment as employees or public officials when they committed the above-mentioned unconstitutional and negligent actions.

36

172. Plaintiffs hereby reserve their right to amend their Complaint as additional information becomes known through discovery.

## IX. DEMAND FOR JURY TRIAL

173. The Plaintiffs demand trial by jury.

Dated at this 26th day of June, 2019.

Respectfully Submitted,
Judge, Lang & Katers, LLC

By:_s/ Christopher P. Katers_____
    Christopher P. Katers (SBN: 1067557)
    David J. Lang (SBN: 1001218)
    Kevin Raasch (SBN: 1100196)
    JUDGE LANG & KATERS, LLC.
    8112 W. Bluemound Road, Ste. 101
    Wauwatosa, WI 53213
    P: (414) 777-0778
    F: (414) 777-0776
    ckaters@jlk-law.com
    kraasch@jlk-law.com
    dlang@jlk-law.com
    Attorneys for Plaintiffs

    -and-
    Gende Law Office, S.C.

By:_s/ James J. Gende II_____
    James J. Gende II (SBN: 1030921)
    GENDE LAW OFFICE, S.C.
    N28W2300 Roundy Dr., Ste. 200
    Pewaukee, WI 53072
    P: (262) 970-8500
    F: (262) 970-7100
    JGende@jamesgendelaw.com
    Attorneys for Plaintiffs