# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

**ESTATE OF LALIAH SWAYZER**, *et al.*,

        **Plaintiffs,**

                                           **Case No. 16-CV-1703**

**v.**

**DAVID A. CLARKE, JR.**, *et al.*,

        **Defendants.**

---

## COUNTY DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

**LEIB KNOTT GAYNOR LLC**

Dated: <u>August 19, 2019</u>        By: <u>*/s/ Douglas S. Knott*</u>

                                 Douglas S. Knott, SBN 1001600
                                 Charles R. Starnes, SBN 1113293
                                 Attorneys for County Defendants
                                 219 N. Milwaukee Street, Suite 710
                                 Milwaukee, WI 53202
                                 Telephone: (414) 276-2102
                                 Fax: (414) 276-2140
                                 Email: dknott@lkglaw.net
                                             cstarnes@lkglaw.net

# TABLE OF CONTENTS

I. INTRODUCTION ……………………………………………………………...1

II. RELEVANT FACTS ………………………………………………………......2

III. SUMMARY JUDGMENT STANDARD …………………………………...13

IV. ARGUMENT …………………………………………………………………15

    A. The Estate's Claims Must be Dismissed …………………………………...16

        1. The Estate's Section 1983 Claims Must be Dismissed as a Stillborn Child is not a Constitutionally-Recognized Person …………………………………..16

        2. Plaintiffs have no Evidence that an Act or Omission of the Defendants Caused Laliah Swayzer's Stillbirth or Post-Birth Death …………………………17

    B. The Claims of Diane and Charlene Ruffin Must Be Dismissed ………………………18

    C. Swayzer's Claims Related to Her Transfer from the Special Needs Unit to Unit 4A Must Be Dismissed ………………………………………………….....................................19

        1. Swayzer's claims should be assessed under the Deliberate Indifference standard of the Eighth Amendment ……………………………………………….21

        2. Swayzer's claims against Officer Love should be dismissed …………………24

        3. Swayzer's claims against Lt. Andrykowski should be dismissed ……………26

            a. There is no evidence Lt. Andrykowski was deliberately indifferent to an objectively serious need ………………………………………27

            b. There is no evidence that the decision to transfer Swayzer to Unit 4A was an unconstitutional cause of harm to her ……………………...29

        4. Swayzer's claims against Correctional Officers Terina Cunningham, Amika Avery, and Deirdra Adams should be dismissed ………………………….31

            a. Plaintiffs fail to state a constitutional claim against Officers Cunningham, Avery, or Adams …………………………………32

            b. The conduct of Officers Cunningham, Avery, and Adams was not a cause of Swayzer's harm as a matter of law ……………………33

D. Swayzer's Claims against Officer Kimberly Witkowiak Must Be Dismissed .........34

1. There is no credible evidence that Officer Witkowiak was aware of an actual risk of harm to Swayzer ……………………………………………34

2. There is no verifying medical evidence that a delay in recognizing a medical emergency caused Swayzer harm ………………………………………37

a. Stillbirth of Fetus …………………………………………………...38

b. Death of Live Baby …………………………………………………...38

c. Injury to Swayzer …………………………………………………...39

E. The Individual Defendants Are Entitled to Qualified Immunity ………………………40

F. Plaintiffs' Monell Claims Against Milwaukee County Fail ……………………………42

1. No Constitutional Violation Occurred …………………………………………...43

2. No Constitutionally Deficient Custom, Practice or Policy ……………………44

a. Plaintiffs' claim for allowing correctional officers to make medical and housing decisions should be dismissed …………………………45

i. There is no evidence of a widespread practice ………………..45

ii. Plaintiffs cannot show causation ……………………………..47

iii. Plaintiffs cannot demonstrate notice to the County …………48

b. Plaintiffs' claim for failing to comply with the terms of a Consent Decree should be dismissed ………………………………………49

i. Consent Decree, Shansky reports, and NCCHC accreditation are irrelevant to any constitutional question ………………...49

ii. Plaintiffs fail to demonstrate causation or notice ……………52

c. Plaintiffs' claim for lack of policies dictating the quality of care must be dismissed ………………………………………………………...53

d. Plaintiffs' claim for fabricating medical records should be dismissed ………………………………………………………………... 56

G. Plaintiffs' Negligence and Wrongful Death Claims Fail ……………………………57

    1. Plaintiffs failed to comply with the Notice-of-Claim Requirements of Wis. Stat. § 893.80 …………………………………………………………………………57

    2. Defendants are entitled to Immunity under Wis. Stat. § 893.80 ……………...58

    3. The Estate's Wrongful Death Claim Fails for Lack of Causation ……………61

    4. Plaintiffs' Negligence Claims Fail for Lack of Proof of Causation …………..61

V. CONCLUSION …………………………………………………………………………62

Defendants Milwaukee County, Kimberly Witkowiak, Keziah Love, Terina Cunningham, Jeff Andrykowski, Amika Avery, Deirdra Adams (incorrectly identified in the Fourth Amended Complaint as "Diedre Adams"), and Wisconsin County Mutual Insurance Company (hereafter collectively "the County Defendants"), by their attorneys, submit the following brief in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56.

## I.     <u>INTRODUCTION</u>

Plaintiff Shade Swayzer (hereinafter "Swayzer") alleges that her medical needs were ignored by various staff at the Milwaukee County Jail and that, as a result, she gave birth unassisted in her cell on July 14, 2016.  Upon discovery by the staff, her child was deceased.  The undisputed medical evidence demonstrates that the fetus was profoundly infected *in utero* and was stillborn. Plaintiffs offer no medical evidence to contradict that conclusion or to meet their burden of demonstrating that the child would have survived but for the conduct of the Defendants.

Swayzer's claims against the County Defendants fall generally into three groups.  First, she alleges Officers Love, Cunningham, Andrykowski, Avery, and Adams should not have transferred her from the Special Needs Unit of the Jail to Unit 4A on July 8, 2016.  <u>See</u> Pls.' Fourth Am. Compl. (Doc. No. 313), ¶¶ 14-18.  Swayzer was transferred from the Special Needs Unit because a suicidal female inmate presented a more acute mental health concern and need for observation.  <u>See</u> PF 28, 32.  It is well-settled that an inmate does not have a constitutional right to a particular jail unit or cell.  Further, Unit 4A is a mixed-use housing unit that, per medical and psychiatric staff, housed inmates with mental health or medical needs, including late-term pregnant inmates.  <u>See</u> PF 34-43.  Medical providers testified Unit 4A was an appropriate housing unit for Swayzer at that time.  None of the officers involved in the transfer, which occurred more than five days before she went into labor, could have anticipated that she would repeatedly refuse the

1

medical staff's offers to assess and treat her. The officers involved in the decision to transfer her were not indifferent as a matter of law and, alternatively, are entitled to qualified immunity under the circumstances. See *infra.*, Part IV.E.

Second, Swayzer alleges Officer Witkowiak was indifferent to her needs on the night she went into labor. See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 13. As discussed below, Officer Witkowiak was not subjectively aware Swayzer had a medical need before she delivered her child. Swayzer declined Officer Witkowiak's inquiries, telling her she did not need help. See PF 71, 78-79. Furthermore, credible evidence demonstrates that the child was stillborn and there is nothing that could have been done to prevent this outcome. Officer Witkowiak was not indifferent as a matter of law and is entitled to qualified immunity under the circumstances. See *infra.*, Part IV.E.

Plaintiffs assert Milwaukee County adopted or endorsed unconstitutional policies. See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶¶ 132-157. Plaintiffs have failed to identify any particular policy relevant to Swayzer's medical care and have failed to demonstrate any policy or procedure was a moving force behind any injury. Their Monell claims fail as a matter of law. See *infra.*, Part IV.F.

Finally, Plaintiffs assert claims of negligence and wrongful death under Wisconsin law against Officers Witkowiak, Love, Cunningham, Andrykowski, Adams, and Avery. However, their state law claims fail as Plaintiffs did not comply with the requirements of Wis. Stat. § 893.80, the officers' acts were discretionary and subject to immunity under Wisconsin law, and Plaintiffs cannot show causation required for either their wrongful death or negligence claims.

## II.   **RELEVANT FACTS**

Swayzer pled guilty to burglary on September 16, 2014 and was sentenced to 18 months incarceration with 18 months of extended supervision on October 10, 2014. This sentence was

stayed and a sentence of 3 years of probation imposed.  See PF 1.  She was arrested by officers of the Glendale Police Department on July 6, 2016 on a Department of Corrections ("DOC") felony warrant for violation of parole for her burglary conviction.  She was also charged with resisting arrest after she resisted the arresting officers' control and attempted to bite one of them.  See PF 2.  In addition, the DOC issued an Order to Detain directing that Swayzer be held in custody until further instructions were received from a DOC representative.  See PF 3.  At that time, she was approximately 36 weeks pregnant with an estimated due date of August 3, 2016.  See PF 4.

After being placed in a police vehicle, Swayzer wrapped a seat belt around her neck and acted as if she had difficulty breathing.  Due to her actions, one of the arresting officers called for a medical unit to evaluate Swayzer.  See PF 5.  She was taken to Columbia St. Mary's Hospital. Although initially refusing medical care, she eventually allowed fetal heart monitoring to be performed.  This showed no abnormality and Swayzer was medically cleared for admission to the Milwaukee County Jail ("Jail").  See PF 6.  She was taken to the Jail at 4:15 p.m.  See PF 7.

### Swayzer Consistently Refuses Medical Treatment

Upon arrival, Swayzer received a pre-booking screening at 4:40 p.m. from a nurse employed by Defendant Armor Correctional Health Services, Inc. ("Armor").  She was uncooperative and it was recorded that she was eight months pregnant.  See PF 8.  At 8:16 p.m., Armor medical staff contacted the St. Mary's Emergency Department to obtain additional information. St. Mary's staff reported that Swayzer had been medically cleared after the fetal heart tone check was found to be normal.  See PF 9.  She was admitted to the Special Medical Unit – sometimes referred to as the SMU, the Infirmary, or Medical Housing Unit – for medical observation and prenatal vitamins were ordered.  See PF 10.  Swayzer was seen at 8:30 p.m. by an Armor social worker due to her lack of cooperation at her initial health screening.  She was fully

3

oriented, made appropriate eye contact, and spoke coherently. She agreed to complete a second screening and denied suicidal intent. The social worker cleared her for general population housing. See PF 11.

Swayzer refused to complete a urine drug screen at 3:50 a.m. on July 7, 2016. See PF 12. At 9:30 a.m., Defendant Frederick Porculas – an Armor nurse – saw Swayzer for a second medical screening. She again refused to submit to a urine drug screen. See PF 13. Due to her prior history of assaultive behavior at the Jail, Swayzer was placed on maximum custody status. See PF 14. This status is not a housing assignment and does not prevent an inmate from being housed consistent with their medical or mental health needs. Rather, it means, among other things, that the inmate has limited time outside their cell and additional security precautions are taken when they are outside their cell. See PF 15.

Swayzer refused to submit to a prenatal assessment by Defendant Katherine Meine, a nurse-midwife employed by Armor, at 11:09 a.m. on July 7, 2016. She would not provide information about her outside prenatal care, but did inform Nurse-Midwife Meine that she felt fetal movements and denied contractions or bleeding. Swayzer later took her prescribed prenatal vitamins. See PF 16. The Armor standard for prenatal care for a patient who is 36 weeks or more pregnant is to be seen on a weekly basis. The Armor standard **does not** require daily vital signs or observation of fetal heart tones. See PF 17.

At 11:40 a.m., Defendant Dr. Karen Ronquillo-Horton – Armor's medical director for the Jail – reviewed Swayzer's case with Defendant Dr. Maureen White. Dr. White was Armor's mental health director at the Jail. Dr. Horton noted Swayzer was pregnant and schizophrenic and Drs. Horton and White agreed she would be transferred to the facility's Special Needs Unit,

4

sometimes referred to as the SNU or Mental Health Unit.[1] See PF 18. Defendant Officer Terina Cunningham, who worked in the Jail classification unit, received a call from someone in the medical unit communicating Drs. Horton and White's request to re-classify Swayzer from the Special Medical Unit to the Special Needs Unit. See PF 19. Swayzer was moved to the Special Needs Unit that day. See PF 20.

The Jail has a total capacity of approximately 960 inmates. More than 50% of the inmates in the Jail at any given time have identified mental health diagnoses and needs. Approximately 75% of the female inmates in the Jail at any given time have identified mental health diagnoses and needs. See PF 21. The Special Needs Unit is used for housing inmates with behavioral or mental health issues. There are only three (3) cells in the Special Needs Unit for female inmates. See PF 22.

On July 8, 2016 at 7:54 a.m., Swayzer was seen by Defendant Dr. Gina Negrette, a psychiatrist employed by Armor. Dr. Negrette found her to be pleasant, without psychomotor concerns, linear, and goal directed. Swayzer had no Auditory Verbal Hallucinations ("AVH") or delusions and Dr. Negrette noted that there were no acute concerns. See PF 23. At 1:16 p.m. on July 8, 2016, Swayzer was seen by an Armor social worker during mental health rounds, but was uncooperative. See PF 24. Swayzer refused to allow a fetal heart tone check by Armor medical staff at 1:30 p.m. See PF 25. She also refused to see Defendant Dr. Tulay Gulsen, an Armor physician assigned to her care. See PF 26. Swayzer refused a second fetal heart tone check from Armor medical staff at 3:23 p.m. See PF 27.

---

[1] "MHU" is used at the Jail for both the Medical Housing Unit and the Mental Health Unit. See Horton Dep. at 32:11-17 (Exhibit 13). To avoid confusion, the County Defendants will refer to the two units respectively as the Special Medical Unit and the Special Needs Unit.

5

**<u>Swayzer Transferred from the Special Needs Unit</u>**

On the evening of July 8, 2016, Defendant Lt. Jeffrey Andrykowski was informed another female inmate had been placed on suicide watch. He was asked to determine whether an inmate in the Special Needs Unit could be moved to the 4A housing unit so that the inmate on suicide watch could be housed in the Special Needs Unit. <u>See</u> PF 28. All three cells in the Special Needs Unit designated for female inmates were occupied at the time. <u>See</u> PF 29. Lt. Andrykowski contacted the classification department and asked Defendant Officer Amika Avery whether an inmate could be moved from the Special Needs Unit to free a bed for the new female on suicide watch. Officer Avery advised him that Swayzer's classification file included no restrictions preventing her transfer to 4A. <u>See</u> PF 30. Lt. Andrykowski also spoke with Defendant Deirdra Adams, who was an officer assigned to the Special Needs Unit. She reviewed Swayzer's documentation and found no movement restrictions. <u>See</u> PF 31. Lt. Andrykowski had the inmate on suicide watch brought out so their cell on 4A could be cleaned. He then escorted Swayzer to 4A. <u>See</u> PF 32. As a security officer, Lt. Andrykowski did not have the authority to make a housing determination. Rather, those decisions are made by the Classification department. <u>See</u> PF 33.

The 4A housing unit is considered a mental health unit by Mental Health Director Dr. White and is used as mental health housing for female inmates. <u>See</u> PF 34. Swayzer's transfer to 4A did not affect her ability to receive medical or mental health care. <u>See</u> PF 35. As stated by Medical Director Dr. Horton at her deposition:

> Q.   I want to know what the difference is. Can you describe a difference for me in the level of care that can be provided in the SNU as compared to cell 4A? And maybe there is no difference, and you can tell me that. But I'm asking what the difference is between the two units in relation to providing medical and mental health care, if any.
>
> …

6

A .   **There is no difference in the provision of care**.

See PF 36.

Similarly, Mental Health Director Dr. White testified:

Q.      Was there any subsequent discussion between you and any other individual
        with the county about movement of Ms. Swayzer from Special Needs to
        some other unit?

A.      Prior to her being moved?

Q.      Correct.

A.      Oh. No. Special -- 4A is a mental health area of the jail, and so as far as the
        mental health component goes, her symptoms and what was going on
        mental health-wise, **she was in an appropriate location based on those**.

See PF 37.  Dr. White also testified that her team of mental health professionals discussed each

inmate whom they were treating on a weekly basis, whether they were housed in the Special Needs

Unit or 4A.  See PF 38.  One of the areas that would be discussed at the weekly meetings was the

inmate's housing, which could have been changed if the mental health professionals deemed it

appropriate.  See PF 39.  A mental health team meeting was held on July 13, 2016 and Dr. White

had no concerns that Swayzer was housed on 4A.  See PF 40.

The Jail's obstetrics professional, Nurse-Midwife Meine, believed that the 4A placement

was appropriate for Swayzer's pregnancy and noted that likely over one-hundred late-term

pregnant inmates had been housed on the unit.  See PF 41.  She also testified:

Q.      Did you have any questions in your mind why Ms. Swayzer was housed in
        4A considering her mental health issues and late-term pregnancy?

A.      **No. You can be in three places when you're pregnant: Special Needs,
        Medical Unit, and 4A**. Any of those three places is where we see people
        that are pregnant, or I see people that are pregnant, **so it doesn't make a
        difference in -- to how I see them, where they go, what the access is**…

See PF 42.  Dr. Gulsen – who was the medical physician assigned to Swayzer – testified the move

to 4A did not affect the care she provided, stating:

7

Q.      So after you expressed your concerns and Dr. Horton provided the explanation, you then had less concern and intended to see Ms. Swayzer daily on 4A, correct?

…

A.      I don't know if we discussed the details why she should be on 4A or SNU because **it doesn't matter for us. We can see them in every unit if you want**.

See PF 43.  Finally, Dr. White further testified that she would have approved Swayzer's move from the Special Needs Unit to 4A had she been asked.  See PF 44.

### Swayzer Continues to Receive Medical Care

Swayzer was offered access to both medical and mental health staff on multiple occasions after the transfer to 4A and before the birth of her child.  On the weekend of July 9-10, 2016, medical providers such as doctors were not scheduled at the facility, only nursing staff.  See PF 45.  Over that weekend, Swayzer received her prescribed daily prenatal vitamins from nursing staff.  She continued to receive her vitamins each following day on 4A.  See PF 46.  On July 10, 2016, a judge found probable cause for Swayzer's resisting arrest charge.  See PF 47.

On Monday, July 11, 2016 at 1:44 p.m., Nurse-Midwife Meine had a follow-up obstetric appointment with Swayzer.  She noted Swayzer had an expected due date of August 3 ("f/u ob edc 8/3").  Nurse-Midwife Meine explained the dangers of refusing care.  However, Swayzer refused to allow her vital signs to be taken or fetal heart tones to be checked.  She reported fetal movements and that the child was "fine" when asked.  See PF 48.  Nurse-Midwife Meine did not request that Swayzer be moved back to the Special Needs Unit following the July 11 appointment, as there was no medical/obstetrical need to do so.  See PF 49.  At 8:33 p.m., an Armor nurse completed a wellness round on 4A.  See PF 50.

On July 12, 2016 at 5:59 p.m., Dr. Gulsen came to Swayzer's cell.  Swayzer refused to be seen or allow fetal monitoring.  Swayzer reported that she was "okay", the child was moving, and

8

she did not have any problems.  See PF 51.  At 7:31 p.m., an Armor nurse completed a wellness round on 4A.  See PF 52.

On July 13, 2016, an Armor nurse completed a wellness round on 4A at 8:11 a.m.  See PF 53.  An Armor nurse completed a second wellness round at 12:42 p.m.  See PF 54.  An Armor mental health case manager saw Swayzer on 4A at 1:07 p.m.  The case manager explained the mental health services available and Swayzer stated she had no needs at the time.  See PF 55.  At 8:44 p.m., Swayzer was seen by another Armor mental health counselor.  At the time, she was lying on her bunk and reading.  Swayzer was oriented to time, person, place, and situation; made appropriate eye contact; behaved unremarkably; and was cooperative and coherent.  She denied any mental health concerns.  See PF 56.  Although Dr. Gulsen intended to see Swayzer on July 13, she was unable to do so as she was occupied with other patients.  See PF 57.

### Swayzer Monitored during the Night of July 13-14, 2016

Defendant Officer Kimberly Witkowiak was the officer assigned to 4A on the overnight third shift of July 13-14, 2016.  The third shift runs from 10:00 p.m. to 6:00 a.m.  See PF 58.  The night of July 13-14, 2016 was the first time she had worked on 4A while Swayzer was housed there.  Officer Witkowiak did not know Swayzer was pregnant.  See PF 59.  Swayzer was housed in cell 10.[2]  See PF 60.  Officer Witkowiak testified that, at the start of her shift, Swayzer did not act or appear unusual.  See PF 61.

Officers are trained to observe inmates during rounds for obvious signs of physical distress and to look for security issues.  See PF 62.  Officer Witkowiak conducted rounds at approximately 11:02 p.m., 11:26 p.m., 11:52 p.m., 12:25 a.m., 12:52 a.m., 1:15 a.m., 1:33 a.m., 1:45 a.m., 2:16

---

[2] Video of the 4A housing unit lacks a direct view of cell 10, which is on the lower level.  Cell 10 is directly behind the pillar in the middle of the camera's view.  See Witkowiak Dep. at 69:7-12, 88:6-11 (Exhibit 23); 4A Video (Exhibit 53).

a.m., 3:10 a.m., 3:29 a.m., 4:23 a.m., 4:40 a.m., 5:05 a.m., and 5:35 a.m. Swayzer was not in any obvious distress at those times. See PF 63. During her second round at 11:26 p.m., Officer Witkowiak engaged Swayzer in conversation regarding her probation hold. Swayzer was coherent during the discussion. See PF 64. At some point in the night, Officer Witkowiak observed Swayzer in her cell without her pants on. This is not unusual in the Jail. See PF 65. During another round, Officer Witkowiak conversed with Swayzer and informed her that she had her K9 partner there. Swayzer greeted the dog. See PF 66. Officer Witkowiak and Swayzer also discussed the Styrofoam food containers that were in her cell. Swayzer explained that she had not been allowed out of her cell to clean it. See PF 67.

During her 3:29 a.m. round, Officer Witkowiak observed Swayzer for approximately 18 seconds. See PF 68. Officer Witkowiak observed Swayzer for approximately 8 seconds during her 4:23 a.m. round. See PF 69. During her 4:40 a.m. round, Officer Witkowiak observed Swayzer for approximately 22 seconds. See PF 70. During the inspection, Swayzer was moving around her cell. Officer Witkowiak asked her what was going on and Swayzer replied nothing. See PF 71. Officer Witkowiak observed Swayzer for approximately 16 seconds during her 5:05 a.m. round. See PF 72. Officer Witkowiak observed Swayzer for approximately 20 seconds during her 5:35 a.m. round. She was not in any obvious distress. See PF 73. Officer Witkowiak reported later that she may have smelled an unknown odor during her 5:35 a.m. round, but it was not distinct and she did not know where it originated. See PF 74.

Officer Witkowiak completed her final round of the shift at 5:55 a.m. on July 14, 2016. During the round, she observed Swayzer's cell first and completed her review of the rest of the unit. Officer Witkowiak noticed an unusual smell that had not been on the unit during prior rounds and which she could not identify. See PF 75. Due to the smell, Officer Witkowiak conducted a

10

second inspection of Swayzer and was at her cell for approximately 55 seconds. She observed that Swayzer was lying in a different direction with her head near the cell toilet and had balled up her blankets in the corner of her bed. See PF 76. Officer Witkowiak also noticed for the first time an unidentified substance, which she believed was possibly blood, on Swayzer's dark green mattress. See PF 77. Officer Witkowiak asked Swayzer what was on her mattress and she responded that it was water. See PF 78. Officer Witkowiak asked Swayzer what was going on and if she was okay. Swayzer stated that she was just sleepy and laid her head back down. See PF 79.

Officer Witkowiak did not believe Swayzer was undergoing a medical emergency at that time as she could have been experiencing her menstrual cycle or have soiled herself. See PF 80. Further, Swayzer stated that she was okay and just sleepy when asked by Officer Witkowiak. See PF 81. Officer Witkowiak left 4A at 5:58 a.m. and completed her rounds on the 4B housing unit. See PF 82. She then spoke with another officer, informing him that Swayzer possibly had blood on her mattress, but that Swayzer had reported the substance was water. See PF 83.

At 6:04 a.m., Officer Witkowiak called Armor nursing staff regarding the possible blood in Swayzer's cell and her behavior. Nursing staff told Officer Witkowiak that Swayzer was pregnant and to initiate a medical emergency. See PF 84. Officer Witkowiak immediately called a medical emergency at 6:05 a.m. See PF 85.

Security and medical staff arrived on 4A at 6:13 a.m. See PF 86. When security and medical personnel entered the cell, Swayzer was laying on her bed facing the wall. See PF 87. She had bunched her blankets around the child. See PF 88. The child had no signs of life. She appeared cyanotic (blueish or greyish) and did not move, breath, or have a heartbeat. See PF 89. Medical personnel began CPR and other measures to attempt to resuscitate they child, but were not able to do so. See PF 90.

11

**The Child Was Stillborn**

Deputy Chief Medical Examiner Dr. Wieslawa Tlomak conducted an autopsy of the child on July 15, 2016.  See PF 91.  Dr. Tlomak stated that the child was likely stillborn based on his discovery of large clots on the placenta, which indicated there was a placental abruption that could deprive the fetus of oxygen and nutrients.  See PF 92.  Ultimately, she was not able to determine the cause or manner of death.  See PF 93.

Dr. Tlomak noted the placenta had acute placental chorioamnionitis, a bacterial infection. See PF 94.  She conducted a hydrostatic float test of the heart, lungs, and trachea.  Neither lung, nor sections from each lobe of the lungs, floated.  See PF 95.  A negative float test indicates that the child's lungs had not filled with air as would be consistent with even a single breath.  See PF 96.  Microscopic examination of tissue samples of the right lung, left lung, spleen, and cerebrospinal fluid revealed widespread infection.  See PF 97.  The right lung and left lung both tested positive for Serratia marescens bacteria.  See PF 98.  The spleen and cerebrospinal fluid tested positive for alpha Streptococcus bacteria.  See PF 99.  There was no evidence of food in the child's stomach.  See PF 100.

Plaintiffs' first expert witness, Timothy Ryan, is a retired correctional administrator.  He has no medical training.  See PF 101.  Ryan does not offer any opinion regarding the cause of death of the child.  See PF 102.  Plaintiffs' second expert, Dr. Susi Vassallo, is an emergency medicine physician and toxicologist.  See PF 103.  Dr. Vassallo does not offer any opinion regarding the child's cause of death.  See PF 104.  Dr. Vassallo has does not offer any opinion regarding whether the child was born alive or stillborn, whether the baby was able to feed after birth, or took milk.  See PF 105.

Defense expert Dr. Carolyn Salafia is a Developmental Pathologist and is board certified in both Pediatric Pathology and Anatomic and Clinical Pathology by the American Board of Pathology.  See PF 106.  Dr. Salafia reviewed the child's autopsy report, which includes a cell placental pathology report.  See PF 107.  Dr. Salafia reviewed a number of criteria for estimating the time of intrauterine death of the fetus.  See PF 108.  The child's lung slides show the spaces where air should be were consumed with infection consistent with aspiration pneumonia/pneumonitis.  See PF 109.  Dr. Salafia opined that the child was deceased at least 24 hours and less than 36 hours before delivery.  See PF 110.

Defense expert Dr. Donald R. Graham is board certified in internal medicine and infectious diseases.  See PF 111.  He reviewed the autopsy protocol and other records and opined that the child died before delivery of pneumonia caused by Serratia marcescens.  See PF 112.

The undisputed evidence is that the fetus died at least 24-36 hours before delivery of fetal pneumonia and widespread infection of multiple organs, including the brain.  See PF 108, 113, 114.  There is no credible evidence from a qualified expert (or any other witness) that the child's infection could have been detected or that it could have been treated *in utero* before her premature delivery.  See PF 115.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment should be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists when the evidence requires a fact finder to resolve the parties' differing versions of the truth at trial.  Id. at 249.  Further, a factual

dispute is genuine only if a reasonable jury could find for either party. Stokes v. Bd. of Educ. of Chicago, 599 F.3d 617, 619 (7th Cir. 2010); Kuhn v. Goodlow, 678 F.3d 552, 555 (7th Cir. 2012). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." Id. at 247-48 (emphasis in original).

The Supreme Court has explained:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Thus, the burden on the party moving for summary judgment is not to show the "absence of a genuine issue of material fact," but rather to show "that there is an absence of evidence to support the non-moving party's case." Id. at 325.

Once a motion for summary judgment has been made and properly supported, the non-movant has the burden of setting forth specific facts showing the existence of a genuine issue of material fact for trial. Id. Plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts"; they must present "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal. Salvadori v. Franklin Sch. Dist., 293 F.3d 989, 996 (7th Cir. 2002). A reviewing court should construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. Anderson, 477 U.S. at 255; Draper v. Martin, 664 F.3d 1110, 1113 (7th Cir. 2011). Only reasonable inferences, not all conceivable inferences, will be drawn. Adikes v. S.H. Kress & Co., 388 U.S. 144 (1980). However, "before a non-movant can benefit from a favorable view

14

of the evidence, it must show that there is some genuine evidentiary dispute." SMS Demag Aktiengesellschaft v. Material Scis. Corp., 565 F.3d 365, 368 (7th Cir. 2009).

IV.  **ARGUMENT**

There is no dispute that the stillbirth of Shade Swayzer's child at the Milwaukee County Jail was an unusual and unfortunate event.  Plaintiffs' pleading, however, stretches any inquiry arising from the event well beyond reason.  The allegations cannot withstand the scrutiny of the present motion.  Specifically, Plaintiffs attempt to place blame on security staff involved in Swayzer's housing transfer on July 8, 2016, nearly a week before the stillbirth.  They ignore undisputed testimony that: the staff made the transfer by necessity to accommodate a suicidal inmate in need of closer observation; Swayzer was in no distress and had no immediate needs at the time of transfer that would prevent transfer; all medical and mental health providers agree she was appropriately housed in Unit 4A after the transfer and made no recommendation that she be removed from that housing area; and Swayzer refused repeated offers of medical, obstetrical and mental health assessments after her transfer, suggesting the housing unit did not deprive Swayzer of necessary attention.  See PF 28-57.  In short, the July 8 transfer issue is a baseless red herring and a distraction that must be removed from the case.

Plaintiffs also ignore undisputed testimony that the Correctional Officer on duty the night of the stillbirth, Kimberly Witkowiak, was not aware that Swayzer was pregnant, interacted with Swayzer repeatedly to question her, and promptly contacted the medical staff when, after re-investigating and questioning Swayzer, she became concerned that Swayzer may have a medical issue.  See PF 58-79.

Most importantly, Plaintiffs offer no scientific or medical evidence that the child was not stillborn or that the child's demise from overwhelming infection could have been prevented by

15

some intervention. No witness or expert has suggested the infection of the child's placenta, lungs, and brain was detectable or treatable. Plaintiffs have **no plausible theory** by which the Defendants are legally responsible for having caused the stillbirth of the child or, alternatively, the death of the child immediately after birth. The jury cannot be allowed to speculate on those complex medical issues. <u>See</u> <u>Perez v. Thorntons, Inc.</u>, 731 F.3d 699, 716 (7th Cir. 2013) (noting "guesswork and speculation are not enough to avoid summary judgment").

In addition to Swayzer, Plaintiffs include the Estate of the stillborn child and Diane and Charlene Ruffin, the daughters of Swayzer and half-siblings of the stillborn child. The Ruffins are legal minors. As explained below in Section IV.A and IV. B, neither the Estate's nor the Ruffin half-siblings' claims may proceed as a matter of law.

After addressing the Estate's and Ruffins' claims, defendants will address in Section IV.C the claims by Shade Swayzer against each of the County defendants. Specifically, Swayzer asserts the following claims against the County Defendants:

1. deliberate indifference/denial of medical care in violation of the Eighth Amendment against all of the County Defendants;

2. a derivative <u>Monell</u> claim against Milwaukee County;

3. Wisconsin state law negligence against Officer Witkowiak, Officer Love, Officer Cunningham, Lt. Andrykowski, Officer Adams, and Officer Avery; and

4. Wisconsin state law wrongful death (Wis. Stat. § 895.03) against Officer Witkowiak, Officer Love, Officer Cunningham, Lt. Andrykowski, Officer Adams, and Officer Avery.

As set forth below at Section IV. C, Plaintiffs' claims against the County Defendants fail for multiple reasons.

### A. **The Estate's Claims Must be Dismissed**

#### 1. **The Estate's Section 1983 Claims Must be Dismissed as a Stillborn Child is not a Constitutionally-Recognized Person**

The only competent medical and scientific evidence presented in this case demonstrates that the fetus died of sepsis and pneumonia more than 24 hours before her delivery on July 14, 2016. See PF 108-114. As such, Laliah Swayzer was never a "person" for the purpose of the Fourteenth Amendment and her Estate cannot pursue claims under 42 U.S.C. § 1983. See, e.g., Reed v. Gardner, 986 F.2d 1122, 1128 (7th Cir. 1993); Coe v. Cook County, 162 F.3d 491, 495 (7th Cir. 1998); La Placa v. Johnson, 1990 U.S. Dist. LEXIS 19195, at *28-29 (N.D. Ill. 1990) (unpublished); Planned Parenthood of Ind. & Ky. v. Comm'r, 194 F. Supp. 3d 818, 832 (S.D. Ind. 2016). As the child was stillborn, The Estate's claims under § 1983 fail as a matter of law and must be dismissed for that reason.

#### 2. **Plaintiffs have no Evidence that an Act or Omission of the Defendants Caused Laliah Swayzer's Stillbirth or Post-Birth Death**

As explained in Defendants' Joint Brief in Support of Motion for Summary Judgment as to Causation Regarding the Death of Laliah Swayzer (Doc. No. 301), which is incorporated by reference as if set forth at length herein, Plaintiffs have no evidence any act or omission by the County Defendants caused the death of Swayzer's child. See PF 91-115. Neither of Plaintiffs' experts have offered an opinion as to the cause of the child's death, when it occurred, or whether it could have been prevented. See PF 101-05, 115. Lacking any plausible theory whatsoever as to why and when Swayzer's child died, Plaintiffs cannot meet their burden in demonstrating that an act or omission by any of the defendants was a cause of the stillbirth.

Alternatively, if the Court were to assume (despite the undisputed medical evidence) that the child was not stillborn, Plaintiffs cannot demonstrate that an act or omission of any Defendant caused its demise after birth. Again, Plaintiffs have not disclosed an expert capable of discussing

the child's or fetuses' cause of death and therefore cannot identify an act or omission that caused it.  As evidence of causation is required for each of the Estate's claims, Plaintiffs have failed to meet their *prima facie* burden.  See Jackson v. Pollion, 733 F.3d 786, 790 (7th Cir. 2013) ("No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct … as a result of failure to treat  the condition without providing evidence that the failure caused injury or a serious risk of injury."); Williams v. Liefer, 491 F.3d 710, 714-15 (7th Cir. 2007) (burden is on "the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm") (internal citations omitted).  All of the Estate's claims therefore fail as a matter of law and must be dismissed with prejudice.

### B.  The Claims of Diane and Charlene Ruffin Must Be Dismissed

Plaintiffs have no evidence of causation as required for any claims related to the death of Swayzer's child.  See Defs.' Joint Brief in Support of Motion for Summary Judgment as to Causation Regarding the Death of Laliah Swayzer (Doc. No. 301).  As such, the derivative claims of Plaintiffs Diane and Charlene Ruffin as the siblings of that child must also be dismissed with prejudice.

In addition, it is well established that siblings of an injured party may not recover under 42 U.S.C. § 1983.  In Bell v. Milwaukee, the Seventh Circuit held that constitutional rights are personal and no derivative claims are allowed.  746 F.2d 1205, 1246-47 (7th Cir. 1984). A plaintiff cannot recover for the loss of a sibling's society and companionship under § 1983.   Id.; Russ v. Watts, 414 F.3d 783 (7th Cir. 2005) (overruling Bell only to the extent it allowed recovery by parents for loss of adult child).  District courts of this Circuit have repeatedly followed Bell and Russ by denying recovery by plaintiff siblings for alleged constitutional violations.  See, *e.g.*, Gayton v. McCoy, 2006 U.S. Dist. LEXIS 37811, at *19 (C.D. Ill. 2006) (unpublished); Minix v.

Canarecci, 2007 U.S. Dist. LEXIS 41729, *13-14 (N.D. Ind. 2007) (unpublished); Adams v. City of Chicago, 2014 U.S. Dist. LEXIS 80064, at *18 (N.D. Ill. 2014) (unpublished).  There is no basis to deviate from these well-established precedents.

Further, Diane and Charlene Ruffin are not competent to bring the instant action in their own capacity.  Federal Rule of Civil Procedure 17(c) provides that a suit may be brought on behalf of a minor by a representative such as a general guardian, a committee, a conservator, or a like fiduciary or – if they lack a duly appointed representative – through a next friend or by an appointed guardian *ad litem*.  Diane and Charlene are the daughters of Swayzer and Charles Ruffin.  Both are legal minors.  See PF 116.  Charles Ruffin testified that he is the legal guardian of Diane and Charlene Ruffin.  See PF 117.  He further testified that he has not spoken to the attorneys appearing for his children in this action and did not authorize anyone to file suit on behalf of his daughters.  See PF 118.  If, as Mr. Ruffin asserts, suit was filed on behalf of Charlene and Diane without his authorization, it must be dismissed.  See M.G.S. v. Toerpe, 2012 U.S. Dist. LEXIS 109751, at *5-8 n.4 (N.D. Ill. 2012) (unpublished) (noting "[t]he Seventh Circuit has repeatedly opined that self-appointed representatives are not authorized to assert claims on behalf of incompetent plaintiffs when a plenary guardian has been appointed by the state.").

### C. Swayzer's Claims Related to Her Transfer from the Special Needs Unit to Unit 4A Must Be Dismissed.

Swayzer's claims against the individual County Defendants fall generally into two categories: claims related to her transfer from the Special Needs Unit to Unit 4A on July 8, 2016, and claims related to her in-cell monitoring on July 14, 2016.  The claims related to her transfer are asserted against Defendants Love, Cunningham, Andrykowski, Avery and Adams. The claim related to her monitoring is asserted against Defendant Witkowiak.  The various claims are addressed here in sequence.

19

Swayzer was initially admitted to the Special Medical Unit for medical observation on July 6, 2016. See PF 10. She was seen by various providers and remained there until the next day, when it was decided to move her to the Special Needs Unit. See PF 11-13, 16, 18-20. She was seen and assessed by a psychiatrist, Dr. Gina Negrette, who noted she was pleasant and had no acute concerns. See PF 23. She refused to be seen by a mental health social worker, twice refused the nurses' attempts to check fetal heart tones, and refused assessment by her assigned physician, Dr. Gulsen. See PF 24-27.

Jail supervisors were informed in the evening of July 8, 2016, that another female inmate was suicidal and required a suicide watch. See PF 28. The unit most appropriate for a suicide watch is the Special Needs Unit, which has only three (3) beds for female inmates. See PF 29. All three beds were occupied at the time. Id. One of the supervisors on duty, Lt. Andrykowski, communicated with the Classification Department and determined that Swayzer was not under a suicide watch or other restriction that would prevent her transfer to Unit 4A. See PF 30. Swayzer was transferred to Unit 4A, where she remained from July 8 to July 14, when she delivered her child. Unit 4A is a mixed housing unit that includes patients with psychiatric and medical needs, including pregnancy. See PF 34-37, 41-43. Swayzer was seen repeatedly by medical and mental health staff while in Unit 4A, including a nurse-midwife who offered her obstetrical assessment. See PF 45-57. She refused all medical assessment and monitoring. Id.

Swayzer's claims against the staff involved in the transfer from Special Needs to Unit 4A should be dismissed for a number of reasons. She cannot assert a constitutional right to housing in any particular cell or unit. See, e.g., Hewitt v. Helms, 459 U.S. 460, 466-67 (1983) (prisoners have no constitutional right to a given housing assignment), overruled in part on other grounds by Sandin v. Conner, 515 U.S. 472 (1995); Williams v. Faulkner, 837 F.2d 304, 309 (7th Cir. 1988)

("Prisoners have no constitutionally protected liberty interest in remaining in any particular wing of a prison."), *aff'd sub nom.* Neitzke v. Williams, 490 U.S. 319 (1989). She had no immediate medical need at the time of transfer, and there is no evidence that her needs could not have been met in Unit 4A if Swayzer had accepted the services offered. See PF 35-57. The staff involved in her transfer cannot be deemed indifferent to risks or threats to her safety that arose only after several days when Swayzer repeatedly refused assessments and went into premature labor. Any claim that the officers involved in Swayzer's transfer violated her constitutional rights should be dismissed.

### 1. Swayzer's claims should be assessed under the Deliberate Indifference standard of the Eighth Amendment.

The analysis of Swayzer's claims under 42 U.S.C. § 1983 must begin with a determination of the appropriate constitutional standard. "'[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody.'" Collins v. Al-Shami, 851 F.3d 727, 731 (7th Cir. 2017) (quoting Currie v. Chhabra, 728 F.3d 626, 630 (7th Cir. 2013)). "[T]he Eighth Amendment applies after a conviction …." Id. Here, Swayzer was held for an outstanding probation violation. Accordingly, she was considered in post-conviction custody of the Wisconsin Department of Corrections and her claims must be analyzed under the Eighth Amendment. See State ex rel. Vanderbeke v. Endicott, 210 Wis.2d 502, 513, 563 N.W.2d 883, 886 (1997) ("While on probation a probationer is in the legal custody of the department of corrections.") (citing Wis. Stat. § 973.10(1)); see also Estate of Fiebrink v. Armor Corr. Health Servs. (In re Estate of Fiebrink), 2019 U.S. Dist. LEXIS 75040, at *25 (May 3, 2019) (Stadtmueller, J) (unpublished) ("Since probation is a term of punishment imposed in lieu of confinement following conviction, the Eighth Amendment applies.").

Swayzer pled guilty to burglary on September 16, 2014 and was sentenced to 18 months incarceration with 18 months of extended supervision on October 10, 2014. This sentence was stayed and a sentence of 3 years of probation imposed. See PF 1. On July 6, 2016, she was arrested on a Wisconsin Department of Corrections ("DOC") felony warrant for violation of her probation for the burglary conviction and additionally charged with resisting arrest. See PF 2. In addition, the DOC issued an Order to Detain directing that Swayzer be held in custody until further instructions were received from a DOC representative. See PF 3. Thus, at the time she was incarcerated on July 6, 2016, a probable cause determination been made "in the form of an arrest warrant." Lopez v. City of Chicago, 464 F.3d 711, 718–19 (7th Cir. 2006). Swayzer was therefore detained as a convicted felon awaiting the next step in an administrative procedure relating to her probation violation and her constitutional claims are properly analyzed under the Eighth Amendment.[3]

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 661-62 (7th Cir. 2016) (alteration in original) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition."

---

[3] Even if this Court determines the Fourteenth Amendment applies, the County Defendants are entitled to summary judgment. A plaintiff asserting denial of medical treatment claims under the Fourteenth Amendment must establish something greater than negligence or gross negligence. See Miranda v. Cty of Lake, 900 F.3d 335, 353-54 (7th Cir. 2018). Rather, Swayzer would have to demonstrate the County Defendants' actions were "objectively unreasonable under the circumstances…." Terry v. Cty. of Milwaukee, 357 F. Supp. 3d 732, 746 (E.D. Wis. Jan. 11, 2019) (Stadtmueller, J.).

22

Petties v. Carter, 836 F.3d 722, 728-29 (7th Cir. 2016). "Objectively serious medical needs are those that have either been diagnosed by a physician and demand treatment, or are 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Cesal v. Moats, 851 F.3d 714, 721 (7th Cir. 2017) (quoting King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012)). Deliberate indifference "comprehends more than mere negligence but less than the purposeful or knowing infliction of harm." Estate of Novack v. County of Wood, 226 F.3d 525, 529 (7th Cir. 2000).

To prove "deliberate indifference," a plaintiff must show an individual defendant "acted with a 'sufficiently culpable state of mind,' – *i.e.*, that [he or she] both knew of and disregarded an excessive risk to inmate health." Lewis v. McLean, 864 F.3d 556, 563 (7th Cir. 2017) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)) (internal citations omitted). "[T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official **actually** knew of and disregarded a substantial risk of harm." Petties, 836 F.3d at 728 (emphasis in original). Negligence is not sufficient for deliberate indifference. See Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996) ("Inadvertent error, negligence, gross negligence and ordinary malpractice" do not constitute deliberate indifference.). "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim." Petties, 836 F.3d at 728. As such, "[o]fficials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety." Id. As discussed below, no County Defendant was aware of an obvious risk to Swayzer's health or safety.

Further, in medical-care cases, the Seventh Circuit "will not find a jail official to have acted with deliberate indifference if she reasonably relied on the judgment of medical personnel." Miranda v. County of Lake, 900 F.3d 335, 343 (2018). The evidence here is that Swayzer was

offered medical and psychiatric care on multiple occasions, but declined it. See PF 48, 51, 55, 56. To the extent that Swayzer claims the Defendants failed to provide her adequate care and treatment, the County Defendants are entitled to reasonably rely on the judgment of the medical personnel.

### 2. Swayzer's claims against Officer Love should be dismissed.

Plaintiffs' allegations against Correctional Officer Keziah Love are minimal. They do not assert a plausible violation of a constitutional right, nor is there evidence that would support such a claim. Plaintiffs allege that Officer Love "was present in the medical unit of [*sic*] July 7, 2016, when medical staff made it abundantly clear that Swayzer was to be housed in the Special Needs/Medical Unit to assure she received the appropriate prenatal care." See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 14. They allege that she "failed to take any action to assure Swayzer was housed consistent with medical directives." Id. Plaintiffs claim Officer Love overheard Dr. Horton advise Swayzer that she would be housed in the Special Needs Unit. Id., ¶ 47.

The allegations against Officer Love demonstrate the baseless, overbroad and ill-informed nature of Plaintiffs' allegations. Officer Love is sued solely because she was "present" as a security officer in the Special Medical Unit while medical personnel made decisions that Plaintiffs allege were not carried out by other medical and security staff. Respectfully, a constitutional duty does not arise merely because an officer is "present" when an inmate (who is in no distress) is discussed. Notably, Plaintiffs do not allege Officer Love interacted with Swayzer between July 7 and July 14, when the child was born. They do not acknowledge that Swayzer was, in fact, transferred to the Special Needs Unit on July 7, which is consistent with what Officer Love is alleged to have overheard. See PF 20. Nor do they allege that she was aware that Swayzer had been transferred out of the Special Needs Unit on July 8, 2016 (after Officer Love's only interaction with her), or that it was her responsibility as a security officer assigned to the Special Medical Unit to follow inmates around the Jail to confirm they are housed "consistent with medical

24

directives." The allegations are frivolous. Officer Love is a mere bystander who is accused of indifference because she happened to overhear a conversation about Swayzer's housing assignment. She could not have anticipated on July 7 that Swayzer would be moved on July 8, nor could she anticipate on July 7 that Swayzer would refuse all medical and psychiatric assessments and give premature birth in her cell on July 14.

Swayzer cannot claim a constitutional right to be housed in any particular jail location. See, e.g., Hewitt, 459 U.S. at 466-67; Williams, 837 F.2d at 309. In addition, there is no evidence Swayzer was in medical distress or had an objectively serious medical need at the time of her interactions with Officer Love. See Hartbarger v. Blackford County Dep't. of Public Welfare, 733 F. Supp. 300, 303 (N.D. Ind. 1990) ("knowledge of her advanced stage of pregnancy is insufficient by itself to put a reasonable jail commander on notice that an inmate has a serious medical condition" where plaintiff was seven months pregnant). Per Plaintiffs' own pleading, Swayzer was in the midst of an interaction with a physician at the time of Officer Love's involvement. See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶¶ 14, 47; see Cesal, 851 F.3d at 721 (defining objectively serious medical need as one requiring a physician's attention). Swayzer had no immediate need for care and attention from Officer Love on July 7, and she could not be indifferent to a medical emergency that would not arise for a week.

Plaintiffs are also simply wrong about Officer's Love's knowledge and responsibilities. Officer Love testified she was present on July 7 when Medical Director Dr. Horton informed Swayzer she would remain housed in the Special Medical Unit. See Knott Decl., Love Dep. at 128:6-11 (Exhibit 21). Dr. Horton would later conclude, after conferring with a colleague, that Swayzer could be housed in the Special Needs Unit. See PF 18. Even if she had known about the transfer to or from the Special Needs Unit, Officer Love was not responsible for communicating

25

any medical directives regarding Swayzer's housing.  Rather, Dr. Horton testified it was the responsibility of medical personnel to inform the classification department of any housing restrictions.  See Knott Decl., Horton Dep. at 298:1-299:12, 301:16-302:6 (Exhibit 13).  There is no evidence Officer Love was responsible for informing classification of the discussions she overheard.  She was not deliberately indifferent to Swayzer and did not act unreasonably in relying on medical staff to provide notice of any medical housing determinations they made.

Finally, a plaintiff asserting a Section 1983 claim must show causation.  Whitlock v. Brueggemann, 682 F.3d 567, 582 (7th Cir. 2012).

> Causation is a standard element of tort liability, and includes two requirements: (1) the act must be the 'cause-in-fact' of the injury, i.e., 'the injury would not have occurred absent the conduct'; and (2) the act must be the 'proximate cause,' sometimes referred to as the 'legal cause,' of the injury, i.e., 'the injury is of a type that a reasonable person would see as a likely result of his or her conduct.'

Id. (quoting Ciomber v. Cooperative Plus, Inc., 527 F.3d 635, 640 n. 1 (7th Cir. 2008)).  Swayzer has no evidence that Officer Love's reliance on medical staff to relay medical housing restrictions caused her any harm.  Officer Terina Cunningham, who worked in the classification unit, testified that she received a call from someone in the medical unit informing her of Swayzer's move from the Special Medical Unit to the Special Needs Unit.  Swayzer was moved to the Special Needs Unit that day.  See PF 19-20.  Thus, the information that Plaintiffs argue should have been conveyed by Officer Love to the classification department was provided – in accordance with the general practice – by medical staff.

### 3.  Swayzer's claims against Lt. Andrykowski should be dismissed.

Plaintiffs' allegations against Lt. Andrykowski are similarly skeletal and poorly-informed. They allege that he "observed Swayzer in the Medical Unit on July 7, 2016, and understood she was pregnant." See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 17.  They allege that he transferred Swayzer from the Special Needs Unit to Unit 4A on July 8, 2016 "in direct disregard of Swayzer's

26

pregnancy, medical directives and policy and procedure" and that she was transferred "to a Maximum-Security [*sic*] with no medical monitoring." Id.

Swayzer's allegations against Lt. Andrykowski suffer from the same flaws as her claim against Officer Love.  Plaintiffs do not allege he interacted with Swayzer between July 8 and July 14, when she delivered the child.  Swayzer had no immediate (*i.e.*, "objectively serious") medical need on July 8 when Lt. Andrykowski participated in Swayzer's transfer from Special Needs to Unit 4A.  See PF 23.  In addition, patients with medical and mental health needs – including late-term pregnancy – were routinely housed in Unit 4A.  See PF 34-37, 41-44.  Contrary to Plaintiffs' assertion that there was "no medical monitoring" in 4A, Swayzer was offered multiple medical and psychiatric assessments in Unit 4A between the transfer on July 8 and her delivery on July 14.  See PF 45-57.  Lt. Andrykowski could not have anticipated that Swayzer would repeatedly refuse those assessments, nor was he aware of the refusals or responsible for follow up when she did so.  Finally, the transfer from Special Needs to Unit 4A was not a proximate cause of injury to Swayzer.

### a. There is no evidence Lt. Andrykowski was deliberately indifferent to an objectively serious need

As noted, there is no evidence that Swayzer had an immediate medical need at the time of Lt. Andrykowski's interactions with her on July 8, 2016.  She was assessed by a psychiatrist the same day and noted to be "pleasant, without psychomotor concerns, linear, and goal directed."  See PF 23.  In addition, Lt. Andrykowski did not move Swayzer to Unit 4A out of indifference to her needs.  Instead, he was informed on July 8 that another female inmate was on suicide watch and required close observation.  See PF 28.  He was asked to determine whether an inmate in the Special Needs Unit could be moved to 4A in order to clear a cell for the inmate on suicide watch.  Id.  All three cells in the Special Needs Unit designated for female inmates were occupied at the time.  See PF 29.  Lt. Andrykowski contacted the classification department and asked Defendant

27

Officer Amika Avery whether an inmate could be moved from the Special Needs Unit to free a bed for the new female on suicide watch. Officer Avery advised him that Swayzer's classification file included no restrictions preventing her transfer to 4A. See PF 30. Lt. Andrykowski then escorted the suicidal female inmate to Special Needs and escorted Swayzer to 4A. See PF 32.

Lt. Andrykowski's involvement in seeking additional protection for a suicidal inmate cannot be deemed indifference as a matter of law. See Estate of Adams v. Christian Cnty., 2017 U.S. Dist. LEXIS 33456, at *17-18 (C.D. Ill. 2017) (unpublished) (no deliberate indifference where officer transferred one inmate on suicide watch out of only padded cell available to house another inmate deemed a higher suicide risk). Not only was his motive an appropriate concern for another inmate, Lt. Andrykowski did not have the authority to make a housing decision and did not make the housing determination in this instance. See PF 33. Rather, he appropriately relied on the Classification unit to inform him if there was a restriction preventing Swayzer's transfer to 4A. See Knott Decl., Andrykowski Dep. at 19:3-7, 27:15-23, 38:15-40:6 (Exhibit 37). He cannot be indifferent where the judgment call was not his to make.

Plaintiffs assert Lt. Andrykowski moved Swayzer from Special Needs in violation of a Jail policy. The undisputed evidence, however, is that there was no protocol at that time requiring him to contact a medical provider to authorize Swayzer's transfer to 4A. See Knott Decl., White Dep. at 40:3-16, 129:14-23, 131:15-20 (Exhibit 12); Knott Decl., Horton Dep. at 216:19-218:1 (Exhibit 13); Knott Decl., McCullough Dep. at 61:6-10 (Exhibit 73). Even if such a policy existed at the time, it is well-settled that "the failure to follow institutional protocol does not create a constitutional violation." Estate of Haak v. Reyniers, 2018 U.S. Dist. LEXIS 175918, at *25 (E.D. Wis. 2018) (Griesbach, C.J.) (unpublished); see also Fuller v. Dillon, 236 F.3d 876, 880 (7th Cir. 2001) ("[T]he failure of the prison officials to follow state administrative rules is not a denial, in

and of itself, of one's due process rights."); <u>J.H. v. Johnson</u>, 346 F.3d 788, 793 (7th Cir. 2003) ("[A] violation of state law … does not per se make a state actor liable under § 1983."); <u>Massey v. Smith</u>, 2015 U.S. Dist. LEXIS 73350, at *32 n. 7 (E.D. Wis. 2015) (Pepper, J.) (unpublished) ("failure to follow policy is not a constitutional violation.").  Certainly, a determination made in the interest of safety of one inmate cannot be deemed indifference.

**b. There is no evidence that the decision to transfer Swayzer to Unit 4A was an unconstitutional cause of harm to her.**

To the extent Plaintiffs argue Swayzer was injured resulting her move from the Special Needs Unit to 4A without prior medical authorization, such a claim also fails for lack of causation. Mental Health Director Dr. White testified 4A is a mental housing unit for female inmates that was appropriate for Swayzer's mental health issues and that she had no concerns regarding her placement on the unit.  <u>See</u> PF 34-35, 37-40.  Nurse-Midwife Meine testified that 4A was an appropriate placement for Swayzer given her pregnancy and numerous pregnant inmates – likely over one hundred – had been housed there.  <u>See</u> PF 41-42.  Both Medical Director Dr. Horton and Swayzer's assigned physician, Dr. Gulsen, testified that the transfer to 4A did not affect the care she received.  <u>See</u> PF 36, 43.  Finally, and perhaps most fatal to Plaintiffs' claims arising out of the July 8 transfer, Dr. White testified that, if asked, she would have approved Swayzer's transfer to 4A and that she did not have any concerns with the placement on July 13, 2016 (the day before Swayzer delivered).  <u>See</u> PF 34, 37-40, 44.  As her medical providers considered 4A an appropriate housing assignment and would have approved the transfer, it cannot be said that moving Swayzer to the unit caused her any harm.

In addition to the testimony of her medical providers that 4A was an appropriate placement, there can be no deliberate indifference where Swayzer continued to receive medical care without interruption.  <u>See</u> PF 45-57; <u>see also Hudson v. Washington</u>, 1996 U.S. Dist. LEXIS 524, at *10-

29

11 (N.D. Ill. 1996) (unpublished) ("No reasonable fact-finder could infer deliberate indifference [where inmate] continued to receive his medications while in general population and that he was seen by medical personnel two or three times per day as his condition increased in severity."); Arroyo v. Sheahan, 1992 U.S. Dist. LEXIS 10395, at *12-15 (N.D. Ill.) (unpublished) (same). Over the weekend of July 9-10, 2016 when only nursing staff was at the facility, she received her prescribed prenatal vitamins. See PF 45-46. Nurse-Midwife Meine saw Swayzer for an obstetric follow-up on July 11, 2016 and was told by Swayzer that she was experiencing fetal movements and that the child was fine. Swayzer refused further assessment by Meine. See PF 48. Meine did not request that she be moved back to the Special Needs Unit following the July 11 appointment as there was no medical need to do so. See PF 49.

On July 12, 2016, Dr. Gulsen saw Swayzer, who reported that she was "okay" and did not have any problems. See PF 51. Although she did not see Swayzer on July 13, 2016, that was not due to her placement on 4A but because Dr. Gulsen was attending to other inmates. See PF 57. Armor nurses completed two wellness rounds on July 13 and would have been available had Swayzer needed or requested aid. See PF 53-54. In addition, multiple mental health providers met with Swayzer on July 13 and she reported having no concerns. See PF 55-56. Thus, contrary to Plaintiffs' baseless claim that she received "no medical monitoring" she continued to receive medical and mental health treatment following her transfer to 4A. Defendant medical and security staff are entitled to rely on Swayzer's refusal of care as an indication that she is not in acute distress.

In summary, Lt. Andrykowski cannot have ignored any substantial risk of harm to Swayzer where 4A was routinely used to house female inmates like her and where she, in fact, received multiple offers and attempts at care. See PF 34-35, 37-38, 41-42, 45-57. Throughout her incarceration, Swayzer consistently refused care and monitoring. See PF 24-27, 48, 51. Plaintiffs

30

cannot show Swayzer experienced any harm from the transfer given that: (1) her medical providers considered it an appropriate placement, (2) she continued to receive care, (3) she continued to refuse the offered care, (4) the transfer would have been approved by Dr. White, and (5) Dr. White saw no need to return her to the Special Needs Unit the day before she gave birth. As such, Swayzer's Section 1983 claim against Lt. Andrykowski fails as a matter of law and should be dismissed.

### 4. Swayzer's claims against Correctional Officers Terina Cunningham, Amika Avery, and Deirdra Adams should be dismissed.

Plaintiffs allege Correctional Officer Terina Cunningham "was responsible on July 7, 2016 for recording medical staff's directives that Swayzer be housed in the Special Needs/Medical Unit" and that she "took no action to assure the same occurred." See Pls.'s Fourth Am. Compl. (Doc. No. 313), ¶ 15. They further allege Officer Cunningham failed to record Dr. Horton's recommendation that Swayzer be housed in the Special Needs Unit, thus allowing her transfer to Unit 4A when the need for a bed in Special Needs for another inmate on suicide watch arose. Id.

Then, in a confusing twist, Plaintiffs also allege that Officer Cunningham did in fact note the medical staff's recommendation that Swayzer be housed in the medical housing unit by recording it on Swayzer's "identification badge" on July 7, 2016. Id., ¶ 48. They allege that other Defendants allowed her transfer to Unit 4A on July 8 despite the "medical instructions written on her custody card" by Officer Cunningham. Id., ¶ 52. It appears that Plaintiffs want to both accuse Officer Cunningham of failing to properly record a housing recommendation and accuse others of failing to follow her properly recorded instruction.

Plaintiffs claim Officer Amika Avery was responsible for approving Swayzer's transfer to 4A on July 8, 2016 and did not seek medical approval prior to the transfer. Id., ¶¶ 16, 52, 53. They

31

allege Officer Deirdra Adams was assigned to the Special Needs Unit on July 8 and allowed the transfer of Swayzer to 4A without seeking medical approval. Id., ¶¶ 18, 52, 53.

### a. Plaintiffs fail to state a constitutional claim against Officers Cunningham, Avery, or Adams

In addition to being confusing and inconsistent, Plaintiffs' allegations against Officers Cunningham, Avery, or Adams fail to state a constitutional claim. Again, Swayzer has no constitutional right to housing in any particular unit of the Jail. See, e.g., Hewitt, 459 U.S. at 466-67; Williams, 837 F.2d at 309. To the extent Plaintiffs allege that these officers failed to follow jail policies or procedures, such an omission would not be of constitutional significance. See, e.g., Fuller, 236 F.3d at 880 ("[T]he failure of the prison officials to follow state administrative rules is not a denial, in and of itself, of one's due process rights."); J.H., 346 F.3d at 793 ("[A] violation of state law … does not per se make a state actor liable under § 1983."); Massey, 2015 U.S. Dist. LEXIS 73350, at *32 n. 7 ("failure to follow policy is not a constitutional violation."); Estate of Haak, 2018 U.S. Dist. LEXIS 175918, at *25 ("the failure to follow institutional protocol does not create a constitutional violation."). It would constitute, at most, a workplace rule violation. More importantly, as discussed above, there was no policy at the time requiring officers to obtain medical approval before transferring an inmate from the Special Needs Unit. See Knott Decl., White Dep. at 40:3-16, 129:14-23, 131:15-20 (Exhibit 12); Knott Decl., Horton Dep. at 216:19-218:1 (Exhibit 13); Knott Decl., McCullough Dep. at 61:6-10 (Exhibit 73).

Nor can Plaintiffs demonstrate Officers Cunningham, Avery, or Adams were deliberately indifferent. Officer Cunningham's sole interaction with Plaintiff was July 7, 2016. See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶¶ 15, 48. The only involvement by Officers Avery or Adams occurred on July 8, 2016. Id., ¶¶ 16, 18, 52, 53. These events occurred a week prior to the alleged constitutional harm. There is no evidence Swayzer had an immediate medical need on July 7th or

32

8th or that Officers Cunningham, Avery, or Adams were indifferent to any such need. It is undisputed that Officer Cunningham and Officer Adams were unaware of Swayzer's pregnancy. See Knott Decl., Cunningham Dep. at 55:3-7, 56:9-14, 64:8-14, 66:9-12 (Exhibit 22); Knott Decl., Adams Dep. at 92:16-18 (Exhibit 39). They cannot be deemed indifferent as a matter of law. Although Officer Avery knew Swayzer was pregnant, she was also aware that pregnant inmates were often housed on Unit 4A. See Knott Decl., Avery Dep. at 79:15-80:1 (Exhibit 38). As such, she cannot be deemed indifferent.

### b. The conduct of Officers Cunningham, Avery, and Adams was not a cause of Swayzer's harm as a matter of law.

Plaintiffs allege that Officer Cunningham recorded Dr. Horton's medical instructions "on [Swayzer's] custody card" and that other defendants ignored those medical instructions. See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 15. If, as Plaintiffs allege, Officer Cunningham recorded the instruction as directed, her conduct was not a cause of harm to Swayzer. Similarly, Plaintiffs claim Officers Avery and Adams allowed Swayzer's transfer to Unit 4A because medical orders regarding her housing were not properly documented. Id., ¶ 52. If they are correct, then Officers Avery and Adams cannot have intentionally caused Swayzer any harm. Further, there is no evidence Officer Adams had access to any document recording the recommendation that Swayzer be housed on the Special Needs Unit.

As with Officer Love and Lt. Andrykowski, there is no evidence showing any alleged failure by Officers Cunningham, Avery, or Adams caused Swayzer harm. As discussed above, Plaintiffs cannot show Swayzer's transfer to 4A – even if contrary to medical instructions – harmed her. The Mental Health Director, Dr. White, testified that 4A is routinely used for housing of female inmates with mental health needs, that she had no concerns regarding Swayzer's placement on the unit, and she would have approved the transfer. See PF 34, 37-40, 44. In addition, the Jail's

33

nurse-midwife, Katherine Meine, testified that 4A was an appropriate placement for Swayzer and she did not recommend Swayzer be transferred back to the Special Needs Unit or Special Medical Unit after seeing her on July 11 as there was no medical need to do so.  See PF 41-42. Both the Medical Director, Dr. Horton, and Swayzer's assigned physician, Dr. Gulsen, testified that the transfer to 4A did not affect the care she received.  See PF 36, 43.  She was seen and offered care by nursing, mental health and medical staff on multiple occasions on July 11, 12 and 13 – the days leading up to the birth.  See PF 45-57.  There is no reason for any Defendant to have anticipated that Swayzer would not receive care in 4A or that she would continue to refuse the care offered. Further, there is no evidence the transfer was a cause of a constitutional injury to Swayzer.

### D. Swayzer's Claims against Officer Kimberly Witkowiak Must Be Dismissed

In addition to the claims arising out of her transfer from the Special Needs Unit to Unit 4A on July 8, 2016, Swayzer also alleges Officer Kimberly Witkowiak was deliberately indifferent to her medical needs on the night she delivered her child.  There is no credible evidence to support Plaintiffs' assertion that Officer Witkowiak consciously ignored Swayzer's needs, nor is there evidence that a delay in medical care caused Swayzer harm.

#### 1. There is no credible evidence that Officer Witkowiak was aware of an actual risk of harm to Swayzer.

Officer Witkowiak was the officer assigned to 4A overnight on July 13-14, 2016 and, as the assigned female officer, conducted all the security rounds on 4A – a female housing unit.  See PF 58.  Jail logs and cameras recorded Officer Witkowiak performing each required inspection round, including multiple occasions in which Officer Witkowiak had extended interactions with Swayzer at the cell front.  She testified to the following with respect to Swayzer:

- She did not know Swayzer was pregnant.  See PF 59.

34

- During her second round at 11:26 p.m., Officer Witkowiak engaged Swayzer in conversation regarding her probation hold. Swayzer was coherent during the discussion. <u>See</u> PF 64.

- Officer Witkowiak conversed with Swayzer during another round and informed her that she had her K9 partner with her. Swayzer greeted the dog. <u>See</u> PF 66.

- During her 3:29 a.m. round, Officer Witkowiak observed Swayzer from the cell front for approximately 18 seconds. <u>See</u> PF 68.

- Officer Witkowiak observed Swayzer for approximately 8 seconds during her 4:23 a.m. round. <u>See</u> PF 69.

- During her 4:40 a.m. round, she observed Swayzer for approximately 22 seconds. Officer Witkowiak observed that Swayzer was moving around her cell, which was unusual for that hour of the night. Officer Witkowiak asked her what was going on and Swayzer replied nothing. <u>See</u> PF 70-71.

- Officer Witkowiak observed Swayzer for approximately 16 seconds during her 5:05 a.m. round. <u>See</u> PF 72.

- Officer Witkowiak observed Swayzer for approximately 20 seconds during her 5:35 a.m. round. She was not in any obvious distress. <u>See</u> PF 73.

- Officer Witkowiak completed her final round of the shift at 5:55 a.m. on July 14, 2016. She observed Swayzer's cell first and completed her review of the rest of the unit. Officer Witkowiak noticed an unusual smell that had not been on the unit during prior rounds and which she could not identify. <u>See</u> PF 75.

- Investigating the source of the unusual smell, she conducted a second inspection of Swayzer's cell during the 5:55 a.m. round and was at her cell front for approximately 55 seconds. She observed that Swayzer was lying in a different direction with her head near the cell toilet and had balled up her blankets in the corner of her bed. <u>See</u> PF 76.

- Officer Witkowiak noticed for the first time an unidentifiable substance, which she believed was possibly blood, on Swayzer's dark green mattress. <u>See</u> PF 77. She asked Swayzer what was on her mattress and she responded that it was water. <u>See</u> PF 78. Officer Witkowiak also asked Swayzer what was going on and if she was okay. Swayzer stated that she was just sleepy and laid her head back down. <u>See</u> PF 79.

- Officer Witkowiak did not feel Swayzer was undergoing a medical emergency at that time as she could have been experiencing her menstrual cycle or have soiled herself. <u>See</u> PF 80. Further, Swayzer stated that she was okay and just sleepy when asked. <u>See</u> PF 81.

35

- Officer Witkowiak left 4A at 5:58 a.m. and completed her rounds on the 4B housing unit. See PF 82. Officer Witkowiak then spoke with another officer, informing him that Swayzer possibly had blood on her mattress, but that she had reported the substance was water. See PF 83.

- At 6:04 a.m., Officer Witkowiak called Armor nursing staff regarding the possible blood in Swayzer's cell and her behavior. Nursing staff told Officer Witkowiak that Swayzer was pregnant and to initiate a medical emergency. See PF 84. Officer Witkowiak immediately called a medical emergency for Swayzer's cell at 6:05 a.m. See PF 85.

Deliberate indifference requires a showing that a defendant "actually believed there was a significant risk of harm" to the plaintiff. Miranda v. Cnty. of Lake, 900 F.3d 335, 350 (7th Cir. 2018). It is undisputed that Officer Witkowiak performed her required rounds in a timely manner and had multiple interactions with Swayzer throughout the night. She testified that she observed no signs of distress until 5:55 a.m., when she noticed what she thought might be blood on Swayzer's mattress. It is undisputed that Officer Witkowiak did not know that Swayzer was pregnant at that time. See PF 59. She asked Swayzer if she was okay and Swayzer replied that she was "just sleepy." See PF 79. Even having received Swayzer's assurance that she was okay, Officer Witkowiak immediately investigated by calling medical staff and reporting what she saw, which resulted in the emergency response. See PF 84. There is no credible evidence disputing her testimony that she was unaware of Swayzer's condition before speaking to the nursing staff and initiating the medical emergency.

Swayzer's account of the events is not credible as a matter of law. In addition to describing Officer Witkowiak as "about eight feet tall," Swayzer described giving birth without removing her underwear and testified that her water did not break until after she had delivered the child and had been transported to Aurora Sinai Hospital. See Knott Decl., Swayzer Dep. at 39:9-18, 45:20-46:7 (Exhibit 71). She described herself as "delusional" that evening and told detectives who

interviewed her immediately following the birth that she heard voices in her head and a sound like a gunshot in the pod the evening of the birth. Id. at 45:12-16; Knott Decl., Interview of Shade Swayzer at MKE County 29 (Exhibit 74); Recorded Interview of Swayzer at 44:30-45:00 (Exhibit 75). She told investigators she believed there was a conspiracy to kill her involving the Glendale Police Department, her probation agent, and another correctional officer. See Knott Decl., Interview of Shade Swayzer at MKE County 30 (Exhibit 74); Knott Decl., Recorded Interview of Swayzer at 1:09:30-01:11:00 (Exhibit 75).

Defendants respectfully submit that no reasonable jury could believe Swayzer's testimony. See Fed. R. Evid. 602 (a witness must have personal knowledge of the matter to which they are testifying); see also Unterreiner v. Volkswage of Am., Inc., 8 F.3d 1206, 1211-12 (7th Cir. 1993) (concluding that a witnesses' testimony cannot defeat summary judgment where the witness previously admitted lacking a recollection of the events). Even if the Court were to credit her testimony despite the inconsistencies and impossibilities contained in it, it still does not suffice to create a genuine issue of fact as to Officer Witkowiak's actual awareness of the risk of harm to Swayzer. Miranda, 900 F.3d at 350.

## 2. There is no verifying medical evidence that a delay in recognizing a medical emergency caused Swayzer harm.

If the Court were to determine there was a question of fact as to Officer Witkowiak's subjective awareness of a risk of harm to Swayzer, she still is entitled to summary judgment as Swayzer has offered no competent medical evidence that she suffered a harm due to a delay in receiving medical attention. A plaintiff claiming a delay in medical treatment violated the Eighth Amendment must offer verifying medical evidence that the delay caused harm:

> In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer "verifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of

37

harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental.

Williams v. Liefer, 491 F.3d 710, 714-15 (7th Cir. 2007) (citations omitted). Swayzer can offer no medical evidence that Officer Witkowiak's alleged delay in giving assistance caused her harm.

### a. Stillbirth of Fetus

Defendants have filed a joint motion seeking dismissal of the claims of the Estate of Laliah Swayzer and any other claims that assume the child was not stillborn on grounds that there is no medical evidence to support such a claim. See Defs' Motion for Summary Judgment as to Causation Regarding the Death of Laliah Swayzer (Doc. Nos. 300-06). The medical examiner concluded the child was likely stillborn and Plaintiffs' experts have not offered any opinions regarding the cause or timing of the child's demise. See Proposed Findings of Fact in Support of Joint Motion (Doc. No. 302), ¶¶ 60, 69-73. Defense experts have opined that the child died *in utero* at least 24-26 hours before delivery due to systemic infection and pneumonia. Id., ¶¶ 74-82. Having failed to proffer any medical theory for the passing, Plaintiffs can offer no evidence that a delay by Officer Witkowiak caused the stillbirth.

### b. Death of Live Baby

If, hypothetically, the child were not stillborn, but passed away some time after a live birth the same result follows. Plaintiffs have no evidence explaining how long the child was alive after birth or why she passed. Nor do they have "verifying medical evidence" that medical intervention would have prevented her death. The jury cannot be allowed to speculate in the absence of a competent medical opinion on whether the child could have been rescued if medical staff were present. See Walker v. Peters, 233 F.3d 494, 502 (7th Cir. 2000) (granting summary judgment for defendants where inmate could only speculate that refusals to provide treatment caused injury).

38

As an illustration of this point, Plaintiffs have alleged that Officer Witkowiak should have called for a medical emergency immediately upon observing what she believed to be blood on Swayzer's mattress. See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 68. Officer Witkowiak questioned Swayzer at approximately 5:55 a.m., was assured she was not in distress and was "just sleepy," then investigated by calling the nursing staff after completing her rounds. See PF 75-79, 84. The nursing staff reviewed their records and advised Officer Witkowiak to call a medical emergency which she did at approximately 6:05 a.m. See PF 84-85. Plaintiffs are critical of Officer Witkowiak for not calling the medical emergency minutes earlier, but have no medical evidence that the delay was of any consequence to either Swayzer or the stillborn child. There is no evidence that the child was alive at 5:55 a.m., for instance, but deceased at 6:05 a.m. Their unsupported claim that a delay caused the child's passing is sheer speculation, without foundation in any witness's testimony, and should be dismissed. Knight v. Wiseman, 590 F.3d 458, 466 (7th Cir. 2009); Norwood v. Ghosh, 723 Fed. App'x. 357, 366 (7th Cir. 2018) (unpublished) ("The mere possibility that delays in treating [the plaintiff] contributed to permanent damage falls short of verifying medical evidence that would allow a reasonable jury to find by a preponderance of the evidence that such causation actually occurred.").

### c. Injury to Swayzer

Defendants are unaware of any physical or emotional injury that Swayzer claims to have suffered during the birth process. Her stay at the hospital after giving birth was brief and uncomplicated, and on her return to the Jail on July 16, 2016, she questioned why the staff put her on observation, stating, "Why am I going on psych observation? I'm not even suicidal. They talked to me about it at the hospital. I've accepted what happened." See Knott Decl., July 16, 2016 Miscellaneous Note, 2:23 p.m. entry, at Armor 306 (Exhibit 76). There is no verifying medical evidence that a delay in medical attention caused Swayzer any physical or emotional harm beyond

39

those normally experienced in childbirth.  See Jackson, 733 F.3d at 790 (stating, "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct … as a result of failure to treat  the condition without providing evidence that the failure caused injury or a serious risk of injury."); Williams, 491 F.3d at 714-15 (burden is on "the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm") (internal citations omitted).  As such, Plaintiffs cannot show Swayzer experienced any harm resulted from the alleged delay as opposed to her underlying condition.

## E.  The Individual Defendants Are Entitled to Qualified Immunity

Even if the Court finds the issue of whether there was a constitutional violation too close to call, the Individual County Defendants (*i.e.*, Officer Love, Lt. Andrykowski, Officer Cunningham, Officer Avery, Officer Adams, and Officer Witkowiak) are nevertheless entitled to qualified immunity, which "protects [officials] from facing suit, not merely liability."  Saucier v. Katz, 533 U.S. 194, 200-01 (2001) *overruled on other grounds by* Pearson v. Callahan, 555 U.S. 223 (2009).  As stated by the Supreme Court, officials should be protected by qualified immunity unless "existing precedent [has] placed the statutory or constitutional question beyond debate" and "every" official would have known that their actions were violative of the Constitution.  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

 A government official is entitled to qualified immunity if a reasonable official could have believed that their conduct was lawful in light of clearly established law and the information the official possessed at the time.  Anderson, 483 U.S. at 641.  Qualified immunity gives officials "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 343, 341 (1986)).

The al-Kidd Court reiterated the two-step test to determine whether a law enforcement officer is entitled to qualified immunity that requires courts to decide: "(1) [whether] the official violated a statutory or constitutional right, and (2) [whether] the right was 'clearly established' at the time of the challenged conduct." 563 U.S. at 735. For a right to be 'clearly established', "**every** 'reasonable official would have understood that what he is doing violates that right.'" Id. at 741. (emphasis added). Thus, an official is entitled to qualified immunity if their actions were those that a reasonable official would have taken. This Court should ask if the actions of the Individual Defendants were reasonable in light of the clearly established law and the information known to them at the time, not whether another reasonable, or more reasonable, interpretation of the events can be constructed after the fact. Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir. 1998) (citing Hunter, 502 U.S. at 228). "The qualified immunity analysis [] is limited to 'the facts that were knowable to the defendant officers at the time they engaged in the conduct in question. Facts an officer learns after the incident ends—whether those facts would supporting granting immunity or denying it—are not relevant." See Hernandez v. Mesa, 137 S. Ct. 2003, 2007 (2017).

The claimed violations here not only fail as discussed above, but at minimum, the Individual County Defendants' actions were not so egregious given "the facts that were knowable to the defendant officers" that it could be said that "every" reasonable official would have known they were constitutionally prohibited. The claims against Officer Love, Officer Cunningham, Officer Avery, Officer Adams, and Lt. Andrykowski relate to Swayzer's transfer from the Special Needs Unit to Unit 4A on July 8 – a week before her medical emergency arose. There is no clearly established right for inmates to remain on one housing unit as opposed to another that is considered appropriate for their medical and mental health needs and where they will continue to receive similar care. See Hewitt, 459 U.S. at 466-67; Hudson, 1996 U.S. Dist. LEXIS 524, at *11. Nor

41

could the officers have known at the time that Swayzer would refuse all medical attention for several more days. As such a right was not 'clearly established' at the time, Lt. Andrykowski, Officer Love, Officer Cunningham, Officer Avery, and Officer Adams – whose liability is premised solely on the transfer to 4A – are entitled to qualified immunity.

Further, the Defendants acted reasonably under the circumstances. Officers Cunningham, Adams, and Witkowiak testified that they did not know she was pregnant. See Knott Decl., Cunningham Dep. at 55:3-7, 56:9-14, 64:8-14, 66:9-12 (Exhibit 22); Knott Decl., Witkowiak Dep. at 15:11-13, 16:12-22, 54:23-25, 133:23-134:9 (Exhibit 23); Knott Decl., Adams Dep. at 92:16-18 (Exhibit 39). Given this lack of knowledge, they cannot be described as acting unreasonably. See Hernandez, 137 S. Ct. at 2007 ("Facts an officer learns after the incident ends [] are not relevant"). Officer Love acted reasonably in relying on medical staff to provide any housing directives to the classification unit as that was the practice. See Knott Decl., Horton Dep. at 298:1-299:12, 301:16-302:6 (Exhibit 13). Lt. Andrykowski, Officer Adams, and Officer Avery acted reasonably as 4A is an appropriate housing assignment for both female inmates with mental health needs and pregnant inmates and there was no protocol requiring him to get medical approval for the transfer at the time. As such, Officer Love, Lt. Andrykowski, Officer Cunningham, Officer Avery, Officer Adams, and Officer Witkowiak are entitled to qualified immunity and Swayzer's 1983 claims against them should be dismissed.

### F. Plaintiffs' *Monell* Claims Against Milwaukee County Fail

Despite having more than two (2) years to conduct unlimited discovery, and despite having pled and re-pled their Monell claims five times, Plaintiffs remain unable to articulate a coherent Monell theory and unable to support their conclusory allegations against Milwaukee County. Rather, they allege "policies" and "practices" so vague and nebulous as to encompass the entirety

42

of medical care at the Jail, they fail to demonstrate how those practices caused Swayzer harm, and they have no proof of the requisite notice to the County's policymakers.

In order to hold a governmental entity such as Milwaukee County liable under the seminal case of Monell v. Dep't. of Social Services, 436 U.S. 658, 691 (1978), Plaintiffs must prove three things: (1) an underlying constitutional violation; (2) the identity of the officials or governmental bodies with final policymaking authority; and (3) proof that those individuals "have, through their decisions, 'caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.'" Simmons v. City of Phila., 947 F.2d 1042, 1062 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992) (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989)).

### 1. No Constitutional Violation Occurred

First, absent a constitutional violation in the first instance – of which there was none here – the derivative issue of a deficient custom, practice or policy is irrelevant. See Collins v. City of Harker Heights, 503 U.S. 115, 123 (1992) (holding that a city may be liable for a policy or custom of failing to train its employees only "if a city employee violates another's constitutional rights."); Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite besides the point."). Here, Swayzer alleges that she was transferred from a mental health unit to a mixed use housing unit where all services were continued – which is not a constitutional harm. She also alleges that a correctional officer who did not know she was pregnant failed to appreciate her change in condition despite the officer asking several times if she was okay – again, not a case that rises to the level of

43

constitutional indifference. There is no underlying constitutional claim here and therefore no policy claim.

## 2. No Constitutionally Deficient Custom, Practice or Policy

Even if Plaintiffs could show that their rights were violated, in order to sustain a derivative Monell claim against Milwaukee County, they must additionally prove the violation was as a result of a municipal policy or practice. See Monell, 436 U.S. at 691. A plaintiff must establish that the policy in question was the "moving force" behind (*i.e.*, the proximate cause of) the constitutional tort. City of Canton v. Harris, 489 U.S. 378, 388 (1989). The challenged governmental practice "must be closely related to the ultimate injury." Id. at 391; Estate of Sims v. Cty. of Barbeau, 506 F.3d 509, 515 (7th Cir. 2009) ("direct causal link" between a custom and the alleged constitutional violations required). A "moving force" is the "catalyst" for the alleged injury, not merely a "contributing factor." Johnson v. Cook Cnty., 526 F. App'x 692, 696 (7th Cir. 2013) (unpublished); Thomas v. Cook Cnty. Sheriff's Dep't., 604 F.3d 293, 303 (7th Cir. 2010).

To prove an official policy, custom, or practice within the meaning of Monell, a plaintiff "must show more than the deficiencies specific to his own experience, of course." Daniel v. Cook Cty., 833 F.3d 728, 734 (7th Cir. 2016). In their Fourth Amended Complaint, Plaintiffs describe only Swayzer's personal experience, but nevertheless allege widespread problems exist. To support a Monell claim, Plaintiffs must "introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." Phelan v. Cook Cnty., 463 F.3d 773, 789 (7th Cir. 2006). They have neither pled sufficient facts to state a claim, nor can they provide evidence demonstrating the required pervasiveness and acquiescence in any alleged policy, custom, or practice.

Assuming a constitutional violation occurred and it is somehow linked to a practice so pervasive as to be deemed a policy, there is also a *mens rea* requirement. Plaintiffs must prove the

44

policymakers of Milwaukee County acted with "deliberate indifference to the rights of persons with whom [correctional officers] came into contact." City of Canton, 489 U.S. at 388. Proof of deliberate indifference requires more than "[a] showing of simple or even heightened negligence." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 407 (1997). Rather, deliberate indifference may be found only when the alleged indifference may be considered a municipal policy or custom. City of Canton, 489 U.S. at 389. This may occur where: (1) the need for more or different training is and the lack of training is likely to result on a constitutional violation or (2) where there exists a prior pattern of constitutional violations that make "the need for further training … plainly obvious…" Id. at 390, n.10. The purpose of requiring that Plaintiff show that there was a pattern of prior, similar instances is to prove that the County was on notice of a deficiency and failed to act. Id. at 389; Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).

### a. Plaintiffs' claim for allowing correctional officers to make medical and housing decisions should be dismissed

### i. There is no evidence of a widespread practice.

Plaintiffs allege that Milwaukee County had a policy, practice, or custom of "allowing untrained correctional officers to make decisions concerning the need for appropriate medical care and decisions on where to house inmates with serious medical needs." See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 132. However, Plaintiffs' evidence of the "widespread practice" is nothing more than Plaintiffs' interpretation of Swayzer's personal experience. In addition, Plaintiffs cannot say the alleged policy caused her harm or that Milwaukee County had notice of any systemic problem.

There is no evidence of a pattern and practice of correctional officers making medical decisions. The fallacy of this allegation is apparent on the face of Plaintiffs' pleading. Officer Love is sued, for instance, because she is alleged to have overheard the Jail medical doctor making

45

a housing determination about Swayzer and not doing enough to carry it out. Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 14. The implication is that it was Officer Love's duty to follow the policy of allowing the medical staff to make a housing determination. Officer Cunningham is likewise accused of failing to record "medical staff's directives that Swayzer be housed in the Special Needs/Medical Unit." Id. (Doc. No. 313) ¶ 15. Plaintiffs are explicitly alleging that the medical staff, by policy and practice, were to make the housing determination and Cunningham failed to adhere to that practice. The allegation undermines their Monell claim. Finally, Lt. Andrykowski is accused of transferring Swayzer's housing "in direct disregard of Swayzer's pregnancy, medical directives and policy and procedure." Id. (Doc. No. 313) ¶ 17. Plaintiffs are again alleging precisely the opposite of the policy they allege to be widespread and a basis for Monell liability. They assert Andrykowski violated Jail policy by not following "medical directives." Their allegation directly undermines their contention that the Jail's routine and widespread practice was to have these correctional officers make housing determinations.

Plaintiffs have no evidence of other instances where inmates suffered harm due correctional officers making medical decisions. Plaintiffs' correctional expert, Timothy P. Ryan, was asked whether he was aware of any instances where officers substituted their judgment for that of medical staff. He could cite only a single instance. However, during that incident, security staff followed the recommendation of medical staff, sent the inmate to the hospital, and the inmate delivered a child at the hospital the next day. See Knott Decl., Ryan Dep. at 82:11-84:9 (Exhibit 65). Ryan confirmed that his evidence of a "pattern" is a single instance in which the officers did the opposite of what he accuses them of doing and his own perception of the Swayzer event:

> Q.    With respect to the last discussion, what you said was that the officers made a recommendation with respect to this inmate and the medical [staff] made a recommendation that she go to the hospital and she in fact went to the hospital, correct?

46

| A. | That's correct. |
| Q. | Are you aware of any other instances of officers substituting their opinion for the medical staff other than that reference in the Shansky report? |
| A. | My only other concern would be Officer Witkowiak and what she did on the evening and morning of July 14th. |
| Q. | And with respect to the other incident where the medical staff in fact sent the inmate to the hospital, do you know when that occurred? |
| A. | No, I do not. |

Id. at 83:19-84:9. Plaintiffs' claim that there is a pattern of such incidents, and that those instances resulted in unconstitutional harm, is baseless. See Thomas, 604 F.3d at 303 (holding custom and practice theory requires, at a minimum, more than three supporting instances of the challenged practice); Palka v. City of Chi., 662 F.3d 428, 435 (7th Cir. 2011) (same); Phelan, 463 F.3d at 790; Daniel, 833 F.3d at 734 (plaintiff "must show more than the deficiencies specific to his own experience").

The same pertains to the allegation that "untrained correctional officers" made inappropriate housing decisions. There is no evidence of a widespread pattern of officers making inmate housing decisions against medical orders which resulted in harm.

### ii. Plaintiffs cannot show causation.

Plaintiffs also fail to demonstrate the nexus between training and Swayzer's event such that the alleged failure was the "moving force" behind her injury. Fundamentally, the assumption that Swayzer was placed in an inappropriate housing unit is false. The undisputed testimony demonstrates that Unit 4A was an acceptable location for Swayzer:

- Mental Health Director Dr. White testified that she had no concerns regarding her placement on the unit and that her staff was capable of providing all mental health services in that unit (PF 34, 37-40);

- Dr. White testified she would have approved the transfer to 4A had she been asked (PF 44);

- Medical Director Dr. Horton testified that the transfer to 4A did not affect the care Swayzer received (PF 36);

47

- The Jail physician assigned to Swayzer's care, Dr. Gulsen, did not feel Swayzer was misplaced in 4A or that her care was affected (PF 43); and

- The Jail's obstetrics specialist, Nurse-Midwife Meine, testified that 4A was an appropriate placement for Swayzer and that she was capable of receiving necessary care there if she would accept it (PF 41-42).

In addition to the testimony of her medical providers that 4A was appropriate, Swayzer continued to receive medical care without interruption up until hours before she delivered her child. See PF 45-56. The only obstacle to her care was Swayzer's own refusal to accept care, which began before her transfer to 4A. See PF 6, 12, 13, 16, 25-27, 48, 51. There is simply no evidence that a housing decision almost a week before the birth was "the moving force" behind a constitutional harm.

### iii. Plaintiffs cannot demonstrate notice to the County.

There is no evidence of multiple prior occurrences that might have placed the County on notice of a systematic problem with untrained officers making complex medical housing decisions. The blunderbuss assertion that "other bad things have happened" to other inmates with other medical conditions is insufficient. A "pattern of **prior similar** instances" is necessary to establish the government culpability in failing to adequately train. See City of Canton, 489 U.S. at 390 (emphasis added); Tuttle, 471 U.S. at 823; Jackson v. Marion County, 66 F.3d 151, 152 (7th Cir. 1995) (the "usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.").

Plaintiffs cannot show the County was aware of any prior similar incidents such that it was on notice. Of the instances mentioned in Plaintiffs' pleadings, the Terrill Thomas incident

48

involved the dehydration death of an inmate in April 2016 after his water was allegedly turned off by correctional staff.  See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 95.  This incident did not involve a pregnant inmate or any allegation of medical or housing decisions being made by correctional officers.  The Kristina Fiebrink and Michael Madden incidents discussed by Plaintiffs occurred **after** Swayzer's incarceration and involved unrelated medical conditions including drug and alcohol withdrawal and heart problems.  Id., ¶¶ 96-97.  There is no allegation any of these incidents involved officers making medical or housing decisions.  Thus, Plaintiffs have no evidence of prior similar incidents that could have provided Milwaukee County with the requisite notice.  As such, their Monell claim related to medical or housing decisions made by correctional staff fails as a matter of law.

### b. Plaintiffs' claim for failing to comply with the terms of a Consent Decree should be dismissed.

#### i. Consent Decree, Shansky reports, and NCCHC accreditation are irrelevant to any constitutional question.

Plaintiffs next make a scattershot allegation that Milwaukee County "failed to comply with the terms and provisions of the Consent Decree concerning healthcare; failed to follow the recommendations of Shansky; failed to work towards compliance with the standards of the National Commission on Correction [sic] Healthcare; allowed officers to substitute their judgment for that of health care staff; failed to conduct emergency drills; and have exhibited a systematic deficiency in staffing…." See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 139.  Plaintiffs' claim is so disjointed and amorphous that it cannot be construed to refer to a County policy at all.

First, Plaintiffs have not even articulated a County policy.  Rather, they have attacked the provision of medical care at the Jail generally.  See Chaparro v. Powell, 2008 U.S. Dist. LEXIS 834, at *6-7 (N.D. Ill. 2008) (unpublished) ("The custom or policy underlying a Monell claim cannot be so amorphous that it effectively exposes a municipality to *respondeat superior*

49

liability."). According to Plaintiffs, Milwaukee County entered into a Consent Decree with a class of plaintiffs – identified as current and future inmates at Jail – in Milwaukee County Circuit Court Case No. 96-CV-1835. See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 99. Plaintiffs mischaracterize the terms of the Consent Decree. Id., ¶¶ 100-102, 111. There is nothing in the 2001 Consent Decree pertinent to Swayzer's medical care. See Knott Decl., Consent Decree (Exhibit 77). To the extent that Dr. Shansky made recommendations related to women's health, the County was in compliance at the time of these events. See Knott Decl., May 2016 Shansky Report at MKE County 1036 (Exhibit 78).

Further, a state court consent decree and the recommendations of a medical monitor do not set a constitutional standard and are irrelevant to Plaintiffs' Monell claim. See Terry v. County of Milwaukee, 2018 U.S. Dist. LEXIS 93298, at *24 (E.D. Wis. 2018) (Stadtmueller, J.) (unpublished) (Consent Decree and Shansky reports do not provide basis for Monell claim). In evaluating a municipality's liability under 42 U.S.C. § 1983, "a court 'looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes.'" Maine v. Thiboutot, 448 U.S. 1, 5 (1980) (quoting Owen v. City of Independence, 445 U.S. 622, 649 (1980)); Sanchez v. Garcia, 2015 U.S. Dist. LEXIS 57912, at *14 (N.D. Ill. 2015) (unpublished) ("Nor is the existence of the consent decree itself evidence of a policy. Sanchez argues that Cermak's policy is to ignore the consent decree … To suggest that the existence of the consent decree somehow supports an inference that Cermak ignores that same consent decree is circular.").

Violations of consent decrees are to be prosecuted as contempt proceedings in the courts in which the decrees are venued. See Alliance to End Repression v. City of Chicago, 356 F.3d 767, 771 (7th Cir. 2004); see also Cagle v. Sutherland, 334 F.3d 980, 987 n. 9 (11th Cir. 2003) (consent decrees are enforced by contempt citations and section 1983 remedies are unnecessary).

50

Additionally, "a consent decree is a form of contract, and, as such, the rules of contract interpretation are applicable." South v. Rowe, 759 F.2d 610, 613 (7th Cir. 1985); see also Martin v. Davies, 917 F.2d 336, 339 (7th Cir. 1990), *cert. denied*, 501 U.S. 1208 (1991) (interpretation of consent decree is governed by contract law, not constitutional law).  The Consent Decree states:

> The Court shall retain jurisdiction for purposes of enforcing this consent decree until it determines that there is substantial compliance. Nothing stated herein shall prevent plaintiffs from moving the Court for enforcement or contempt upon a claim of non-compliance.

See Knott Decl., Consent Decree at 5 (Exhibit 77).  Consequently, to the extent that Plaintiffs' claims are based on non-compliance with the 2001 Consent Decree or the related recommendations of a medical monitor, those claims should be dismissed as they are properly venued in the Milwaukee County Circuit Court and they do not set a constitutional standard.

Finally, Plaintiffs' allegation that the County "failed to work towards compliance" with the standards of the National Commission on Correctional Healthcare ("NCCHC") is also irrelevant and the same arguments apply.  The County is not constitutionally obligated to work toward compliance with a particular organization's standards.  While the County did include in its contract with Armor a goal that Armor would work toward completing an NCCHC audit, the existence of that contract term does not evidence a policy on the part of the County of not meeting NCCHC standards.  See Knott Decl., May 2013 Armor Contract at MKE County 1086-87 (Exhibit 79).  It means the opposite: the County is setting NCCHC compliance as a goal for its vendor. Furthermore, Plaintiffs cannot identify how successful completion of an NCCHC audit would have impacted Swayzer's care. Plaintiffs fall well short of demonstrating that NCCHC compliance is a constitutional requirement or that a lack of compliance was the "moving force" behind Swayzer's outcome. Finally, the allegation is simply untrue as there was an effort to achieve NCCHC compliance.  See Knott Decl., NCCHC Armor Pre-NCCHC Follow-up Audit (Exhibit 80).

### ii. Plaintiffs fail to demonstrate causation or notice.

As discussed above, the claim that officers substituted their judgment for that of medical staff fails as a matter of law. The only other alleged deficiencies as to the Consent Decree and Dr. Shansky's reports mentioned in Plaintiffs' <u>Monell</u> claim relate to a staffing shortage and lack of medical emergency drills. <u>See</u> Pls.' Fourth Am. Compl. (Doc. No. 313), ¶¶ 105, 110, 139. However, Plaintiffs cannot show the alleged staffing shortage or failure to conduct emergency drills are causally related to this incident or that the County had notice of any deficiencies. Plaintiffs' medical expert, Dr. Vassallo, testified that she had no opinion as to whether healthcare or correctional staffing levels at the Jail contributed to the alleged incident. <u>See</u> Knott Decl., Vassallo Dep. at 210:17-211:8 (Exhibit 66). She offered no opinion on emergency drills at the Jail. <u>See</u> Knott Decl., Vassallo Report (Exhibit 70). Plaintiff's correctional expert, Mr. Ryan, stated he did not believe correctional staffing played a role on this incident. <u>See</u> Knott Decl., Ryan Dep. at 196:13-17 (Exhibit 65). He also offered no opinion on emergency drills at the Jail. <u>See</u> Knott Decl., Ryan Report (Exhibit 69).

Mr. Ryan was critical of healthcare staffing and based his opinion on a report 2012 report by Dr. Shansky, the fact that Armor Nurse Porlucas worked overtime, and Dr. Shansky's report of May 2016. <u>Id.</u> at 11, 34, 36-37.[4] The 2012 report is irrelevant as it was written before the May 2013 start of Armor's contract and four years prior to this incident. <u>See</u> Knott Decl., May 2013 Armor Contract (Exhibit 79). Mr. Ryan testified his concerns about healthcare staffing were based solely on Dr. Shansky's reports and expertise. <u>See</u> Knott Decl., Ryan Dep. at 181:14-24 (Exhibit 65). When asked whether the Jail's medical staffing levels affected the care Swayzer received,

---

[4] Mr. Ryan claims Dr. Shansky reported a "'sustained crisis'" related to staffing. <u>See</u> Knott Decl., Ryan Report at 11 (Exhibit 69). The County Defendants were unable to find a use of "sustained crisis" in any of Dr. Shansky's writings exchanged during discovery.

Ryan stated he had concerns the medical staff who saw her from July 8 to July 13 were paying her enough attention, reading reports, and reading the orders from her doctor. Id. at 184:14-185:11. However, Ryan also testified he is not a medical expert and not qualified to give medical opinions as to the performance of medical staff. Id. at 185:12-16. Thus, Plaintiffs' expert has admitted he is unqualified to opine on whether medical staffing levels were causally related to Swayzer's event.

Further, the only alleged instance where Swayzer did not receive medical care was when Dr. Gulsen was unable to see her on July 13, 2016. See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 58; PF 57. Otherwise, Swayzer was repeatedly seen by medical staff and consistently refused the care offered. See PF 8, 11-13, 16, 18, 23-27, 45-56. As the only instance where Swayzer did not receive care involved a physician, any shortage of nursing staff (or nurses working overtime) is irrelevant. Notably, Dr. Shansky's May 2016 report had no criticism of physician staffing at the Jail. See Knott Decl., May 2016 Shansky Report (Exhibit 78). As Mr. Ryan relied on Dr. Shansky and Dr. Shansky did not remark on physician shortages at the Jail prior to Swayzer's delivery, Plaintiffs cannot demonstrate a physician shortage was causally related to this incident or that the County was on notice of any systemic deficiency in physician staffing.

In short, Plaintiffs have no evidence of a cognizable County policy, no evidence of causation, and no evidence of prior, similar incidents where failing to meet the requirements of the Consent Decree, failing to follow the recommendations of Dr. Shansky, lack of NCCHC accreditation, lack of emergency drills, or lack of staffing caused harm. As such, their Monell claim fails as a matter of law.

### c. Plaintiffs' claim for lack of policies dictating the quality of care must be dismissed.

Plaintiffs claim Milwaukee County had no policies "in place to dictate the quality of care to detainees…" See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 147. They also, bizarrely, claim

that this failure to have policies was "done in accordance with MC's, MCSO's and Armor's policies, practices, and/or customs condoning the use of said procedures" and that this lack of a policy was an "officially adopted" policy. Id. Logical inconsistencies aside, this theory fails as it is not a Monell claim at all but instead an attempt to impose *respondeat superior* liability on the County in contravention of well-settled § 1983 principles. See Chaparro, 2008 U.S. Dist. LEXIS 834, at *6-7.

The only facts alleged in the Fourth Amended Complaint related to the quality of care provided come from Paragraph 105, which states "Shansky has found that, '…continued turnover in health care leadership positions contribute to lack of oversite [*sic*] of quality of care…'" See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 105. Notably, the County Defendants are unable to find the language quoted in Paragraph 105 in any of Dr. Shansky's writings exchanged during discovery. The charge that Milwaukee County had no system of medical oversight in place is particularly odd as it relies on a report from the Jail's medical monitor, who is charged with assisting the County with oversight of its healthcare program and makes bi-annual reports commenting on the medical practices and leadership at the Jail.

The claim that the County had a policy of not engaging in oversight of the medical care provided to inmates at the Jail is baseless, not causally related to Swayzer's delivery, and there is no evidence of notice to the County of any systemic problem with medical oversight. Dr. Shansky's May 2016 report notes turnover in certain healthcare leadership, but states that Armor had hired a new Health Services Administrator and Director of Nursing with "very good hospital experience…" See Knott Decl., May 2016 Shansky Report at MKE County 1027 (Exhibit 78). He also noted that Armor brought in senior correctional nurses to assist the new leadership. Id. Dr. Shansky also stated his belief that "the vendor's plan to provide support should prove effective."

54

_Id._ He stated the Medical Director and Director of Mental Health Services (Drs. Horton and White) provided stability for the healthcare program and he "was also impressed with the efforts of the Quality Improvement Coordinator…" _Id._ Further, "[t]he Director of Mental Health Services, as I indicated previously, has been in place and continues to do a good job of managing the program" while the Medical Director "continued to perform exceptionally well…" _Id._ at MKE County 1028, 1029. In short, Dr. Shansky's comments in the report immediately preceding the Swayzer event do not suggest a lack of oversight or direction. To the contrary, they allege an organized plan of improvement.

Dr. Shansky noted an ongoing quality improvement ("QI") program "performed excellent reviews looking at both the appropriateness of the RN assessment as well as the appropriateness of the acuity level assigned." _Id._ at MKE County 1032. He also made recommendations for the quality improvement program. _Id._ Dr. Shansky noted the Medical Director was already engaged in and should continue – as part of the quality improvement program – review of physicians' performance. _Id._ He reported that women's health was already in compliance. _Id._ at MKE County 1036. Dr. Shansky specifically discussed the quality improvement plan and stated he met with the Quality Improvement Coordinator and reviewed multiple studies with her. _Id._ at MKE County 1039-40. Thus, rather than an "officially adopted" policy of not having a policy dictating the quality of care, Dr. Shansky documented a robust and ongoing quality improvement program for healthcare at the Jail that was in place prior to Swayzer's incarceration. While there had been turnover at Armor, Dr. Shansky was content with the management team and Armor's leadership plans. Not only was there extensive, documented internal oversight of the healthcare program, Dr. Shansky's reporting itself constitutes direct evidence of the County's efforts to ensure the quality of care at the Jail.

The alleged "policy" of "not having policies" for oversight is so broad it allows no response. In addition to the failure to provide any evidence for the existence of a widespread problem, Plaintiffs cannot show any alleged failure of oversight caused constitutional harm or notice on the part of the County. Plaintiffs cannot demonstrate a lack of oversight caused Swayzer any harm when she received medical care throughout her incarceration and rejected all attempts to provide assistance. See PF 8, 11-13, 16, 18, 23-27, 45-56. Further, there was no notice of any systemic lack of healthcare oversight where Dr. Shansky's report from six weeks prior to this incident document ongoing efforts to ensure proper management of the healthcare program and to improve the care delivered to inmates. As such, Plaintiffs' Monell claim for lack of oversight fails as a matter of law and must be dismissed with prejudice.

### d. Plaintiffs' claim for fabricating medical records should be dismissed.

Finally, Plaintiffs allege that Milwaukee County "officially adopted" a policy "of fabricating medical records to make it appear as if medical care was provided…" See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶ 153. This allegation is ludicrous, without any factual support, and intended only to scandalize. There is no County policy allowing inmate medical records to be fabricated. Moreover, there is no allegation, much less evidence, that Swayzer's medical records were fabricated or that she did not receive the care documented. There is no evidence the County Defendants or any other Milwaukee County employee ever fabricated the medical records of other inmates. Finally, there is no evidence the County was on notice of a widespread problem of false documentation of inmate medical records. For these reasons, Plaintiffs' Monell claim for the fabrication of medical records must be dismissed, with prejudice.

### G.  **Plaintiffs' Negligence and Wrongful Death Claims Fail**

In addition to the claims under 42 U.S.C. § 1983 addressed above, Plaintiffs have alleged

Negligence and Wrongful Death claims under Wisconsin state law against certain individual

defendants.  See Pls.' Fourth Am. Compl. (Doc. No. 313).  Each of the state law claims fails as a

matter of law and must be dismissed.

> ### 1.  **Plaintiffs failed to comply with the Notice-of-Claim Requirements of Wis. Stat. § 893.80**

Plaintiffs' state law claims are defective as they failed to comply with Wisconsin's notice-

of-claim requirements under Wis. Stat. § 893.80.  Unless the notice-of-claim requirement is met,

> no action may be brought or maintained against any … political corporation, governmental subdivision or agency thereof nor against any officer, official, agent or employee of the corporation, subdivision or agency for acts done in their official capacity or in the course of their agency or employment upon a claim or cause of action . . . .

Wis. Stat. § 893.80(1d).  The notice-of-claim requirement has several parts.  First, within 120 days

of the event giving rise to the Plaintiffs' claim, they must serve written notice of the circumstances

of the claim on the governmental officials and must serve a claim notice containing the address of

the claimant and an itemized statement of the requested relief on the appropriate clerk or secretary

for the governmental officials.  Id.

The County Defendants do not dispute that Plaintiffs complied with Wis. Stat. § 893.80(1d)

when they filed a Notice of Claim on November 11, 2016.  See Knott Decl., Notice of Claim

(Exhibit 81).  However, Wis. Stat. § 893.80(1g) sets forth certain preconditions that must occur

after a plaintiff files a notice of claim but before they may file a civil action:

> Notice of disallowance of the claim submitted under sub. (1d) shall be served on the claimant by registered or certified mail and the receipt therefor, signed by the claimant, or the returned registered letter, shall be proof of service. Failure of the appropriate body to disallow a claim within 120 days after presentation of the written notice of the claim is a disallowance. No action on a claim under this section

against any defendant fire company, corporation, subdivision or agency nor against any defendant officer, official, agent or employee, may be brought after 6 months from the date of service of the notice of disallowance, and the notice of disallowance shall contain a statement to that effect.

Wisconsin courts have interpreted Wis. Stat. § 893.80 to invalidate any civil action on those claims filed prior to the government's disallowance under subsection (1g). See Colby v. Columbia County, 550 N.W.2d 124, 130-33 (Wis. 1996). Additionally, such a defect cannot be cured by simply amending the complaint after the disallowance:

> Although Selerski argues that he should have been permitted to amend his complaint to allege the expiration of the 120-day period (which ran after he filed his summons and complaint), amendments are, obviously, only permitted if the action is otherwise properly commenced, and Selerski submits no authority, and we have found none, that holds that the 120-day period may be short-circuited by a prematurely filed summons and complaint that is later amended. Indeed, Rabe v. Outagamie County, 72 Wis. 2d 492, 498-499, 241 N.W.2d 428, 432 (1976), recognizes that an action that is filed prematurely must be dismissed.

Selerski v. Vill. of W. Milwaukee, 212 Wis.2d 10, 20, 568 N.W.2d 9, 13-14 (Wis. Ct. App. 1997).

Plaintiffs' state law claims must be dismissed for failure to comply with § 893.80. Their Notice of Claim was filed on November 11, 2016. See Knott Decl., Notice of Claim (Exhibit 81). Because no disallowance on that notice was issued, it was disallowed by statute after the lapse of the 120-day period on March 13, 2017. See Wis. Stat. § 893.80(1g). However, the Plaintiffs commenced the present lawsuit prematurely on December 23, 2016. See Pls.' Compl., (Doc. No. 1). Their state law claims must be dismissed with prejudice. See Hutter v. Huneke, 2017 U.S. Dist. LEXIS 58323, at *2 (W.D. Wis. 2017) (unpublished) ("Section 893.80 requires that the claim be presented to the clerk of the county and that the claim be disallowed *before* the lawsuit may be filed.") (italics in original).

### 2. Defendants are entitled to Immunity under Wis. Stat. § 893.80

Lt. Andrykowski, Officer Love, Officer Cunningham, Officer Avery, Officer Adams, and Officer Witkowiak are immune from liability under Wis. Stat. § 893.80(4), which provides:

> [n]o suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

Legislative, quasi-legislative, judicial, and quasi-judicial functions "include any act that involves the exercise of discretion and judgment." Lodl v. Progressive N. Ins. Co., 253 Wis. 2d 323, 335 (2002). Wisconsin's governmental immunity "provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties." Pries v. McMillon, 326 Wis. 2d 37, 784 N.W.2d 648, 654 (2010)). Generally, "public officers are immune from liability for damages resulting from their negligence or unintentional fault in the performance of discretionary functions." Lister v. Board of Regents of Univ. of Wis. Sys., 72 Wis. 2d 282, 301 (1976).

"The doctrine of governmental immunity is quite broad" under Wisconsin law. See Estate of Perry v. Wenzel, 872 F.3d 439, 462 (7th Cir. 2017) (granting immunity to all non-medical Jail officials, including correctional officers). There are only four narrow exceptions to immunity: "(1) the performance of ministerial duties; (2) the performance of duties with respect to a 'known danger;' (3) actions involving medical discretion; and (4) actions that are 'malicious, willful, and intentional.'" Bicknese v. Sutula, 2003 WI 31, 260 Wis. 2d 713, 660 N.W.2d 289, 296 (Wis. 2003). As these Defendants are not medical professionals, the medical discretion exception is inapplicable. Estate of Perry, 872 F.3d at 463. Similarly, there is no evidence these Defendants acted maliciously, willfully, or intentionally.

The known-danger exception is inapplicable as it "arises only when there exists a danger that is known and compelling enough to give rise to a ministerial duty on the part of a municipality or its officers." Lodl, 2002 WI 71, ¶ 4. Here, the known-danger exception is inapplicable as none

59

of the County Defendants knew of any danger compelling action. Officers Cunningham, Adams, and Witkowiak testified that they did not know Swayzer was pregnant. See Knott Decl., Cunningham Dep. at 55:3-7, 56:9-14, 64:8-14, 66:9-12 (Exhibit 22); Knott Decl., Witkowiak Dep. at 15:11-13, 16:12-22, 54:23-25, 133:23-134:9 (Exhibit 23); Knott Decl., Adams Dep. at 92:16-18 (Exhibit 39). Officer Love could not have anticipated on July 7 that the events of July 14 would occur. Likewise, Lt. Andrykowski, Officer Avery, and Officer Adams would not have been aware on July 8 that Swayzer would be at risk of harm a week later as 4A is an appropriate housing assignment for both female inmates with mental health needs and pregnant inmates.

Finally, the ministerial duty exception does not apply. Governmental immunity does not apply where an "act is associated with the performance of ministerial duties imposed by law." Moretto v. Free Bird LLC, 2015 Wisc. App. LEXIS 524, at *5, 869 N.W.2d 170 (Wis. Ct. App. 2015) (unpublished). "A ministerial duty is one that is 'absolute, certain and imperative, involving merely the performance of a specific task when the law **imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion**.'" Lodl, 253 Wis. 2d at 337 (quoting Lister, 72 Wis. 2d at 301) (emphasis added). "To determine whether a written law or policy establishes a ministerial duty, [courts] look to the language of the writing to determine whether the duty is 'expressed so clearly and precisely, so as to eliminate the [] exercise of discretion.'" Moretto, 2015 Wisc. App. LEXIS 524, at *6 (quoting Pries, 326 Wis. 2d at 55). "A government entity may have a mandatory duty but still have discretion or judgment in the time, place, or manner in which that duty is to be performed. Thus, mandatory and ministerial are neither synonymous nor mutually exclusive. They are simply different concepts that pertain to different legal issues…" Id. at *13-14. Assuming, _arguendo_, that these Defendants had a duty to Swayzer, there is no writing that removed their "discretion or

60

judgment in the time, place, or manner in which that duty is to be performed."  As such, Officer Love, Lt. Andrykowski, Officer Cunningham, Officer Avery, Officer Adams, and Officer Witkowiak are immune to Plaintiffs' state law claims.

### 3. The Estate's Wrongful Death Claim Fails for Lack of Causation

As noted in Defendants' Joint Brief (Doc. No. 301), "[w]rongful death actions are derivative tort actions." Christ v. Exxon Mobil Corp., 2015 WI 58, ¶ 22, 362 Wis. 2d 668, 866 N.W.2d 602 (Wis. 2015).  Although the "statute creates a 'new action' … the person's right of action depends not only upon the death of another person but also upon that other person's entitlement to maintain an action and recover if [her] death had not occurred." Id.  A decedent must have had a valid claim for damages against a defendant at the time of death for a wrongful death claim to exist.  Id., ¶ 23.  The statute merely "permits the representative of a deceased to maintain an action the deceased could have maintained had he or she lived." Tesar v. Anderson, 2010 WI App 116, ¶ 34, 329 Wis. 2d 240, 789 N.W.2d 351 (Wis. Ct. App. 2010).

The Estate's claim must be dismissed for the reasons set forth in Section IV. A., supra, and the Defendants' Joint Brief (Doc. No. 301).  There is no credible medical evidence that the child was not stillborn and no credible medical evidence that a County Defendant's conduct caused the child's stillbirth.  Assuming, hypothetically, that the child was not stillborn, there is no verifying medical evidence that a delay in medical treatment caused her to pass.

### 4. Plaintiffs' Negligence Claims Fail for Lack of Proof of Causation.

Plaintiffs asserts state law negligence claims against Officer Love, Lt. Andrykowski, Officer Cunningham, Officer Avery, Officer Adams, and Officer Witkowiak based on a multitude of alleged failings.  See Pls.' Fourth Am. Compl. (Doc. No. 313), ¶¶ 159-164.  Negligence requires "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury."

61

<u>Antwaun A. v. Heritage Mut. Ins. Co.</u>, 228 Wis. 2d 44, 55, 596 N.W.2d 456, 461 (Wis. 1999). While "everyone owes a duty to the world at large, the duty owed to the world is not unlimited but rather is restricted to what is reasonable under the circumstances." <u>Hocking v. City of Dodgeville</u>, 318 Wis. 2d 681, 690, 768 N.W.2d 552 (Wis. 2009).  As explained above, Plaintiffs have no evidence that these Defendants caused harm to any of the Plaintiffs.  On that basis alone, the negligence claims against them must be dismissed, with prejudice.

## V.      **CONCLUSION**

Based on the foregoing, Defendants Milwaukee County, Kimberly Witkowiak, Keziah Love, Terina Cunningham, Jeff Andrykowski, Amika Avery, Deirdra Adams, and Wisconsin County Mutual Insurance Company respectfully request that this Court enter an Order granting summary judgment in favor of these Defendants and against Plaintiffs, *with prejudice*, in accordance with Federal Rule of Civil Procedure 56.


Respectfully submitted,

**LEIB KNOTT GAYNOR LLC**


Dated: <u>August 19, 2019</u>            By: <u>/s/ *Douglas S. Knott*           </u>
                                Douglas S. Knott, SBN 1001600
                                Charles R. Starnes, SBN 1113293
                                Attorneys for County Defendants
                                219 N. Milwaukee Street, Suite 710
                                Milwaukee, WI 53202
                                Telephone: (414) 276-2102
                                Fax: (414) 276-2140
                                Email: dknott@lkglaw.net
                                         cstarnes@lkglaw.net

62