# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

THE ESTATE OF LALIAH SWAYZER;     )
SHADE SWAYZER; DIANE RUFFIN; and     )
CHARLENE RUFFIN,     )
     )
     Plaintiffs,     )
     )
v.     )     Case No.:     16-CV-1703
     )
DAVID J. CLARKE JR; et al.     )
     )
     Defendants.     )

---

## Defendants Gulsen, White, and Meine's Memorandum of Law in Support of Their Motion for Summary Judgment

Defendants, Dr. Gulsen, Dr. White, and Nurse Katherine Meine[1], by their undersigned counsel, provide the following memorandum of law in support of their motion for summary judgment:[2]

---

[1] RN Porlucas previously moved for summary judgment (ECF 126–132, 156–159, 163–166), and rests upon the grounds set forth in that briefing. To the extent that Plaintiff argued that additional discovery was needed as to RN Porlucas, Defendants point out that Plaintiff's medical expert, Dr. Vassallo, had no criticism of Porlucas in her report. Plaintiff's correctional expert, Mr. Ryan, agreed that he did not have any medical training and was not offering a medical opinion. (J. PFOF ¶ 69).

[2] As these Defendants have joined in the previously-filed joint summary judgment on causation (ECF No. 300–06), they do not address causation in this memorandum, but believe that summary judgment is additionally warranted based upon the arguments forwarded in that motion. These Defendants have included a supplemental statement of facts that add onto those provided with Defendants' joint summary judgment motion on causation, and will refer to their supplemental statement of facts as "GWM Add'l PSOF" with the initial statement of proposed facts as "J. PFOF."

Case 2:16-cv-01703-PP-WED   Filed 08/20/19   Page 1 of 28   Document 383

# I.   INTRODUCTION

Plaintiffs have asserted a single deliberate indifference claim against these Defendants. *See* Dkt. 313, at 26 (Section 1983 claim against "All Defendants"). Their theory of Plaintiffs' case is this: there was an unfortunate medical outcome in the Milwaukee County Jail, so medical providers at the Jail must have been deliberately indifferent.

However, the competent evidence in this case reveals that these Defendants provided (or, in the face of Ms. Swayzer's repeated refusals, attempted to provide) more than adequate medical care to Ms. Swayzer during the period of incarceration at issue. The competent evidence in this case makes clear that Ms. Swayzer had the capability and capacity to direct (or refuse) the care offered to her and her pregnancy. Ms. Swayzer decided to refuse care and did not alert these Defendants to any issues regarding her pregnancy. The actions of these Defendants were far and away from anything that could be considered deliberate indifference. As a result, this Court must award summary judgment in favor of these Defendants.

# II.   STANDARD OF REVIEW

## II.A   General Considerations

 Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The entry of summary judgment is not "a disfavored procedural shortcut, but rather an integral part of the Federal Rules

as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing FED. R. CIV. P. 1). "Summary judgment is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgment must be granted." *Jones v. Johnson*, 26 F.3d 727, 728 (7th Cir. 1994); *see also Celotex*, 477 U.S. at 322.

When reviewing motion for summary judgment, this Court views the evidence and draws all reasonable inferences in light most favorable to the non-movant. *Walker v. Northeast Reg'l Commuter R.R. Corp.*, 225 F.3d 895, 897 (7th Cir. 2000). That does not mean that this Court is "required to draw every requested inference" but rather "only reasonable ones that are supported by the record." *Omnicare v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Furthermore, the non-movant cannot rely on ambiguous evidence, conclusory allegations, or the hope that supporting evidence may turn up to resist a motion for summary judgment. *See Nowak v. St. Rita High Sch.,* 142 F.3d 999, 1002 (7th Cir. 1998). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Anderson*, 477 U.S. at 252.

Additionally, the non-movant's failure to present proof on an essential element of his case necessarily renders all other facts immaterial. *Celotex*, 447 U.S. at 322–23. In short, summary judgment requires the non-movant to "put up or shut up." *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012).

### II.B.  Specific Considerations with Respect to Plaintiff's Deliberate Indifference Claim.

Plaintiff forwards only a Section 1983 deliberate indifference claim

against these Defendants. (ECF 146, at 23). The Seventh Circuit found that Fourteenth Amendment standards applied to a pre-trial detainee's claim for medical deliberate indifference. *See generally Miranda*, 900 F.3d 335 (7th Cir. 2018). However, in this case, Ms. Swayzer was arrested for a violation of her probation. *See* (GWM Add'l PSOF ¶ 84). As such, it is still the Eighth Amendment, not the Fourteenth, that applies in this case, as Ms. Swayzer's probation was "'following conviction.'" *E.g.*, *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017*); Lopez v. City of Chicago*, 464 F.3d 711, 718–19 (7th Cir. 2006).

To present a viable Eighth Amendment claim, Plaintiffs must demonstrate that Ms. Swayzer had an objectively serious medical condition, and that these Defendants were subjectively aware of—and consciously disregarded—a risk to her health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (emphasis added). Liability is individual and predicated upon an individual's own actions. *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009).

Deliberate indifference also requires a culpable state of mind, akin to criminal recklessness. *Norfleet v. Webster,* 439 F.3d 392, 397 (7th Cir. 2006) (emphasis added). Mere negligence, or even gross negligence, does not constitute deliberate indifference. *Archie v. City of Racine,* 847 F.2d 1211, 1219 (7th Cir. 1988). The showing is, rather, "'something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks.'" *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (citations omitted). "It is not enough that there was a danger of

Case 2:16-cv-01703-PP-WED   Filed 08/20/19   Page 4 of 28   Document 383

which a prison official objectively should have been aware. **'The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference.***"** *Estate of Novack v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (emphases added) (citation omitted).

Accordingly, a claim of deliberate indifference cannot survive summary judgment unless a litigant can present **competent** evidence that a medical professional's treatment decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). Indeed, in *Whiting v. Wexford*, the Seventh Circuit found that a plaintiff's lack of supporting expert testimony was considered fatal to his claim that medical personnel were deliberate indifferent to his medical needs. *Whiting*, 839 F.3d 658, 664 (7th Cir. 2016) ("Whiting doesn't have any expert testimony indicating that Dr. David's infection diagnosis and concomitant treatment plan departed from accepted medical practice, much less substantially so.") (emphases in original).

## III.    DISCUSSION

### III.A.        Plaintiff has failed to present a viable claim against Dr. White.

Dr. White did not directly treat Ms. Swazyer. (GWM Add'l PSOF ¶ 85). Dr. White's only direct involvement was a telephone call from Dr. Horton concerning

Ms. Swayzer's placement in the Special Needs Unit. (GWM Add'l PSOF ¶ 86). The interaction between Dr. White and Dr. Horton was a professional courtesy. (GWM Add'l PSOF ¶ 86). Dr. White was never made aware of any acute issues pertaining to Ms. Swayzer. (GWMP Add'l PSOF ¶ 85). And, while Dr. White was not aware that Ms. Swayzer was subsequently transferred from the Special Needs Unit to Unit 4A of the Jail, Dr. White agreed that Ms. Swayzer's subsequent placement in Unit 4A would not have detrimentally affected the care provided to her. (GWM Add'l PSOF ¶ 87). And, in fact, placement on Unit 4A did not ultimately impact the mental or medical care provided to Ms. Swayzer. (GWM Add'l PSOF ¶ 87).

As noted above, Section 1983 claims are premised upon individual liability. *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009). Plaintiffs have provided no cognizable basis that Dr. White was somehow deliberately indifferent in concurring with the placement of Ms. Swayzer in the Special Needs Unit. Though Plaintiffs attempt to take issue with subsequent treatment or placement decisions, attempting to impute liability on Dr. White is an attempt to establish liability impermissibly through a *respondeat superior* theory.

To the extent that Plaintiffs have attempted to impute individual liability on Dr. White for an alleged failure to supervise, they have provided no competent basis for doing so. Plaintiffs are not psychologists, nor mental health directors at any jail facility. Plaintiff's expert, Dr. Vassallo, is an emergency room physician, and has never worked inside a jail or prison, much less in a capacity of a mental health director at a county jail. (J. PFOF 71); (GWM Add'l PSOF ¶ 124). Dr. Vassallo

readily agreed that she would not provide day-to-day treatment to psychiatric patients outside of the emergency department, and would defer to a psychiatric consultant for mentally ill patients in the emergency room. (GWMP Addl'l PSOF at ¶¶ 125, 130).

Dr. White's name appears exactly twice in Dr. Vassallo's report. (GWMP Add'l PSOF ¶ 122). Specifically, Dr. Vassallo's report attempts to assert—without any support—that Dr. White was aware of a note written by Ms. Meine, and that Dr. White herself failed to manage Ms. Swayzer's mental health care. (GWMP Add'l PSOF at Exh 3 p. 6 & 12). These conclusions are rendered without any explanation or citation to underlying data or methodologies, and fail to meet the standards of the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

The Federal Rules of Civil Procedure and relevant case law is exceedingly clear that an independent expert's report needs to lay out, explicitly, all opinions the expert holds, the methodology used to generate those opinions, and the facts to which the expert applied the methodology. Fed. R. Civ. P. 26(a)(2)(B)(i) ("The report must contain: (i) a complete statement of all opinions….") (emphasis added). "[E]xpert reports cannot be 'sketchy, vague, or preliminary in nature'" and must be sufficiently complete "'so as to shorten or decrease the need for expert depositions and thus to conserve resources.'" *Chappel v. SBC-Ameritech*, No. 05 C 7003, 2007 U.S. Dist. LEXIS 51133, at *3 (N.D. Ill. July 13, 2007) (citing *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). Broad statements and vague referrals simply do not cut it. *Id.* at *8. Neither does the failure to identify

specific facts or data considered by the expert with each proffered opinion. *See*

*Siburt v. U.S. Bank*, No. 10-C-135, 2011 U.S. Dist. LEXIS 94531, at *11-13 (E.D.

Wis. Aug. 23, 2011). "Talking off the cuff—deploying neither data nor analysis—is

not an acceptable methodology." *Lang v. Kohl's Food Stores*, 217 F.3d 919, 924 (7th

Cir. 2004). Additionally, a party cannot rely upon an expert's subsequent

deposition testimony as a vehicle to provide information or opinions that should

have been included in the initial report. *Lexington Ins. Co. v. Horace Mann Ins.*

*Co.*, N.D. Ill. No. 11-C-2352, 2015 U.S. Dist. LEXIS 120061, at *27 (N.D. Ill.

August 27, 2015).

   While Dr. Vassallo's deposition was an impermissible tool to supplement her

insufficient report, the deposition was largely an exercise in the same. Dr. Vassallo

agreed that she did not read Dr. White's deposition testimony and agreed that it

would have provided her with insight into Dr. White's involvement with the patient.

(GWM Add'l PSOF ¶ 123). It was apparent that Dr. Vassallo was talking "off the

cuff" with respect to Dr. White's involvement and care in this case. She admitted at

her deposition that she would defer to mental health providers in her job and let

slip that she had not reviewed any literature with respect to Dr. White or her role

as a mental health director. (GWM Add'l PSOF ¶ 127). Her report and subsequent

deposition is the very type of "sketchy, vague [and] preliminary" abstractions that

Rule 26 is designed to avoid.

   "Many times we have emphasized that experts' work is admissible only to the

extent it is reasoned, uses the methods of the discipline, and is founded on data."

*Higgins v. Koch Development Corp.*, 794 F.3d 697, 705 (7th Cir. 2015) (upholding District Court's finding that physician expert was unqualified and granting summary judgment). Dr. Vassallo's opinion fails all three criteria. Her assertions are revealed to be also exercises in speculation, which are insufficient to be deemed relevant, admissible evidence. As such, this Court should disregard Plaintiffs' attempt to use Dr. Vassallo to muddy the waters.

Rather, as will be explained further below—and in the other summary judgment motions filed by the defendants—Ms. Swayzer received appropriate psychological care while in the mental health facility. While previously diagnosed with psychiatric conditions, Ms. Swayzer was demonstrably competent (as confirmed both by jail providers as well as providers from third-party hospitals) and able to direct her own care. Ms. Swayzer was adequately followed by mental health staff, who abided by Ms. Swayzer's wishes to remain unmedicated while she was pregnant. This was not only a decision that was within her purview as an autonomous patient, but a reasonable one given her competency and concerns with pregnancies and drug interactions. Ms. Swayzer continued to have the capacity and knowledge to request care if she required throughout her period of incarceration. (GWM Add'l PSOF ¶ 134), and the treatment offered by mental health staff at the facility was within the standard of care. (GWM Add'l PSOF ¶ 135). Given that, and given Dr. White's limited role in this case, Plaintiffs have provided no competent,

articulable evidence that Dr. White was deliberately indifferent to Ms. Swayzer. Summary judgment is undeniably warranted in Dr. White's favor.[3]

### III.B. Plaintiff has failed to present a viable deliberate indifference claim against Nurse Katherine Meine.

Certified Nurse Midwife Katherine Meine attempted on several occasions to assess and care for Ms. Swayzer's and her pregnancy; after several refusals, Ms. Meine referred Ms. Swayzer to an outside provider as an alternative attempt to deliver care. Plaintiffs allege that Ms. Meine was somehow deliberately indifferent through these efforts. Before turning to Ms. Meine's attempts to deliver care to Ms. Swayzer, a background discussion of Ms. Swayzer's pregnancy and mental health status is important.

### III.B.1. *Background regarding Ms. Swayzer's pregnancy and applicable standard of care*

Ms. Swayzer was arrested on July 6, 2016; as she was pregnant, she was sent to Columbia St. Mary's Hospital for medical clearance. (J. PFOF ¶ 5).

At the time that Ms. Swayzer was arrested, she was approximately 36 weeks pregnant (GWM Add'l PSOF ¶ 88). Ms. Swayzer had previously (and successfully) borne two children to term. (GWM Add'l PSOF ¶ 89). Ms. Swayzer had previously presented to medical providers at Aurora Health Care in June 2016 due to concerns that she had regarding her pregnancy. (GWM Add'l PSOF ¶ 90). Ms. Swayzer's

---

[3] To the extent that Plaintiffs attempt to raise a deliberate indifference count against Dr. White in Count II, that claim should also fail. Count II is a *Monell* claim, which, as Dr. Horton has aptly pointed out, cannot be asserted against an official personally, but rather against the corporate defendant. *E.g., Kentucky v. Graham*, 473 U.S. 159, 163 (1985) (*Monell* claim is not brought against individual officer); *see also generally* ECF No. 343 at 23–27 (Dr. Horton's Memorandum in Support of Summary Judgment, providing additional supporting examples).

Case 2:16-cv-01703-PP-WED    Filed 08/20/19    Page 10 of 28    Document 383

concerns were determined to be unfounded, and she was observed to have a stable pregnancy. (GWM Add'l PSOF ¶ 92). On June 26, 2016, Ms. Swayzer was provided discharge information that advised her to contact medical professionals if adverse or warning signs arose. (GWM Add'l PSOF ¶ 92). Ms. Swayzer also advised providers at Aurora Health Care that while she had been provided the medication risperidone for her mental health, she had stopped taking it, and that decision was approved by her behavioral health provider. (GWM Add'l PSOF ¶ 92).

After her arrest and transport to Columbia St. Mary's Hospital on July 6th, Ms. Swayzer initially refused to provide answers to providers at the Hospital, and also refused fetal monitoring. (GWM Add'l PSOF ¶ 93). Ms. Swayzer's decision to refuse assessment and care was accepted and allowed by the providers at Columbia St. Mary's. (GWM Add'l PSOF ¶ 94). Ultimately, Ms. Swayzer decided to allow monitoring, which demonstrated that her pregnancy still continued to proceed normally. (GWM Add'l PSOF ¶ 95).

The national standard for pregnancies like Ms. Swayzer's is a preventative checkup once a week. (J. PFOF ¶ 15); (GWM Add'l PSOF ¶ 96). The check-up is to check fetal heart rate, examine the size of the uterus, and take a subjective history from the patient regarding any developments that the patient may have noticed during the interim. (GWM Add'l PSOF ¶ 97). The standard of care allows for flexibility on the weekly checkups, and the check-ups are not considered acute, urgent, or emergent situations. (GWM Add'l PSOF ¶ 98). The standard of care does not require that fetal vital signs, or provider observation, must be provided daily. (J.

PFOF ¶ 15). The patient's involvement and cooperation play a large role to advise providers of changes or conditions in their pregnancy, and it is the patient's own decision to determine whether they want to seek provider examination or intervention. (GWM Add'l PSOF ¶ 99).

> ### III.B.2. *Background regarding Ms. Swayzer's mental health history and applicable standard of care.*

Ms. Swayzer had a mental health history of schizophrenia (paranoid type) at the time of her incarceration in July 2016. (GWM Add'l PSOF 100). Females with schizophrenia may have episodes of psychosis, but many women with schizophrenia go into remission and do not require medications for long periods of time. (GWM Add'l PSOF 101). In Ms. Swayzer's case, her mental health diagnoses did not render her incompetent to make decisions concerning her care or with respect to her pregnancy. (GWM Add'l PSOF ¶ 102).

Indeed, immediately prior to her incarceration, Ms. Swayzer demonstrated sufficient capacity to advocate and make decisions for her medical and mental health care—decisions which were respected by outside providers. (GWM Add'l PSOF ¶ 103). Ms. Swayzer made an articulated decision not to take antipsychotic medication because of potential harm to her child, a decision that is echoed by many pregnant females with schizophrenia. (GWM Add'l PSOF at ¶ 104–05). In such instances, without an active showing of psychosis or incompetency, allowance of a pregnant female with schizophrenia to refuse antipsychotic medication is acceptable and in accordance with best medical practices. (GWM Add'l PSOF at ¶ 106).

During her incarceration at the Milwaukee County Jail, Ms. Swayzer demonstrated the ability to make autonomous decisions concerning herself and her pregnancy. (GWM Add'l PSOF at 107). On July 6, 2016, Ms. Swayzer was seen by PSW Camarata and was observed to be alert and oriented at this time, agreeable, cooperative, coherent with logical thought processes, and stable for general population. (J. PFOF ¶ 12). On July 7, Ms. Swayzer was seen by RN Fred Porlucas, who also observed her to be cooperative, responsive, and coherent. (J. PFOF ¶ 13).

On July 8th, Ms. Swayzer was seen by psychiatrist Dr. Negrette. (J. PFOF ¶ 25). Ms. Swayzer was pleasant and calm, and there was no overt evidence of psychosis, mania or manic behaviors. (J. PFOF ¶ 25). She was linear and goal directed, and denied psychotic symptoms, denied hearing things, and denied thought disorder symptoms. (J. PFOF ¶ 25). Ms. Swayzer had no acute mental health symptoms on July 8, 2016 and Dr. Negrette's plan was to follow up as needed while she remained in custody. (J. PFOF ¶ 31). Ms. Swayzer was also seen by PSW Kristen Rector on July 8th, and was coherent and had logical thought processes. (Dkt. 303-1 at 49). On July 13, 2016, Ms. Swayzer was subsequently seen by Case Manager Rebecca Goss. (J. PFOF ¶ 43). Ms. Goss noted that Ms. Swayzer was alert, able to communicate, and did not advise of any case management needs—Ms. Swayzer was also advised of how to access mental health services. (J. PFOF ¶ 43). Ms. Swayzer was later seen on July 13th by Mental Health Clinician Steven Schmid. (J. PFOF ¶ 44). Ms. Swayzer was observed to be alert and oriented, and laying on her bunk reading; she denied any need for mental health intervention. (J.

PFOF ¶ 44). There was no showing that Ms. Swayzer was acutely psychotic at any point in time prior to her delivery on July 14th. And—putting aside the insufficiencies of her report—Dr. Vassallo admitted that she could not determine if Ms. Swayzer was actively psychotic within the Milwaukee County Jail. (GWM Add'l PSOF ¶ 126). For her part, Ms. Swayzer agreed that she was "with it" while she was in the jail. (GWM Add'l PSOF ¶ 108). All competent evidence demonstrates that Ms. Swayzer continued to demonstrate the capacity and capability to make treatment decisions for herself and her pregnancy, and to advocate for her needs if necessary.

*III.B.3 Nurse Meine unquestionably attempted to provide Ms. Swayzer with appropriate prenatal care and was not deliberately indifferent to Ms. Swayzer's needs.*

The foregoing backdrop serves to highlight Nurse Meine's provision of reasonable and competent care to Ms. Swayzer during her period of incarceration in July 2016.

A recitation of Ms. Meine's care shows repeated attempts to assist Ms. Swayzer with her pregnancy.

On July 7, 2016, Ms. Meine met with Ms. Swayzer and Ms. Swayzer informed Meine that she was 8 months pregnant and due in the middle of August 2016; this meant Shade was either 35 or 36-weeks pregnant. (J. PFOF ¶ 14). Ms. Swayzer informed Ms. Meine that the baby was fine and moving, that she was receiving prenatal care, and denied any contractions, leaking, or bleeding. (J. PFOF ¶ 16).

However, Ms. Swayzer refused to allow Ms. Meine to perform a physical prenatal assessment, including taking vital signs or observing the baby's fetal heart tones, and refused to sign a form documenting her refusal. (J. PFOF ¶ 17). Ms.

Meine documented the refusal and had a witness to the refusal. (J. PFOF ¶ 17). Ms. Meine informed Ms. Swayzer of preterm labor precautions and the risks of refusing the physical evaluation including stillbirth, death, long-term disability, preterm birth, or other complications causing damage or death to Ms. Swayzer or the baby. (J. PFOF ¶ 18). Ms. Meine also informed Ms. Swayzer to report contractions occurring every ten minutes for more than an hour, or any leaking, fluids, bleeding that she could not explain, or if Ms. Swayzer did not feel the baby move for more than a couple of hours. (J. PFOF ¶ 19). Indeed, Ms. Swayzer had previously demonstrated this knowledge and ability when she decided to seek help at Aurora Health for potential complications of her pregnancy. (GWM Add'l PSOF ¶ 90).

Ms. Meine further informed Ms. Swayzer that if she had complications such as contractions, bleeding, leaking fluids, the baby not moving—and if she reported them to the healthcare staff—she would be sent out of the Jail for an appointment with an outside provider. (J. PFOF ¶ 20). In doing so, Ms. Meine was aware that Ms. Swayzer had been assessed the day before at Columbia St. Mary's. (J. PFOF ¶ 21). Based upon her limited assessment and knowledge of prior medical history, Ms. Meine determined that Ms. Swayzer was not experiencing any acute obstetric issues that required immediate or emergent care on July 7, 2016. (J. PFOF ¶ 24; GWM Add'l PSOF ¶ 112).

Ms. Meine came up with a treatment plan for Shade: to be seen once a week given the gestational age of Shade's baby, and for an evaluation by Mental Health. (J. PFOF ¶ 22). Ms. Meine also asked for an expedited acquisition of Ms. Swayzer's

medical records, which confirmed the treatment plan. (J. PFOF ¶ 23). As noted above, Ms. Swayzer was subsequently seen by Dr. Negrette the next day (July 8th) and was observed to be linear and goal directed and without acute mental health needs. (J. PFOF ¶ 25–26). Ms. Swayzer was seen by Nurse Karen Gray on July 8th as well, and Ms. Swayzer refused Nurse Gray's attempt at a physical assessment and fetal heart tone check. (J. PFOF ¶ 32). Ms. Swayzer also refused to be seen by Dr. Gulsen on July 8th. (J. PFOF ¶ 33).

Ms. Meine's next encounter with Ms. Swayzer occurred on July 11th. (J. PFOF ¶ 35). At that time, Ms. Swayzer informed Meine that her baby was fine and moving, and she denied that she was having contractions, leaking, or bleeding. (J. PFOF ¶ 35). Ms. Swayzer again refused to allow Ms. Meine to perform a physical exam or listen to the baby's fetal heart tones. (J. PFOF ¶ 35). Ms. Meine repeated the labor precautions and instructions she had previously provided Ms. Swayzer, including the need to report contractions, leaking, bleeding, or the baby not moving, and that by not getting a physical examination it could mean they missed something regarding the baby. (J. PFOF ¶ 36). Based upon Ms. Swayzer's statements and her own observations, Ms. Meine again determined that Ms. Swayzer was not experiencing obstetric complications. (J. PFOF ¶ 37; GWM Add'l PSOF ¶ 113).

Ms. Meine then consulted with Dr. Horton concerning Ms. Swayzer's refusals of care. (J. PFOF ¶ 38). They agreed to arrange for an outside referral for a further checkup within one week's time, to see if Ms. Swayzer would be receptive to another

provider. (J. PFOF ¶ 38). Ms. Meine also contacted Dr. Negrette to ensure that Dr. Negrette was aware that Ms. Swayzer was still in the facility for purposes of follow up. (GWM Add'l PSOF ¶ 114). Ms. Meine was never aware of any obstetrical complications with respect to Ms. Swayzer prior to the July 14th delivery. (GWMP Add'l PSOF ¶ 115). And, while Ms. Swayzer was located on Unit 4A for parts of her incarceration, Ms. Meine was not impacted in the delivery of care to Ms. Swayzer.

Ms. Meine's efforts were anything but deliberately indifferent.

The foregoing, in combination with the efforts of other medical providers as discussed here and in Defendants' joint motion on causation, demonstrates that Ms. Meine and other providers at Milwaukee County Jail were acting responsibly and professionally when interacting with Ms. Swayzer and her pregnancy. To try and overcome this reality, Plaintiffs have attempted to forward expert opinion from Dr. Vassallo concerning Ms. Meine's care. However, Dr. Vassallo's opinion leaves much to be desired, and should be disregarded by the Court. *E.g., Higgins*, 794 F.3d at 705 (7th Cir. 2015).

As an initial matter, Dr. Vassallo admitted during her deposition that she is not competent to opine on the standard of care for day-to-day obstetrical care—she would defer to a midwife (such as Ms. Meine) or an obstetrician with respect to such issues. (GWM Add'l PSOF ¶ 130). Dr. Vassallo admitted during her deposition that she was not familiar with American College of Obstetrician and Gynecologist ("ACOG") guidelines for pregnancy and did not do any research to apprise herself of the standards for pregnant women at Ms. Swayzer's pregnancy stage, including

standards for follow-up with respect to those individuals. (GWM Add'l PSOF ¶ 131).
Indeed, Dr. Vassallo's report offers no methodology or thought process to support
the inflammatory and conclusory allegations that she levels against Ms. Meine.
Rather, Dr. Vassallo claimed during her deposition that she was relying on
"common sense" to critique Ms. Meine's care. (GWM Add'l PSOF ¶ 132). This
reality, in and of itself, vitiates Dr. Vassallo's ability to competently articulate an
expert opinion respect to Ms. Swayzer's obstetrical care.

Furthermore, Dr. Vassallo's critique is based upon Ms. Swayzer's supposed
mental illness. *Id.* Dr. Vassallo's contentions are unsupported by the record. First,
as previously discussed, Dr. Vassallo deferred day-to-day physiatric treatment to
psychiatrists, such as Dr. Negrette. Second, as previously noted, Dr. Vassallo was
unable at her deposition to back up her assertion that Ms. Swayzer was psychotic
and unable to engage in decision-making for herself. Dr. Vassallo also could not
articulate the applicable guidelines concerning follow-up care that would apply to
Ms. Swayzer's stage of pregnancy. Once again, Dr. Vassallo's opinion was revealed
to be a vague, sketchy, off-the-cuff diatribe that the federal courts have singularly
rejected as appropriate expert commentary. *Lang*, 217 F.3d at 924 (7th Cir. 2004).

In any event, Dr. Vassallo's testimony is insufficient to allow Plaintiffs to
proceed forward. Under the Eighth Amendment, "medical professionals . . . are
entitled to deference in treatment decisions unless **no** minimally competent medical
professional would have so responded under the circumstances at issue." *McGee v.*
*Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (emphasis added). "A difference of opinion

as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (emphasis added). At most, Plaintiffs have presented a disagreement as to the care that Ms. Meine provided or attempted to provide to Ms. Swayzer.

As noted above, mental health providers and expert witnesses have confirmed that Ms. Swayzer was competent and able to accept or refuse care during the period at issue. *See supra*. Similarly, multiple experts have agreed that medical personnel at Milwaukee County Jail were right to accept Ms. Swayzer's decisions to refuse care. (GWM Add'l PSOF ¶ 136, 138, 145).

Specifically, Dr. Edwards, a Professor at the University of Oklahoma's College of Medicine and Chief of the University of Oklahoma's Section of Maternal–Fetal Medicine, opined that, given 1.) Ms. Swayzer's statements to providers, 2.) Ms. Swayzer's demonstrated ability to advocate for her care, and 3.) outward presentation as an uncomplicated 37-week pregnancy meant that A.) Ms. Meine's attempts to provide once-weekly checks was appropriate, as was B.) her acceptance of Ms. Swayzer's decisions to refuse, and C.) her ultimate attempt to refer Ms. Swayzer to an outside provider. (GWM Add'l PSOF ¶ 139). Dr. Vanjani, a board-certified Obstetrician and Gynecologist who has provided service to incarcerated pregnant females, also concurred with Dr. Edwards's opinion that one-week checks were warranted, that Ms. Swayzer had the right to refuse care, and that providers appropriately attempted to provide care on multiple instances. (GWM Add'l PSOF 146–148). In fact, Dr. Vanjani noted that the providers at the Jail "made great

efforts to provide prenatal care to Ms. Swayzer" and **"went above the community standard to try to provide prenatal care to Ms. Swayzer."** (GWM Add'l PSOF at ¶¶ 147–148). Plaintiffs did not rebut the opinions presented by Professor Edwards and Dr. Vanjani. (J. PFOF at 84). Plaintiffs cannot dispute that, extending all potential credit to Dr. Vassallo, the situation before this court, is at most a dispute over medical judgment. This is insufficient for a deliberate indifference claim. *Garvin*, 236 F.3d at 898 (7th Cir. 2001)

Plaintiffs' contentions slip further away when reviewing applicable case law concerning the context of this case. As this Court is aware, Ms. Swayzer was "not entitled to demand specific care" under the Eighth Amendment. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). And, medical professionals cannot be deliberately indifferent under the Eighth Amendment where the patient has decided to refuse care. *E.g.*, *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006); *Blankenship v. Birch*, 590 Fed App'x 629, 633 (7th Cir. 2014). Here, there is documented evidence by providers of Ms. Swayzer's repeated decisions to refuse care—and it was her right to do so. However, her decision to refuse care vitiates her ability to now claim, in hindsight, that medical providers should have done something differently. Thus, Ms. Meine's multiple attempts to see Ms. Swayzer and her attempt to try an alternative provider not only went above the community standards, they well exceeded Eighth Amendment requirements in the situation.

While Defendants have pursued a dispositive motion on causation, some additional discussion is warranted with respect to Ms. Meine. Since Plaintiffs have

no articulated theory as to how Ms. Swayzer's child passed away, they also axiomatically have no articulated theory as to how Ms. Meine's conduct proximately caused such an outcome. This is extremely important, not just with respect to proximate cause generally, but especially in respect to the practice of medicine. As the Seventh Circuit has noted, "[p]hysicians do not practice with a crystal ball in hand." *Sanville v. McCaughtry*, 266 F.3d 724, 736 (7th Cir. 2001).

Professor Edwards and Drs. Hanus and Dr. Vanjani have articulated that Ms. Swayzer presented to Ms. Meine as an uncomplicated 36-week pregnant female with the capacity to advocate and refuse care as she saw fit. Ms. Swayzer did not advise, nor did Ms. Meine observe, any obstetrical complications which would require deviation from the standard of care. As previously noted, the standard of care for Ms. Swayzer indicated once-weekly check-ups of a non-urgent, non-emergent nature. Ms. Swayzer was seen multiple times within that one-week period and did not complain of complications, nor did she contact medical providers before the delivery to advise them of potential issues. Accordingly, both Professor Edwards and Dr. Vanjani have opined that, based upon the presentation of Ms. Swayzer to staff at Milwaukee County Jail, there was no reasonable basis for providers to have been aware of a complication. (GWM Add'l PSOF ¶ 140, 141, 149). Obstetric care is reliant upon the mother's compliance and cooperation to detect potential complications. Even had Ms. Swayzer allowed assessments or advised of a chance in her pregnancy, it is unknown whether intervention could have occurred and been successful in this case. (GWM Add'l PSOF ¶ 11, 143, 150). Not only does this

militate against a deliberate indifference claim in the first place, but it also means that Plaintiffs accordingly unable to develop a competent proximate cause theory with respect to Ms. Meine. *Estate of Novack*, 226 F.3d at 529 (7th Cir. 2000) ("'The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.") (citation omitted). In other words, since Plaintiffs are unable to articulate the cause of death, how are they able to articulate a causal nexus of that death with respect to any provider? Summary judgment must accordingly be warranted. *Whitlock v. Brueggeman*, 682 F.3d 567, 582 (7th Cir. 2012) ("'Just as there is no common law tort without injury, there is no constitutional tort without injury."); *see also e.g.*, *Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000) (granting summary judgment for defendants where inmate could only speculate that refusals to provide treatment caused injury).

### III.C. Dr. Gulsen likewise unquestionably attempted to provide Ms. Swayzer with appropriate prenatal care and was not deliberately indifferent to Ms. Swayzer's needs.

Dr. Gulsen's attempt to meet with and assess Ms. Swayzer overlapped attempts by other providers to also engage with Ms. Swayzer. On July 8, 2016, Dr. Gulsen attempted to conduct an exam of Ms. Swayzer, but, as with other providers, was rebuffed. (J. PFOF ¶ 33). At the time, Dr. Gulsen had reviewed prior notes from Nurse Meine, other mental health providers, and prior hospital records. (J. PFOF ¶ 34). Dr. Gulsen was also aware that the standard of care indicated weekly visits for pregnant patients at Ms. Swayzer's stage of pregnancy. (J. PFOF ¶ 34). As Ms.

Swayzer appeared stable, and had the right to refuse care, Dr. Gulsen was not concerned about Ms. Swayzer's refusal. (J. PFOF ¶ 33).

Dr. Gulsen attempted to assess Ms. Swayzer on July 12th. (J. PFOF ¶ 40). Ms. Swayzer again refused an examination. (J. PFOF ¶ 40). Dr. Gulsen advised Ms. Swayzer of the potential consequences with respect to refusal, and Ms. Swayzer responded with, "I know, I know. I don't need to see you. I am ok. I know myself and my baby." (J. PFOF ¶ 40). Ms. Swayzer advised Dr. Gulsen that her baby was moving. (J. PFOF ¶ 40). Ms. Swayzer refused to allow Dr. Gulsen to further assess her and refused to sign a refusal of treatment form. (J. PFOF ¶ 40). As Ms. Swayzer advised Dr. Gulsen that the baby was moving, and did not provide any concerns or complications regarding her pregnancy, Dr. Gulsen believed that Ms. Swayzer was stable. (J. PFOF ¶ 60). Dr. Gulsen was also aware that, by the time she had seen Ms. Swayzer on July 12th, she had been recommended for an outside referral. (J. PFOF ¶ 42).

On July 13th, Dr. Gulsen again intended on seeing Ms. Swayzer as per Dr. Horton's request. (GWM Add'l PSOF ¶ 118). Unfortunately, as part of her duties, Dr. Gulsen was called to assist with other patients on that particular day and was unable to round on Ms. Swayzer. (GWM Add'l PSOF ¶ 119). While Dr. Gulsen does not recall the particular instances that occurred on July 13th, she noted that there are a number of unanticipated events that can occur in a jail on a daily basis, such as fights, withdrawal complications, and complications from high blood pressure or diabetes. (GWM Add'l PSOF ¶ 120). As a result of time taken to deal with those

patients, Dr. Gulsen was unable to see Ms. Swayzer on July 13th. (GWM Add'l PSOF ¶ 121).

Plaintiff's expert, Dr. Vassallo, contends that Dr. Gulsen was deliberately indifferent because she should have "escalated" Ms. Swayzer's refusal on July 8th and because she did not see Ms. Swayzer on July 13th. (GWMP Add'l PSOF ¶ 129). As is the theme with Dr. Vassallo's report, her section regarding Dr. Gulsen is exceedingly brief and conclusory. Dr. Vassallo offers no articulated basis for her contention of deliberate indifference other than sketchy, off-the-cuff remarks about her review of Dr. Gulsen's deposition. Dr. Vassallo does not provide any articulated standard of care, much less an analysis as to how Dr. Gulsen's activities met or did not meet that criteria. As noted above, Dr. Vassallo demonstrated a lack of knowledge as to guidelines applicable to Ms. Swayzer, and admitted she would defer to obstetric specialists as to day-to-day care. So, this Court should again disregard Dr. Vassallo's alleged contentions as speculative and irrelevant.

Rather, Dr. Gulsen's attempts to provide care to Ms. Swayzer must be examined both in the context of her own interactions, as well as the overall care provisioned to Ms. Swayzer while she was in the Milwaukee County Jail. Dr. Gulsen attempted to reach out to Ms. Swayzer on both July 8th and July 12th without much result. Dr. Gulsen was aware on these encounters that Ms. Swayzer had previously been cleared by an external hospital, had been seen by other medical and mental health providers in the jail, and, particularly on July 12th, that Ms. Swayzer had a referral pending to an outside provider. Ms. Swayzer's interactions

with Dr. Gulsen were harmonious with the medical records—she was insisting she and her baby were fine, and wanted to be left alone. This was Ms. Swayzer's right as a patient, she was competent to make that call, and Dr. Gulsen appropriately let her be. Though Ms. Swayzer had the capacity—and demonstrated ability—to seek provider care if she had an issue with her pregnancy (*see* § III.B.1, *supra*), she did not advise Dr. Gulsen that she was having any complications on either the 8th or the 12th. As Professor Edwards notes, there was no reason to escalate care, as Ms. Swayzer was presenting as an uncomplicated pregnancy in her 36th week. (GWM Add'l PSOF ¶ 141). At the very most, Plaintiffs have generated a vague dispute as to the degree of care that Dr. Gulsen attempted to offer to Ms. Swayzer, but this is simply insufficient for an Eighth Amendment claim. *McGee,* 721 F.3d at 481; *Garvin,* 236 F.3d at 898.

Similarly, the fact that Dr. Gulsen was waylaid by patients that she deemed of a higher acuity on July 13th does not create a triable deliberate indifference claim. On July 13th, as far as providers were aware, Ms. Swayzer was proceeding with an uncomplicated pregnancy. Ms. Swayzer had been seen by multiple providers over the prior week and advised each of them that her baby was moving and that she was doing fine. On July 13th, Dr. Gulsen was also aware that Ms. Swayzer had been set up for a referral to an outside provider. Plaintiff has offered no basis to contest Dr. Gulsen's recollection that her time on July 13th was spent dealing with emergent or higher acuity issues. Given Ms. Swayzer's appearance of an uncomplicated pregnancy, her prior history of refusing treatment, and the

existence of other patients with medical needs, Dr. Gulsen made a judgment call. Dr. Vassallo has offered no competent basis to critique Dr. Gulsen's medical judgment on that day. Conversely, Dr. Edwards has specifically opined that—based upon Ms. Swayzer's presentation and past interactions with providers—Dr. Gulsen's decision to defer an interaction with Ms. Swayzer until July 14th was an appropriate exercise of medical judgment and not a deviation from the standard of care. (GWM Add'l PSOF ¶ 142, (Edwards R., p. 6). Especially given Dr. Gulsen's prior attempts to interact with Ms. Swayzer and attempts to examine her and her pregnancy, Plaintiffs have failed to demonstrate deliberate indifference. *E.g., Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) (Court must examine overall treatment record, and isolated occurrences or exceptions do not give rise to a finding of deliberate indifference).

Similarly, Plaintiffs have failed to demonstrate a causal link between Dr. Gulsen's involvement in this case and the unfortunate passing of Ms. Swayzer's baby. Ms. Swayzer continually refused physical assessments and advised providers that her baby was moving and she was doing fine. Plaintiffs have offered no basis to conclude that any interaction between Dr. Gulsen and Ms. Swayzer would have been any different than the interactions that took place between the two on prior dates, or for that matter, the interactions that took place between Ms. Swayzer and other medical or mental health providers prior to July 13th. Indeed, Ms. Swayzer offered similar platitudes to Ms. Goss and Mr. Schmid when they encountered her on July 13th. Both Ms. Goss and Mr. Schmid reported that Ms. Swayzer had no

concerns when they encountered her on July 13th, and that Ms. Swayzer demonstrated the ability to alert providers if she had an issue. No such alert was provided to Dr. Gulsen or any other medical provider on July 13th. As such, Plaintiffs' contentions again reveal themselves to be speculative. Summary judgment is accordingly warranted.

## Conclusion

Medical and mental health providers, including these Defendants, attempted to provide Ms. Swayzer with appropriate care and treatment at the Milwaukee County Jail. Ms. Swayzer determined, as was her right, that she did not want to engage with providers at the jail. Rather, Ms. Swayzer consistently advised providers that her baby was moving, and that she and her baby were doing fine. Ms. Swayzer's presentation and assurances to providers were consistent with her stage of pregnancy, and at no time were these Defendants aware of any complications with respect to her pregnancy. Given that, the competent expert testimony presented in this case confirms that these Defendants went beyond the applicable standard of care in attempting to provide Ms. Swayzer and her baby with care. Plaintiffs have been wholly unable to demonstrate that these Defendants acted with deliberate indifference towards her or her baby, or were the cause of her passing.

While the outcome in this case was unfortunate, it was not a result of any deliberate indifference by Dr. White, Dr. Gulsen, or Nurse Meine. This Court must accordingly award these Defendants summary judgment.

Respectfully submitted,
CUNNINGHAM, MEYER & VEDRINE, P.C.


By: /s/ Chad M. Skarpiak
        One of the Attorneys for Defendants

Michael R. Slovis
Chad M. Skarpiak
CUNNINGHAM, MEYER & VEDRINE, P.C.
1 East Wacker Drive, Suite 2200
Chicago, Illinois 60601
Tel: (312) 578-0049
cskarpiak@cmvlaw.com