UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF LALIAH SWAYZER, et al.,

           Plaintiffs,

    v.                                      Case No. 16-cv-1703-bhl

MILWAUKEE COUNTY, et al.,

           Defendants.

---

## DECISION AND ORDER ON SUMMARY JUDGMENT

---

      In the early morning hours of July 14, 2016, corrections officers at the Milwaukee County Criminal Justice Facility (the "Jail") discovered Shade Swayzer, a mentally-ill woman in the late stages of a pregnancy, bleeding in her cell alongside the body of her deceased baby daughter, Laliah. Corrections staff contend that, prior to this discovery, they had repeatedly offered, and Swayzer had repeatedly refused, medical examination and treatment. While the parties dispute precisely what happened on the night of the tragedy, including whether Laliah was stillborn or died shortly after birth, it is undisputed that the heartbreaking events led to this lawsuit, through which Swayzer seeks to recover damages for herself, Laliah's estate, and Swayzer's two other daughters. In pursuit of a recovery, Plaintiffs cast a wide net and now assert claims against six individual medical and mental health professionals, five individual corrections officers, Milwaukee County, and Armor Correctional Services, Inc. (Armor).[1] Plaintiffs' legal theories are set forth in four counts: (1) claims for constitutional violations under 42 U.S.C. §1983; (2) *Monell* claims against Milwaukee County and Armor for embracing policies that allegedly caused the tragedy; (3) state law negligence claims against the individual corrections officers; and (4) state law wrongful death claims against the same individual corrections officers. After years of protracted and combative discovery, Defendants have filed seven separate motions for summary judgment. For the reasons stated below, those motions are granted in part and denied in part.

---

[1] The Amended Complaint also names insurers that may have interests or obligations arising from the litigation. (ECF No. 313 ¶20, 30-32).

# BACKGROUND

## 1. The Parties

Plaintiff Shade Swayzer is an adult resident of the state of Wisconsin. At the time of the events giving rise to this lawsuit, Swayzer had been diagnosed as bipolar with paranoid schizophrenia. She was also in the late stages of a pregnancy. (ECF No. 432 ¶1). Laliah Swayzer is Swayzer's deceased or stillborn child, who was pronounced dead on July 14, 2016. The parties dispute whether Laliah was stillborn or died shortly after birth in the Jail. Plaintiffs Diane and Charlene Ruffin are Swayzer's other daughters and the surviving sisters of Laliah. (ECF No. 313 ¶¶11-12).

Defendant Milwaukee County is responsible for operating the Jail. (ECF No. 313 ¶19). At all material times, Defendants Kimberly Witkowiak, Terina Cunningham, Jeff Andrykowski, Amika Avery, and Diedre Adams were employed by Milwaukee County as corrections officers at the Jail. (*Id.* ¶¶13-18).

Defendant Armor is a Florida corporation that contracted with Milwaukee County to provide healthcare services for inmates at the Jail. (ECF No. 313 ¶21). Defendant Karen Ronquillo-Horton, M.D., is a physician licensed to practice medicine in the state of Wisconsin and was employed by Armor as the Medical Director at the Jail from November 2014 through December 2018. Defendant Maureen White was the Jail's Mental Health Director. Defendants Katherine Meine, Gina Negrette, Tulay Gulsen, and Steven Schmid are Armor employees who worked at the Jail. Meine is a Nurse Practitioner, Dr. Negrette is a licensed psychiatrist, Dr. Gulsen is a licensed physician, and Schmid is a psychiatric social worker. (*Id.* ¶¶22-29).

## 2. Swayzer's Arrest and Arrival at the Jail – July 6, 2016

On July 6, 2016, City of Glendale police officers were dispatched to the Motel 6 in Glendale, Wisconsin. (ECF No. 379 ¶4). At the motel, the officers arrested Swayzer for a parole violation based on a Department of Corrections warrant. (ECF No. 423 ¶2). She was later also charged with resisting arrest based on her attempt to bite one of the arresting officers. (*Id.*).

At the time of her arrest, Swayzer was approximately thirty-six-weeks pregnant. (ECF No. 423 ¶4). Accordingly, when she was arrested the officers transported her by ambulance to Columbia St. Mary's hospital for medical clearance before taking her to the Jail. (ECF No. 379 ¶5). Swayzer was admitted to the hospital at 2:08 p.m. and, after initially refusing examination, eventually agreed to an obstetrics assessment, including the use of a fetal heart monitor. (*Id.* ¶¶6-

7).  According to the hospital records, which were later provided to Jail personnel, Swayzer was not experiencing cramping/contractions, was not leaking fluid, and was not experiencing any vaginal bleeding.  (*Id.*).  The records indicate the fetal heart monitoring "look[ed] good."  (*Id.* ¶7).  Hospital staff also recorded that Swayzer told them her baby was "possibly" due August 15th, and that she "still had a couple months to go."  (*Id.* ¶8).  After being medically cleared, Swayzer was transported to the Jail for booking.  (*Id.* ¶9).

When Swayzer arrived at the Jail, staff confirmed that she had been evaluated and medically cleared at Columbia St. Mary's.  (ECF No. 379 ¶10).  Swayzer does not recall meeting with any nurses upon her arrival, but Psychiatric Social Worker Damon Camarata confirmed that he met with her.  (*Id.* ¶11).  Camarata testified that Swayzer refused to answer safety-related questions, but said she was fine and not suicidal.  (*Id*. ¶12).  Camarata encouraged Swayzer to complete the medical evaluations.  (*Id*.).  He testified that she was alert and oriented at this time, agreeable, cooperative, coherent with logical thought processes, stable for general population, and did not meet the criteria for special needs housing based only on her history of schizophrenia.  (*Id*. ¶21; ECF No. 429 ¶16).

### 3.  Jail Staff's Initial Assessment of Swayzer – July 7, 2016

On July 7, the day after her arrival at the Jail, Swayzer was evaluated by Nurse Fred Porlucas for an intake screening, where she was cooperative, responsive, and coherent. (ECF No. 379 ¶13).  Swayzer was able to explain her mental health history and reported she had last taken her psychiatric medication, Risperdal, three days earlier.  (ECF No. 429 ¶¶17-19).  Porlucas completed a mental health screening analysis and reported that Swayzer was not presenting with acute mental health issues and displayed no major mental health symptoms.  (*Id.* ¶18).  Swayzer's clinical disposition was a stable mental health condition and routine mental health referral.  (*Id.*).  Although Swayzer hugged Porlucas during the evaluation, he did not consider this conduct to demonstrate that she presented a risk of harm to herself or others, nor was it a mental health concern.  (*Id.* ¶20).

Later that day, Swayzer also met with Certified Nurse Midwife Katherine Meine.  Swayzer told Meine she was eight-months pregnant, due in the middle of August, and thus either thirty-five or thirty-six-weeks pregnant. (ECF No. 379 ¶14).  Swayzer described her medical history and reported that the baby was fine and moving and that she had been receiving prenatal care prior to her arrest.  Swayzer denied having any contractions, leaking, or bleeding.  She refused to allow a

physical prenatal assessment and would not allow Meine to take her vital signs or observe the baby's fetal heart tones. She also declined to sign a form documenting her refusal. (*Id.* ¶¶16-17). Meine explained several preterm labor precautions and alerted Swayzer to the risks to both mother and baby of refusing a physical evaluation, including stillbirth, death, long-term disability, and preterm birth. Meine told Swayzer to report contractions occurring every ten minutes for more than an hour, any leaking fluids, bleeding that she could not explain, or if she did not feel the baby move for more than a couple of hours. (*Id.* ¶¶18). Even after being notified of these risks, Swayzer still refused the physical examination. (*Id.* ¶19). Meine also informed Swayzer that if she reported complications to healthcare staff, she would be sent out for an appointment with an outside provider. (*Id.* ¶20). Meine later explained she was not concerned about Swayzer's refusals because of her assessment the day before at Columbia St. Mary's and because she reported the baby was moving. (*Id.* ¶21).

According to Meine, the standard for prenatal care for a patient who is thirty-six weeks or more pregnant is to be seen on a weekly basis and does not require daily vital signs or observation of fetal heart tones. (ECF No. 379 ¶15). Meine's treatment plan was for Swayzer to be seen once a week. Meine also called for a Mental Health evaluation based on Swayzer's history of mental illness. (*Id.* ¶22).

Following her visit with Swayzer, Meine instructed a nurse to obtain Swayzer's medical records on an expedited basis. Meine reviewed records from a recent (June 23) prenatal visit to Aurora Sinai but they did not change her treatment plan, because Swayzer was not experiencing any acute obstetric issues that required immediate or emergent care. (ECF No. 379 ¶23). Meine then consulted with Dr. Horton about a treatment plan, which Dr. Horton approved. (ECF No. 427 ¶34).

Upon receiving Meine's proposed plan, Dr. Horton consulted with Dr. White, the Jail's Mental Health Director, and then ordered that Swayzer be transferred from the Special Medical Unit (SMU) (inpatient medical unit) to the Special Needs Unit (SNU) (inpatient mental health unit). (ECF No. 427 ¶35). The SNU is used to house inmates suffering significant mental or physical issues. (ECF No. 423 ¶22). Swayzer was designated a special needs inmate due to her mental health issues and the late stage of her pregnancy. (*Id.* ¶18). As a result, Defendant Officer Terina Cunningham received a call to reclassify Swayzer from the SMU to the SNU, and Swayzer was then moved to the SNU in compliance with Dr. Horton and Dr. White's directive. (*Id.* ¶¶19-

20).  Dr. Horton also ordered that medical staff were to follow up with Swayzer on a daily basis and that Swayzer was to be seen by Mental Health personnel at the Jail.  (ECF No. 427 ¶¶ 36-37).

Officer Cunningham asserts that she placed Dr. Horton and Dr. White's reclassification order on Swayzer's classification card on July 7.  (ECF No. 473 ¶24).  However, during a subsequent internal investigation, Cunningham acknowledged that, while she made a notation on Swayzer's classification card, she did not update the summary page on Swayzer's classification file and she did not make any notations on Swayzer's inmate locator, also known as a tier card.  (ECF No. 473 ¶¶25-26).  Cunningham also told investigators that she added the missing information to Swayzer's classification file *after* learning of Laliah's death on July 14.  (*Id.* ¶25).

### 4.  Swayzer's Move to Unit 4A – July 8, 2016

The next day, Swayzer was transferred out of the SNU and into a different part of the jail called "Unit 4A."  (ECF No. 427 ¶38).  According to Dr. White, Unit 4A is a "step down unit" that is used as mental health housing for female inmates.  (ECF No. 423 ¶34).  With regard to the medical component, Meine testified that pregnant inmates can be housed in one of three places: SNU, the medical unit, or Unit 4A.  (*Id.* ¶42).  She noted that she goes to see pregnant inmates wherever they are housed, so their placement does not impact the care she provides.  (*Id.*).  Dr. Horton also testified that there is no difference in the provision of care offered in the SNU and Unit 4A.  (*Id.* ¶36).  Similarly, Dr. Gulsen testified that she sees inmates regardless of the unit they are in.  (*Id.* ¶43).  Plaintiffs assert that inmates in the SNU are monitored more closely, as there are two officers who are constantly monitoring the inmates and the cells are constructed so that inmates can be more easily observed.  (ECF No. 425 ¶111).

Lt. Jeffrey Andrykowski explained that Swayzer was transferred after he received a call informing him that another female inmate was suicidal and needed to be housed in the SNU.  (ECF No. 423 ¶28).  Because the SNU has only three cells for female inmates, and all were in use, he contacted the classification department to see if any of the inmates then in the SNU could be moved to an overflow cell in the 4A housing unit.  (*Id.* ¶¶28-29).  Corrections officers Amika Avery and Deirdre Adams both indicated that Swayzer's tier card showed no mention of Dr. Horton's order that Swayzer stay in the SNU or any other restrictions preventing her transfer to Unit 4A.  (ECF No. 423 ¶¶30-31).  Avery admitted that if an order had been on Swayzer's tier card, she would not

have approved the move.[2]  (ECF 422 ¶42).  Both also acknowledged that they relied on their file review and did not undertake any additional follow up with medical staff to confirm why Swayzer was in the SNU or whether she could be transferred.  They maintain, however, that Jail policy at the time did not require that they obtain medical approval before transferring an inmate from the SNU.  (ECF No. 473 ¶35).

At a July 13, 2016 mental health team meeting, Dr. White raised no concerns about Swayzer being housed on Unit 4A.  (ECF No. 423 ¶40).  She later opined that, after Swayzer's transfer to Unit 4A, "so far as the mental health component goes, her symptoms and what was going on mental health-wise, she was in an appropriate location based on those."  (*Id.* ¶37).  Meine also believed that Swayzer's placement on Unit 4A was appropriate, noting that it was likely that more than one hundred late-term pregnant inmates had been housed in Unit 4A.  (*Id.*).

### 5.  Swayzer's Medical and Mental Health Treatment in Unit 4A – July 8-12, 2016

According to Swayzer, no medical personnel came to visit her after she was moved to Unit 4A.  (ECF No. 399 ¶23).  Swayzer asserts that no one came to check on her and if someone had offered to physically examine her baby, "of course" she would have allowed the examination.  (ECF No. 438-6 at 23-24, 109).  Swayzer does not recall meeting with mental health care providers, but she confirms that she did not have delusions or hear any voices while at the Jail.  (ECF No. 438-6 at 10-11, 24-25).  She also confirms that if she had been offered medication for her schizophrenia, she would not have taken it.  (ECF No. 438-6 at 100).

Defendants dispute Swayzer's characterizations of the lack of care.  According to Dr. Negrette, she met with Swayzer in the Jail's Mental Health Unit after Swayzer was moved to Unit 4A.  Dr. Negrette was an "as-needed psychiatrist" hired to see inmates and assist in medication management.  (ECF No. 429 ¶¶10-11).  At the time of the meeting, there were no reports of Swayzer presenting acute mental health needs, although Meine had noted that Swayzer had been talking to herself.  (ECF No. 429 ¶21).  Dr. Negrette reported that Swayzer was stable, appeared pleasant and calm, with no overt evidence of psychosis, mania or manic behaviors, and was linear

[2] Avery testified that she believed "classification card" and "tier card" were synonymous.  Defendants maintain they are not.  Cunningham asserts that she placed the note "House in MHU Dr. White Per NP K. Meine" on Swayzer's classification card on July 7, 2016, but she did not add that information to the tier card.  (ECF No. 400-2 at 3-5).  It appears that Avery checked only Swayzer's tier card, not her classification card when she determined there were no restrictions preventing Swayzer's transfer to Unit 4A.  (*See* ECF No. 473 ¶¶41-42; ECF No. 399 ¶79; ECF No. 400-4 at 3-4).

and goal directed. (*Id.* ¶23). Swayzer was able to describe why she was seeing Dr. Negrette. She also provided a history of her mental illness and explained what her symptoms were when she felt sick, including hearing things and not thinking right. (*Id*. ¶24). Swayzer denied having psychotic symptoms, hearing things, and thought-disorder symptoms; she stated that she was essentially thinking right. (*Id.*). She confirmed she had previously been on Risperdal but was not currently taking it and explained that she did not feel like she needed her medications and did not want the Risperdal medication from the jail. (*Id.* ¶33). Dr. Negrette confirmed Swayzer was able to explain why she needed the medication, what her symptoms were, and what the symptoms would be if she did not take the medications. (*Id.*). The doctor also confirmed that Swayzer knew how to contact her through a pink-slip system at the Jail and reported that Swayzer said she did not have any other concerns. (*Id.* ¶34). Dr. Negrette discussed continuing with Risperdal and told Swayzer to ask for follow up if she needed it. (*Id.*). At the conclusion of the meeting, Dr. Negrette decided to follow up with Swayzer on an as-needed basis if she remained in custody. (*Id.* ¶40). Swayzer asserts that she has no memory of meeting with Dr. Negrette, noting that "[t]here's no way in the world I can remember these people." (ECF No. 438-6 at 99-100).

According to Defendants, other medical providers made attempts to check on Swayzer on July 8, 2016. PSW Kristin Rector assessed Swayzer on her mental health rounds. (ECF No. 429 ¶43). She found her behavior to be unremarkable; Swayzer made eye contact, her speech was coherent, and her thought processes were logical. (*Id.*). Nurse Karen Gray asserts that she attempted to conduct a physical assessment of Swayzer along with a fetal heart tone check on the baby, but Swayzer refused. (ECF No. 379 ¶32). Dr. Gulsen, a primary care physician, asserts that Swayzer also refused to see her. (*Id.* ¶33). Dr. Gulsen asserts that she was not concerned by Swayzer's refusal because hospital records, Meine's records, and notes from the mental health providers all indicated that Swayzer was stable. (*Id.*).

The parties agree that on July 9-10 Swayzer received no medical or mental health care. (ECF No. 399 ¶24). Defendants explain that this was a weekend, and provider visits were not required under the applicable standard of care. (*Id.*).

According to Meine, on July 11, 2016, Swayzer informed her that her baby was fine and moving, and denied she was having contractions, leaking, or bleeding. (ECF No. 379 ¶35). Meine asserts that Swayzer again refused to allow her to perform a physical exam or listen to the baby's fetal heart tones. (*Id.*). Meine states that she repeated the labor precautions and instructions she

had previously provided Swayzer, including the need to report contractions, leaking, bleeding, or the baby not moving, and that by not getting a physical examination it could mean they missed something regarding the baby. (*Id.* ¶36). Meine asserts that Swayzer told her she was not experiencing any acute obstetric issues that required emergent or immediate care. (*Id.* ¶37).

Meine states that, after her July 11 visit with Swayzer, she consulted with Dr. Horton and told her that Swayzer had again refused a physical assessment. (ECF No. 379 ¶38). They arranged an outside appointment for Swayzer at Aurora Sinai hospital within the next week. (*Id.*). They also agreed to try having another provider see Swayzer in the Jail with the hope that she might be more receptive if approached by someone new. (*Id.*).

According to Dr. Gulsen, the next day, on July 12, 2016, at Dr. Horton's request, she made another attempt to assess Swayzer. (ECF No. 379 ¶40). Dr. Gulsen states that she informed Swayzer of the potential adverse consequences of refusing care, and Swayzer responded, "I know, I know. I don't need to see you. I am okay. I know myself and my baby." (*Id.*). Swayzer said the baby was moving and again refused to allow Dr. Gulsen to take vital signs or listen to the baby's fetal heart tones. (*Id.*). She also refused to sign the form indicating she was refusing treatment. (*Id.*). Based on Swayzer's responses, Dr. Gulsen believed Swayzer was stable, but because she was unable to physically assess vital signs and the baby's fetal heart tones, Dr. Gulsen could not confirm whether Swayzer's baby was alive on July 12, 2016. (*Id.* ¶41). Dr. Gulsen agreed that an outside appointment was necessary given Swayzer's continued refusal to be examined. (*Id.* ¶42).

### 6. The Discovery of Laliah's Birth and Death – July 13-14, 2016

During the day of July 13, two other Jail personnel made efforts to meet with Swayzer. First, Case Manager Rebecca Goss asserts that she saw Swayzer in her cell during Goss's rounds. (ECF No. 379 ¶43). According to Goss, Swayzer was alert and able to communicate and stated she had no case management needs at the time. (*Id.*). Goss states that she reminded Swayzer of the Jail's mental health services and how to access those services. (*Id.*). Goss had no concerns about Swayzer at that time. (*Id.*). Mental Health Clinician Steven Schmid asserts that he evaluated Swayzer on his rounds later that day. (*Id.* ¶44). Although evidence regarding the timing of his visit is confused, he noted that Swayzer was alert and oriented and laying on her bunk while reading a book. (*Id.*). He testified that, in response to his questions, Swayzer denied any mental

health concerns or questions and said she did not require any mental health counseling or crisis intervention at that time. (*Id.*).

The parties offer dramatically different versions of the events that took place overnight on July 13 and early July 14. Corrections Officer Kimberly Witkowiak was assigned to Unit 4A on the overnight shift. (ECF No. 379 ¶45). Witkowiak had not worked on Unit 4A since Swayzer had been moved there. (ECF No. 423 ¶59). According to Witkowiak, she conducted fifteen rounds between 11:00 p.m. and 5:35 a.m. and during none of those rounds was Swayzer in obvious distress. (*Id.* ¶63). Witkowiak reports engaging in conversation with Swayzer on at least three occasions, including a discussion with Swayzer about Witkowiak's K9 partner, who accompanied the corrections officer on at least one of the rounds. (*Id.* ¶¶64, 66-67). Witkowiak also confirms observing Swayzer in her cell for brief periods of time during her 3:29, 4:23, 4:40, 5:05, and 5:35 a.m. rounds. (*Id.* ¶69-73). During one of those rounds, when Witkowiak asked Swayzer what was going on, Swayzer replied "nothing." (*Id.*).

Witkowiak acknowledges smelling an unknown odor during her 5:35 a.m. round, but she states that it was not distinct, and she did not know where it originated. (ECF No. 423 ¶¶74-75). After completing that final round, Witkowiak went back to Swayzer's cell and observed her for about a minute. (*Id.* ¶76). She observed Swayzer laying in a different direction with her head near the toilet. (*Id.*). Witkowiak then noticed a substance she thought might be blood on Swayzer's mattress. (*Id.* ¶77). In response to Witkowiak's questioning, Swayzer said the substance was merely water. (*Id.* ¶78). After confirming Swayzer was okay, Witkowiak left at about 5:58 a.m. and completed rounds on another unit. (*Id.* ¶¶81-82).

According to Witkowiak, after completing her rounds, she spoke with another officer about the blood-like substance on Swayzer's mattress and then, at 6:04 a.m., called nursing staff who alerted her to Swayzer's pregnancy and directed her to initiate a medical emergency. (ECF No. 423 ¶83-84). Security and medical personnel entered Swayzer's cell at about 6:13 a.m. and found Swayzer laying down on her bed facing the wall with a baby's body between her and the wall. (*Id.* ¶¶86-88). The baby had no signs of life. (*Id.* ¶89). Medical personnel began CPR and other measures on the baby in an attempt to revive her but were unsuccessful. (*Id.* ¶90).

Swayzer tells a much different story. She claims she told Witkowiak that she was in labor, her water had broken, she was having contractions, and she needed medical attention. (ECF No. 399 ¶54). Witkowiak asked her if she was pregnant and Swayzer said "yes," after which

Witkowiak did not respond but instead introduced Swayzer to her K9 partner, replying "This is my dog." (ECF No. 438-6 at 27-28). Swayzer insists she also told Witkowiak she was hemorrhaging and specifically asked for help, but Witkowiak did nothing. (*Id.*). Swayzer then laid back in her bed until around 4:00 a.m. when she started to push the baby out. (*Id.* at 32). She testified that she used her hands to bring the baby onto her chest and that the baby was alive and "had a very faint cry." (*Id.* at 39-40, 46). She did not know when the baby passed away but admits the baby did not appear to be breathing the second time Witkowiak came to the cell door. (*Id.* at 53).

The Milwaukee County Medical Examiner's Office conducted an autopsy but was not able to determine the cause or manner of death for Laliah. (ECF No. 379 ¶59). The medical examiner concluded the infant was likely stillborn. (*Id.* ¶60). A hydrostatic float test conducted during the autopsy indicated that Laliah never breathed air into her lungs. (*Id.* ¶¶63-64). Her stomach was empty, indicating she had not successfully nursed. (*Id.* ¶68). In addition, Laliah had multiple bacterial infections and pneumonia in both lungs. (*Id.* ¶¶65-67). Microscopic examination of the placenta revealed acute chorioamnionitis—an infectious inflammation of the tissues of the placenta. (*Id.* ¶62). Plaintiffs' medical expert, an emergency medicine physician and toxicologist, was unable to offer an opinion on the cause of death and had no opinion regarding whether Laliah was born alive or stillborn. (*Id.* ¶72). Defendants' medical experts, a developmental pathologist and a doctor who is board certified in internal medicine and infectious diseases, both opined that Laliah died at least twenty-four to thirty-six hours before delivery due to widespread infection and pneumonia. (*Id.* ¶¶74-82).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291-92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Anderson*, 477 U.S. at 248.

The moving party bears the burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To survive a properly supported summary judgment motion, the opposing party must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

### I. Summary Judgment Is Appropriate on Some, But Not All, of Plaintiffs' Section 1983 Claims.

In Count I of their Fourth Amended Complaint, Plaintiffs assert claims against "all Defendants" for violations of Plaintiffs' Fourth, Eighth and Fourteenth Amendment rights. (ECF No. 313 ¶¶124, 128-29).[3] In their briefing, Plaintiffs clarify that their claims are premised on Defendants' alleged deliberate indifference to the serious medical needs of both Swayzer and Laliah. (*Id.*). In support of these claims, Plaintiffs reiterate the undisputedly tragic factual background while highlighting two main issues: (1) Defendants' failure to examine Swayzer and Laliah or, alternatively, their acquiescence in Swayzer's refusal to allow them to examine her or Laliah; and (2) Defendants' transfer of Swayzer from the SNU to Unit 4A, allegedly contrary to Dr. Horton's orders.

All Defendants seek summary judgment on Plaintiffs' §1983 claims. In support of dismissal, Defendants challenge Plaintiffs' standing, insist that Plaintiffs cannot prove causation, and individually argue that the record cannot support liability findings against each of them. The

---

[3] Plaintiffs purport to sue all Defendants in both their official and individual capacities. (ECF No. 313 ¶33). The parties do not address this issue in their briefs and Plaintiffs appear not to appreciate the implications of this allegation. "Personal-capacity suits seek to impose liability upon a governmental official for actions he takes under color of state law . . .. Official capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir. 1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). In other words, a personal-capacity suit is appropriate when an official, acting under the color of state law, personally deprives a plaintiff of a federal right. *Id.* On the other hand, an official-capacity suit is appropriate when a person is only executing or implementing the official policy or custom of a government entity. *Id.* Because Plaintiffs assert *Monell* claims against Milwaukee County and Armor in Count II of the Fourth Amended Complaint, their attempt to assert official capacity claims against the individual Defendants is redundant and unnecessary. In addition, because Plaintiffs have failed to establish the existence of an official policy or custom, as discussed in Section II below, their official capacity claims fail as a matter of law in any event.

Court will explain below which of these arguments has merit and which fall short, at least at summary judgment.

## A. Only Swayzer and Laliah's Estate Have Standing to Assert Claims under Section 1983.

Before challenging the merits of Plaintiffs' claims, Defendants challenge the standing of Laliah's Estate and both Diane and Charlene Ruffin to assert claims under §1983. (ECF No. 355 at 17-19). Defendants insist that because Laliah was stillborn, neither she nor her estate can claim constitutional violations under §1983. Defendants further contend that Diane and Charlene Ruffin lack standing to assert claims because the complaint alleges only violations of others' (their mother's or deceased sister's) constitutional rights. Because of factual disputes, the Court cannot conclude that the Estate lacks standing. But the Court agrees with Defendants that Diane and Charlene Ruffin are not proper §1983 plaintiffs.

### 1. If Laliah Was Born Alive, Her Estate Can Assert Section 1983 Claims.

With respect to the claims made by Laliah's Estate, Seventh Circuit law holds that an unborn fetus is not a person who can assert constitutional claims. *See Coe v. County of Cook*, 162 F.3d 491, 495 (7th Cir. 1998) ("the life, liberty, and property that the due process clauses protect are rights of persons, and the courts have decided that a fetus is not a person within the meaning of these clauses"). Under this principle, if Laliah was stillborn, she had no standing to assert violations of any constitutional rights and neither does her estate. *See Estate of Unborn Child of Jawson v. Milwaukee County*, No. 19-C-1008, 2020 WL 4815809 at *3 (E.D. Wis. Aug. 19, 2020) (holding that Seventh Circuit precedent establishes that "a fetus is not a person within the scope of the Fourteenth Amendment"). If Laliah was born alive, however, even for just a short period, she would have possessed constitutional rights and, if those rights were violated, her estate would have standing to assert claims for those violations under §1983.

Defendants' standing challenge thus depends on whether Laliah was alive at birth. This issue is disputed and cannot be resolved on summary judgment. Defendants point to what they call the "only competent medical and scientific evidence," which they insist shows Laliah died of sepsis and pneumonia more than twenty-four hours *before* her delivery. (ECF No. 355 at 17). The record contains an array of medical evidence strongly supporting Defendants' contention that Laliah was stillborn. The Milwaukee County Medical Examiner concluded the infant was "likely stillborn." A hydrostatic float test indicated Laliah never breathed air into her lungs. And her

autopsy showed she had not successfully nursed and had multiple bacterial infections and pneumonia in her lungs. A microscopic examination of the placenta revealed acute chorioamnionitis—an infectious inflammation of the tissues of the placenta. (ECF No. 379 ¶¶60-68).

Against this objective medical evidence is Swayzer's own testimony. Swayzer has sworn under oath that Laliah was born alive, even if only briefly:

> **Q** And tell me what you remember about the baby when it came out.
> **A** She had a very faint cry. You know, usually when a baby is born, it screams very loudly. My baby's vocals sound like they were -- they were used before they were just very quiet. Her scream was very, very low.
> . . .
> **Q** How long did the baby cry?
> **A** I'm not sure. I'm sorry. I didn't count the minutes or anything like that.
> **Q** Did it seem like a long time, short time?
> **A** Short time.
> **Q** Was it like less than a minute?
> **A** No. It was about a minute.
> **Q** It was about a minute after the baby was born that it cried?
> **A** The baby cried for about a minute.
> **Q** And then did it ever cry again?
> **A** I'm not -- yeah. Cried once or twice, or maybe even three times.
> **Q** And when? How long after that first minute did the baby cry again?
> **A** I'm not sure.
> **Q** Was the baby's cry stronger when it came back?
> **A** No. It was very weak.

(ECF No. 438-6 at 39:2-40:14).

At summary judgment, the Court is not permitted to resolve the conflicts between these two bodies of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Consequently, while the medical evidence appears compelling, it does not carry the day. Swayzer is the only person with firsthand knowledge of the events immediately surrounding Laliah's birth and, if her testimony is believed, a jury could find that Laliah was born alive. This genuine issue of material fact defeats Defendants' effort to secure summary judgment against Laliah's Estate for lack of standing.

### 2. Diane and Charlene Ruffin Lack Standing.

Defendants have a meritorious argument with respect to the standing of Diane and Charlene Ruffin. There is no suggestion in the complaint or factual record that any of the Defendants

personally interacted with, let alone violated the rights of, either of the Ruffins. Neither was present when the alleged constitutional violations occurred and their only connection to the events in question is their familial relationship with the other two Plaintiffs, Swayzer (their mother) and Laliah (their sister). (ECF No. 313 ¶¶11-12). Because constitutional claims under §1983 are personal, Diane and Charlene Ruffin cannot assert claims based on the alleged violation of Swayzer's or Laliah's constitutional rights. *See Russ v. Watts*, 414 F.3d 783, 1246-47 (7th Cir. 2005). Their attempt to assert derivative claims, based on violations of others' rights, fails as a matter of law. Defendants are all entitled to summary judgment on the §1983 claims of Diane and Charlene Ruffin.

### B. Different Legal Standards Apply to the Claims of Swayzer and Laliah's Estate.

Before addressing Defendants' merits-based summary judgment arguments, the Court must confirm the correct legal standard applicable to Plaintiffs' constitutional claims. Under Seventh Circuit law, inmate complaints about medical care are governed by different constitutional standards depending on the nature of the inmate's incarceration. For an individual who has been convicted of a crime, an alleged denial of appropriate medical care is analyzed under the Eighth Amendment's ban on cruel and unusual punishment. *Collins v. Al-Sham*i, 851 F.3d, 727, 731 (7th Cir. 2017). A different standard applies, however, to claims brought by persons not yet convicted of a crime, such as pretrial detainees. The Eighth Amendment's prohibition on cruel and unusual punishment does not apply to pretrial detainees because it applies only *after* conviction. Accordingly, pre-conviction claims of inadequate medical care are analyzed under the due process clause of the Fourteenth Amendment. *Id*.; *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

It is not obvious which standard applies to Swayzer's constitutional claims. At the time of her incarceration, Swayzer had already been convicted of burglary and was arrested for allegedly violating the terms of her post-conviction probation. But the alleged probation violation had yet to be adjudicated. Thus, Swayzer's claims fall in a legal gray area, not definitely addressed by the Seventh Circuit or Supreme Court. In the face of this legal ambiguity, Defendants argue that Swayzer's probation was a form of post-conviction legal custody governed by the Eighth Amendment. (ECF No. 355 at 21-22). At least one judge in this district has accepted this logic. *See Estate of Fiebrink v. Armor Correctional Health Servs.*, No. 18-CV-832-JPS, 2019 WL 1980625 (E.D. Wis. May 3, 2019). Plaintiffs do not address the issue at all. They appear content

to assume the "deliberate indifference" standard applies and argue solely based on Eighth Amendment caselaw and terminology. Given the parties' agreement on the applicable standard, and Plaintiffs' waiver of any argument that a different standard applies, the Court will analyze Swayzer's claims under an Eighth Amendment deliberate indifference rubric.

The claims of Laliah's Estate are a different matter, however. As explained above, the Estate has standing only if Laliah was born alive. But even in this scenario, the Estate's claims would not be governed by the Eighth Amendment. Laliah was (obviously) never convicted of a crime, making the punishment model and protections of the Eighth Amendment inapplicable. *See Miranda*, 900 F.3d at 350. If she perished because of Defendants' violations of her rights while she was in their custody, her claims would be governed by the general protections of the Fourteenth Amendment's due process clause. *Id.* This requires application of a different standard. Under the due process clause, the Estate would be required to prove that Defendants "acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [her] case" and that their conduct was "objectively unreasonable." *McCann v. Ogle County, Ill.*, 909 F.3d 881, 886 (7th Cir. 2018) (citations omitted). This standard requires a "focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.* Despite the hundreds of pages of summary judgment briefing, none of the parties analyzes Laliah's Estate's claims under the "objectively unreasonable" standard, but as will be clear below, even applying this standard, the outcome is the same.

### C. Defendants Are Not Entitled to Summary Judgment Based Solely on Causation.

Defendants join in a separate motion seeking summary judgment based solely on the argument that Plaintiff's claims fail for lack of evidence of causation. (ECF No. 300). They contend that Plaintiffs' failure to offer an affirmative theory, supported by expert evidence, of how Defendants caused Laliah's death dooms Plaintiffs' claims. (ECF No. 301 at 1). Defendants cite a number of Seventh Circuit cases confirming that causation is an essential element of Swayzer's Eighth Amendment claims. (*Id.* at 10-11). Based on this caselaw, Defendants insist Plaintiffs' failure to offer expert testimony on the cause of Laliah's death, including whether she was stillborn, improperly leaves the finder of fact to speculate on causation. (*Id.* at 13).

Defendants overstate the proof required for causation. In *Ortiz v. City of Chicago*, 656 F.3d 523, 534-35 (7th Cir. 2011), the Court of Appeals emphasized that plaintiffs need only limited evidence on causation to avoid summary judgment in a §1983 deliberate indifference case. Citing its prior holding in *Gayton v. McCoy*, the Seventh Circuit emphasized that proximate cause is a question for the jury and summary judgment is appropriate on causation only in "rare cases." *Id.* at 534. Accordingly, "[w]here an obviously ill detainee dies in custody and the defendants' failure to provide medical care is challenged, the causation inquiry is quite broad." *Id.* at 535. The issue is not the cause of the inmate's death, but rather whether defendants failed "to provide adequate medical care." *Id.* And, where a jury can infer from medical records and witness testimony that defendants caused the inmate harm when they failed to treat him or her properly, with knowledge of a serious medical condition, summary judgment is inappropriate. *Id.* Expert testimony on causation is not required. *Id.* Based on this reasoning, the Court of Appeals reversed a district court's grant of summary judgment on causation grounds. *Id.*

This reasoning precludes entry of summary judgment on causation here. There is sufficient non-expert testimony in the record that Swayzer and Laliah may have suffered harm as a result of Defendants' allegedly deliberate indifferent and objectively unreasonable conduct. Accordingly, even if Laliah died *in utero* from preexisting conditions, Swayzer could still recover damages if a jury finds Defendants' improper failure to provide treatment caused Swayzer harm. Likewise, if the jury finds that Laliah was born alive and was deprived of objectively reasonable medical care leading up to and immediately following her birth, her estate could recover.

### D. The Record Will Not Support Liability Findings Against Several of the Individual Medical Defendants.

As noted above, the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the states by the Fourteenth Amendment, includes an affirmative obligation on state actors to provide medical care for those whom the state is incarcerating. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Jail medical staff violate the Eighth Amendment when they are deliberately indifferent to the serious medical needs of inmates, and thereby inflict unnecessary and wanton pain. *See id.* at 103-05; *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) ("[T]he Eighth Amendment, as the Supreme Court has interpreted it, 'protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain,

including . . . grossly inadequate medical care.'" (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (internal quotations omitted)).

Whether inadequate medical care amounts to cruel and unusual punishment is a two-part inquiry. Under the first part of the test, the plaintiff must prove that he or she suffered from an "objectively serious medical condition." *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018). Second, the plaintiff must also show that "the 'defendant was deliberately indifferent to that condition.'" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (*en banc*)). The second inquiry requires a look into the individual defendant's "subjective state of mind." *Wilson*, 901 F.3d at 820. An official is deliberately indifferent if that official was aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). "Something more than negligence or even malpractice is required." *Pyles*, 771 F.3d at 409.

In applying this test, courts defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. *Pyles*, 771 F.3d at 409. A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id*. This is because "the Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997).

Plaintiffs assert that six individual Defendants—Dr. Horton, Dr. Negrette, Dr. Gulsen, Dr. White, Nurse Midwife Meine, and Psychiatric Social Worker Schmid—were deliberately indifferent in providing (or failing to provide) medical treatment and psychiatric services to Swayzer during her incarceration. For summary judgment purposes, these Defendants do not dispute that Swayzer had serious medical needs. (ECF No. 337; ECF No. 343 at 14; ECF No. 383; ECF No. 480). But they insist each of their individual actions are insufficient to support a finding of liability. Given the record, the Court cannot conclude that Dr. Gulsen and Meine are entitled to judgment as a matter of law, and their motions for summary judgment are therefore denied. But Plaintiffs have not identified sufficient evidence to maintain claims against Dr. Horton, Dr. White, Dr. Negrette, or Schmid, so summary judgment will be granted in their favor.

1. **The Liability of Dr. Gulsen and Nurse Midwife Meine Cannot Be Resolved on Summary Judgment.**

   a. **Dr. Gulsen's Alleged Failure to Treat Swayzer after July 8 Precludes Summary Judgment.**

Dr. Gulsen was a primary care physician at the Jail. She testified and the records reflect that she twice attempted to examine Swayzer (on July 8 and 12), but Swayzer refused examination both times. According to Dr. Gulsen, after the second attempt, she informed Swayzer of the potential adverse consequences of refusing care, and Swayzer acknowledged the risk but reported she could feel her baby moving and did not want to be examined. Dr. Gulsen explained that Swayzer's refusal of care was not alarming given Swayzer's documented stable status from earlier hospital visits and notes from Meine. Moreover, pregnant inmates in the thirty-second week of pregnancy or later are generally seen on a weekly basis, putting Swayzer's treatment in line with the standard. Swayzer had also consistently confirmed that she felt the baby moving, and she was scheduled for follow-up visits by medical personnel. Dr. Gulsen intended to make another attempt to examine Swayzer on July 13 but failed to do so when work with other inmates precluded that visit. According to Dr. Gulsen, these facts show she "unquestionably attempted to provide" Swayzer with appropriate prenatal care and could not have been deliberately indifferent. (ECF No. 383 at 22-23).

But Swayzer disputes Dr. Gulsen's account of her attempts at treatment. Swayzer swears that, after being moved to Unit 4A on July 8, no medical professional came to check on her. She stated that, if someone had offered to physically examine her baby, "of course" she would have allowed the examination. (ECF No. 438-6 at 23-24, 109).

While the documentary record supports Dr. Gulsen's version of events, Swayzer's testimony to the contrary is sufficient to create a genuine issue of material fact. Given that Swayzer was a late-term pregnant woman with a significant history of mental illness who was under Dr. Gulsen's care, a jury that believes Swayzer's assertions that no doctor came to check on her after July 8 could reasonably conclude that Dr. Gulsen's failure to examine Swayzer demonstrated deliberate indifference to Swayzer's serious medical needs. A jury could also reasonably conclude that Dr. Gulsen's failure to examine Swayzer or listen to Laliah's fetal heart tones was objectively unreasonable. Accordingly, Dr. Gulsen's summary judgment motion must be denied.

### b. Meine's Alleged Failure to Treat Swayzer after July 8 Precludes Summary Judgment.

Of the individual medical Defendants, the medical records show that Meine, a nurse midwife, had perhaps the most interactions with Swayzer. Meine asserts that she met with Swayzer shortly after her arrival at the Jail on July 7. She discussed Swayzer's pregnancy with her, including her due date, and Swayzer confirmed that her baby was fine and moving. Swayzer also reported she had been receiving prenatal care and denied experiencing any contractions, leaking, or bleeding. Beyond responding to Meine's inquiries, Meine asserts that Swayzer refused to allow her to perform a physical prenatal assessment or take vital signs or observe the baby's fetal heart tones. Swayzer did not sign a form documenting her rejection of Meine's treatment attempts. Meine explains that, at that time, she was not concerned about Swayzer's refusal of an exam given her recent assessment at the hospital before coming to the jail and Swayzer's report that the baby was moving. Moreover, Meine explains that the standard for prenatal care calls for a patient thirty-six weeks or more pregnant to be seen weekly not daily. Accordingly, Meine developed a treatment plan for Swayzer to be seen once a week and for an evaluation by Mental Health, given her history of mental illness.

Meine states that she next met with Swayzer on July 11, a couple of days after Swayzer's transfer to Unit 4A and five days after her last physical examination and monitoring of Laliah. According to Meine, Swayzer again reported that her baby was moving and denied having any other complications from the pregnancy. Swayzer also continued her refusal to allow a physical exam or monitoring of the baby's heart tones. Meine states that she repeated her prior warning to Swayzer of the risks of not allowing an examination. Meine states that she consulted with Dr. Horton, and they decided to arrange for an outside referral within the next week (which would have been more than a week after her last physical exam) in the hopes that Swayzer might be more receptive to inquiries from a different health care provider. Based on these facts, Meine argues she unquestionably attempted to provide Swayzer with appropriate prenatal care and cannot be found to have been deliberately indifferent to Swayzer's serious medical needs. (ECF No. 383 at 14).

But, as already noted, Swayzer provides a very different account of her interactions with Meine after being transferred to Unit 4A. Namely, Swayzer asserts that Meine never came to check on her, and she insists that she never refused to allow Meine to physically examine Laliah.

In fact, Swayzer noted that if a nurse had said, "I want to physically examine your baby," she would "of course" have allowed her to do so. (ECF No. 438-6 at 109:6-23).

As with Dr. Gulsen, a jury who believed Swayzer's account could reasonably conclude that Meine's failure to try to examine Swayzer after July 8 demonstrated deliberate indifference to Swayzer's serious medical needs. A jury could also reasonably conclude that that failure along with her failure to listen to Laliah's fetal heart tones was objectively unreasonable. Accordingly, Meine's summary judgment motion must be denied.

### 2. The Record Shows that Dr. Horton, Dr. White, Dr. Negrette, and Schmid Are Entitled to Summary Judgment.

#### a. A Reasonable Jury Could Not Find Dr. Horton Violated Plaintiff's Rights.

Swayzer's claims against Dr. Horton arise from Dr. Horton's role as Medical Director at the Jail. In this capacity, Dr. Horton's primary duty was largely supervisory. She oversaw health services at the Jail and never physically saw or attempted to treat Swayzer or Laliah personally. Dr. Horton did, however, approve the treatment plan created by Meine. In approving the plan, Dr. Horton specifically ordered that Swayzer was to be housed in the SNU and medical staff were to follow up with Swayzer on a daily basis. Based on these facts, Dr. Horton argues she is entitled to summary judgment.

Plaintiffs insist that a jury could find Dr. Horton was deliberately indifferent because medical staff never took Swayzer's vital signs or listened to Laliah's fetal heart tones while Swayzer was at the Jail. They also argue Dr. Horton was deliberately indifferent because she failed to act when Jail personnel disregarded her treatment plan for Swayzer. Plaintiffs highlight that Dr. Horton took no steps to enforce her directive that Swayzer be housed in the SNU. Plaintiffs also argue that Dr. Horton failed to ensure that medical staff followed up with Swayzer daily, resulting in Swayzer not being seen by any medical staff over the weekend of July 9-10.

Based on the record presented, the Court rejects Plaintiffs' arguments. Dr. Horton had no direct contact with Swayzer. As a supervisor, she relied on reports by other medical and mental health professionals when creating a plan of care for Swayzer and Laliah. Thus, as far as Dr. Horton knew, according to Meine and Dr. Gulsen, Swayzer was refusing their repeated attempts to examine her and Laliah. Plaintiffs' assertion that Dr. Horton should have forced treatment on Swayzer during her brief stay in the Jail ignores Swayzer's individual right to control her own treatment. That an inmate has a history of mental illness does not in and of itself give authorities

either the power or the obligation to disregard the inmate's right to make medical choices concerning her own body. The Supreme Court has held that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment," *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990), and that prisoners retain a liberty interest in refusing forced medical treatment while incarcerated, s*ee Washington v. Harper*, 494 U.S. 210, 221–22 (1990). Thus, Dr. Horton cannot be found to have violated Plaintiffs' rights for not directing medical staff to disrespect Swayzer's right to reject medical examination.

Plaintiffs argue that there were no efforts to determine whether Swayzer was competent to reject treatment, highlighting her schizophrenia diagnosis. But Defendants explain that, while individuals with schizophrenia may have episodes of psychosis, many go into remission and do not require medications for long periods of time. (ECF No. 425 ¶101). Defendants note that during her incarceration, Swayzer demonstrated the ability to make autonomous decisions concerning herself and her pregnancy. (*Id.* ¶107). Mental health staff repeatedly assessed Swayzer's mental state and, each time judged there to be no sign of acute psychosis. They consistently observed her to be calm and coherent with logical thought processes. (ECF No. 379 ¶¶12, 43, 44; ECF No. 429 ¶¶16, 18, 23-24, 33, 43). Swayzer herself testified that she was "with it" while she was at the Jail, and she denied hearing voices or having hallucinations. (ECF No. 438-6 at 24-26, 106). She also recounted how she was able to describe her medical condition to Witkowiak and ask for help. (*Id.* at 27-28). Based on this record, no jury could reasonably conclude that Swayzer was not competent to exercise her right to refuse medical treatment, so Dr. Horton cannot be liable for failing to force treatment on Swayzer.

Plaintiffs also argue that Dr. Horton violated their constitutional rights when she allowed Swayzer to remain in Unit 4A after learning that she had been transferred from the SNU. No jury could reasonably reach such a conclusion. Dr. Horton denies that she knew about the transfer, but there is evidence showing that she both knew about and condoned the transfer. Dr. Gulsen testified that, on July 12, Dr. Horton asked her to examine Swayzer and told her Swayzer could be found on Unit 4A. (ECF No. 438-17 at 41-42). Dr. Gulsen went on to testify that Dr. Horton said it was fine for Swayzer to be on Unit 4A because she had been medically cleared and it did not matter if she was in SNU or Unit 4A because she and other medical providers could see her in either place. (*Id.* at 42-43). Dr. Gulsen noted that Dr. Horton asked her to visit Swayzer every day to take her vitals and check for problems. (*Id.* at 39). Putting aside Dr. Horton's assertion that she did not

know about the transfer, she confirmed that the provision of medical care is the same in the SNU and Unit 4A. (ECF No. 423 ¶36). Further, Dr. White, the Jail's Mental Health Director, explained that Unit 4A is used as mental health housing for female inmates and that, as far as Swayzer's mental health needs were concerned, placement on Unit 4A was appropriate. (*Id.* ¶37). In fact, after learning during a mental health team meeting on July 13 that Swayzer had been transferred from the SNU to Unit 4A, Dr. White raised no concerns. (*Id.* ¶40).

Plaintiffs highlight Dr. Horton and Dr. White's July 7 directive that Swayzer be housed in the SNU, but this ignores that little was known about Swayzer's mental health status at the time the directive was made. Following the directive, the reports that Dr. Horton received all reflected Swayzer's statements that the baby was moving and that she was reporting no complications, leaking, or contractions. Further, all mental health reports indicated that she was not experiencing acute psychosis and was stable, logical, and coherent. Swayzer's own testimony that she was not hearing voices or having hallucinations, that Laliah was moving up until the time of her delivery, and that she was able to communicate to Witkowiak her medical condition and need for help all confirm these reports. Accordingly, based on this record, even if Dr. Horton was aware of the transfer, no jury could reasonably conclude that Dr. Horton violated Plaintiffs' rights when she altered course from her original directive and allowed Swayzer to remain in Unit 4A with a direct request to Dr. Gulsen that she evaluate Swayzer daily. Dr. Horton is entitled to summary judgment.

### b. A Reasonable Jury Could Not Find Dr. White Violated Plaintiffs' Rights.

Dr. White was the Mental Health Director at the Jail. The record confirms she had no direct contact with Swayzer during the week of her incarceration and her role in the events surrounding Swayzer's incarceration was minimal. Dr. White participated in a single phone call with Dr. Horton to discuss the decision to house Swayzer in the SNU. Dr. White characterizes this telephone consultation as a "professional courtesy." Because §1983 liability requires personal involvement in the violation, Dr. White insists the lack of any evidence showing her involvement in any of the alleged constitutional violations makes summary judgment appropriate. (ECF No. 383 at 6).

Plaintiffs do not take issue with Dr. White's apparent role in recommending, or at least supporting, the directive that Swayzer be housed in the SNU. Instead, they fault Dr. White for allegedly failing to fill out appropriate paperwork to document the decision and for failing to

follow up when Swayzer was later moved from the SNU to Unit 4A in contradiction of the housing directive. (ECF No. 424 at 7-8).

Both of these attempts to impose fault on Dr. White fail on the undisputed facts. First, Plaintiffs point to no evidence that Dr. White had a role in any documentation failure related to Swayzer's housing. While non-medical Jail staff appear to have made documentation errors, there is no basis to tar Dr. White with those failures. Next, even assuming Dr. White learned of Swayzer's transfer (and the evidence on this point is very thin), as discussed above, no jury could reasonably conclude based on Swayzer's mental health condition at that time, that Dr. White was deliberately indifferent to Swayzer's mental health needs when she allowed her to remain on Unit 4A. Moreover, because there is no evidence suggesting that Swayzer was demonstrating acute psychosis, was unable to communicate her needs, or that she posed a risk of harm to herself or her baby, no jury could reasonably conclude that Dr. White's decision to allow Swayzer to be housed on Unit 4A (which is where mentally ill female inmates are housed) was objectively unreasonable.

Plaintiffs also vaguely suggest that Dr. White, as Mental Health Director, should be held responsible for the failings of mental health staff working under her. But §1983 liability requires personal involvement and cannot be based on a respondeat superior theory. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). While a supervisor can be deliberately indifferent by failing to act in the face of unconstitutional conduct by staff, there is no such evidence here. To hold a supervisor liable, a plaintiff must show the supervisor knew about the unconstitutional conduct and either facilitated, approved, condoned, or turned a blind eye to it. *See Backes v. Village of Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011). Plaintiffs present no evidence that Dr. White was aware of any unconstitutional conduct by mental health staff in the Jail. Nor have they identified any conduct by Dr. White to approve, condone, or turn a blind eye to such misconduct. Accordingly, Dr. White is entitled to summary judgment.

### c. A Reasonable Jury Could Not Find Dr. Negrette Violated Plaintiffs' Rights.

Dr. Negrette was employed by Armor as an as-needed psychiatrist responsible for seeing inmates for medication management. In this capacity, she met with Swayzer on July 8 in the Mental Health Unit of the Jail. Before doing so, Dr. Negrette reviewed Meine's notes, which included a report that Swayzer had been observed talking to herself in her room. In the meeting, Swayzer appeared pleasant and calm with no outward signs of psychosis, mania, or manic

behavior. She was able to describe her mental health treatment history, including her prior prescription for Risperdal, and denied having any psychotic symptoms. Swayzer expressly declined Dr. Negrette's offer to resume the medication and confirmed she knew how to contact Dr. Negrette if she had any future concerns. Dr. Negrette made a note to follow up with Swayzer if she remained in custody, but no meeting took place prior to the dramatic events of July 13. Dr. Negrette argues that these facts will not support a claim that she was deliberately indifferent. (ECF No. 337 at 1).

Plaintiffs criticize Dr. Negrette for taking no action to treat Swayzer "[o]ther than meeting with Swayzer on [July 8] and offering her medications which she refused." (ECF No. 428 at 3). Plaintiffs also fault Dr. Negrette for not responding when Swayzer allegedly exhibited symptoms of acute schizophrenia during their meeting. (*Id.*) And they complain that Dr. Negrette was informed that Swayzer was being housed in Unit 4A and failed to escalate this violation of Swayzer's treatment plan. (*Id.*).

Plaintiffs' efforts to tag Dr. Negrette with liability fail for both factual and legal reasons. First, many of Plaintiffs' factual assertions are simply not supported by the record. Plaintiffs assert that "Swayzer told Dr. Negrette that she was not thinking right and hearing things when she saw her on July 8th," and claim Swayzer was actually exhibiting symptoms of schizophrenia when she met with Dr. Negrette. This misrepresents the record. Plaintiffs cite Dr. Negrette's deposition, but the transcript shows Dr. Negrette actually testified that Swayzer said she was *not* having any symptoms. The passage Plaintiffs cite contains testimony in which Dr. Negrette describes *potential* symptoms she would have been looking for. It is clear she was not describing anything Swayzer was actually exhibiting. (ECF No. 438-20 at 102-107). Plaintiffs are reckless (at best) to state otherwise. Plaintiffs are similarly reckless in suggesting that Meine "escalated" concerns about Swayzer to Dr. Negrette on July 11. (ECF No. 428 at 2). The testimony reflects Meine saying she left a voicemail for Dr. Negrette to let her know Swayzer was still in the Jail; the transcript in no way suggests a need for escalation or urgent treatment. Finally, Dr. Negrette cannot be faulted for failing to escalate Swayzer's move from the SNU to Unit 4A, (ECF No. 428 at 4), because there is no indication Dr. Negrette was aware that Swayzer was being housed in Unit 4A. While Dr. Negrette met with Swayzer, their meeting took place in the Mental Health Unit, not Unit 4A. (ECF No. 438-20 at 29). Plaintiffs have cited no evidence that Dr. Negrette was aware of the transfer. Absent such evidence, Dr. Negrette cannot be faulted for not addressing the

medically unauthorized housing change. Moreover, as detailed above, the mere movement of Swayzer from the SNU to Unit 4A is not a basis to impose liability.

In the end, there is insufficient evidence to establish that Dr. Negrette was deliberately indifferent or that her treatment efforts were objectively unreasonable. Dr. Negrette made efforts to treat Swayzer, but those efforts were rebuffed. She discussed Swayzer's mental health history and offered to have Swayzer resume taking her medications. Swayzer refused. Dr. Negrette concluded Swayzer was competent to make that refusal. In these circumstances, Dr. Negrette's medical judgment is entitled to deference. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment."). Given the lack of evidence that Dr. Negrette's professional judgment was unsound, she is entitled to summary judgment.

### d. A Reasonable Jury Could Not Find Schmid Violated Plaintiffs' Rights.

Steven Schmid was a Psychiatric Social Worker at the Jail and had only one interaction with Swayzer. On July 13, 2016, he met with Swayzer during his assigned rounds. He reported she was alert and oriented. She denied having any mental health concerns and confirmed she knew how to access care if she needed it. (ECF No. 379 ¶¶43-44). Based on this limited, single interaction, Schmid insists there is no evidence on which a reasonable jury could find him deliberately indifferent to Swayzer's mental health needs.

Plaintiffs do not identify anything in the content of Schmid's interaction with Swayzer that could rise to the level of deliberate indifference. Instead, they point to Swayzer's testimony that no one checked on her or her baby after she was moved to Unit 4A. But it is clear from the testimony that Swayzer was referring to *medical* providers when she made this statement, not *mental health* providers. (ECF No. 438-6 at 108-09). Plaintiffs present no evidence supporting a conclusion that no *mental health* providers interacted with Swayzer after her move to Unit 4A. Indeed, video from the Jail shows Schmid at Swayzer's cell door. (ECF No. 507 ¶14). Plaintiffs also seek to avoid summary judgment by accusing Schmid of lying and raising questions about the timing of the visit. (ECF No. 504 at 4-5). At his deposition, Schmid testified, based on a review of his notes, that he met with Swayzer at 8:44 p.m. He specifically acknowledged he had no independent recollection of the events, and his testimony was based solely on his review of Jail

records. (ECF No. 507 ¶¶12-15). Video footage from the Jail shows that Schmid visited Swayzer's cell at 4:11 p.m. After his deposition, Schmid corrected his testimony concerning the timing of the meeting in a sworn declaration. (*Id.*).

This confusion over the time, even if taken in the light most favorable to Plaintiffs, does not create an issue of material fact as to the constitutional significance of Schmid's conduct. Plaintiffs offer no evidence that Schmid did not perform the substance of his limited role adequately. Whether he confirmed Swayzer's mental state at 4:11 or 8:44 has no relevance to whether a jury could find him deliberately indifferent or his actions objectively unreasonable. Plaintiffs' attempt to brand him a "liar" is unhelpful, and their challenge to the contents of his correcting declaration under the "sham affidavit" is off base. There is nothing improper about a witness correcting testimony when subsequent records make clear that an earlier recollection (based solely on mistaken records) was wrong. Because there is no evidence that Schmid's performance was insufficient, let alone deliberately indifferent or objectively unreasonable, he is entitled to summary judgment.

### E. The Record Will Not Support Liability Findings Against Several of the Corrections Officer Defendants.

Plaintiffs also assert §1983 claims against five individual corrections officers from the Jail—Lt. Andrykowski, and Corrections Officers Cunningham, Avery, Adams, and Witkowiak. All five seek summary judgment on grounds that the record will not support a finding they violated Plaintiffs' rights. The Court agrees with Defendants except with regard to the claims against Witkowiak.

#### 1. A Reasonable Jury Could Not Find Andrykowski, Cunningham, Avery, and Adams Violated Plaintiffs' Rights.

Plaintiffs' claims against Andrykowski, Cunningham, Avery, and Adams relate to their involvement in Swayzer's transfer from the SNU to Unit 4A. The events leading to the transfer began when Andrykowski received a call informing him of a suicidal female inmate who needed housing in the SNU. Corrections staff needed to make room for the suicidal inmate because the SNU has only three cells for female inmates, and all were in use. In response, Andrykowski contacted the Jail classification department to see if any of the inmates then in the SNU could be moved to an overflow cell in Unit 4A. Corrections officers Avery and Adams checked Swayzer's file, which they claim showed no restrictions on her movement, even though Dr. Horton had

ordered that she be housed in the SNU. Swayzer was then moved to Unit 4A to make room for the suicidal inmate. Avery admitted that if the order had been on Swayzer's classification card, she would not have approved the move. (ECF 422 ¶42).

Cunningham had responsibility for classifying Swayzer upon her arrival in the Jail and apparently failed to correctly document Dr. Horton's order concerning Swayzer's housing in the SNU. Cunningham later told investigators that she noted Dr. Horton's instructions on Swayzer's classification card but admitted she failed to update the summary page on Swayzer's classification file and did not make any notations on Swayzer's tier card. (ECF 422 ¶¶25-26). Cunningham also admitted that she added the missing information to Swayzer's classification file *after* learning of Laliah's death. (ECF No 422 ¶25). Avery and Adams also both acknowledged they took no steps to follow up with medical staff to question or confirm why Swayzer was in the SNU or whether she could be transferred. They simply looked at the file, and seeing no restrictions, they approved the move.

Against this factual backdrop, Andrykowski, Cunningham, Avery, and Adams argue there is insufficient evidence in the record to support deliberate indifference findings against them. (ECF No. 355 at 27, 31). Andrykowski insists his limited interaction with Swayzer shows no constitutional violation. He also argues Swayzer lacked an objectively serious medical need, and that her transfer to Unit 4A did not cause her harm. (*Id*. at 27). Cunningham, Avery, and Adams argue that Swayzer's claim fails because an inmate has no right to housing in any particular unit in the Jail. (*Id*. at 32). These Defendants also argue that the confused facts over the documentation or mis-documentation of Dr. Horton's order in Swayzer's classification file preclude Swayzer from proving her claims against them. (*Id.* at 33). Finally, they insist Swayzer cannot prove that the transfer caused her any harm. (*Id*.).

In response, Plaintiffs highlight the role each corrections officer had in transferring Swayzer out of the SNU in violation of the Jail Medical Director's order. (ECF No. 421 at 37-44). They note the inconsistent testimony offered by Cunningham and Adams over the documentation of the order, which at least arguably led to Swayzer's transfer. And, Plaintiffs insist that a jury would be fully justified, based on this record, in finding that Swayzer suffered harm as a result of the unauthorized transfer. They also contend that Swayzer's mental health and late-stage pregnancy were sufficient to create an objectively serious medical need. (ECF No. 421 at 25-26).

While the Court agrees that the record contains ample evidence that Plaintiffs had objectively serious medical needs, the Court concludes that Defendants are entitled to summary judgment. First, these Defendants' actions in connection with Swayzer's transfer to Unit 4A were at most negligent, which is insufficient to establish a constitutional violation. The Supreme Court long ago noted that "[a]n accident, although it may produce added anguish" is not sufficient to establish a violation of the Eighth or Fourteenth Amendments. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Cunningham admits that she timely updated only one of Swayzer's classification documents, and the evidence shows that Avery and Adams checked only the classification documents that Cunningham failed to update. But Plaintiffs present no evidence suggesting that these actions were anything other than sloppy errors, which, even if regrettable, fall short of a constitutional violation. *See Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (finding that "[a]t most, any failure to review the logbooks would be characterized as negligence, which is insufficient to constitute deliberate indifference").

Next, Plaintiffs' suggestion that Andrykowski, Adams, and Avery should have independently verified the accuracy of Swayzer's classification documents before transferring her is also without merit. A reasonable jury could not conclude that the officers acted improperly in relying on the classification records and failing to contact medical providers before transferring an inmate out of SNU. *See Boyce*, 314 F.3d at 889. In fact, Defendants have presented evidence that no such requirement existed at that time. Plaintiffs' suggestion that every jail employee must ensure that every other jail employee is properly performing his or her job responsibilities has no support in the law. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.").

Furthermore, as these Defendants have argued, Swayzer cannot establish that she suffered any recoverable injury as a result of the transfer. The Seventh Circuit recently emphasized that "a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages.'" *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (quoting *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019)). Given that no jury could reasonably conclude that Dr. Horton and Dr. White violated Plaintiffs' rights

when they allowed Swayzer to remain in Unit 4A, Plaintiffs have failed to develop evidence that these officers' actions, which resulted in her being transferred to Unit 4A, caused her any injury or damages. Andrykowski, Cunningham, Avery, and Adams are entitled to summary judgment.

### 2. Factual Disputes Concerning the Events of July 13-14 Preclude Entry of Summary Judgment for Witkowiak.

Plaintiffs' claims against Witkowiak relate to the disputed events of the night and early morning of July 13-14. During that time period, Witkowiak was assigned to Unit 4A on the overnight shift. Witkowiak claims she conducted rounds 15 times between 11:00 p.m. and 5:35 a.m. but never observed Swayzer in obvious distress. Witkowiak reports engaging in conversation with Swayzer on at least three occasions and confirms seeing Swayzer walk around her cell during one early morning round. Witkowiak also acknowledges smelling an unknown odor during her final morning round but did not immediately trace the odor to Swayzer's cell. It was only after completing her final round that Witkowiak saw Swayzer lying on a mattress with a substance that she thought might be blood. Witkowiak claims Swayzer denied having any problems and it was only after Witkowiak spoke to nursing staff and learned of Swayzer's late-stage pregnancy that she called a medical emergency. When they entered the cell, they found Swayzer laying down in her bed with Laliah's deceased body between her and the wall.

Swayzer's version of events is different. She claims she told Witkowiak she was in labor and needed help, but that Witkowiak ignored her and did nothing. Swayzer was then forced to lay back in her bed until delivering her baby by herself. She claims she used her own hands to push the baby out and then bring the infant onto her chest. She also insists the baby was alive but likely passed away later in the morning.

Witkowiak argues that notwithstanding these factual disputes she is entitled to summary judgment because "[t]here is no *credible* evidence to support [Swayzer's] assertion that Officer Witkowiak consciously ignored Swayzer's need." (ECF No. 355 at 34) (italics added). It is elementary federal practice, however, that credibility issues cannot be resolved on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations . . . are jury functions, not those of a judge[.]").

Witkowiak also claims Plaintiffs' claims fail because there is no evidence that any delay in providing Swayzer medical care caused her harm. (ECF No. 355 at 34). But the Court cannot conclude on summary judgment that even a short delay in attending to Swayzer would have been

ineffective. The record certainly permits an inference that a delay might have spared Swayzer some pain and suffering and, perhaps, even preserved Laliah's life. A jury might find otherwise, but that is not an issue for summary judgment. Witkowiak's motion is therefore denied.

## II. Plaintiff's *Monell* Claims Lack Evidentiary Support.

Plaintiffs' next claims are solely against Milwaukee County and Armor Corrections based on a *Monell* theory. (ECF No. 313 ¶¶124, 128-29). Under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), a municipal entity, like Milwaukee County, can be held liable for constitutional violations under §1983, but this liability attaches only if the constitutional violation is the result of a municipal policy or custom. This liability extends to contractors, like Armor, that provide essential services on behalf of municipalities. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).

The critical question in seeking to hold an entity liable under *Monell* "is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*). *Monell* recognizes three primary ways in which one might prove that the corporation or municipality itself inflicted the harm. First, the plaintiff may show that the alleged unconstitutional conduct implements or executes an official policy adopted by the entity's officers. *Monell*, 436 U.S. at 690; *see also Glisson*, 849 F.3d at 379 (quoting *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35 (2010)). Second, the plaintiff may show that the unconstitutional action was done pursuant to a custom—even one that is not formally codified. *Monell*, 436 U.S. at 690–91. Finally, the plaintiff may prove that an actor with final decision-making authority within the entity adopted the relevant policy or custom. *Id.* at 694; *see also Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011).

Both Milwaukee County and Armor seek summary judgment because, among other reasons, Plaintiffs cannot establish the existence of a custom or policy that led to the constitutional violations alleged. (ECF No. 355 at 44; ECF No. 350 at 14). In response to the County's motion, Plaintiffs insist that an earlier case involving a pregnant inmate who gave birth at the Jail, *Terry v. County of Milwaukee*, 357 F. Supp. 3d 732 (E.D. Wis. 2019), demonstrates that the County's policies for dealing with pregnant inmates at the Jail are inadequate. (ECF No. 421 at 48-50). They also claim that Jail classification officers "do not consider medical issues as part of the

classification process," are not "trained" to do so, and "do not review policies or procedures" with respect to pregnant or special needs inmates.  (*Id.*).

Plaintiffs' *Monell* theories suffer from being heavy on rhetoric and light on substantive support.  The citation to *Terry* without more is insufficient to support *Monell* liability.  While *Terry* involved a similar tragedy in the Jail, that commonality of result is not evidence of a County custom or policy that led to the alleged violation of Swayzer's rights.  Beyond the adjectives, adverbs and bombast, Plaintiffs make no effort to tie the events in the two cases to a particular practice (or policy deficit) that was (or could be) the source for both events.  Two tragic outcomes, without more, are not evidence of a policy or custom sufficient to establish *Monell* liability.

Plaintiffs' attempts to elevate the classification officers' alleged errors in this case to the level of a policy founder because Plaintiffs' arguments are both internally inconsistent and lacking in evidentiary support.  Plaintiffs contend on the one hand that there are "no classification policies" at the Jail while simultaneously insisting that (1) staff do not review the Jail's classification policies and (2) the County does not train staff to review the policies.  If there are no policies, as Plaintiffs first assert, then Plaintiffs cannot fault staff for not reviewing them or the County for not offering training on them.  These inconsistencies aside, Plaintiffs' arguments fail at core because they offer no factual support for the existence or violation of any of these policies or practices.  Making inconsistent assertions is not a substitute for evidentiary support.  And, in fact, to the contrary, Avery and Cunningham testified to the existence of classification policies, and to reviewing them on the job and during training.  (*See* ECF No. 474 at 27).

In response to Armor's motion, Plaintiffs again cite *Terry*, but then identify three specific policies and practices on which they base their *Monell* claims against that entity.  Plaintiffs fault Armor for:  (1) allowing "untrained correctional staff" to make decisions concerning appropriate medical treatment and the housing of special needs inmates; (2) ignoring a state court consent decree; and (3) not having a policy to dictate the quality of care provided to detainees.  (ECF No. 430 at 19).

These arguments fail for the same reasons discussed above.  Plaintiffs again do not tie the facts of *Terry* to the circumstances of this case sufficient to permit the finding of a policy or practice.  And the assertions about Armor failing either to train corrections staff or to have a policy on the quality of care are conclusions without factual support.  Indeed, Armor was responsible for medical staff, not corrections staff, at the Jail.   And there is no evidence of a lack of training or a

policy relating to quality of care. The Court also rejects Plaintiffs' attempt to bootstrap their *Monell* claim on the allegation that Armor has failed to comply with a state court consent decree. Any violations of the consent decree are for the state court that entered it to address. *See, e.g., Montgomery v. O'Grady*, No. 89-C-8286, 1991 WL 10891, at *3 (N.D. Ill. Jan. 18, 1991) (holding that establishing a violation of a consent decree is not sufficient to establish a violation of constitutional right).

Accordingly, Plaintiffs have not established customs, practices, or policies sufficient to continue *Monell* claims against Milwaukee County or Armor. Both entities' motions for summary judgment on Count II will be granted.

### III. Plaintiffs' State Law Claims Fail Because Plaintiffs Have Not Complied with the Wisconsin Notice of Claims Statute.

Plaintiffs also assert state law negligence and wrongful death claims against the individual corrections officer Defendants. Defendants insist they are entitled to summary judgment on these claims because Plaintiffs failed to comply with the state Notice of Claim statute, state law immunity shields them from liability, and on causation grounds. Under established Wisconsin Supreme Court caselaw, Defendants are correct on their first argument, so the Court need not address the others.

Defendants argue that Plaintiffs' failure to comply with Wis. Stat. §893.80 renders their state law claims for negligence and wrongful death defective. (ECF No. 355 at 57). Section 893.80 contains both a notice of injury and a notice of claim requirement, and both requirements must be satisfied prior to filing a lawsuit. Wis. Stat. §893.80. Under §893.80(1d)(a), the notice of injury provision, a claimant must serve written notice of the circumstances of her claim upon the relevant governmental entity or employee within 120 days of the event giving rise to that claim. Wis. Stat. §893.80(1d)(a). Alternatively, the claimant can satisfy the provision if she proves the defendant had actual notice of her claims and was not prejudiced by the lack of formal, written notice. *See Townsend v. Neenah Joint School Dist.*, 358 Wis. 2d 618, 634, 856 N.W.2d 644 (Ct. App. 2014). Under §893.80(1d)(b), the notice of claim provision, a prospective plaintiff must also present a claim containing her address and an itemized statement of the relief sought to the appropriate clerk or secretary. Wis. Stat. §893.80(1d)(b). If that claim is disallowed, the claimant can file suit. *Id.*

Defendants contend that Plaintiffs have failed to satisfy the second of these notice requirements. They point out that Plaintiffs filed a Notice of Claim with the appropriate clerk on

November 11, 2016, and then brought this lawsuit on December 26, 2016. The lawsuit was thus filed before Plaintiffs received formal disallowance of the claim and more than 60 days before the expiration of the 120-day disallowance period. (ECF No. 355 at 58).

Under Wisconsin law, disallowance occurs when the claimant receives notice via registered or certified mail, or after 120 days have elapsed. *See* Wis. Stat. §893.80(1g). Importantly, unlike the notice of injury provision, the notice of claim provision cannot be satisfied by a showing of actual notice and lack of prejudice. *See Townsend*, 358 Wis.2d at 634. Instead, the claimant must show substantial compliance with the provision's four requirements. *Id.* Wisconsin courts follow two principles when analyzing whether a plaintiff has substantially complied with the requirements of §893.80(1)(b). *See Thorp v. Town of Lebanon*, 235 Wis. 2d 610, 629, 612 N.W.2d 59 (2000) (citing *DNR v. City of Waukesha*, 184 Wis. 2d, 178, 198 (1994)). First, "[t]he notice must provide enough information to apprise a governmental entity of the budget it will need to set aside in case of litigation or settlement." *Thorp*, 235 Wis. 2d at 629 (citing *DNR*, 184 Wis. 2d at 198). Second, the notice should "'be construed so as to preserve bona fide claims." *Thorp*, 235 Wis. 2d at 629 (quoting *DNR*, 184 Wis. 2d at 198).

Plaintiffs offer four arguments to justify their non-compliance, but whether in isolation or taken as a whole, none carries the day. (ECF No. 421 at 58-60). Plaintiff's first three arguments are either irrelevant or procedurally wrong. Plaintiffs begin by arguing that Wis. Stat. §893.15(3) has tolled the statute of limitations on their state law claims while this action has been pending. The Court expresses no opinion on whether this legal assertion is correct but, even if is, the statute of limitations has nothing to do with whether Plaintiffs complied with the notice-of-claims statute. Second, Plaintiffs argue that this is a Fed. R. Civ. P. 12(b)(6) motion in disguise, improperly raised at summary judgment. This is procedurally incorrect. While noncompliance with the notice-of-claim statute is an affirmative defense that must be raised in responsive pleadings, *see Maple Grove Country Club Inc. v. Maple Grove Estates Sanitary Dist.*, 386 Wis. 2d 425, 443, 926 N.W.2d 184 (2019), Defendants timely raised the defense in their answer to the fourth amended complaint, (ECF No. 321 at 8). They were not required to raise this issue in a motion to dismiss, and Plaintiffs cite no law that would require otherwise. Plaintiffs' third argument is that dismissal would engender inefficiency because Plaintiffs could simply refile the state law claims in a state circuit court, and those claims would then likely be removed or consolidated with the present action. As

with Plaintiffs' first argument, the Court again takes no position on the merits of this strategy. But hypothetical future inefficiencies do not justify Plaintiffs' noncompliance with §893.80.

Plaintiffs' fourth argument is that, because Defendants had actual notice of the state law claims, §893.80 has been satisfied. This argument conflates and misunderstands the legal differences between §§893.80(1d)(a) and 893.80(1d)(b). Under Wisconsin law, actual knowledge and lack of prejudice are sufficient to satisfy the former, but not the latter. *See Townsend*, 358 Wis. 2d at 634 ("actual notice and lack of prejudice are an alternative to the written notice for subsec. (a) but not for subsec. (b)") (citing §893.80(1d)); *see also Bostco LLC v. Milwaukee Metro. Sewerage Dist.*, 350 Wis. 2d 554, 608, 835 N.W.2d 160 (2013) ("[T]he notice of claim provisions may be satisfied with substantial, rather than strict, compliance.") (citing *Figgs v. City of Milwaukee*, 121 Wis. 2d 44, 55 (1984)). And Plaintiffs proffer no facts to align this action with those where Wisconsin courts have found substantial compliance with §893.80(1d)(b). For instance, in *State v. Town of Linn*, 205 Wis. 2d 426, 440-41, 556 N.W.2d 394 (Ct. App. 1996), the court held that the defendant's promise to continue enforcing illegal parking restrictions constituted disallowance of a claim. In *State Dep't of Natural Resources v. City of Waukesha*, 184 Wis. 2d 178, 201, 515 N.W.2d 888 (1994), the Court determined that the defendant effectively disallowed the State's claim when it issued letters asserting the legal impossibility of compliance with new regulations. On the other hand, in *Colby v. Columbia Cnty.*, 202 Wis. 2d 342, 358, 550 N.W.2d 124 (1996), the Court found that §893.80(1d)(b) barred the plaintiff's claim because "he had failed to wait until the County had either denied his claim, or the 120-day disallowance period had expired." Similarly, in *Selerski v. Village of West Milwaukee*, 212 Wis. 2d 10, 20, 568 N.W.2d 9 (Ct. App. 1997), the court held that the plaintiff's failure to wait until either his claim was disallowed or the 120-day disallowance period expired was "fatal to [the] action based on matter underlying the claim." The upshot is that substantial compliance with the disallowance requirement is only found where the plaintiff identifies some action taken by the defendant that effectively communicated intent to disallow the claim. Here, Plaintiffs do not explain how 56 days of silence constituted disallowance, nor do they cite any law to support that notion. Accordingly, Plaintiffs failed to comply with §893.80(1d)(b), and their state law claims for negligence and wrongful death must be dismissed.

**CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' joint motion for summary judgment as to causation (ECF No. 300) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Gina Negrette's motion for summary judgment under Fed. R. Civ. P. 56 (ECF No. 336) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Karen Ronquillo-Horton's motion for summary judgment under Fed. R. Civ. P. 56 (ECF No. 342) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Wisconsin Health Care Liability Insurance Plan, which was named as a Defendant solely in its capacity as Dr. Horton and Dr. Negrette's insurer (*see* ECF No. 395), is **DISMISSED** because Plaintiffs' claims against Dr. Horton and Dr. Negrette have been dismissed.

**IT IS FURTHER ORDERED** that Defendant Armor Correctional Health Services Inc.'s motion for summary judgment under Fed. R. Civ. P. 56 (ECF No. 349) is **GRANTED.**

**IT IS FURTHER ORDERED** that the motion of Defendants Diedre Adams, Jeff Andrykowski, Amika Avery, Terina Cunningham, Kimberly Witkowiak, and Milwaukee County for summary judgment under Fed. R. Civ. P. 56 (ECF No. 353) is **GRANTED** in part and **DENIED** in part. The motion is granted with respect to the claims of Plaintiffs Diane and Charlene Ruffin and with respect to all Plaintiffs' claims against Adams, Andrykowski, Avery, Cunningham, and Milwaukee County; the motion is denied in all other respects.

**IT IS FURTHER ORDERED** that the motion of Defendants Turay Gulsen, Katherine Meine, and Maureen White for summary judgment under Fed. R. Civ. P. 56 (ECF No. 382) is **GRANTED** in part and **DENIED** in part. The motion is granted with respect to the claims of Plaintiffs Diane and Charlene Ruffin and with respect to all Plaintiffs' claims against Dr. White but denied in all other respects.

**IT IS FURTHER ORDERED** that the motion of Defendant Steven Schmid for summary judgment under Fed. R. Civ. P. 56 (ECF No. 479) is **GRANTED**.

Dated at Milwaukee, Wisconsin on March 4, 2022.

s/ *Brett H. Ludwig*
_____
BRETT H. LUDWIG
United States District Judge